# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

JANE DOE,                                    )
                                             )
                    Plaintiff,               )
                                             )
vs.                                          ) **CASE NO.** SACV 20-00322-JWH (GJS)
                                             )
                                             )
COUNTY OF ORANGE; DON BARNES; )
WILLIAM BAKER; JOE BALICKI;      )
MARK STICHTER; and DOES 1-10,    )
inclusive,                                   )
                                             )
                    Defendants.              )
_____ )

## DEPOSITION OF
JANE DOE
VOLUME 4

**DATE:**       Friday, May 6, 2022

**REPORTER:**   Sylvia Almaguer-Miller, CSR No. 8767

## VIA REMOTE VIDEO TECHNOLOGY



# HINES REPORTERS

**INTERNATIONAL TOWER**
**888 S. FIGUEROA STREET, SUITE 940, LOS ANGELES, CALIFORNIA 90017**

**866.432.4300; 213.688.7887**

**WWW.HINESREPORTERS.COM**

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 2 of 168   Page ID
#:2268
Jane Doe vs. County of Orange                              Deposition of Jane Doe, Vol. 4

1           UNITED STATES DISTRICT COURT

2        DISTRICT OF CALIFORNIA - CENTRAL DISTRICT

3

4   JANE DOE,                    )
                                 )
5               Plaintiff, ) Case No. SACV 20-00322-JWH
                                 )          (GJS)
6            vs.                 )
                                 )
7   COUNTY OF ORANGE; DON        )
    BARNES; WILLIAM BAKER; JOE   )
8   BALICKI; MARK STICHTER; and )
    DOES 1-10, inclusive,        )
9                                )
                Defendants.  )
10  _____)

11

12

13                    DEPOSITION OF

13                      JANE DOE

14            VIA REMOTE VIDEO TECHNOLOGY

15              FRIDAY, MAY 6, 2022

16                    VOLUME 4

17

18

19

20  REPORTED BY:  SYLVIA ALMAGUER-MILLER, CSR NO. 8767

21  VIDEOTAPED BY:  KAMERON HINES

22

23

24

25

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 3 of 168   Page ID
#:2269
Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1              Deposition of JANE DOE ███████████ called as

 2    a witness by the Defendants, before SYLVIA

 3    ALMAGUER-MILLER, Certified Shorthand Reporter Number

 4    8767 for the State of California, commencing at 11:16

 5    a.m. on FRIDAY, MAY 6, 2022, VIA REMOTE VIDEO

 6    TECHNOLOGY.

 7

 8                        *    *    *

 9

10    APPEARANCES OF COUNSEL:

11

12              For the Plaintiff JANE DOE ██████████

13                 IN PROPRIA PERSONA

14    █████████████████████████████████████████

15    █████████████████████████████████████████

16    █████████████████████████████████████████

17

18              For the Defendants COUNTY OF ORANGE, ET AL.:

19                 COLLINS + COLLINS
                   BY:  REBECCA CHMURA, ESQ.
20                 750 THE CITY DRIVE S
                   ORANGE, CALIFORNIA 92868
21                 TEL:  714-823-4100
                   Email:  rchmura@ccllp.law
22

23

24

25
```

```
 1                    I N D E X

 2

 3    Examination by Ms. Chmura          Page

 4

 5

 6                  E X H I B I T S

 7    Exhibit 1     Doe vs. El Monte Complaint       Page 63

 8    Exhibit 2     Doe vs. Gavin Newsom             Page 63

 9    Exhibit 3     Doe vs. Edward Weamer            Page 65

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | A     Yes. | 12:16:55 |
| 2 | Q     And they didn't have anything to cover | |
| 3 | themselves? | 12:16:57 |
| 4 | A     No. | |
| 5 | Q     Okay.  And then the other times you talked | 12:17:02 |
| 6 | about when you were asked to -- you were told to be | |
| 7 | completely naked, what were those? | 12:17:08 |
| 8 | A     I was ordered to wear a bra. | |
| 9 | Q     And underwear? | 12:17:15 |
| 10 | A     I'm sorry? | |
| 11 | Q     And underwear? | 12:17:18 |
| 12 | A     You mean, under the waist? | |
| 13 | Q     Yes.  Your underpants, underwear. | 12:17:27 |
| 14 | A     I was wearing underwear. | |
| 15 | Q     Okay.  So when you -- | 12:17:33 |
| 16 | A     Panties. | |
| 17 | Q     When you say that you were asked to be | 12:17:35 |
| 18 | completely naked, on the other searches, do you mean | |
| 19 | that you were asked to be in your bra and underwear? | 12:17:43 |
| 20 | A     You mean other than the time I was ordered to | |
| 21 | wear a bra? | 12:17:53 |
| 22 | Q     No.  What I'm asking:  These other searches | |
| 23 | that you testify happened, you said that you were asked | 12:17:59 |
| 24 | to go down to your bra and underwear; right? | |
| 25 | A     The first time I was ordered to wear a bra, and | 12:18:16 |

| | | |
|---|---|---|
| 1 | the other time I was wearing a bra and panty. | 12:18:23 |
| 2 | Q    Okay.  So just wearing bra and panties to you, | |
| 3 | do you consider that being fully naked? | 12:18:37 |
| 4 | A    Under the definition of strip search of | |
| 5 | California Penal Code, it doesn't have to be fully naked | 12:18:44 |
| 6 | to fall within the definition of strip search. | |
| 7 | Q    Okay.  Well, I'm not asking what the Penal Code | 12:18:53 |
| 8 | says.  I'm asking:  In your opinion, if you were in your | |
| 9 | bra and underwear, do you consider that being fully | 12:18:59 |
| 10 | naked? | |
| 11 | A    No. | 12:19:04 |
| 12 | Q    Okay.  All right.  So we're going to kind of | |
| 13 | circle back.  We were talking a little earlier about the | 12:19:11 |
| 14 | rape that you had experienced in April of 2019 and there | |
| 15 | was an accumulation of things in August of 2019 that | 12:19:17 |
| 16 | caused you to attempt to take your own life; right? | |
| 17 | A    Yes. | 12:19:25 |
| 18 | Q    Was that the first time you had ever attempted | |
| 19 | to take your own life? | 12:19:32 |
| 20 | A    Yes. | |
| 21 | Q    Okay.  And I believe that was late August of | 12:19:37 |
| 22 | 2019; right? | |
| 23 | A    Yes. | 12:19:42 |
| 24 | Q    And what happened?  How did you attempt to take | |
| 25 | your own life during that time? | 12:19:53 |

| 1 | A    I was trying to carry out a plan to jump off a | 12:20:04 |
| 2 | bridge. | |
| 3 | Q    Did you actually go to this bridge that you | 12:20:10 |
| 4 | were planning on jumping off? | |
| 5 | A    Before -- before I carried out, I was too -- I | 12:20:29 |
| 6 | was taken to the hospital. | |
| 7 | Q    Did someone find you in the process of trying | 12:20:36 |
| 8 | to get to that bridge? | |
| 9 | A    No.  Somebody find out the risk of my -- my | 12:20:55 |
| 10 | suicidal attempt. | |
| 11 | Q    And who was it that found out? | 12:21:01 |
| 12 | A    A doctor. | |
| 13 | Q    A doctor from where? | 12:21:12 |
| 14 | A    LAC USC. | |
| 15 | Q    Okay.  And you wanting to take your own life | 12:21:20 |
| 16 | was -- the root of that was because you had been raped; | |
| 17 | right? | 12:21:23 |
| 18 | A    No.  It's not just one thing.  If I wanted to | |
| 19 | end my life solely because of the rape, I could have | 12:21:38 |
| 20 | done that before because I was raped in April.  I could | |
| 21 | have done that in July, in June.  But it's a combination | 12:21:55 |
| 22 | of everything that happened in August 2019. | |
| 23 | Q    Okay.  And then you also attempted to take your | 12:22:06 |
| 24 | own life in November of 2019; right? | |
| 25 | A    Yes. | 12:22:10 |

| | | |
|---|---|---|
| 1 | Q    Okay.  So it's safe to say more than three | 12:30:34 |
| 2 | years? | |
| 3 | A    Yes. | 12:30:39 |
| 4 | Q    Okay.  And one of your other injuries that | |
| 5 | you've alleged is that you had dysfunctional menstrual | 12:30:47 |
| 6 | bleeding; right? | |
| 7 | A    Yes. | 12:30:50 |
| 8 | Q    And you went to the E.R. for that in August of | |
| 9 | 2019? | 12:30:52 |
| 10 | A    Yes. | |
| 11 | Q    And what were your symptoms when you went to | 12:30:57 |
| 12 | the E.R. in August of 2019? | |
| 13 | A    It's just my period didn't stop at the time | 12:31:08 |
| 14 | when it's supposed to stop. | |
| 15 | Q    Okay.  So when you came into the jail, you were | 12:31:18 |
| 16 | on your period at the time; right? | |
| 17 | A    Yes. | 12:31:22 |
| 18 | Q    How many days -- go ahead. | |
| 19 | A    When I was released, I was -- my period was | 12:31:28 |
| 20 | supposed to stop. | |
| 21 | Q    Do you recall how many days prior to being | 12:31:34 |
| 22 | incarcerated you had started your period? | |
| 23 | A    I think -- I think just right before I was | 12:31:43 |
| 24 | arrested.  Because I remember after I was arrested, I -- | |
| 25 | when I was arrested, I was wearing a pad, and after I | 12:31:56 |

Case 8:20-cv-00322-JWH-GJS  Document 139-7  Filed 05/13/22  Page 9 of 168  Page ID #:2275

Jane Doe vs. County of Orange                    Deposition of Jane Doe, Vol. 4

```
 1   was arrested, because it took quite some time from where   12:32:08

 2   I was arrested to Orange County Jail, and after I

 3   arrived at Orange County Jail, I make the request to        12:32:19

 4   change my pad and they -- they didn't allow me to change

 5   my pad right away.  They pushed me to sit down.  So my      12:32:37

 6   period started just right before I was arrested.

 7       Q    Okay.  And while you were in the jail, you were   12:32:46

 8   given feminine products; right?

 9       A    But the first time it -- how can I put it?  The   12:33:05

10   first time when I asked for a pad to change, I was

11   treated badly.                                              12:33:14

12       Q    Okay.  Go ahead.  Sorry.  I didn't mean to

13   interrupt you.                                              12:33:23

14       A    I told them my pad was full, I needed to change

15   my pad, and they didn't allow me and they push me to sit   12:33:35

16   down and caused my blood spill out on my pants.

17       Q    Okay.  So after that time and for the remainder   12:33:51

18   of your incarceration, another three or four days, you

19   were given pads while incarcerated; right?                 12:33:56

20       A    Yes.  That's correct.

21       Q    Did you have to pay for those?                    12:34:01

22       A    No.

23       Q    So you would just ask them and they would         12:34:05

24   provide them to you?

25       A    I think the pads were stored in a specific area   12:34:18
```

**Jane Doe vs. County of Orange**                                          **Deposition of Jane Doe, Vol. 4**

| | | |
|---|---|---|
| 1 | and everybody can -- can get the pad from -- | 12:34:33 |
| 2 | (The reporter interrupted due to | |
| 3 | simultaneous speaking.) | 12:34:33 |
| 4 | Q    BY MS. CHMURA:  Sorry.  You said everyone can | |
| 5 | just come to a specific area.  Is that what you said? | 12:34:37 |
| 6 | A    Yes.  It's like a storage, some sort of thing. | |
| 7 | Q    So it was accessible to the inmates if they | 12:34:47 |
| 8 | needed them? | |
| 9 | A    Yes. | 12:34:50 |
| 10 | Q    Okay.  So you were never without pads or | |
| 11 | tampons during your incarceration; right? | 12:34:56 |
| 12 | A    There's no tampon available. | |
| 13 | Q    Okay.  So you were never without the | 12:35:00 |
| 14 | availability of a pad while you were incarcerated; | |
| 15 | right? | 12:35:03 |
| 16 | A    It's not completely right. | |
| 17 | Q    Other than that first -- other than that first | 12:35:11 |
| 18 | time? | |
| 19 | A    Yes.  Other than the first time. | 12:35:17 |
| 20 | Q    Okay.  So after you first asked for a pad, how | |
| 21 | long did it take for you to get a new pad? | 12:35:24 |
| 22 | A    I don't remember. | |
| 23 | Q    Did you go the entire first night without being | 12:35:29 |
| 24 | able to change your pad? | |
| 25 | A    No.  I think after some time, but I don't | 12:35:42 |

**Jane Doe vs. County of Orange**                                    **Deposition of Jane Doe, Vol. 4**

1   remember how many minutes or hours I got my first pad.   12:35:53

2        Q    What about after you were -- you took a shower,

3   were you given a new pad after you had taken a shower?   12:36:07

4        A    I don't remember.  I don't remember.

5        Q    Well, after you showered, were you just asked   12:36:17

6   to put on your underwear without having a pad on?

7        A    No.  I think I -- I was wearing a pad after   12:36:29

8   shower, but I don't remember where I got the pad.

9        Q    Okay.  And then circling back to the   12:36:38

10  E.R. visit.  So your symptoms were you were just

11  bleeding longer than normal; right?   12:36:45

12       A    Yes.

13       Q    So how many days longer had you -- you   12:36:50

14  continued to bleed than normal?

15       A    My period started on August 7th.  At the time   12:37:10

16  when I ended up in the E.R., it's more than five or six

17  days.   12:37:22

18       Q    Okay.  And when you went to the E.R., what sort

19  of treatment did they provide to you for this bleeding?   12:37:30

20       A    They didn't provide any treatment.

21       Q    Did they give you a diagnosis of why you were   12:37:37

22  experiencing this bleeding longer than normal?

23       A    No.  They just do a ultrasound.   12:37:50

24       Q    And what did they tell you were the results of

25  the ultrasound?   12:37:58

Case 8:20-cv-00322-JWH-GJS  Document 139-7  Filed 05/13/22  Page 12 of 168  Page ID
#:2278

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

| 1 | A | I remember they -- they found something. | 12:38:08 |

2     Q     What did they find?

3     A     What's the name?  Fi- -- fibroid.                12:38:26

4     Q     So they found a fibroid?

5     A     I don't know how many, but I remember they       12:38:33

6  found something.

7     Q     And that was on your uterus?                     12:38:39

8     A     Yes.

9     Q     Okay.  And you had a surgery for -- on your      12:38:45

10  uterus in June of 2020; right?

11    A     Yes.                                             12:38:48

12    Q     Okay.  And that was removing a polyp from your

13  uterus?                                                  12:38:52

14    A     Yes.

15    Q     Was that an inpatient or outpatient procedure?  12:39:00

16    A     I don't know what's the difference.

17    Q     Sure.  So an inpatient means that you to have    12:39:05

18  stay in the hospital.  An outpatient means that they do

19  the procedure and you get to go home that day.          12:39:10

20    A     Oh.  Outpatient.

21    Q     Okay.                                            12:39:13

22    A     I could go home right after the surgery.

23    Q     Okay.  Which hospital did you have the surgery?  12:39:21

24    A     LAC USC.

25    Q     And did they -- they told you that they removed  12:39:36

Case 8:20-cv-00322-JWH-GJS Document 139-7 Filed 05/13/22 Page 13 of 168 Page ID #:2279

Jane Doe vs. County of Orange                                      Deposition of Jane Doe, Vol. 4

```
 1   incarcerated, you've been on a series of different        13:09:14

 2   antidepressants?

 3       A    I'm sorry?  Say again.                           13:09:19

 4       Q    Sure.  Since you were incarcerated, you've been

 5   on a number of different antidepressants?                 13:09:28

 6       A    Yes.

 7       Q    Okay.  Other than the antidepressants post-      13:09:33

 8   incarceration, are there any other medications you were

 9   prescribed?                                               13:09:37

10       A    No.

11       Q    Are you okay to keep going for just a little     13:09:52

12   more, Ms. Doe, or do you want to take a break?

13       A    How long are you talking about?  I think --      13:10:00

14       Q    I don't have too much more to get through.

15       A    Yeah.  Because I think you run out of time;      13:10:06

16   right?

17       Q    I've not been keeping an eye on the clock, but   13:10:13

18   I only have a few more questions.  So we can get those

19   now, or do you want to take a quick five-minute break?    13:10:19

20       A    Let's get it done.

21       Q    Okay.  I'm going to pull -- I'm going to share   13:10:25

22   my screen.  So I'm going to pull up an exhibit, a few

23   exhibits.                                                 13:10:35

24          Okay.  First, Ms. Doe, you have several other

25   lawsuits filed in the state of California; correct?       13:10:40
```

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 14 of 168   Page ID
#:2280
Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

| | | |
|---|---|---|
| 1 | A    Yes. | 13:10:42 |
| 2 | Q    Okay.  Ms. Doe, can you see my screen? | |
| 3 | A    Not yet. | 13:11:01 |
| 4 | MS. CHMURA:  It looks like we lost Ms. Doe's | |
| 5 | video on my end.  Do you see? | 13:11:06 |
| 6 | THE VIDEOGRAPHER:  It looks like it's frozen. | |
| 7 | So let's give it a second.  See if it comes back. | 13:11:21 |
| 8 | Ms. Doe, are you still there?  Can you still | |
| 9 | hear us? | 13:11:40 |
| 10 | We'll have to wait and see what happens here. | |
| 11 | I'm going to take us off record.  The time is | 13:12:13 |
| 12 | 1:12 p.m.  We're going off record. | |
| 13 | (Off the record.) | 13:12:19 |
| 14 | THE VIDEOGRAPHER:  The time is 1:27 p.m.  We're | |
| 15 | back on the record. | 13:27:32 |
| 16 | Q    BY MS. CHMURA:  Okay.  Ms. Doe prior to going | |
| 17 | off the record, I was trying to share an exhibit with | 13:27:37 |
| 18 | you and that exhibit was a complaint filed in the | |
| 19 | lawsuit in the District Court, Central District of | 13:27:44 |
| 20 | California, titled Jane Doe vs. The City of El Monte, | |
| 21 | and that case number is CV20-00797RG -- that's a K-JDE. | 13:28:00 |
| 22 | Is that a lawsuit that you've filed? | |
| 23 | A    Yes. | 13:28:03 |
| 24 | Q    Okay.  And you drafted the complaint in that | |
| 25 | matter? | 13:28:06 |

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 15 of 168   Page ID #:2281

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1        A     Yes.                                          13:28:08

 2        Q     You personally drafted the complaint?

 3        A     Yes.                                          13:28:11

 4        Q     Okay.  And the contents of that complaint are

 5   true and accurate; right?                               13:28:15

 6        A     Yes.

 7        Q     Okay.  So there's nothing in that complaint  13:28:19

 8   that contains any false information?

 9        A     Everything in that complaint is best to my   13:28:29

10   knowledge.

11        Q     Best to your knowledge as true and accurate? 13:28:34

12        A     Yes.  Yes.

13        Q     Okay.  And you also alleged in that case that 13:28:40

14   you experienced the dysfunctional menstrual bleeding as

15   a result of the allegations in that complaint; right?   13:28:51

16        A     Yes.

17        Q     Okay.  You also filed the case in the United 13:28:59

18   States District Court, Central District of California

19   titled Jane Doe vs. Gavin Newsom; right?                13:29:06

20        A     Yes.

21        Q     And that's Case No. 2; -- or 2:20-cv-04525-JAK 13:29:18

22   (PVCx).  Is that the same complaint as Jane Doe vs.

23   Gavin Newsom?                                           13:29:29

24        A     Same complaint?  What do mean?

25        Q     That's the case number for that case?        13:29:33
```

Case 8:20-cv-00322-JWH-GJS  Document 139-7  Filed 05/13/22  Page 16 of 168  Page ID
#:2282

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1      A    I don't remember the case number, but, yes, I     13:29:37

 2  filed a case against Gavin Newsom.

 3      Q    Okay.                                              13:29:44

 4      A    What's your question?

 5      Q    Just wanted to confirm that you filed that.       13:29:48

 6  And you drafted that complaint in that matter?

 7      A    Yes.                                              13:29:52

 8      Q    And the information contained in that complaint

 9  is true and accurate?                                      13:29:56

10      A    Yes.  Best to my knowledge.

11          THE REPORTER:  Ms. Chmura, are you marking any     13:30:10

12  of these as exhibits?

13          MS. CHMURA:  I guess since she hasn't seen         13:30:15

14  them, I'm not -- yeah.  I can -- I'll mark them as

15  exhibits, and I'll send them to Ms. Doe after the         13:30:19

16  proceeding.

17          So I'll be marking the complaint in Doe vs. El     13:30:22

18  Monte as Exhibit 1, and Doe vs. Newsom as Exhibit 2.

19              (Exhibit 1, Doe vs. El Monte Complaint,        13:30:36

20              was marked for identification, a copy of

21              which is attached hereto.)                     13:30:36

22              (Exhibit 2, Doe vs. Newsom Complaint, was

23              marked for identification, a copy of which     13:30:36

24              is attached hereto.)

25      Q    BY MS. CHMURA:  And you also alleged in the Doe   13:30:38
```

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 17 of 168   Page ID
#:2283

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

| 1 | vs. Newsom complaint that you suffered from | 13:30:41 |
| 2 | dysfunctional menstrual bleeding as a result of the | |
| 3 | allegations in that complaint; right? | 13:30:46 |
| 4 |     A    That complaint does not seek any damage and -- | |
| 5 | how can I put it?  That complaint is just mirror from | 13:31:17 |
| 6 | the prior complaint. | |
| 7 |     Q    What do you mean it's a mirror from the prior | 13:31:28 |
| 8 | complaint? | |
| 9 |     A    So usually -- how can I put it?  The lawsuit | 13:31:50 |
| 10 | against Newsom does not seek any damage. | |
| 11 |     Q    So what are you seeking by filing that lawsuit | 13:31:59 |
| 12 | against Newsom if you're not seeking damages? | |
| 13 |     A    Injunction relief. | 13:32:03 |
| 14 |     Q    Injunctive relief? | |
| 15 |     A    Yes. | 13:32:07 |
| 16 |     Q    Okay.  So you're not necessarily seeking | |
| 17 | monetary damages in that case; you're seeking equitable | 13:32:11 |
| 18 | relief? | |
| 19 |     A    Yes.  I'm not seeking any monetary damages from | 13:32:19 |
| 20 | Gavin Newsom. | |
| 21 |     Q    Okay.  But the complaint against Gavin Newsom | 13:32:25 |
| 22 | and the other defendants, you did personally draft that; | |
| 23 | right? | 13:32:29 |
| 24 |     A    Yes. | |
| 25 |     Q    Okay.  And then the complaint of Jane Doe vs. | 13:32:34 |

| | | |
|---|---|---|
| 1 | Edward Weamer in the Superior Court for the State of | 13:32:39 |
| 2 | California, County of Contra Costa, Case No. C20-0087 -- | |
| 3 | or -827, that is a complaint that you filed; right? | 13:32:49 |
| 4 | A    Yes. | |
| 5 | Q    And you personally drafted the complaint? | 13:32:55 |
| 6 | A    Yes. | |
| 7 | Q    And the information contained in that complaint | 13:32:57 |
| 8 | is true and accurate? | |
| 9 | A    Yes.   Best to my knowledge. | 13:33:03 |
| 10 | THE REPORTER:   Is that going to be Exhibit 3? | |
| 11 | MS. CHMURA:   Yes.   That will be Exhibit 3. | 13:33:08 |
| 12 | Thank you. | |
| 13 | (Exhibit 3, Doe vs. Edward Weamer, was | 13:33:09 |
| 14 | marked for identification, a copy of which | |
| 15 | is attached hereto.) | 13:33:09 |
| 16 | Q    BY MS. CHMURA:   Okay.   And I just wanted to | |
| 17 | touch base a little bit more about your time in jail, | 13:33:13 |
| 18 | and that will be the end of our deposition.   Have you're | |
| 19 | also contending that you didn't sleep very well in jail; | 13:33:19 |
| 20 | right? | |
| 21 | A    Yes. | 13:33:20 |
| 22 | Q    And why did you not sleep well in jail? | |
| 23 | A    The entire environment and the trauma. | 13:33:33 |
| 24 | Everything and -- yeah. | |
| 25 | Q    What do you mean by the entire environment? | 13:33:49 |

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 19 of 168   Page ID
#:2285

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1      A    The noise.  The lights.  And the aftermath      13:33:53

 2   after being arrested.

 3      Q    And the noise, is that related to the toilets   13:34:04

 4   flushing?

 5      A    Yes.                                            13:34:06

 6      Q    Were there any other noises that kept you up?

 7      A    No.  I don't think so.                          13:34:13

 8      Q    And was that a noise issue every single night

 9   that you were incarcerated?                             13:34:17

10      A    Yes.

11      Q    Okay.  And then the lights.  The lights         13:34:23

12   remained on in your cell?

13      A    Over my bed.  Not the entire cell.              13:34:30

14      Q    So how many lights were over your bed that were

15   turned on?                                              13:34:38

16      A    How many lights?  I don't know because it's --

17   how can I put it?  It's a section of light.  I don't    13:34:56

18   know how to put it.  It's just light over my head.

19      Q    And the light was directly pointed at you?      13:35:04

20      A    Yes.

21      Q    It was shining right in your face?              13:35:08

22      A    Yes.

23      Q    How bright was the lights?                      13:35:11

24      A    Very bright.

25      Q    And when you say "very bright," do you mean,    13:35:17
```

Case 8:20-cv-00322-JWH-GJS  Document 139-7  Filed 05/13/22  Page 20 of 168  Page ID
#:2286

Jane Doe vs. County of Orange                                      Deposition of Jane Doe, Vol. 4

 1    you know, when you look at the sun and you get the          13:35:20

 2    little spots in your eyes.  It's that bright?

 3        A    It's bright enough to read if you want to read.    13:35:31

 4        Q    Bright enough to read?

 5        A    If you want to read a book, that's enough.         13:35:35

 6        Q    And were there other lights on in the cell, or

 7    was it just the one light on over your bed?                 13:35:45

 8        A    Some of the lights were off, but it's not --

 9    the lights that's over my bed was not the only one light    13:35:56

10    that was on.

11        Q    Okay.  And did you see other inmates around you    13:36:04

12    sleeping?

13        A    I saw them laying in bed, but I don't know         13:36:09

14    whether they were asleep.

15        Q    Okay.  And then on all nights that you were        13:36:16

16    incarcerated, were you at some point able to fall

17    asleep?                                                     13:36:19

18        A    At some point, yeah.  I had little sleep.

19        Q    Okay.  So you did get some sleep while you were    13:36:32

20    incarcerated?

21        A    Little sleep.  A few minutes here and there,       13:36:37

22    but not -- how can I put it?  My sleep cannot continue.

23        Q    So you just had a few minutes of sleep each        13:36:56

24    night, is that your testimony?

25        A    No.  A few sleep here and there between the        13:37:01

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 21 of 168   Page ID #:2287

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1  noise, between the lights.  I don't know how to tell      13:37:10

 2  you.

 3      Q    Prior to being incarcerated, how many hours per  13:37:17

 4  night would you typically sleep?

 5      A    I don't have the exact number.                   13:37:24

 6      Q    Well, I need your best estimate.

 7      A    I can't estimate because, like I said, I just    13:37:32

 8  sleep a few minutes here and there.  I sleep for a few

 9  minutes.  I wake up.  I sleep a few minutes.  I wake up.  13:37:45

10  Just -- so I don't know.

11      Q    So that was your sleep pattern prior to being    13:37:51

12  incarcerated?

13      A    Prior to incarceration, I took medication.       13:37:59

14      Q    So you used medication to fall asleep at night

15  prior to incarceration?                                  13:38:04

16      A    Yes.

17      Q    And while you were incarcerated, did you tell    13:38:06

18  the medical staff that you were using a sleeping aid to

19  sleep?                                                   13:38:13

20      A    I remember they asked me what medication I was

21  on, but I -- I don't remember why I didn't get the       13:38:31

22  medication in the jail.  I don't remember.

23      Q    Did you tell them that you needed a sleep aid    13:38:38

24  for sleep purposes?

25      A    I don't remember.                                13:38:43
```

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 22 of 168   Page ID
#:2288

**Jane Doe vs. County of Orange**                                    **Deposition of Jane Doe, Vol. 4**

```
 1        Q     Do you recall if you asked them at any point to     13:38:47

 2   provide you with a sleeping medication to help you

 3   sleep?                                                          13:38:55

 4        A     I dare to ask anything else after -- after how

 5   I was treated by them.  I was afraid to ask anything            13:39:12

 6   else.

 7        Q     Okay.  So you were afraid to ask for a sleep         13:39:17

 8   medication?

 9        A     Anything.  Not just medication.  I was               13:39:26

10   afraid -- I was afraid to ask for anything.

11        Q     And why were you afraid?                             13:39:36

12        A     The first time when I asked for a pad to

13   change, they denied my request and pushed me, push my          13:39:59

14   shoulder and forced me to sit down.  I told them

15   multiple times I was cold to death.  They laughed at me;       13:40:12

16   yelled at me.  I requested food.  They denied my

17   request.  After this kind of experience, I was afraid to      13:40:35

18   ask for anything, anything.

19        Q     Okay.  So you didn't ask for anything else           13:40:46

20   because of that first experience?

21        A     Yes.                                                 13:40:53

22        Q     Okay.  And then you said that you were cold to

23   death?                                                          13:40:57

24        A     Yes.

25        Q     That was just in the booking area; right?           13:41:01
```

Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

```
 1        A     The first floor.   Whether you stayed there for    13:41:08
 2   booking or whatever reason, it's the first floor.
 3   Because even when I was not going through the booking         13:41:19
 4   process, after I came back to court, they also put the
 5   people on the first floor, but we were not going through      13:41:32
 6   the booking process.
 7        Q     How long approximately did you spend on the        13:41:38
 8   first floor during your incarceration?
 9        A     The first day when I first arrived to until        13:41:51
10   midnight, and the last day -- the last day, I don't know
11   how many hours, but I did stay on the first floor for         13:42:04
12   quite some time after coming back from court.
13        Q     And after coming back from court, did you ask      13:42:20
14   for a blanket at that time?
15        A     No.   Because like I told you, I was afraid to     13:42:30
16   ask for anything.
17        Q     Did you tell the guards when you were on the       13:42:38
18   first floor after coming back from court that you were
19   cold?                                                         13:42:45
20        A     No.   I was afraid.
21        Q     Okay.   So the first day when you were on the      13:42:54
22   first floor, you told the guards that you were cold?
23        A     Yes.                                               13:42:58
24        Q     And you asked for a blanket?
25        A     Or something.   I don't remember whether I         13:43:06
```

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 24 of 168   Page ID
#:2290
Jane Doe vs. County of Orange                                    Deposition of Jane Doe, Vol. 4

1    mentioned blanket but just anything to keep warm.          13:43:14

2        Q    Did you see other inmates with blankets?

3        A    No.                                               13:43:19

4        Q    Did you hear of any other inmates making

5    complaints about the temperature being cold?              13:43:26

6        A    I don't know whether or not they make

7    complaints but everyone goes like this (indicating).      13:43:35

8             MS. CHMURA:  And just so the record can reflect

9    that Ms. Doe was holding her hands up against her         13:43:44

10   shoulders.

11       Q    So to you, that indicated that they were cold?   13:43:50

12       A    Yes.

13       Q    Did you talk to any other inmates about being    13:43:55

14   cold?

15       A    I don't remember.  What's the point to talk      13:44:03

16   about it?

17       Q    Okay.  So when you were in the module with the   13:44:14

18   other inmates in general population, were you cold at

19   that time?                                                13:44:20

20       A    No.  The second floor was better.

21       Q    Okay.  And on the first floor, do you know       13:44:31

22   how -- do you know what the temperature was on the first

23   floor?                                                    13:44:36

24       A    No.

25       Q    Okay.  And then you also said that you were      13:44:45

1   denied food while being incarcerated?                    13:44:48

2        A    The first day.

3        Q    Just the first day?                             13:44:53

4        A    Yes.

5        Q    And was that also when you were on the first    13:44:57

6   floor?

7        A    Yes.                                            13:45:02

8        Q    So you weren't denied any food any other time

9   while being incarcerated; right?                         13:45:05

10       A    After August 9th.  The first meal that I got

11  was in the morning of August 9th.                        13:45:30

12       Q    Okay.  And from August 9th to the last day that

13  you were at Women's Central Jail, you were given food;    13:45:37

14  right?

15       A    Yes.                                            13:45:39

16       Q    Do you recall how many meals per day you ate?

17       A    Three meals.                                    13:45:45

18            MS. CHMURA:  Okay.  I think that's all I have

19  for you, Ms. Doe.                                         13:46:08

20            THE WITNESS:  Thank you.

21            MS. CHMURA:  So we can go off the record.       13:46:13

22            THE VIDEOGRAPHER:  Anything else for the record

23  from anyone today before I close it out.                 13:46:18

24            MS. CHMURA:  No.  Thank you.

25            THE VIDEOGRAPHER:  This marks the end of Media   13:46:28

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 26 of 168   Page ID #:2292

Jane Doe vs. County of Orange                                        Deposition of Jane Doe, Vol. 4

1    No. 1 and concludes Volume 4 of the deposition of Jane          13:46:33

2    Doe.  Total media used today is one.

3           Off record at 1:46 p.m.                                  13:46:40

4               (The deposition concluded.)

5                                                                    13:46:40

6

7                                                                    13:46:40

8

9                                                                    13:46:40

10

11                                                                   13:46:40

12

13                                                                   13:46:40

14

15                                                                   13:46:40

16

17                                                                   13:46:40

18

19                                                                   13:46:40

20

21                                                                   13:46:40

22

23                                                                   13:46:40

24

25                                                                   13:46:40

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, SYLVIA ALMAGUER-MILLER, CSR No. 8767,

 4   Certified Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6   before me at the time and place therein set forth, at

 7   which time the witness was put under oath by me;

 8          That the testimony of the witness, the

 9   questions propounded and all objections and statements

10   made at the time of the examination were recorded

11   stenographically by me at the time and were thereafter

12   transcribed;

13          That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16   employee of any attorney of the parties, nor

17   financially interested in the action.

18          I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21          Dated this 11th day of May, 2022.

22

23          _____
                 Sylvia Almaguer-Miller
24               Sylvia Almaguer-Miller, CSR No. 8767

25
```

DEFTS. MSJ C 268

FILED

2020 JAN 27 AM 9: 22

1  Jane Doe

5  Plaintiff in Pro Se

**EXHIBIT**

**1**

5.6.22 S. Almaguer-Miller, CSR #8767

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

11  JANE DOE,

    No.

12          Plaintiff,

**CV20-00797-RGK-JDE**

13     v.

14  CITY OF EL MONTE; COUNTY OF LOS
ANGELES; DAVID REYNOSO;
15  MARTHA TATE; MICHAEL
BUCKHANNON; ALEX VILLANUEVA;
16  LILIANA JARA; RICHARD RUIZ;
JACKIE LACEY; PETER CAGNEY;
17  KAREN THORP; JUNE CHUNG; and
DOES 1 - 10, inclusive,

18

        Defendants.

**COMPLAINT FOR DAMAGES AND
DECLARATORY AND INJUNCTIVE
RELIEF**

19                                **JURY TRIAL IS HEREBY DEMANDED**

21      Plaintiff Jane Doe ("Plaintiff") alleges and complains the following, on information and

22  belief except for information identified as being based on personal knowledge, which allegations

23  are likely to have evidentiary support after a reasonable opportunity for further discovery.

25                         **INTRODUCTION**

26      1.    This is a civil rights complaint for damages and declaratory and injunctive relief

27  arising from Defendants' violations of Plaintiff's fundamental rights to be free from

28  discrimination and unreasonable searches and seizures, among others guaranteed by the United

1

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUCTIVE RELIEF

**DEFTS. MSJ C 269**

States Constitution, California Constitution, and California laws. Defendants violated these rights when they conspired and practiced discriminatory under-policing and selective under-enforcement against rape victims, including Plaintiff.

2.    This action stems from law enforcement personnel's response to a heinous crime - rape. This action is about the discriminatory practice and ill will of law enforcement personnel, their betrayal of public trust, and failure to protect residents from victimization by rapists. Our law enforcement's response to rapes sends a catastrophic message to the whole of our society. To rape victims: bringing a complaint is useless. To rapists: you're allowed to rape as many women as you want and there will be no consequence!

3.    Without the ability to hold law enforcement accountable for its responses, rape victims, including Plaintiff, will be far too likely to face hostility, disinterest, and concrete harms as a result of their interactions with law enforcement. The people who mishandle rape cases are just as bad as the perpetrators themselves because they are perpetuating rape.

4.    Plaintiff has been injured by Defendants' willful refusal to provide the accommodations, advantages, privileges, and facilities of an unbiased and adequate sexual assault investigation, and effective prosecution. Plaintiff has endured multiple traumas; first, the criminal assault itself; second, a discriminatory, unconstitutional, unfair, and unequal treatment by the people sworn to protect the public - the government officials and actors who have instead discredited, dismissed, and denigrated Plaintiff as a rape victim; and finally, the additional trauma of watching her case and hope for justice languish and ultimately vanish, due to the sabotage, inaction and refusal to act by the law enforcement personnel. Plaintiff's attacker will not see a day of consequence for his violent assault against her.

5.    As described in more detail below, Defendants' (a) actions, (b) patterns of behavior, (c) history of decision-making, and (d) departures from normal procedures in the course of their response to sexual assaults, demonstrate ongoing, intentional discrimination against rape victims, including Plaintiff. Specifically, Defendants have committed constitutional violations by implementing, promoting, or maintaining policies, practices, and/or customs that:

a.    Refuse to investigate officer misconduct properly, misconduct is widespread

2

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1    without ramification or discipline;

2    b.  Refuse to implement and/or ignore proper training and supervision of

3    government employees handling sexual assault cases;

4    c.  Allocate more resources to other violent crimes than to sexual assaults;

5    d.  Credit suspects' account over victims' version of story;

6    e.  Fail to arrest and charge known perpetrators of sexual assault;

7    f.  Disproportionately refuse to thoroughly investigate sexual assault cases;

8    g.  Disproportionately refuse to prosecute perpetrators of sexual assault;

9    h.  Traumatize Plaintiff in the course of her interactions with Defendants by,

10   among other things, refusing to treat her testimony as adequate evidence

11   regarding lack of consent;

12   i.  Subject Plaintiff and other rape victims to future assaults by known

13   perpetrators by failing to act on, investigate, and prosecute prior sexual

14   assaults;

15   j.  Treat sexual assault cases with less urgency and importance than is afforded to

16   other types of violent crimes;

17   k.  Treat victims of sexual assault, including Plaintiff, with less respect and devote

18   less attention to their cases than to cases of other crimes (collectively referred

19   to herein as the "Policies").

20   6.   Defendants' unconstitutional and discriminatory conduct subjects Plaintiff and

21   other victims of sexual assault to continued risk at the hands of perpetrators who are never held

22   accountable.

23   7.   Defendants' violations did not stop there. Despite Plaintiff's plain and actual

24   authority was to download her particular message conversations on her smartphone Defendants

25   transformed it into a complete search and seizure. As a result, in addition to violating Plaintiff's

26   right to be free from unreasonable searches and seizures Defendants violated Plaintiff's privacy.

27

28                                    **PARTIES**

3

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 271**

1       8.    Plaintiff, Jane Doe ("Plaintiff"), at all times herein mentioned, was a resident of

2  the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3       9.    Defendant, City of El Monte ("the City"), is a public entity and municipal

4  corporation duly organized and existing under and by virtue of the laws of the State of California.

5  El Monte Police Department ("EMPD") is an operating department of the City. The City is

6  responsible for the training, policies, procedures, and actions of EMPD and its employees. The

7  City has direct supervisory authority over EMPD and its officers, and EMPD policies are City

8  policies for purposes of municipal liability.

9       10.    Defendant, County of Los Angeles ("the County"), is an incorporated municipality

10  organized and existing under the laws of the State of California and wholly located within the

11  State of California. Los Angeles County Sheriff's Department ("LASD") and Los Angeles

12  County District Attorney's Office ("LADA") are operating departments of the County. The

13  County is responsible for the training, policies, procedures, and actions of LASD and LADA, and

14  their employees. The County has direct supervisory authority over LASD, LADA, and their

15  personnel, and LASD and LADA policies are County policies for purposes of municipal liability.

16       11.    <u>Defendant EMPD Officers</u>: At all times herein mentioned, Plaintiff is informed

17  and believe, and thereon alleges that individual Defendants Chief of Police David Reynoso

18  ("Reynoso"), Officer Martha Tate, ID 578 ("Tate"), and Lieutenant Michael Buckhannon, ID 571

19  ("Buckhannon"), were residents of the County of Los Angeles and were civilian employees,

20  agents and/or representatives of EMPD. At all times relevant hereto, said Defendants were acting

21  within the course and scope of their employment as officers, lieutenants, detectives, and/or

22  civilian employees of EMPD, a department and subdivision of Defendant City of El Monte. At

23  all times relevant herein, said Defendants were acting under color of law, under the color of

24  statutes, ordinances, regulations, policies, customs, practices and usages of the City, EMPD,

25  and/or the State of California. At all times relevant hereto, Plaintiff alleges Reynoso served as the

26  highest official for EMPD and made the City and EMPD policy for that office. As Chief of

27  Police, Reynoso holds the command and policy making position with regards to EMPD. Reynoso

28  has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced in the

4

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 272

1   unconstitutional actions, policies, customs and practices as described fully below. Reynoso has,

2   wholly or in part, directly and proximately caused and, in the absence of the injunctive relief

3   which Plaintiff seeks in this Complaint, will continue in the future to proximately cause, the

4   injuries and violations of rights set forth fully below.

5         12.   Defendant LASD Officers: At all times herein mentioned, Plaintiff is informed and

6   believe, and thereon alleges that individual Defendants Sheriff Alex Villanueva ("Villanueva") is

7   an elected public official. Individual Defendants Detective Liliana Jara ("Jara") and Lieutenant

8   Richard Ruiz ("Ruiz"), were residents of the County of Los Angeles and were civilian employees,

9   agents and/or representatives of LASD. At all times relevant hereto, said Defendants were acting

10   within the course and scope of their employment as officers, lieutenants, detectives, and/or

11   civilian employees of LASD, a department and subdivision of the County. At all times relevant

12   herein, said Defendants were acting under color of law, under the color of statutes, ordinances,

13   regulations, policies, customs, practices and usages of the County, its Sheriff's department, and/or

14   the State of California. At all times relevant hereto, Plaintiff alleges Villanueva served as the

15   highest official for LASD and made the County and LASD policy for that office. As Sheriff of

16   the County, Villanueva holds the command and policy making position with regards to LASD.

17   Villanueva has caused, created, authorized, condoned, ratified, approved or knowingly acquiesced

18   in the unconstitutional actions, policies, customs and practices as described fully below.

19   Villanueva has, wholly or in part, directly and proximately caused and, in the absence of the

20   injunctive relief which Plaintiff seeks in this Complaint, will continue in the future to proximately

21   cause, the injuries and violations of rights set forth fully below.

22         13.   Defendant LADA Officials: At all times herein mentioned, Plaintiff is informed

23   and believe, and thereon alleges that individual Defendant District Attorney Jackie Lacey

24   ("Lacey") is an elected public official. Individual Defendants Head Deputy Peter Cagney

25   ("Cagney"), Assistant Head Deputy Karen Thorp ("Thorp"), and Deputy June Chung ("Chung"),

26   were residents of the County of Los Angeles and were civilian employees, agents and/or

27   representatives of LADA. At all times relevant hereto, said Defendants were acting within the

28   course and scope of their employment as civilian employees of LADA, a department and

<div align="center">5</div>

<div align="center">COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF</div>

<div align="right">**DEFTS. MSJ C 273**</div>

1   subdivision of Defendant Los Angeles County. At all times relevant herein, said Defendants were

2   acting under color of law, under the color of statutes, ordinances, regulations, policies, customs,

3   practices and usages of the County, its department, and/or the State of California. At all times

4   relevant hereto, Plaintiff alleges Lacey served as the highest official for LADA and made the

5   County and LADA policy for that office. **LADA Officials are not immune to this suit**.

6   "Prosecutorial immunity only protects the defendants from [§] 1983 damage claims; it does not

7   protect them from suits for injunctive relief." Gobel, 867 F.2d at 1203 n.6. To determine whether

8   particular actions warrant absolute immunity, courts apply a "functional approach." Buckley v.

9   Fitzsimmons, 509 U.S. 259, 269 (1993). This approach "looks to 'the nature of the function

10  performed, **not the identity of the actor who performed it**[.]'" Id. (quoting Forrester v. White,

11  484 U.S. 219, 229 (1988)). "Absolute immunity 'is an extreme remedy, and it is justified only

12  where any lesser degree of immunity could impair the judicial process itself.'" Garmon v. Cty. of

13  Los Angeles, 828 F.3d 837, 843 (9th Cir. 2016) (quoting Lacey v. Maricopa Cty., 693 F.3d 896,

14  912 (9th Cir. 2012) (en banc)). See also Brooks v. Clark Cty., 828 F.3d 910, 915–16 (9th Cir.

15  2016) (discussing absolute immunity). "[T]he official seeking absolute immunity bears the

16  burden of showing that such immunity is justified for the function in question." Burns, 500 U.S.

17  at 486. "The presumption is that qualified rather than absolute immunity is sufficient to protect

18  government officials in the exercise of their duties." Id. At 486-87. The purpose of absolute

19  immunity is to eliminate susceptibility to legal actions that would inhibit prosecutors from

20  aggressively prosecuting cases. When prosecutors fail to perform their duties, provide favoritism

21  to suspects, and reluctantly prosecute cases that they should have prosecuted this Court should

22  reject their absolute immunity. The following actions by LADA Officials are neither prosecutorial

23  in nature nor decisions of judgment but deplorable intentional antithesis of exercise of judgment:

24      a.  As the largest local prosecutorial office in the nation, no written policies relating to

25          prosecution of rape exists which suggests deliberate indifference to rape victims

26          safety and a general disinterest in prosecuting sexual assaults due to bias (Lacey

27          has publicly been criticized for inaction in the case of four women who report

28          having been raped by actor Danny Masterson.);

6

DEFTS. MSJ C 274

b. When asked to adopt "offender-focused approach" and "expert witness strategy" that are recommended by National District Attorneys Association ("NDAA") LADA Officials maliciously refused, giving a purported reason that the case cannot be proved beyond a reasonable doubt. Bias against rape victims could not be clearer; **Ex. 1** (Prosecuting Alcohol-Facilitated Sexual Assault), **Ex. 2** (Cold Case Alcohol- and Drug-Facilitated Sexual Assault), **Ex. 3** (Understanding the non-stranger rapist), **Ex. 4** (Plaintiff's email to HD Peter Cagney)

c. Willfully refuse to perform their duties pursuant to professional standards;

d. Intentionally discredit Plaintiff's account of allegation because she is a rape victim;

e. Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

f. Deter Plaintiff from pursuing justice by falsely telling her that there was not enough evidence and creating purported reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a rape victim;

g. Falsely told Plaintiff there was no corroboration, despite corroboration is not required by law for conviction; **Ex. 5** (Model Response to Sexual Violence for Prosecutors)

h. Made multiple untrue statements to Plaintiff that were far departure from professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for LADA Officials to exercise their discretion;

i. Intentionally enforce a "non-law", falsely requiring corroboration and evidence of force to establish rape, a requirement that is not required by law or jury instruction; (Lacey openly said acquaintance cases are particularly difficult to prove, unless the accused admits what happened, makes incriminating statements, or the victim's account can be corroborated with independent evidence, reflecting higher criteria

7

DEFTS. MSJ C 275

1 | compared to other crimes with no showing of valid state interest but solely aiming

2 | at conviction rate for prosecutor's own personal interest.

3 | https://www.nbclosangeles.com/news/local/former-socal-police-officer-will-not-

4 | face-rape-charge/2227236/)

5 | j. | Maliciously ignore the fact that a victim's testimony alone is legally sufficient

6 | evidence for filing charges but falsely told Plaintiff that the law requires more than

7 | that and it's the way the law is, reflecting rape cases are less "worthy" of

8 | prosecution than other crime cases;

9 | k. | Willfully provide favoritism and leniency towards rapists, including Suarez who

10 | attacked Plaintiff;

11 | l. | Intentionally use their control and influence to shut Plaintiff out of criminal justice

12 | system and reduce the number of perpetrators held accountable for sexual assaults;

13 | m. | Employ disparate unwritten policy to rape cases compared to other type of crimes;

14 | (According to prosecution data obtained by NBC4's I-Team, in LA County, in

15 | 2018 police presented 815 forcible rape investigations to prosecutors. Charges

16 | were filed in 188 reflecting an extremely low prosecution rate of 23%. This

17 | compares to a higher rate at every stage for non-rape crimes, reflecting the lowest

18 | priority of LADA's efforts.)

19 | n. | Act in their own personal interest to avoid losing at trial simply because rape cases

20 | are hard to win and they want their personal conviction rates look good;

21 | o. | Consciously manipulate prosecution for political purposes;

22 | (https://variety.com/2020/politics/news/weinstein-rape-charges-los-angeles-

23 | 1203461860/)

24 | p. | Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional

25 | rights;

26 | q. | Employ unconstitutional and discriminatory practice against sexual assault

27 | victims, including Plaintiff; and

28 | r. | Misuse their power to undermine the quality of justice.

8

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 276

14.     Defendant DOES 1 through 50 are not known or identified at this time. On information and belief, Plaintiff alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein. When the true names and capacities of said Defendants become known, Plaintiff will seek relief to amend this complaint to show their true identities in place of their fictitious names as DOES 1 through 50. Defendants, DOES 1 through 50, and each of them, were the agents, employees and servants of the City or the County. Defendants DOES 1 through 50 acted in the course and scope of said agency, service and employment at all relevant times.

15.     Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE is intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged.

16.     Defendants, and each of them, did the acts and omissions hereinafter alleged in bad faith and with knowledge that their conduct violated well established and settled law.

17.     All Defendants are sued in their official capacities for declaratory and injunctive relief as to all claims. All Defendants are also sued for damages arising from violations of 42 U.S.C. §§ 1983 and 1985, and for violations of state law and the California Constitution.

18.     Defendants EMPD and LASD Officers, LADA Officials, and DOES 1 through 50 are also sued in their individual capacities for their violations of Plaintiff's constitutional and statutory rights.

## JURISDICTION AND VENUE

19.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367(a) because this action arises under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

20.     The Court may award damages and grant declaratory and injunctive relief for constitutional violations pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, and/or Federal Rules of

9

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 277

1    Civil Procedure 57 and 65.

2        21.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the events that

3    give rise to this action occurred within this district and the Defendants reside in this district and

4    state.

5

6                          **EMPD POLICIES AND PROCEDURES**

7        22.    At all relevant times, all EMPD members were required to be apprised of the First,

8    Fourth, and Fourteenth Amendment of the United States Constitution, and were required, at all

9    times, to follow the United States Constitution, the laws of California and also to comply with

10   EMPD Policies and Procedures ("EMPD P&Ps"). EMPD P&Ps are written orders which apply to

11   all EMPD members such as Defendant EMPD Officers. Each member of EMPD, including

12   Defendant EMPD Officers, are required to be familiar with the EMPD P&Ps and must adhere to

13   its directives.  **Ex. 6** (EMPD Policies and Procedures).

14       23.    EMPD P&Ps 319.2 POLICY states that "The continued employment or

15   appointment of every member of the El Monte Police Department shall be based on conduct that

16   reasonably conforms to the guidelines set forth herein. Failure to meet the guidelines set forth in

17   this policy, whether on- or off-duty, may be cause for disciplinary action.

18       24.    EMPD P&Ps 319.3.2 SUPERVISOR RESPONSIBILITIES states that

19   "Supervisors and managers are required to follow all policies and procedures and may be subject

20   to discipline for: (a) Failure to be reasonably aware of the performance of their subordinates or to

21   provide appropriate guidance and control. (b) Failure to promptly and fully report any known

22   misconduct of a member to his/her immediate supervisor or to document such misconduct

23   appropriately or as required by policy.

24       25.    EMPD P&Ps 319.5 pertains to CAUSES FOR DISCIPLINE. 319.5.3

25   DISCRIMINATION, OPPRESSION OR FAVORITISM states that "Discriminating against,

26   oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex,

27   sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical

28   or mental disability, medical condition or other classification protected by law, or intentionally

                                    10
                  COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

                                                          **DEFTS. MSJ C 278**

1    denying or impeding another in the exercise or enjoyment of any right, privilege, power or

2    immunity, knowing the conduct is unlawful.

3        26.    EMPD P&Ps 319.5 elaborates CAUSES FOR DISCIPLINE. 319.5.8

4    PERFORMANCE includes "(a) Failure to disclose or misrepresenting material facts, or making

5    any false or misleading statement on any application, examination form, or other official

6    document, report or form, or during the course of any work-related investigation. (b) The

7    falsification of any work-related records, making misleading entries or statements with the intent

8    to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of

9    any department record, public record, book, paper or document. (c) Failure to participate in, or

10    giving false or misleading statements, or misrepresenting or omitting material information to a

11    supervisor or other person in a position of authority, in connection with any investigation or in the

12    reporting of any department-related business.

13        27.    EMPD P&Ps 601 details the requirements for sexual assault investigations. EMPD

14    P&Ps 601.5 TRAINING states that "Subject to available resources, periodic training will be

15    provided to:

16    (a) Members who are first responders. Training should include:

17    1. Initial response to sexual assaults.

18    2. Legal issues.

19    3. Victim advocacy.

20    4. Victim's response to trauma."

21        28.    EMPD P&Ps 601.7 VICTIM INTERVIEWS states that "Whenever possible, **a**

22    **member of SART** should be included in the initial victim interviews. **No opinion** of whether the

23    case is unfounded shall be included in the report. Victims should be apprised of applicable

24    victim's rights provisions, as outlined in the Victim and Witness Assistance Policy.

25        29.    EMPD P&Ps 601.7.1 VICTIM RIGHTS states that "Whenever there is an alleged

26    sexual assault, the assigned officer shall accomplish the following:

27    (a) Advise the victim **in writing** of the right to have a victim advocate and a support

28    person of the victim's choosing present at any interview or contact by law enforcement,

<div align="center">11</div>

<div align="center">COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF</div>

any other rights of a sexual assault victim pursuant to Penal Code § 680.2 and the right to have a person of the same or opposite gender present in the room during any interview with a law enforcement official unless no such person is reasonably available (Penal Code § 679.04).

## LASD CODE OF ETHICS

30.     At all relevant times, all LASD members were required to be apprised of the First, Fourth, and Fourteenth Amendment of the United States Constitution, and were required, at all times, to follow the United States Constitution, the laws of California and also to comply with LASD Code of Ethics ("LASD COEs"). LASD COEs are written statements which apply to all LASD members such as Defendant LASD Officers. Each member of LASD, including Defendant LASD Officers, are required to be familiar with the LASD COEs and must adhere to its directives. **Ex. 7** (LASD Code of Ethics).

31.     LASD COEs states that "I will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities."

## CRIMINAL PROSECUTION

32.     As the United States Supreme Court has explained, the prosecutor represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.

33.     American Bar Association Criminal Justice Standards for the Prosecution Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the

12

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 280**

prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4 Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor may file and maintain charges even if juries in the jurisdiction have tended to acquit persons accused of the particular kind of criminal act in question.

34.    In cases which involve a **serious threat** to the community, the prosecutor should not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit persons accused of the particular kind of criminal act in question because prosecutors have an ethical obligation to pursue difficult cases for public safety reasons.

35.    According to NDAA, rape cases rarely have physical evidence that conclusively proves that a rape occurred. The evidence need not conclusively prove that a rape occurred; rather, it must give the jury a sufficient **context** in which to evaluate the victim's credibility. **Ex. 1** (Prosecuting Alcohol-Facilitated Sexual Assault).

36.    Los Angeles County District Attorney ("LADA") declares that their office's top priority is the prosecution of violent and dangerous criminals – murders, rapists, gang members, child abusers and robbers among them. (http://da.lacounty.gov/about/office-overview)

37.    AEquitas is a national technical assistance provider that specializes in the prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit organization that brings decades of prosecution experience and collaborative approach to offer law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

## RELEVANT LEGISLATION

38.    In 2014 Gov. Jerry Brown has signed a bill into law that makes California the first in the nation to have a clear definition of when people agree to sex. "Lack of protest or resistance does not mean consent," the law states, "nor does silence mean consent. Affirmative consent must be ongoing throughout a sexual activity and can be revoked at any time."

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

39.    On or about April 1, 2019 Carlos Suarez (aka Charlie Suarez, hereinafter

13

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 281**

1  "Suarez") friended Plaintiff via a mobile app "Wechat". After a few days of chatting, on or about

2  April 5, 2019, Suarez invited Plaintiff out for a dinner date. Plaintiff went home after a two-hour

3  dinner with Suarez but later Suarez brought over Japanese whiskey and Spanish wine. Plaintiff

4  and Suarez had been drinking in Suarez's car for about three hours. Plaintiff eventually lost

5  consciousness after consuming a lot of alcohol.

6      40.    On or about April 6, 2019 at around 8:00 am Plaintiff woke up in an unfamiliar

7  place, naked with a sore vagina. Suarez was also naked lying in bed next to Plaintiff. Plaintiff was

8  still drunk and confused about what had happened. Suarez inserted his penis into Plaintiff's

9  vagina but she didn't know what to say or what to do. Plaintiff was completely lost and everything

10 was way beyond her comprehension. She didn't resist because she's afraid of any confrontation

11 and escalated situation. She remained silent and went along with what the offender wanted

12 because she reasonably believed that Suarez would commit violence against her if the situation

13 was escalated. Plaintiff never gave her consent to sexual contact with Suarez while she was

14 awake not to mention when she was unconscious.

15     41.    On or about May 3, 2019 Plaintiff lured Suarez to a hotel and stood him up which

16 was the last time Plaintiff saw Suarez. Between April 7, 2019 and May 3, 2019 Plaintiff not only

17 had no sexual contact with Suarez but also declined his sexual advances.

18     42.    Plaintiff finally gathered her courage to come forward on June 7, 2019. At the time

19 she believed that coming forward would be her first step to heal and it was her obligation to

20 report it to stop it. However, it turned out she was completely wrong and her life has been turned

21 upside down.

22     43.    On June 7, 2019 plaintiff was interviewed by Tate at EMPD. During the interview

23 no victim services personnel was present and Plaintiff was not informed that she had the right to

24 request a victim advocate. However, EMPD P&Ps 601.7 VICTIM INTERVIEWS states that

25 "Whenever possible, a member of SART should be included in the initial victim interviews."

26     44.    The first session of the interview was not recorded and during that session Plaintiff

27 told Tate she was afraid to upset Suarez when she woke up in an unfamiliar place in the morning

28 of Apr 6, 2019. When Tate told Plaintiff to retell the story for recording purposes Plaintiff was

14

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 282

1   very frustrated. Plaintiff was re-traumatized by recounting the incident twice. Throughout the

2   interview Plaintiff noticed Tate's fake smile and the way Tate looked at her with skepticism.

3       45.     Despite the crime was facilitated by alcohol Tate asked Plaintiff "Did he force

4   you?" Nobody needs force to rape an unconscious woman. Nobody needs force to rape a woman

5   who's in shock and fear. Alcohol is a weapon of choice by perpetrators. Regardless of silence is

6   not consent, by asking irrelevant questions Tate focused on physical force instead of the absence

7   of consent. From the very outset Tate had no intention to uncover the truth that there was no word

8   or conduct indicating Plaintiff's freely given agreement to sexual contact. Ex. 8 (Jury instruction

9   for criminal sex offense).

10      46.     At the end of the interview, without any investigation, Tate willfully smirked and

11  announced to Plaintiff that it was not a rape. Tate's statement was like a bombshell that caused

12  Plaintiff to raise her voice and yell "he admitted it." Tate didn't care and showed Plaintiff out.

13  Tate's comment suggests that she believed this was just a drunken night rather than a crime. It is

14  not a policy of EMPD to tell victims of burglaries or attempted murder that their allegations are

15  NOT a crime. The power of Tate's announcement was no different than a bullet shot in Plaintiff's

16  head. Ex. 9 (Plaintiff's email to EMPD).

17      47.     After the initial interview Tate falsified her incident report by fabricating Plaintiff

18  gave consent and willingly had sexual intercourse with Suarez because Plaintiff wanted to do so.

19  This action reflects Tate's discriminatory intent to dismiss Plaintiff's allegation. Ex. 10 (Incident

20  report prepared by Officer Martha Tate).

21      48.     Plaintiff, after waking up naked in an unfamiliar place with a sore vagina, told her

22  simple and plain narrative to Tate: she didn't know what to do and she was afraid to upset the

23  attacker which implies she's afraid of the consequence of confrontation and escalated situation.

24  Tate twisted the story, bypassing the appropriate context and substituting instead the more

25  familiar account of a sexual encounter. Having preempted Plaintiff's story with one of her own,

26  Tate's falsified report made sense given the premises of her announcement. In other words, before

27  any investigation, Tate had drawn her own conclusion: this was not a rape. Tate's willful denial of

28  what Plaintiff had experienced was the result of stereotyped assumption about the truth of a

15

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 283

1   reported sexual assault, that women are likely to report "regretted sex" as rape.

2        49.     Plaintiff told her narrative to Tate on tape: she didn't say no, she didn't say yes
3   when Suarez had sex with her after she woke up. Having sex was not what she wanted. Tate
4   distorted the story with her discriminatory mind, again replacing Plaintiff's story with one of her
5   own, Tate wrote in her report that Plaintiff gave consent and willingly had sexual intercourse with
6   Suarez because she wanted to do so.

7        50.     Plaintiff told her narrative to Tate: Suarez told Plaintiff to book a hotel. Plaintiff
8   didn't do so because she didn't want to have sex with Suarez in the first place, but she went out for
9   dinner with Suarez. Plaintiff went home straight after dinner with Suarez. Tate distorted the story,
10  again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff was
11  supposed to meet Suarez in a motel but she changed her mind.

12       51.     Plaintiff showed Tate Suarez's indirect confession stating that "I felt like you were
13  a virgin and I was stretching you out." However, Tate maliciously omitted this most important
14  text message in her report.

15       52.     Tate's willful refusal to take Plaintiff at her words - that she had been raped - and
16  Tate's malicious conclusion are symptomatic of a widely recognized stereotype: law
17  enforcement's deep-seated distrust of rape victims.

18       53.     After the second time Plaintiff recounted her story, Tate's question "What brings
19  you here today?" reflects her doubt about Plaintiff's allegation and explains Tate's initial motive
20  to falsify her report. A victim of other types of crime would not be asked the same question.

21       54.     Tate asked Plaintiff what made her think she was a victim of rape based on Tate's
22  assumption about sexual assault victims are lying. Victims of other type of crimes would not be
23  asked the same question. Such humiliating and degrading question strongly suggests her
24  discriminatory animus towards rape victims.

25       55.     Tate's incident report is a summary of her version of events from her
26  discriminatory perspective instead of Plaintiff's.

27       56.     Tate did not inform Plaintiff of victims' rights. At that time, and at all relevant
28  times, Tate was aware of her duties as an EMPD police officer, specifically adherence to EMPD

16

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 284

1     P&Ps 601 Sexual Assault Investigations. Tate has remained on her job without any discipline.

2       57.   On or about June 13, 2019, days after Plaintiff's encounter with Tate, while

3   struggling immensely with Tate's announcement, Plaintiff ended up in urgent care for severe

4   sleep disorder.

5       58.   On or about July 2, 2019 Plaintiff met with Jara at LASD's city of Industry station.

6   Jara asked Plaintiff to recount her story but not long after she started Jara assumed that Plaintiff

7   didn't remember giving consent. Jara ignored Plaintiff telling her it was not the case. Jara refused

8   to take Plaintiff's answer and grilled Plaintiff "you ever had this situation that your friend told

9   you that you danced last night when you were drunk and you don't remember?" Plaintiff had to

10   raise her voice and respond "NEVER". It came across Jara was so intimidating and bullying. It

11   also demonstrates how Jara coerced Plaintiff to recant her allegation of rape, reflecting her

12   malicious and discriminatory intent.

13       59.   Jara's question - "What do you want here?" - indicates that she believed that

14   Plaintiff was making a false allegation to gain something else. Jara's humiliating and degrading

15   question was nowhere to be found in LASD's standard operating procedures or investigation

16   guide. Her question is simply a good starting point to devalue Plaintiff's credibility. "What do you

17   want here?" is the main theme of Jara's investigation right from the outset. Victims of other type

18   of crimes would not be asked the same question. Jara's question caused Plaintiff to raise her voice

19   in shock and answer "I want JUSTICE."

20       60.   When Jara was reading Plaintiff's conversations with Suarez she stated "It doesn't

21   look like you were raped." Jara's stereotyped remarks reveal her stereotypical distrust towards

22   rape victims. Such stereotype about how victims should behave violates the Equal Protection

23   Clause, United States v. Virginia, 518 U.S. 515, 517 (1996), and interferes with the ability of

24   investigators to find the truth. Then Jara questioned Plaintiff again "Why did you say 'I can make

25   you lose your job'?" Jara never missed a chance to challenge Plaintiff's every word and action.

26       61.   Jara announced the need to download from Plaintiff's cell phone the conversations

27   between Plaintiff and Suarez. Plaintiff asked Jara how long it would take and Jara replied it would

28   take about two weeks. Jara didn't inform Plaintiff that she would do something else on the cell

17

DEFTS. MSJ C 285

1  phone. However, regardless of repeated requests for her phone's return, Plaintiff did not get her

2  phone back until four months later. Plaintiff would not have given her phone to Jara if she had

3  known that an illegal search and seizure would be conducted.

4      62.    Plaintiff insisted that Suarez confessed he was stretching her out. Jara further

5  intimidated Plaintiff "That's not a confession. Did he say he raped you?" Jara expected that there

6  was only one form of confession.

7      63.    Jara also argued that a woman's vagina would not be loosened when they are

8  aroused. Then Plaintiff asked her how a woman would give birth. After Plaintiff got home she

9  had to send Jara a medical article describing how a woman's vagina changes under different

10  circumstances to enrich her knowledge about a woman's body part.

11      64.    Jara questioned Plaintiff's intent to come forward. She concluded that Plaintiff

12  came forward because she found out Suarez was cheating and she was mad. Again, Plaintiff had

13  to raise her voice to deny Jara's accusation.

14      65.    Jara said founding out his cheating could be Suarez's defense. Plaintiff flat out

15  said "that's not a valid defense" but in response she said "yes it is". The entire time Jara was

16  trying to discourage Plaintiff following through her allegation rather than discover the truth.

17      66.    Text messages showed that Suarez put words in Plaintiff's mouth and invited

18  himself over but Jara concluded that Plaintiff invited him over. Jara kept challenging Plaintiff

19  why she did this/that as if she was a criminal. Jara said Plaintiff's text messages after April 6

20  looked like she was ok with having sex in the motel by ignoring how Plaintiff processed trauma.

21      67.    Plaintiff showed Jara some articles that finally made her come forward but Jara

22  attacked Plaintiff that she printed them out after the police report was filed despite the fact that

23  nowadays most people read on screen instead of paper, reflecting Jara's dismissive attitude. The

24  entire time Jara put Plaintiff into a defense mode that Plaintiff had to defend herself although she

25  was a crime victim.

26      68.    Jara's assumptions made Plaintiff reach the point that she had to yell multiple

27  times "I date him does not mean I want to have sex with him. How come I did not have sex with

28  him after April 6?" Jara put Plaintiff in a position that she was extremely frustrated to the level

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 286

1   that she couldn't express herself and wanted the "interview" to end as quickly as possible because

2   the entire "interview" was conducted in a very accusatory manner, very threatening.

3       69.    Jara kept saying this case was going nowhere, this case had a lot of problems. She

4   also said "if all you want is to arrest this guy it is not gonna happen. I will not make an arrest."

5   Jara's announcement reflects her discriminatory intent to invalidate Plaintiff's allegation.

6       70.    It is not a policy of LASD to constantly tell victims of burglaries or attempted

7   murder that their allegations are problematic and impossible to prove beyond a reasonable doubt.

8       71.    At the end of the interrogation Jara told Plaintiff "I will get his phone and see if

9   there's more messages." Her statement again reflects her presumption that Plaintiff was lying or

10   hiding something else.

11       72.    Plaintiff suffered a sexual attack while she was unconscious after drinking.

12   Against this backdrop, Jara's demeaning and accusatory tone of questioning was suspect and

13   suggestive of discrimination. Jara's discriminatory attitude explained why she assumed that

14   Plaintiff did not remember giving consent and stated that "It doesn't look like you were raped."

15   Jara's conduct reflects she discredited Plaintiff's statements because Plaintiff consumed alcohol.

16       73.    No useful information was extracted during Plaintiff's encounter with Jara. No

17   question regarding the crime element was asked. Instead, the only motive of this "interview" was

18   to challenge Plaintiff's every word and reaction. The only intent of this "interview" was to

19   invalidate and dismiss Plaintiff's allegation. Rather than work with the victim and gather

20   evidence according to each element of the crime Jara repeatedly declared that this type of case

21   was problematic which could not be proven beyond a reasonable doubt. The "interview"

22   conducted by Jara was meaningless with respect to proving a crime.

23       74.    Jara did not inform Plaintiff of victims' rights as set forth in California

24   constitution. At that time, and at all relevant times, Jara had full knowledge of LASD COEs and

25   awareness of proper investigation protocol.

26       75.    Again and again, Plaintiff has not been treated like the victim in this case. The

27   trauma Plaintiff has experienced at the hands of Defendants prevented her from having any kind

28   of normal life.

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 287

76.     On or about July 3, 2019 Plaintiff was really concerned by Jara's attitude and she believed that Jara was not able to appropriately manage her case. Plaintiff reached out Ruiz and requested another detective to work on her case but her attempt was not successful. Jara remained on Plaintiff's case.

77.     On or about July 14, 2019 Plaintiff filed a complaint against Jara and Special Victims Bureau with Inspector General. Jara has remained on her job without any discipline.

78.     On or about July 22, 2019, while Jara was on vacation, Plaintiff reached out Ruiz to get her phone back. Over the phone while discussing the case Plaintiff was challenged by Ruiz "How did you not know you were violated?" His question left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes.

79.     On Aug 8, 2019 Plaintiff was framed and charged with misdemeanor. Plaintiff never worried about that because she believed she would not be convicted for something she didn't do.

80.     Despite pretext phonecall is a commonly used technique to obtain confession from the offender Jara opt not to use it but on or about Aug 14, 2019 she told Plaintiff she had done everything she could. Plaintiff was never notified after law enforcement contact with the suspect reflecting a serious disregard for Plaintiff's safety.

81.     On or about Aug 14, 2019 Plaintiff phoned Ruiz to inquire the investigation but in an intimidating manner Plaintiff was challenged by Ruiz about her gofundme page which was her private business and had nothing to do with the crime in question. It reveals that LASD Officers' true motive was to spend more energy and time on proving Plaintiff was filing a false claim rather than prove there was a crime occurred. It demonstrates how LASD Officers misused state resources.

82.     At that time, and at all relevant times, Ruiz was aware of LASD COEs and his role as a supervisor.

83.     The language and attitude of Jara and Ruiz suggests that LASD Officers made minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case.

20

DEFTS. MSJ C 288

84. On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual bleeding. In Plaintiff's entire life it was her very first time to visit ER.

85. On or about Aug 23, 2019 LADA declined to file charges against Suarez.

86. On Aug 23, 2019 Chung had a phone conversation with Plaintiff. It is prosecutor's duty to educate juries that just because a woman has an open crime case it doesn't mean that she is not a victim of sexual assault. Despite simply filing a motion to limine can keep out irrelevant or prejudicial evidence Chung falsely told Plaintiff that the open case in Orange County against Plaintiff affected her credibility and made the filing charges against Suarez impossible which was a clear deprivation of Plaintiff's rights secured to her under Fourteenth Amendment. At the time Plaintiff was not convicted and was charged with misdemeanor. The choice of misdemeanor over felony is a callous disregard for victim and community safety, reflecting Chung's dismissive attitude. Having an open crime case does not justify the deprivation of a victim's rights.

87. A victim of attempted murder or other crime would not be told his/her open criminal case would affect his/her credibility.

88. Regardless of corroboration the purported reason for non-prosecution given by Chung was that Plaintiff's case was a "he said she said" case. Given the fact that the suspect admitted he tore apart Plaintiff's vagina this is obviously an untrue statement.

89. The American Bar Association standard related to Prosecution Function says that the duty of the prosecutor is to seek justice, not merely to convict. Giving false statement to a victim is not prosecutorial in nature. Instead, Chung was afraid to lose the case and affect her personal performance. In another words Chung acted in her own interest and personal capacity during the employment as a prosecutor.

90. Despite alcohol is a weapon of choice another purported reason for non-prosecution given by Chung was "You also voluntarily consumed alcohol, correct?" which suggests a strong purposeful animus towards Plaintiff. A burglary allegation would not be dismissed because the victim forgot to lock the door or close the window.

91. At that time, and at all relevant times, Chung was aware of LADA's mission and her role as a prosecutor.

21

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 289**

92.     On Aug 23, 2019 Thorp called Plaintiff and during the phone call Thorp was reading Tate's falsified report. Thorp's statement - "We can't prove it in court to a jury that **a jury is not likely to convict**." – is a far departure from professional standards. "**If someone thinks they were raped** and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Thorp's stereotype about how victims should behave constitutes purposeful unlawful discrimination.

93.     When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Thorp falsely told Plaintiff that in order to prove a case "We need **a forensic medical exam**. We need his semen. We need **evidence of force**."

94.     By intentionally ignoring all the circumstantial evidence Thorp made an untrue statement "We need something more than **the victim alone saying that this happened**." "**But it's the way the law is**."

95.     Despite most sexual assault victims either delay reporting or never report the crime Thorp made a statement "If you're raped you go to the police right away." Thorp's stereotype about how victims should behave constitutes unlawful discrimination.

96.     When Plaintiff pointed out Suarez's predatory behavior to ply her with alcohol Thorp's statement - "**It doesn't matter. You drank it**." – suggests a strong animus towards rape victims because a victim of burglary would not be told "It doesn't matter. You didn't lock your door." Thorp's language also reflects her discriminatory intent to discard Plaintiff's allegation.

97.     At that time, and at all relevant times, Thorp was aware of LADA's mission and her role as a prosecutor. At all times Plaintiff have been wondering what a victim means to LADA Officials.

98.     Plaintiff finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his act, and nothing was stopping him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she was not and he walks free with the confidence that he can rape other women with no repercussions.

22

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 290

99.   On or about Aug 30, 2019, as a direct result of injustice and unlawful discrimination after sexual assault Plaintiff felt hopeless and worthless, therefore she was transported to the hospital and put on suicidal watch for five days.

100.   On or about Sep 15, 2019 Plaintiff moved out to a new home for fear of her safety.

101.   On or about Sep 27, 2019, Plaintiff obtained a copy of the incident report prepared by Tate from Special Victims Bureau. Plaintiff was dumbfounded when reading that Tate wrote in her report "She gave consent and willingly had sexual intercourse with him because she wanted to do so."

102.   Immediately Plaintiff went to EMPD and the watch commander on duty was Buckhannon at the time. Buckhannon agreed to replay the interview type in front of Plaintiff and two victim advocates from Peace over Violence. During Plaintiff's interview with Buckhannon, by repeating Tate's pattern (telling the victim it was not a rape before any investigation), before listening to the entire interview tape, Buckhannon started applying double standard and defending Tate, and told Plaintiff it was not fair to Tate to make an allegation against her. Buckhannon also justified a falsified police report by telling Plaintiff that Tate would need just a little bit training.

103.   In the waiting room, looking at the falsified police report, Plaintiff asked her victim advocate Anne "Can you imagine how many victims didn't get the justice they deserved?"

104.   Out of the blue, Buckhannon asked Plaintiff "Were you married?" Plaintiff answered "No" with confusion. Then Buckhannon declared that he had been married for twenty years and he did not ask for consent each time he had sex with his wife. (which implies "I have been raping my wife for twenty years but she didn't file a complaint so you shouldn't have filed this complaint.") Such remarks strongly suggest an intention to treat sexual assault cases less seriously than other assaults, as well as an animus against rape victims. Buckhannon's pro-defendant attitude is capable of several interpretations: perhaps he believed that women cry rape, that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless because she was dating the attacker, that such assault was less severe and traumatic because she knew this suspect, or that state officials should not intrude upon non-stranger sexual assaults. Whatever the reason, Buckhannon's language reflects an outdated misconception concerning

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 291**

1    sexual assaults that cannot be used as a source of differential treatment. Buckhannon's statement

2    also demonstrates his discriminatory intent to devalue Plaintiff's allegation.

3        105.    After Plaintiff stepped out of Buckhannon's office she immediately realized that

4    she forgot her document on his desk. Therefore, Plaintiff returned and retrieved her document on

5    Buckhannon's desk. Despite the document belonged to Plaintiff Buckhannon told her it was

6    disrespectful to take something from his desk without asking. However, Buckhannon thinks it is

7    fine for a man to put his penis in Plaintiff's vagina without asking for consent. It demonstrates

8    how Buckhannon devalues Plaintiff's bodily integrity.

9        106.    At that time, and at all relevant times, Buckhannon was aware of his duties as a

10   EMPD member and his role as a supervisor.

11       107.    On or about Oct 4, 2019 Plaintiff filed a police misconduct complaint against Tate

12   but Plaintiff never received any acknowledge from EMPD that they have received her complaint.

13       108.    In October and November 2019 Plaintiff repeatedly requested the investigation

14   report prepared by Jara but her requests were denied by Lieutenant Michael Burse with Special

15   Victims Bureau and she was told she would need a subpoena and attorney for the said purposes.

16       109.    On or about Nov 28, 2019 Plaintiff attempted suicide by trying to overdose

17   sleeping aid. The life-long devastating harm caused by sexual assault is profound and exacerbated

18   by Defendants' deprivation of Plaintiff's fundamental rights secured to her by laws.

19       110.    The depth of trauma inflicted upon Plaintiff has a significant impact not only on

20   the victim, but on the entire community because of the scope and lasting effect of the harm, and

21   the fact that unpunished perpetrators are encouraged to repeat their crimes.

22       111.    The depth of Defendants' discriminatory treatment of sexual assault victims is all

23   the more troubling given the recent expansion of societal awareness of and sensitivity to sexual

24   assault. The discriminatory treatment, deprivation of equal protection of the laws, and invasion of

25   privacy by Defendants caused significant emotional injury to Plaintiff separate and apart from the

26   harm she suffered as a sexual assault victim.

27       112.    Upon information and belief, critical decision-making regarding the distribution of

28   resources and staffing, training of officers, detectives, and other personnel, treatment of victims

24

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 292

1   who come forward, and other policies and/or practices that led to the discriminatory denial and/or

2   hostile provision of services to Plaintiff were made by Defendants Reynoso, Villanueva, Lacey,

3   and/or among others.

4       113.   Failure of EMPD, LASD, and LADA to adhere to written policy, COEs, mission

5   statement, and training, permits and facilitates the unlawful conduct described above.

6   Accountability systems of EMPD, LASD, and LADA, do not sufficiently detect or prevent

7   unlawful conduct, EMPD, LASD, and LADA did not properly consider and resolve complaints

8   from Plaintiff. Early warning system of EMPD, LASD, and LADA does not adequately identify

9   or effectively respond to a need for intervention to prevent future violations of constitutional

10  rights of sexual assault victims.

11      114.   Plaintiff's complaints were not formally investigated. EMPD, LASD, and LADA

12  minimized the seriousness of Plaintiff's complaints by failing to investigate as a serious complaint

13  that could potentially result in discipline.

14      115.   Plaintiff's complaint was resolved at the unit level by LASD through "service

15  reviews" rather than as formal administrative investigations. By official policy, service reviews

16  may not result in formal discipline unless elevated to an administrative investigation. Only

17  official administrative investigations, which are primarily conducted by LASD's Internal Affairs

18  Bureau (IAB), may result in formal discipline.

19      116.   Practice of handling complaints of misconduct as service reviews allows deputies

20  to evade investigation and discipline, which fundamentally undermines meaningful

21  accountability. Such willful failure to conduct proper investigation has remained as unofficial

22  policy for decades.

23      117.   LASD's system for conducting service reviews perpetuates patterns of unlawful

24  community interactions and provides disincentives with regards to LASD's policies prohibiting

25  bias. This has the effect of diminishing and devaluing allegations of discrimination made by

26  civilians. When assessed within the totality of the circumstances, LASD's failure to appropriately

27  handle discrimination complaints provides evidence of an equal protection violation, adding to

28  the statistical evidence of bias.

25

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 293

118.    At its core, the current organizational structure of EMPD, LASD, and LADA is not capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault victims or to stop repeat perpetrators, particularly those who sexually assault women they know or who use drugs/alcohol to commit their sexual assaults.

119.    On Jan 7, 2020 Plaintiff received a phone call from Cagney. Despite Plaintiff never gave her consent to Suarez the purported reason for non-prosecution given by Cagney was "You had sex with him. You had contact with him." Despite most rape victims either delay reporting or never report the crime, especially the perpetrator is non-stranger, Cagney falsely told Plaintiff the case was not able to prove beyond a reasonable doubt because "You delayed reporting.", reflecting LADA Officials' dismissive attitude. The insufficient evidence although purporting to be reasonable but in fact was a disguise and pretext for intentional discriminatory under-enforcement against rape victims. Ex. 11 (Educating Juries in Sexual Assault Cases)

120.    At that time, and at all relevant times, Cagney was aware of LADA's mission and his role as a prosecutor.

121.    On or about Jan 9, 2020 Plaintiff requested LADA's Sexual Assault Policy and Procedure Manual but she was told by Gina Satriano (LADA's Director of Bureau of Branch and Area Operation Region II) that LADA had no such thing even though LADA is the largest local prosecutorial office in the nation.

122.    Not having any written policy and procedure for prosecution of a heinous crime – sexual assault, suggests that LADA disregard the known or obvious consequence and it is a conscious choice even though they claim that their top priority is the prosecution of rapists.

**FIRST CAUSE OF ACTION**

**Equal Protection (42 U.S.C. § 1983)**

**Against all Defendants**

123.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

124.    The Fourteenth Amendment prohibits the states from denying to all persons within

26

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 294

1  its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and

2  denying the equal protection of the laws includes the omission to protect.

3      125. "The purpose of the equal protection clause of the Fourteenth Amendment is to

4  secure every person within the State's jurisdiction against intentional and arbitrary discrimination,

5  whether occasioned by express terms of a statute or by its improper execution through duly

6  constituted agents." Sioux City Bridge Co. v. Dakota Cty., 260 U.S. 441, 445 (1923) (quoting

7  Sunday Lake Iron Co. v. Wakefield Twp., 247 U.S. 350, 352 (1918)). Discriminatory policing

8  occurs when police officers and departments selectively enforce the law - or fail to enforce the

9  law - based on arbitrary factors.

10      126. Equal protection rights are violated when (1) a person is a member of an

11  identifiable class; (2) that person is intentionally treated differently from others similarly situated;

12  and (3) there is no rational basis for the difference in treatment. Discriminatory intent implies

13  more than intent as volition or intent as awareness of consequences. It implies that the decision

14  maker selected or reaffirmed a particular course of action at least in part because of – not merely

15  in spite of – its adverse effects upon an identifiable group.

16      127. Plaintiff is a member of an identifiable group. As pled above, she is a rape victim

17  who has been treated differently based upon illegitimate stereotypes and archaic notions of sexual

18  assault. She further alleges that Defendants acted with discriminatory intent in discounting,

19  invalidating, and dismissing her allegation.

20      128. Telling Plaintiff it was not a rape before any investigation, falsifying incident

21  report, interrogating Plaintiff, unreasonably searching and seizing Plaintiff's private data, and

22  blaming Plaintiff, when analyzed as a whole using a contextualist approach, permit the inference

23  that Plaintiff's individual case was treated differently without a rational basis and showcase

24  Defendants' custom and practice of intentional discriminatory under-policing. Defendants

25  intentionally provide unequal protection to sexual assault victims in the form of failing to respond

26  with equal effort to sexual assault victims the same as Defendants do with victims of other

27  crimes.

28      129. There was no reason for the misconducts and ill treatments other than animus

27

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 295

1    toward victims of sexual assault. Such conducts are not at all related to any governmental purpose

2    and they are a far deviation from commonly accepted procedures. It's not a single word, not a

3    single act, but a series of conducts that demonstrate Defendants' pattern of deliberate indifference

4    and unconstitutional practice to discourage the vigorous prosecution of violent crimes against

5    sexual assault victims.

6        130.    An individual who alleges that a state actor intentionally treated her differently

7    than other similarly-situated individuals and alleges that there was no rational basis for the

8    difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim.

9        131.    Plaintiff has been deprived of her rights of equal protection under the law – and as

10   of the date of this filing, continues to be deprived of these rights – on account of sexual assault, in

11   violation of the Fourteenth Amendment to the United States Constitution, in that she has been

12   afforded less favorable terms and conditions than victims of other assaults/crimes, and continues

13   to be afforded less favorable terms and conditions. As a consequence, Plaintiff, as a victim of

14   sexual assault, obtained less protective resources of the state compared with victims of other

15   assaults/crimes. The devaluation of sexual assaults burdens a particular set of victims. The laws

16   against violence were not and will not be uniformly enforced. Because the vast majority of

17   victims of sexual assault are women, discriminatory practice has an unjustified disparate impact

18   on women.

19       132.    The acts of Defendants were unnecessary, objectively unreasonable and malicious.

20       133.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's

21   Fourteenth Amendment rights, Plaintiff has suffered, is suffering, and will continue to suffer

22   injuries, including but not limited to continued trauma, humiliation, emotional distress, anxiety,

23   depression, stigma, and embarrassment.

24

25                          **SECOND CAUSE OF ACTION**

26                **Unreasonable Search and Seizure (42 U.S.C. § 1983)**

27              **Against the County, LASD Officers, LADA Officials, and Does 1-50**

28       134.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

                                            28

DEFTS. MSJ C 296

the paragraphs above.

135.  The Fourth Amendment protection from unreasonable search and seizure has been extended to protect individuals with a "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347 (1967).

136.  The modern reality of smartphones is people carry their entire lives on their cell phones. The smartphone has everything as if it was a mobile home. All information on cell phone is private.

137.  Plaintiff showed Jara nothing else but her particular conversations with Suarez. Plaintiff's actual consent should be limited to her conversations with Suarez. She had reasonable expectation of privacy for everything on her cell phone except for her conversations with Suarez. Plaintiff handed over her cell phone solely for Jara to download her conversations with Suarez and Jara was aware of that. Jara didn't inform Plaintiff that she would do something else on Plaintiff's cell phone.

138.  When officers receive consent to search for narcotics and then also search for and seize currency and exchange receipts, insurance policies, loan receipts, and certificates of title to real estate, the officers have misused the limited consent as a license to conduct a general exploratory search. Such unlawful action by government officers or agents raises the issue of the overall voluntariness of the actual consent. United States v. Dichiarinte, 445 F.2d 126 (7th Cir. 1971). A consent search is reasonable only if kept within the bounds of the actual consent. Honig v. United States, 208 F.2d 916, 919 (8th Cir. 1953).

139.  A person giving consent to a search of her cell phone for the sole and express purpose of downloading particular conversations restricts the officers' search to only those conversations. There was no indication that Jara desired to look for anything else other than Plaintiff's conversations with Suarez.

140.  The 9th Circuit Court of Appeals stated "We think it is clearly improper for a government agent to gain access to records which would otherwise be unavailable to him by invoking the private individual's trust in his government, only to betray that trust." If Plaintiff had known her entire life would be searched she wouldn't have handed over her cell phone. She

29

1  handed over her cell phone based on her trust in her government but later she found out she was

2  betrayed and her cell phone was strip searched even though her private data was irrelevant to the

3  crime in question.

4      141.    By unlawfully abusing Plaintiff's actual consent, and/or by failing to intercede to

5  prevent such unlawful conduct, Defendants violated Plaintiff's Fourth Amendment right to be

6  secure in her person against unreasonable searches and seizures.

7      142.    As a proximate and foreseeable result of Defendants' unconstitutional acts or

8  omissions, Plaintiff's private information was subjected to analysis by LASD personnel without a

9  warrant, valid consent, or exigent circumstances, in violation of her Fourth Amendment rights.

10     143.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's

11 Fourth Amendment rights, although Plaintiff's private data is irrelevant to the crime in question,

12 it has been, and continue to be, in the possession of government agencies including but not

13 necessarily limited to LASD and LADA, resulting in a continuing violation of her Fourth

14 Amendment rights.

15     144.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's

16 Fourth Amendment rights, Plaintiff has suffered, is suffering, and will continue to suffer injuries,

17 including but not limited to continued invasion of privacy, humiliation, emotional distress,

18 anxiety, depression, stigma, and embarrassment.

19     145.    The acts of Defendants were unnecessary, objectively unreasonable and malicious.

20

21                          **THIRD CAUSE OF ACTION**

22                     **Civil Conspiracy (42 U.S.C. § 1985)**

23                          **Against all Defendants**

24     146.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

25 the paragraphs above.

26     147.    Starting on June 7, 2019 Defendants, in whole or part, conspired among

27 themselves and with others for the purpose of depriving, directly or indirectly, Plaintiff of equal

28 protection under the law with the intent to deny her right to be treated fairly and equally.

30

**DEFTS. MSJ C 298**

1    148.    Defendants engaged in a conspiracy among themselves and with others based on

2    discriminatory animus for the purpose of depriving, directly or indirectly, Plaintiff's right to equal

3    protection under the law in violation of 42 U.S.C. § 1985, with the object of that conspiracy being

4    to conceal the fact that the complaints of crime made by sexual assault victims, including

5    Plaintiff, are less important to EMPD, LASD, and LADA than complaints made by victims of

6    other assaults/crimes.

7    149.    Defendants conspired among themselves and with others to deprive Plaintiff of

8    equal protection of the laws as alleged in this Complaint based on animosity toward Plaintiff as a

9    person of sexual assault victim.

10    150.    Furthermore, EMPD Officers conspired among themselves and with others in

11    order to minimize, specifically, Tate's police misconduct occurring on June 7, 2019, which

12    reflects her hostility towards Plaintiff, and the fact that she breached her most basic police duties

13    when she fabricated material facts, and wantonly left Plaintiff's vulnerable to even greater danger

14    and harm.

15    151.    LASD Officers conspired among themselves and with others in order to coerce

16    Plaintiff to recant her allegation, specifically, Jara's police misconduct occurring on July 2, 2019,

17    which reflected her hostility towards Plaintiff, and the fact that she breached her most basic duties

18    when she acted on stereotypes about how a victim of sexual assault should behave, and wantonly

19    left Plaintiff's vulnerable to even greater danger and harm.

20    152.    Failing to supervise and discipline, defending Tate's wrong doings, tolerating

21    Jara's bad acts, when analyzed as a whole using a contextualist approach, permit the inference

22    that Defendants have a meeting of the minds to violate Plaintiff's constitutional rights.

23    153.    Between August 2019 and January 2020 LADA Officials made multiple untrue

24    statements that were far departure from professional standards, jury instruction, and prosecution

25    guidelines by employing their discriminatory policy towards rape victims, in order to prevent

26    Plaintiff from exercising her constitutional rights.

27    154.    Defendants, in part or whole, directly or indirectly, have used their control and

28    influence to reduce the number of perpetrators held accountable for rapes.

31

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 299

155.     As a result of said conspiracy Plaintiff has suffered, is suffering, and will continue to suffer injuries, including but not limited to continued trauma, humiliation, emotional distress, anxiety, depression, stigma, and embarrassment.

156.     The acts of Defendants were unnecessary, objectively unreasonable and malicious.

## FOURTH CAUSE OF ACTION

**Municipal Liability for Unconstitutional Policies, Customs, and Practices (42 U.S.C. § 1983)**
**Against all Defendants**

157.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

158.     On and for some time prior to June 7, 2019 (and continuing to the present date) Defendants deprived Plaintiff of the rights secured to her by the Fourth and Fourteenth Amendments to the United States Constitution, in that said Defendants and their supervising and managerial employees, agents, and representatives, acting with gross negligence and with reckless and deliberate indifference to the rights of the public in general, and of Plaintiff, and of persons in her class, situation and comparable position in particular, knowingly maintained, enforced and applied officially recognized policies, practices or customs of:

(a) Employing and retaining law enforcement personnel, including MARTHA TATE, MICHAEL BUCKHANNON, LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN THORP, JUNE CHUNG, and DOES 1-50, who had dangerous propensities for discriminating against rape victims and conducting illegal searches and seizures by failing to follow written EMPD P&Ps, LASD COEs, LADA's mission, and/or well established laws;

(b) Inadequately supervising, training, controlling, assigning, and disciplining officers, detectives, and other personnel, who the City and County knew or in the exercise of reasonable care should have known had the aforementioned propensities and character traits;

(c) Failing or refusing to competently and impartially investigate allegations of

32

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 300**

1  misconducts, failing or refusing to enforce established administrative procedures, to

2  ensure victims and community safety, despite Defendants' knowledge of abuse and

3  misconduct;

4  (d) Having and maintaining an unconstitutional custom of discriminatory under-policing,

5  selective under-enforcement, favoritism toward rapists, and/or hostile provision of

6  services to Plaintiff, which also is demonstrated by inadequate training regarding these

7  subjects, and Defendants have no valid justification for such policies, customs, and

8  practice. The practices of Defendants, were done with a deliberate indifference to

9  individuals' safety and rights; and

10  (e) Fostering and encouraging an atmosphere of lawlessness, abuse and unconstitutional

11  misconduct, as to encourage their personnel to believe that discriminatory under-policing,

12  selective under-enforcement, and illegal searches and seizures would be tolerated, and to

13  believe that unlawful acts would be overlooked without discipline or other official

14  ramifications.

15  159.  Defendants have demonstrated their deliberate indifference to widespread law

16  enforcement abuses by failing and refusing to impartially investigate personnel complaints,

17  failing to discipline or prosecute personnel who commit acts of dishonesty and misconduct.

18  160.  By reason of the aforementioned custom and practices of Defendants, Plaintiff was

19  severely injured and subjected to lifetime pain and suffering.

20  161.  Defendants, together with various other personnel, whether named or unnamed,

21  had either actual or constructive knowledge of the deficient policies, practices and customs

22  alleged in the paragraphs above. Despite having knowledge as stated above these Defendants

23  condoned, tolerated and through actions and inactions thereby ratified such policies. Said

24  Defendants also acted with deliberate indifference to the foreseeable effects and consequences of

25  these practice with respect to the constitutional rights of Plaintiff, and other individuals similarly

26  situated.

27  162.  By perpetrating, tolerating and ratifying the outrageous conduct and other

28  wrongful acts, Defendants acted with an intentional, reckless, and callous disregard for Plaintiff's

33

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 301

1  constitutional rights. Defendants, each of their actions were willful, wanton, oppressive,

2  malicious, fraudulent, and extremely offensive and unconscionable to any person of normal

3  sensibilities.

4  163. Furthermore, the practice implemented and maintained and still tolerated by

5  Defendants, were affirmatively linked to and were a significantly influential force behind the

6  injuries of Plaintiff. Such unconstitutional custom is and will be a threat to justice and community

7  safety.

9  **FIFTH CAUSE OF ACTION**

10  **Municipal Liability – Failure to Train and/or Supervise (42 U.S.C. § 1983)**

11  **Against all Defendants**

12  164. Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

13  the paragraphs above.

14  165. On information and belief, the overwhelming majority of law enforcement

15  personnel who handle sexual assaults remain woefully untrained, and fundamentally biased

16  against sexual assault victims, making assumptions about why and when sexual assault victims

17  behave in certain ways and excusing perpetrator conduct as acceptable and/or "normal" behavior.

18  166. While acting under the color of state law and within the course and scope of their

19  employment, MARTHA TATE, MICHAEL BUCKHANNON, LILIANA JARA, RICHARD

20  RUIZ, PETER CAGNEY, KAREN THORP, JUNE CHUNG, and DOES 1-50's unconstitutional

21  practice, deprived Plaintiff's rights secured to her by the Fourth and Fourteenth Amendments,

22  including her right to be free from discrimination and unreasonable search and seizure.

23  167. The training **policies** of EMPD, LASD, and LADA were not adequate to train their

24  personnel, including but not limited to, MARTHA TATE, MICHAEL BUCKHANNON,

25  LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN THORP, JUNE CHUNG, and

26  DOES 1-50, with regards to understanding crime elements, employing investigative tools,

27  conducting reasonable searches and seizures, prosecuting sexual assaults, selecting unbiased jury,

28  and treating victims equally and fairly. As a direct result, EMPD, LASD and LADA personnel,

34

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 302

1  including MARTHA TATE, MICHAEL BUCKHANNON, LILIANA JARA, RICHARD RUIZ,

2  PETER CAGNEY, KAREN THORP, JUNE CHUNG, and DOES 1-50, are not able to handle the

3  usual and recurring situations with which they must deal, including treating every crime victim

4  fairly and respectfully. These inadequate training policies existed prior to the date of this incident

5  and continue to this day.

6      168.    Defendants were deliberately indifferent to the known or obvious consequences of

7  their failure to train and/or supervise their personnel, including MARTHA TATE, MICHAEL

8  BUCKHANNON, LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN THORP,

9  JUNE CHUNG, and DOES 1-50, adequately with regards to understanding crime elements,

10  employing investigative tools, conducting reasonable searches and seizures, prosecuting sexual

11  assaults, selecting unbiased jury, and treating victims equally and fairly. This inadequate training

12  includes failing to teach personnel to properly handle sexual assault investigation and

13  prosecution.

14      169.    Defendants were aware that failure to implement some sort of training and/or

15  supervision with regards to their discriminatory and unlawful practice would result in continuing

16  to have numerous unreasonable officers involved violation of sexual assault victims'

17  constitutional rights annually.

18      170.    The failure of Defendants to provide adequate training and/or supervision with

19  regards to understanding crime elements, employing investigative tools, conducting reasonable

20  searches and seizures, prosecuting sexual assaults, selecting unbiased jury, and treating victims

21  equally and fairly, caused the deprivation of the Plaintiff's rights by MARTHA TATE,

22  MICHAEL BUCKHANNON, LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN

23  THORP, JUNE CHUNG, and DOES 1-50. In other words, Defendants' failure to train and/or

24  supervise is so closely related to the deprivation of the Plaintiff's rights as to be the moving force

25  that caused the ultimate injury.

26      171.    By failing to achieve adequate training and/or supervision, MARTHA TATE,

27  MICHAEL BUCKHANNON, LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN

28  THORP, JUNE CHUNG, and DOES 1-50, acted with an intentional, reckless, and callous

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 303

1  disregard for Plaintiff's constitutional rights. MARTHA TATE, MICHAEL BUCKHANNON,

2  LILIANA JARA, RICHARD RUIZ, PETER CAGNEY, KAREN THORP, JUNE CHUNG, and

3  DOES 1-50, each of their actions was willful, wanton, oppressive, malicious, fraudulent, and

4  extremely offensive and unconscionable to any person of normal sensibilities.

6  **SIXTH CAUSE OF ACTION**

7  **Violation of Safe Streets Act – 42 U.S.C. § 3789d**

8  **Against all Defendants**

9      172.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

10  the paragraphs above.

11      173.   Defendants' handling of sexual assault cases has an unnecessary disparate impact

12  on sexual assault victims, it violates the Safe Streets Act and its implementing regulations, even

13  where the discrimination is not intentional, not to mention Defendants' conducts were intentional.

15  **SEVENTH CAUSE OF ACTION**

16  **Violation of Cal. Const. Art. I, § 7 – Equal Protection**

17  **Against all Defendants**

18      174.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

19  the paragraphs above.

20      175.   Laxity in enforcement is not sufficient to amount to a denial of equal protection.

21      176.   Defendants violated Plaintiff's civil rights by having a widespread practice and/or

22  custom of discriminatory under-policing and selective under-enforcement, when enforced, caused

23  a constitutional deprivation to Plaintiff, although not authorized by written law or express

24  municipal policy, was so permanent and well settled as to constitute a custom or usage with the

25  force of law.

26      177.   Defendants' custom was intentional and, when enforced, had a discriminatory

27  impact on sexual assault victims. Plaintiff's case was not isolated incident. Plaintiff received

28  disparate treatment relative to victims of other violent crimes. Defendants set out to make

36

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 304**

1  reporting and pursuing investigation of rapes as unpleasant and difficult as possible.

2  178.    The constitutional injury inflicted by Defendants was caused by the persons with

3  final policymaking authority at the City, the County, EMPD, LASD, and LADA.

4  179.    Defendants knew about the above-described conducts and facilitated them,

5  approved them, condoned them, and/or turned a blind eye to the conducts and systematic failure.

6  180.    The above-described conducts of Defendants constitute a violation of Article 1, § 7

7  of the California Constitution.

8

9  ## EIGHTH CAUSE OF ACTION

10  **Violation of Cal. Const. Art. I, § 13 – Unreasonable Search and Seizure**

11  **Against the County, LASD Officers, LADA Officials, and Does 1-50**

12  181.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

13  the paragraphs above.

14  182.    By a complete search of Plaintiff's smartphone and unlawfully analyzing

15  Plaintiff's smartphone without a warrant, valid consent, or exigent circumstances, and/or by

16  failing to intercede to prevent such unlawful search, Defendants violated Plaintiff's right under

17  Art. I, § 13 to be secure in her person against unreasonable searches and seizures.

18  183.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's

19  rights under Art. I, § 13, Plaintiff's private electronic data has been, and continue to be, in the

20  possession of Defendants, resulting in an ongoing violation of those rights.

21

22  ## NINTH CAUSE OF ACTION

23  **Violation of Cal. Const. Art. I, § 1 – Right of Privacy**

24  **Against the County, LASD Officers, LADA Officials, Does 1-50**

25  184.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

26  the paragraphs above.

27  185.    As a California resident, Plaintiff has a legally protected privacy interest in her

28  electronic information, which is recognized as an inalienable right under the California

37

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 305

1    Constitution, Article I, § 1.

2         186.    Plaintiff has a reasonable expectation of privacy in her electronic information, as

3    contained in her smartphone. Plaintiff has a reasonable expectation of privacy not to have her

4    electronic data searched and seized unreasonably.

5         187.    By unlawfully obtaining Plaintiff's private data without a warrant, valid consent,

6    or exigent circumstances, while she was victim of sexual assault, Defendants committed a serious

7    invasion of her privacy interests.

8         188.    As a proximate and foreseeable result of Defendants' violations of Plaintiff's

9    privacy rights under Art. I, § 1, Plaintiff's private data has been, and continues to be, in the

10   possession of government agencies including but not limited to LASD and LADA.

11        189.    None of the foregoing serious invasions of privacy was justified.

12

13                               **TENTH CAUSE OF ACTION**

14           **Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights**

15                                **Against all Defendants**

16        190.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

17   the paragraphs above.

18        191.    California's Constitution protects the rights of crime victims. Defendants have

19   violated the rights of Plaintiff to be treated with fairness, respect, and dignity, by among other

20   things:

21                a.   Subjecting Plaintiff to re-traumatization, demeaning and humiliating

22                     interrogation tactics, including inappropriately questioning her reactions

23                     without presence of victim advocate;

24                b.   Routinely and inappropriately impugning the credibility of sexual assault

25                     victims, including Plaintiff;

26                c.   Conducting illegal searches and seizures, with no reasonable cause;

27                d.   Telling Plaintiff that the crime perpetrated against her was not actually

28                     criminal;

                                            38
                    COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 306**

1        e.   Treating Plaintiff like suspect, rather than victim;

2        f.   Willfully failing to inform Plaintiff of her rights as a crime victim; and

3        g.   Maliciously using coercion and purported reasons to deter Plaintiff from

4            exercising her constitutional rights.

5    192.   Defendants' conducts violated Plaintiff's rights that set forth in California

6 Constitution she was entitled (a) to be treated with fairness and respect for her privacy and

7 dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal justice

8 process. (b) to be informed of the rights enumerated in California Constitution Art. I, § 28 (b).

10 <p align="center">**ELEVENTH CAUSE OF ACTION**</p>

11 <p align="center">**Intentional Infliction of Emotional Distress**</p>

12 <p align="center">**Against all Defendants**</p>

13    193.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

14 the paragraphs above.

15    194.   Except for homicide, rape is the most serious violation of a person's body because

16 it deprives the victim of both physical and emotional privacy and autonomy. As a rape victim,

17 Plaintiff was particularly susceptible to emotional distress at that time but Defendants willfully

18 engaged in acts and omissions alleged herein with a discriminatory intent or a reckless disregard

19 for the probability of aggravating the emotional distress that Plaintiff was already suffering. Such

20 ill treatment is not what Plaintiff came forward for. Law enforcement personnel's response to

21 sexual assault has made Plaintiff feel like being murdered would be better than being raped.

22    195.   After Plaintiff gathered her courage to step forward and identify her assailant she

23 has been re-traumatized again and again at the hands of law enforcement personnel.

24    196.   As a direct and proximate result of the Defendants' outrageous and unlawful

25 conducts as described herein, Plaintiff has suffered and/or continue to suffer loss of trust, comfort,

26 protection, and support, humiliation, mental anguish, nervous shock, severe emotional distress,

27 and other special and general damages in amounts according to proof.

28    197.   Punitive damages should be assessed against Defendants for the purpose of

<p align="center">39</p>
<p align="center">COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF</p>

<p align="right">**DEFTS. MSJ C 307**</p>

1   punishment and for the sake of example.

2

3   **TWELFTH CAUSE OF ACTION**

4   **Violation of Bane Act (Cal. Civil Code § 52.1)**

5   **Against all Defendants**

6       198.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

7   the paragraphs above.

8       199.    California Civil Code, Section 52.1 (the Bane Act), prohibits any person from

9   interfering by threats, intimidation, or coercion with another person's exercise or enjoyment of

10  his/her constitutional rights secured by the Constitution or laws of the United States, or of the

11  rights secured by the Constitution or laws of this state.

12      200.    Defendants, while working as law enforcement personnel for EMPD, LASD, and

13  LADA, and acting within the course and scope of their duties, interfered with or attempted to

14  interfere with the rights of Plaintiff to be free from unreasonable searches and seizures, to equal

15  protection of the laws, and to be free from state actions that shock the conscience, by threatening

16  or committing acts involving violence, threats, coercion, or intimidation.

17

18  **THIRTEENTH CAUSE OF ACTION**

19  **Conversion/Claim and Delivery**

20  **Against LASD Officers, LADA Officials, and DOES 1 - 50**

21

22      201.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

23  the paragraphs above.

24      202.    Plaintiff owns and/or has the right to possess the electronic data unlawfully taken

25  from her smartphone, as well as any information derived from said phone.

26      203.    By abusing Plaintiff's actual and valid consent, Defendants unlawfully obtained

27  electronic data from Plaintiff's smartphone, and Defendants are unlawfully retaining said data and

28  any information derived from the unlawful analysis of her smartphone.

40

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

1    204.    Plaintiff has the right to immediate possession of the electronic data unlawfully

2    taken from her, as well as any information derived from the unlawful analysis of her smartphone.

3

4    <div align="center">**DECLARATORY RELIEF SOUGHT**</div>

5    205.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

6    the paragraphs above.

7    206.    Plaintiff respectfully prays for a declaratory judgment that Defendants, and each of

8    them, have engaged in a pattern or practice of conduct that violated Plaintiff's rights under the

9    Fourth and Fourteenth Amendment to the United States Constitution, Art. I, §§ 1, 7, 13, 28(b) of

10    the California Constitution, Cal. Civil Code § 52.1, and/or California common law.

11

12    <div align="center">**INJUNCTIVE RELIEF SOUGHT**</div>

13    207.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

14    the paragraphs above.

15    208.    Plaintiff prays for a permanent injunction compelling Lacey and/or LADA to file

16    criminal charges against Suarez.

17    209.    Plaintiff prays for a permanent injunction disbarring PETER CAGNEY, KAREN

18    THORP, and JUNE CHUNG.

19    210.    Defendants' unlawful searches and seizures have resulted and will result in

20    irreparable injury to Plaintiff. There is no plain, speedy, adequate or complete remedy at law to

21    address the wrongs described herein.

22    211.    Plaintiff seeks injunctive relief to prevent continued harm and to protect herself

23    from Defendants' unlawful seizures.

24    212.    Wherefore, Plaintiff requests a permanent injunction enjoining Defendants, and

25    each of them, and their employees, agents, and persons acting with Defendants, from reading,

26    exploring, storing, retaining, using, copying, transferring, distributing, disclosing, or releasing

27    Plaintiff's electronic data (including but not limited to photos, videos, app data, messages, emails,

28    google search content etc.) that Defendants illegally obtained from her smartphone other than her

<div align="center">41</div>

<div align="center">COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF</div>

message conversations with Carlos Suarez (aka Charlie Suarez).

213.    Plaintiff requests a permanent injunction compelling Defendants, and each of them, and their employees, agents, and persons acting with Defendants, to destroy and expunge all data they illegally obtained and kept from Plaintiff's smartphone except for her message conversations with Suarez.

214.    Plaintiff also prays that the Court issue a permanent injunction against Defendants ordering them to:

        a.   Properly train and supervise government employees handling sexual assault cases or evidence;

        b.   Stop abusing crime victims' actual consent and conducting illegal searches and seizures;

        c.   Establish written policy and procedure manual for investigation and prosecution of sexual assaults;

        d.   Require and enforce trauma-informed approaches to investigation and prosecution of sexual assault cases;

        e.   Treat sexual assault cases with the same urgency and importance afforded to other types of crimes;

        f.   Provide adequate resources for investigation and processing of sexual assault cases;

        g.   Treat victims of sexual assault with the same respect and attention to their cases as victims of other crimes; and

        h.   Accurately and publicly report data reflecting the number of sexual assaults reported, investigated, prosecuted, and processed to conclusion within the criminal justice system on a bi-annual basis.

## PRAYER

WHEREFORE, Plaintiff prays judgment against Defendants and each of them, as follows:

AS TO EACH CAUSE OF ACTION AS APPLICABLE

42

DEFTS. MSJ C 310

1. For general damages according to proof;

2. For special damages according to proof;

3. For exemplary damages as provided by law, in an amount to be proved against each individual Defendant;

4. For interest;

5. For civil penalties pursuant to Civil Code § 52;

6. For attorney's fees pursuant to 42 U.S.C. § 1988 and Civil Code §§ 52 and 52.1;

7. For reasonable costs of this suit;

8. For treble damages under Civil Code § 52.1;

9. For such other and further relief as the Court may deem just, proper, and appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: Jan 27, 2020

 

Jane Doe

Plaintiff in Pro Se

43

DEFTS. MSJ C 311

1

**EXHIBITS TO COMPLAINT**

2

3

**TABLE OF CONTENTS**

4

| Exhibit # | Document | Pages |
|---|---|---|
| 1 | \<Prosecuting Alcohol-Facilitated Sexual Assault> by National District Attorneys Association | 46 - 49 |
| 2 | \<Cold Case Alcohol- and Drug-Facilitated Sexual Assault> by National Sexual Assault Kit Initiative (SAKI) | 51 - 52 |
| 3 | \<Understanding the non-stranger rapist> by NDAA | 54 - 56 |
| 4 | Plaintiff's email to HD Peter Cagney | 58 - 59 |
| 5 | \<Model Response to Sexual Violence for Prosecutors> by AEquitas | 61 |
| 6 | EMPD Policies and Procedures | 63 - 70 |
| 7 | LASD Code of Ethics | 72 |
| 8 | Jury instruction for criminal sex offense | 74 - 79 |
| 9 | Plaintiff's email to EMPD | 81 - 82 |
| 10 | Incident report prepared by Officer Martha Tate | 84 - 85 |
| 11 | \<Educating Juries in Sexual Assault Cases> by AEquitas | 87 - 89 |
| 12 | No action from City of El Monte after 45 days | 91 - 92 |
| 13 | Gov claim rejection letter from County of Los Angeles | 94 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44

COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 312**

EXHIBIT 1

DEFTS. MSJ C 313

## THREE-STEP PROCESS

### Analyzing Consent and Distinguishing Rape from Drunken Sex: Defendant's Predatory Behavior

Prosecutors will face perhaps their greatest challenge in AFSA cases where the defendant was drunk as well. Alcohol consumption by perpetrators and victims tends to co-occur.⁴⁸ The reality is that approximately fifty percent of all sexual assaults are committed by a man who has been drinking.⁴⁹ "Although alcohol consumption and sexual assault frequently co-occur, this phenomenon does not prove that alcohol use causes sexual assault."⁵⁰ Nevertheless, many defendants will attempt to use alcohol as an excuse for rape.⁵¹ The public has a tendency to view rape of a voluntarily intoxicated victim as more of an opportunistic crime than a predatory crime. When a jury hears that the defendant was drinking, it is easy for jurors to assume that it was drunken sex as opposed to sexual assault unless prosecutors disenchant them of the idea. Jurors may think: "There but for the grace of God, go I (or my son or my friend)." It is the prosecutor's job to keep the focus on the defendant and his behavior.

Most states do not recognize voluntary intoxication as a defense; however, some do.⁵² Even in states that do not recognize intoxication as a defense, it may be a barrier to prosecution. Prosecutors can overcome the hurdle of the intoxication defense by looking for the defendant's predatory behavior. The prosecutor must look carefully at all the facts of the case to determine whether the defendant is a predator or just a drunk guy who did not intentionally rape anyone. Often, a successful predator will mask his actions in such a way that they appear opportunistic as opposed to predatory. The more predatory the defendant's behavior, the easier it is to prove that he is a rapist. Factors to consider include the following:

- **Did the defendant use force or threaten the victim?** Using force or threats of force to accomplish intercourse is not consistent with consensual sex.
- **Did the victim say "no?"** If so, why did the defendant disregard her "no?" Why was the victim's "no" not good enough for the defendant? Ignoring a sexual partner when she says "no" is not consistent with consensual sex.
- **Look at the defendant's level of intoxication.** What was his capacity to do other things? Could he walk? Talk? Play pool? Drive a car? Was his

speech slurred? The more sober he was, the easier it is to show he was a predator, especially if the victim was extremely intoxicated.

- **Was there any planning or manipulation on the part of the defendant?** Were there any attempts to deceive the victim? Did the defendant do anything to control the situation and overcome the victim's will? Did he isolate her? Did he lie to her?
- **Is there any evidence of grooming?** Did the defendant do anything during the time prior to the rape to gain the victim's trust? Did he do anything to make it easier to rape her? Is there any evidence that he set his "target" drunk? For example, did he talk about making a "special punch" to get his "target" drunk? Did he buy her drinks and encourage her to drink them in an attempt to get her drunk?
- **Did the defendant prey upon the victim's vulnerabilities?** Did he do anything to wear down the victim's resistance? Is there any evidence that the defendant selected the victim because he knew that she would be an easy target?
- **Has the defendant done it before?** Have anyone else ever accused him of rape or other misconduct? Has anyone ever seen women leaving his room/apartment/home crying or distraught?⁵³
- **Did the defendant know the victim?** If so, did he use his knowledge or familiarity with the victim to gain access to her or to isolate her? Did he use his knowledge to attempt to silence her?

Consideration of the factors listed above should help prosecutors analyze whether the defendant is a predator and distinguish between drunken sex and rape.

### Step 2: Analyzing Credibility and Corroboration

The second step in handling AFSA cases is determining whether the allegations can be proven by analyzing the victim's credibility as well as any corroboration that exists. Jurors' negative perceptions of a victim's credibility can be a significant barrier to successful prosecution. In rape cases, credibility of the victim and provability of the case are inherently intertwined, in large part because rape is a crime of secrecy. There are almost never eyewitnesses to a rape. Moreover, rape cases rarely have physical evidence that conclusively proves that a rape occurred.

PROSECUTING ALCOHOL-FACILITATED SEXUAL ASSAULT

**DEFTS. MSJ C 314**

## THREE-STEP PROCESS

The defense may attempt to challenge the witness's testimony on the grounds that the witness is not competent; however, it is unlikely that a court will find a witness incompetent on this basis as long as the witness can testify that she was able to perceive the incident. There is a distinction between attacks on competence and attacks on credibility. When a witness is intoxicated at the time of an occurrence about which the witness has testified, intoxication is a proper matter for the jury to consider as affecting the witness's credibility. "If the witness was under the influence at the time of the events which [s]he describes in his[/her] testimony or at the time [s]he testifies, this condition is provable, on cross or by extrinsic evidence, to impeach."

### Ability To Remember

The third factor that relates to a victim's credibility is the victim's ability to remember what happened. In order to be able to testify about what happened, the victim must, of course, be able to remember what happened. If she does not remember, there must be some other way to prove what happened or the case cannot go forward. Although the victim may not remember every detail of the assault, she may have other information that is crucial to the case. When interviewing the victim about her memory, explain why you are asking. Encourage the victim to speak with an advocate for additional support.

Alcohol consumption diminishes the ability of the victim to remember what happened. "As the amount of alcohol consumed increases, so does the magnitude of the memory impairments." Large quantities of alcohol, particularly if consumed rapidly, may result in the victim experiencing either a fragmentary or an *en bloc* blackout. Fragmentary blackouts occur when people may recall portions of the episode after the incident when cues for events are provided." *En bloc* blackouts have "definitive starting points, contain amnesia for all events within a discrete period, end with a sense of lost time, and require a high blood alcohol concentration." The *en bloc* blackout is not a "process of forgetting, but rather one of 'not remembering.'" "In contrast, fragmentary blackouts involve a more transient, perhaps forgetful memory loss for which aspects of experience are recalled via provision of pertinent cues. Thus, memory traces form but require facilitation to be accessed."

## PROSECUTING ALCOHOL-FACILITATED SEXUAL ASSAULT

### Existence of Corroborative Evidence

The fourth factor that relates to victim credibility is the prosecution's ability to corroborate the victim's version of events. In cases where corroborative evidence exists, it may compensate for lack of perception or memory. There is always something more to corroborate the victim if we look hard enough.

Corroboration is important because it gives the jury a context in which to evaluate the victim's testimony. The evidence might only corroborate a small piece of the victim's version of events, but each piece of corroboration builds upon the last and enhances a jury's ability to find the victim credible. This principle can be illustrated with the diagram pictured below. In the majority of rape cases, there are almost never any eyewitnesses to the rape, making the description of the moment of the tape "he said/she said." In order to decide who is credible, jurors need a context in which to evaluate the victim's credibility. Prosecutors can give jurors a context by giving them the "circles of credibility." These include, among other things, medical evidence, eye and ear witnesses, and physical evidence. In some cases, a prosecutor might be able to corroborate a victim's testimony with expert testimony that explains behavior that is counterintuitive to juror expectations. In others, corroboration might consist of the defendant's statement or confession. The evidence need not conclusively prove that a rape occurred; rather, it must give the jury a sufficient context in which to evaluate the victim's credibility.

DEFTS. MSJ C 315

All victims deserve protection; prosecutors and allied professionals should implement strategies for protecting each and every one. In doing so, however, prosecutors must be cognizant of any flaws that may exist either with the victim or the case in order to ensure the greatest chance of success at trial.

### Step 3: Trying the Case

#### Offender-Focused Prosecution

AFSA cases are difficult to win at trial. Jurors tend to view AFSA cases as crimes of opportunity rather than deliberate, intentional crimes; therefore, it is not uncommon for them to be forgiving of defendants accused of AFSA. The prosecutor can overcome this tendency by using an offender-focused approach to the trial. This focus explains to the jury why a rapist would prey upon a person like the victim. The characteristics that cause the victim to seem flawed to the jury—and thus unlikeable—are the same characteristics that made her an appealing victim to the rapist. The rapist selected her because of those very characteristics. Communicating this to the jury refocuses the jury's attention on the defendant's predatory behavior. Utilizing an offender-focused investigation and prosecution can show jurors why the defendant before them is a predator as opposed to a nice guy caught in a bad predicament through no fault of his own. Although prosecutors generally focus on the offender when trying any other criminal case, they tend to focus on the victim and any of the victim's flaws or vulnerabilities in rape cases. Rape cases must be tried in the same way that other criminal cases are tried—with a focus on the offender.

Instead of viewing a victim's vulnerabilities as weaknesses, explain why a predator would target a person with those vulnerabilities. The reality of rape cases is that the better a target a victim is for an offender, the worse the victim generally will be viewed as a witness for the prosecution. The flaws that make the victim a target for the offender also often make the victim less credible in a jury's eyes. For example, a victim who goes to a bar and drinks to the point of vomiting and unconsciousness will be an easy target for a predator. A victim who becomes voluntarily intoxicated does not do so with the expectation that she will be sexually assaulted. Voluntary intoxication does not equal consent to sexual acts. Remind the

jury that defendants generally select their victims with the intention of not getting caught. Show the jury that the crime was intentional and deliberate, even if it was opportunistic.

Using an offender-focused approach to the investigation and prosecution of sex crimes can overcome a number of common challenges in rape cases. For example, a prosecutor may be able to explain how a defendant was able to rape a victim without using a traditional weapon. Jurors generally expect that a rapist will use a weapon, or at least use some form of excessive force. However, in 2005, only seven percent of rapes involved the use of a firearm and three percent involved a knife. Nonstranger rapists generally use only the force necessary to overcome the victim's resistance. In many cases, this may equate to nothing more than lying on top of the victim and pinning her arms down. Nonstranger rapists are also far more likely to gain control of their victims through psychological or emotional force—the use of deception, manipulation, planning, premeditation, and betraying victims' trust. One of the most common tools used by non-stranger rapists is alcohol. Prosecutors should look for evidence of all of these tools. Did the defendant lie to the victim by promising her a safe ride home and then driving her to a field where he raped her? Did he trick her by asking to come inside her home to use the bathroom? Did he buy her drinks or convince her to keep drinking when she wanted to stop?

Another challenge that can be overcome with an offender-focused prosecution is delayed reporting by the victim. Rather than viewing the delayed report as vulnerability on the part of the victim, consider whether the defendant played a role in delaying the report. Did the defendant do something as part of his "exit strategy" to keep the victim quiet? Did he threaten her, either with force or blackmail (by threatening to get her into trouble for any bad decisions she made that he took advantage of)? Did he make her question her own judgment by telling her she had led him on, thereby causing him to rape her? If so, explain the delayed report in terms of the defendant's exit strategy and how it was almost successful in keeping the victim quiet. In these kinds of situations, the prosecutor could argue, "He tried to shame her into silence."

The prosecutor can focus on other themes as well when prosecuting an

DEFTS. MSJ C 316

## THREE-STEP PROCESS

offender-focused AFSA case. Sample themes include: "Who needs force when you have alcohol?" or "The defendant committed the perfect crime."[47] The prosecutor can also argue, "A predator picks his prey," however, use caution when labeling a perpetrator of AFSA a "predator" at trial. Although a person who rapes an incapacitated victim is a predator, the jury may view the prosecution as overzealous if jurors are not convinced that the defendant is a predator. Instead, show that the defendant acted intentionally, deliberately, thoughtfully, and freely, and that he was in charge.

### Pretrial Motions

Prosecutors should utilize pretrial motions to protect the victim's physical safety and privacy. The following are some pretrial motions the prosecutor should consider filing.

■ **Bond.** File a motion to revoke bond if the defendant contacts the victim (or her friends or family members).

■ **Courtroom.** File a motion to clear the courtroom of individuals who might threaten or attempt to intimidate the victim. Request extra deputies for the courtroom or arrange for a deputy or police officer to escort her between her car and the courthouse. You may not always succeed, but the victim will see that you are fighting to protect her.

■ **Rape shield.** Oppose defense attempts to pierce the rape shield law.[48] If the defendant has not filed a rape shield motion, the prosecutor should consider filing a motion preemptively to preclude the defense from piercing the rape shield law by introducing instances of the victim's past sexual behavior."

■ **Motion in limine to exclude irrelevant facts.** A prosecutor might also be able to file a pretrial motion to exclude references to irrelevant bad behavior, such as prior convictions or drug and alcohol use on other occasions. If the victim is an alcoholic, is it relevant to this case? "Standing alone, the mere fact of chronic alcoholism is ordinarily not provable on credibility."[49]

■ **Illegal defenses.** In states where voluntary intoxication is not a defense, the prosecutor should file a motion to preclude its use as a defense and include a brief summary of supporting statutes or case law. Although many judges are familiar with the law precluding the use of intoxication as a defense in the states in which it is not a defense, it cannot

---

## PROSECUTING ALCOHOL-FACILITATED SEXUAL ASSAULT

hurt to ensure that the judge has this law at his or her fingertips.

■ **Other bad acts (404(b)).** When possible, the prosecutor may file a motion to introduce evidence of the defendant's other bad acts.[50] All too often, in nonstranger rape cases, the investigation looks only at the current case and does not look for prior rapes. When possible, the prosecutor should ask police officers to interview the defendant's friends, prior girlfriends, and others who might know about prior acts. Although these people may have a reason to lie, they may also be willing to assist. If the defendant has any prior rapes, review those cases, even if they were dismissed. Further investigation might be warranted. Do not only look for completed rapes; also look for evidence that can be used to demonstrate the defendant's pattern of behavior toward women. Prior bad acts stopping short of actual rape may support the argument that he deceived the victim, manipulated her, or planned and premeditated the rape.

### Working with the Victim

Prosecutors can do at least three things to assist the victim in testifying in a competent and credible manner: (1) support; (2) protect; and (3) prepare the victim.

■ **Support the Victim.** Support can be provided in a number of ways. For example, a multidisciplinary Sexual Assault Response Team (SART)[51] can support and comfort the victim, especially when the team includes victim advocates who can work with prosecutors to ensure that the victim is comfortable on the witness stand. A SART can empower the victim and give her the support she needs to make it through the investigation and trial process. Other ways to support the victim include creating a Sexual Assault Nurse Examiner (SANE)[52] program, working with victim advocates, and providing a safe and comfortable place for the victim to wait to testify. A victim who feels supported is more likely to feel comfortable on the witness stand, which will make her a better witness.

■ **Protect the Victim.** A prosecutor should protect the victim to the best of his or her ability. A victim who feels protected through the process is less likely to become defensive or angry on the witness stand. When a victim becomes angry or defensive, jurors are likely to believe that the victim has something to hide, rather than recognizing these reactions as nor-

**DEFTS. MSJ C 317**

EXHIBIT 2

DEFTS. MSJ C 318

forcible assault where the evidence and the law support such prosecution.[14]

An unconscious victim cannot factually or legally consent to a sexual act. Alcohol-induced unconsciousness is sometimes referred to as "passing out" or a blackout.[15] In such cases, the prosecution must prove that a sexual act occurred while the victim was unconscious (i.e., asleep or passed out).[16] In some jurisdictions, a victim who drifts in and out of unconsciousness is considered to be unconscious for purposes of the statute.[17]

In some jurisdictions, the prosecution may need to prove that the defendant knew (or should have known) that the victim was too intoxicated to consent.[18] Many victims in such cases have difficulty recalling events or have incomplete memories.[19] A blackout (e.g., loss of memory due to intoxication or drugs) differs from unconsciousness.[20] Generally speaking, a person experiencing a blackout, although conscious, may display visible signs of gross intoxication and will be drowsy or sleepy. These visible signs can be used as evidence to show not only that the victim was too intoxicated to consent, but that the offender knew that to be the case. When taking a fresh look at these cases, it is also important to note recent (2016) research conducted by Heather Flowe, et al. This research found that many victims retain their memory of the core details of the assault but will have trouble remembering the peripheral details.[21] Investigators may be able to locate persons who saw the victim or offender immediately before or after the assault. Although corroborating witnesses are undoubtedly helpful, such corroboration generally is not essential to prosecuting and proving the case.[22]

## Offender Behavior

Perpetrators who know their victims rarely need to use traditional weapons to commit sexual assault. Instead, these perpetrators weaponize tactics such as careful planning, manipulation, deceit, and betrayal of the victim's trust. Most notably, many employ alcohol to commit sexual assault.[23] Alcohol is often the weapon of choice because it is easily accessible, culturally normative, and highly potent.[24]

Whether or not sexual assault victims voluntarily consumed alcohol, perpetrators often try to shift the focus of an investigation or a trial off of their behavior and redirect attention to the victim's behavior. The victim's use of alcohol will be portrayed as the height of personal irresponsibility, which enables the offender to suggest that the victim invited or deserved whatever happened while being intoxicated. The prosecution must consider whether the offender coerced the victim to consume alcohol. What appears "voluntary" may be a result of the suspect's repeated urging or even a threat to leave the victim.

On the other hand, perpetrators who consumed alcohol themselves will seek to use the slightest impairment on their part as a means to avoid responsibility. Instead, they will portray themselves as unsophisticated, hapless (but basically decent) people who made—at worst—a poor (but understandable and excusable) judgment call while under the influence.[25] Focusing on offender conduct is consequently important; evidence of signed bar tabs, interaction with others, or playing games (e.g., pool, darts) may offer proof of minimal impairment. Contacting the offender's former associates or colleagues as part of a cold case investigation can also yield significant information about the offender's level of sobriety.

At trial, the defense team may challenge the victim's credibility by questioning his/her reactions to the assault. Such reactions (including emotional difficulties, substance abuse, and memory problems) are the direct result of the assault and are properly attributable to the actions of the offender, who also stands to benefit directly from them.[26] The prosecution should convey to jurors the offender's responsibility for reactions and behavior attributable to the assault; this approach helps jurors understand why the offender assaulted someone who was intoxicated, and/or how and why the offender sought to cause these behaviors.

When an alcohol-facilitated sexual assault becomes a cold case, an offender may feel untouchable, having escaped responsibility for months or years. Investigators should anticipate that the opening or reopening of the case will revive the perpetrator's attempts to paint the victim as blameworthy and therefore less credible. Those efforts may include fabricating or embellishing details that other evidence can disprove.

During a cold case investigation, witnesses may recall additional details not previously disclosed; this newfound information can refute defense assertions and/or corroborate the prosecution's theory of the case. The current investigation should include a search for other (possibly similar) crimes the perpetrator may have committed that may provide a source of 404(b) evidence to reveal predatory planning.[27] Interviewing people in the offender's social circle may uncover reports of the offender boasting to others about the assault under investigation or similar crimes committed while a victim was intoxicated. In certain cases, a pretext phone call may also be an appropriate investigatory tool.[28]

## Victim Responses

Sexual assault victims experience individualized reactions during, and in the aftermath of, the assault; this is true no matter the type of sexual assault (e.g., alcohol-facilitated, drug-facilitated, no alcohol or drugs involved). During the

DEFTS. MSJ C 319

51

Case 8:20-cv-00322-JWH-GJS Document 139-7 Filed 05/13/22 Page 79 of 168 Page ID
#:2345
Case 2:20-cv-00327-JWH-GJS Document 7 Filed 09/21/20 Page 82 of 794 Page ID #:97

assault, victims may "freeze" (i.e., not physically resist the offender) as a result of shock, fear, and/or trauma.[30] Some victim responses, such as self-blame for voluntary ingestion of alcohol or drugs,[30] are often more common in alcohol-facilitated assault cases.

Sexual assault victims frequently do not report crimes.[31] Victims of alcohol- and drug-facilitated rapes are least likely to report the assault to authorities.[32] The reasons for not reporting may include feelings of shame and embarrassment, a sense of disbelief, failure to self-identify as a rape victim,[33] self-blame, feelings of guilt about certain behavior, concerns about getting the perpetrator "in trouble," inability to recall details, the possibility of the victim's future contact with the offender, the desire for life to return to normal, and fear of being treated poorly by law enforcement officials.[34]

If not adequately explained at trial, many of the victim's behaviors and reactions may be misunderstood. As a result, some individuals may view such behaviors and reactions as undermining the victim's credibility or as an indication that the victim consented.[35] One strategy is for prosecutors to present expert testimony to explain the range of varying responses victims may have to the trauma of sexual assault. The expert should testify in general terms, without having met with the victim or reviewed discovery,** and without opining about the victim's credibility or whether the victim was assaulted.[36] Specific credentials are not necessary; an individual may qualify as an expert based on professional experience working with victims of alcohol- and drug-facilitated sexual assault, as well as familiarity with relevant studies and literature. Desirable expert qualifications include clinical experience, direct victim service, education and/or training, knowledge of relevant articles, authorship of articles, and prior qualification as an expert on victim behavior in criminal or civil court.

## Conclusion

Perpetrators of alcohol- and drug-facilitated sexual assault rely on several individuals (including those within the criminal justice system, jurors, and even the victim) to blame the attack on the victim. Cold cases should not discourage investigators and prosecutors from pressing forward. A renewed investigation will likely reveal evidence that was not understood fully at the time of the initial report or is newly discovered.

Prosecutors must present evidence that focuses on the facts and contextual information surrounding the crime, show

evidence of the offender's premeditation and knowledge of the victim's condition around the time of the assault, and plan for relevant experts to testify on toxicology and victim responses to trauma. By following these suggestions from the SAKI TTA Team and collaborators, prosecutors can present an offender-focused case that allows jurors to engage in informed deliberations to arrive at a just verdict.

References:

1. Significant portions of this article were adapted from Kristiansson, V. (2016). Prosecuting alcohol-facilitated sexual assault: A substantive article for allied professionals. Sexual Assault Report, 20(2), 17–36.

2. Many of these issues and strategies will be equally applicable in non-cold-case sexual assault prosecutions. Throughout this article, examples of rules of evidence, statutes, and case law are included in the footnotes, using legal examples from only a few jurisdictions in order to keep the resource more streamlined. Those jurisdictions include Ohio, West Virginia, Pennsylvania, and New Jersey. For more information about statutes across the nation addressing alcohol- or drug-facilitated sexual assault, contact AEquitas.

3. "If recreational drugs were tools, alcohol would be a sledgehammer." White, A. M. (2003). What happened? Alcohol, memory blackouts and the brain. Alcohol Research and Health, 27(2), 186; and Abbey, A., Zawacki, T., Buck, P. O., Clinton, A. M., & McAuslan, P. (2001). Alcohol and sexual assault. Alcohol Research & Health, 25(1), 43–51.

4. Id.

5. See, e.g., American Prosecutors Research Institute. (2003). Alcohol toxicology for prosecutors: Targeting hardcore impaired drivers. Alexandria, VA: Author. Retrieved from http://www.ndaa.org/pdf/toxicology_final.pdf; and Scalzo, T. (2007, Aug.). Prosecuting alcohol-facilitated sexual assault. Alexandria, VA: National District Attorneys Association, American Prosecutors Research Institute. Retrieved from http://www.ndaa.org/pdf/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf.

6. National Institute on Alcohol Abuse and Alcoholism. (1990, Oct.). Alcohol alert: Alcohol and women. No. 10 PH 290. Retrieved from http://pubs.niaaa.nih.gov/publications/aa10.htm; and Frezza, M., di Padova, C., Pozzato, G., Terpin, M., Baraona, E., & Lieber, C. S. (1990). High blood alcohol levels in women—The role of decreased gastric alcohol dehydrogenase activity and first-pass metabolism. New England Journal of Medicine, 322(2), 95–99.

7. Id.

8. Id.

9. Kerrigan, S. (2010, January). The use of alcohol to facilitate sexual assault. Forensic Science Review, 22(1), 15–32. See also University Health Service, University of Michigan. (n.d.). The effects of combining alcohol with other drugs [Web page]. Retrieved from https://uhs.umich.edu/combine. Accessed August 23, 2016.

10. LeBeau, M.A., & Montgomery, M. A. (2010). Challenges of drug-facilitated sexual assault. Forensic Science Review, 22(1), 1–6.

11. White, 2003.

12. For additional information about alcohol-facilitated sexual assault, see Scalzo, 2007.

13. See, e.g., 18 Pa. Cons. Stat. Ann. § 3121(a)(3) ("(a) Offense defined.—A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant: . . . (3) Who is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring."). The two theories are not necessarily mutually exclusive as a victim may have been too intoxicated to consent at one or more points in time during the incident, and unconscious at other points in time. See also Long, J., Wurman-Barr, C., & Kristiansson, V. (2016, August). Alcohol and drug facilitated sexual assault: A survey of the law. Statutes in Review. Washington, DC: AEquitas. Retrieved from http://www.aequitasresource.org/Alcohol-Facilitated-Sexual-Assault-A-Survey-of-the-Law_SIR1.pdf.

---

** A process that starts at the beginning of the case and continues up until the trial. During discovery, the prosecution must provide the defendant copies of evidence and information that will be used at trial.

EXHIBIT 3

DEFTS. MSJ C 321

The National
Center for the
Prosecution of
Violence
Against Women

# voice

The following hypothetical scenario is used by the author to provide concrete examples of several points made about offenders throughout the article. Prosecutors should remember that while the examples given here are based on the facts of each case, an individual and unique, as prosecutors should consult with offender experts whenever necessary. All names have been changed, and any resemblance to real or imaginary persons is unintended.

## SCENARIO

Dr. John Smith, a wealthy, attractive physician, is charged with the rape of June Roe, who works as a secretary for an office supply company. The two met at a speed dating event, at a bar. Smith approached Roe at the bar, where she indicated ordered a drink. He ordered himself a drink and purchased several more drinks for Roe over the course of the night (over her protestations even after the oral that she felt she'd had enough). Smith and Roe danced throughout the night and shared several kisses on the dance floor.

Roe refused Smith's offers of a ride home, but after the third unsuccessfully to flag down a cab, she finally accepted. He asked if he could come in as use the bathroom. Roe allowed this, but only led him downstairs in her house. She waited in the kitchen and, while Smith was in the bathroom, Smith came out, saw that Roe had vomited and told her to go clean up in the bathroom and take some Tums. When Roe returned, Smith asked if he could sleep on the couch, and Roe reluctantly agreed. They kissed for a few minutes, and then Roe went into her bedroom alone to go to sleep.

Roe woke up during the night to find Smith having sex with her. She tried to push him off, and asked what he was doing. Smith told Roe it was almost done. Roe held struggling then stopped moving and stared to cry when Smith grabbed her neck and squeezed tightly to stop her from moving after raping her. Smith asked Roe "What's your problem?" Roe told him to leave. He let himself out.

Roe called in sick to work the next day and told a friend what had happened. The friend convinced Roe to go to the hospital. Roe blamed herself for the assault, and therefore told the hospital nurse that she did not want to report (mandatory reporting by the nurse resulted in law enforcement involvement). Law enforcement interviewed Roe briefly at the hospital. Roe explained that she didn't report because she didn't think she would be believed.

Smith, when giving a voluntary statement to law enforcement, said that Roe was intoxicated when he met her at the bar, so he considered and drove her safely home, invited him in, and he agreed. Roe seduced him, and then asked him to spend the night. Smith stated that after several attempts, she consented, and that Roe was lying about the rape because she was crazy. Smith said he kissed and consensual sex and that Roe was lying about the conclusion on the battle of blows he found in Roe's bathroom medicine cabinet while she was vomiting in the kitchen. Smith also said Roe probably felt guilty about having a one-night stand. Smith insisted that the bartender would say that Roe had been throwing herself at him all night. Law enforcement interviewed the bartender, who said that Smith is a frequent customer and is a very good tipper. The bartender also stated that women were always throwing themselves at Smith, and he was always buying women drinks.

continued 1

## INTRODUCTION

The non-stranger rapist commits sexual crimes in the context of an interpersonal relationship. He is the husband who rapes his wife, the doctor who sexually assaults a patient during an exam, taking pictures of her naked; or the best friend who comforts his friend's girlfriend after a fight, then takes the opportunity to rape her. In a non-stranger sexual assault, it is not the crime itself, but the relationship between the victim and the offender that makes the offense so hard to identify, define, and prosecute.

In order to understand the non-stranger rapist, prosecutors must understand the offender's motives as to commit his crimes, the role the relationship between the victim and the offender plays in a sexual assault, and the offender's skills as a criminal to manipulate his victim and the jury. Only when the prosecutor truly understand the nature of the offense and the offender can the crime successfully be prosecuted.

## OFFENDER
## MOTIVATION:
## WHY DID HE DO IT?

In non-stranger sexual assaults, juries often struggle to understand the offender's motivation. The clearest answer to the question, "Why did he do it," is that sexual assault fulfills needs for the offender. The offender's needs, which motivate him to commit sexual assault, can be divided into two main categories: sexual deviance and character trait motivation.

Sexual deviance motivates assault through a deviant sexual arousal pattern. Sexual deviance occurs when an offender sexualizes typically non-sexual objects, dynamics, emotions, or contexts. An offender may be aroused by physical and/or psychological vulnerability in his victims, whether they result from intoxication or physical or mental

disabilities. While psychologists do not know how sexual deviance develops, they do know that offenders reinforce deviant sources of arousal through masturbation, fantasy and other behaviors.

In the hypothetical case, the issues of sexual deviance are exhibited in the context of Smith's choices. Specifically, it becomes clear that Dr. Smith can achieve and maintain sexual interest in and arousal for a woman who gets sick, smells like vomit, resists, and begins to cry. He is able to stay aroused when he puts his mouth and strangles her. All of these elements are indicative of a deviation from the norms of sexual behavior.

The facts suggest that Dr. Smith engaged in purposeful behavior to ensure that he would have a non-consenting partner: through the use of alcohol, drugs, and coercion. This purposeful behavior is in stark contrast to Dr. Smith's likely option of engaging in a consensual sexual relationship or achieving sexual release in another manner. The facts suggest that Dr. Smith is increased in rape not consensual sex. There is no coincidence in the choices made by sexual offenders.

Secondly, an offender may possess certain character traits which motivate his offenses. When an offender has a criminal, narcissistic, or otherwise incompassionate and socially-compromised personality, he can feel entitled to offend for a variety of reasons. He may lack the internal barriers that prevent offending, like guilt, remorse, empathy, or compassion. He may overvalue his belief system which devalues the rights of others and overvalues his rights. He may be indifferent to, or aroused by, the pain, suffering, injury, or humiliation of others. The offender also may feel that the rules of society do not apply to him.

The fact pattern suggests that Dr. Smith is socially and professionally successful. He uses his knowledge as an anesthesiologist to incapacitate Ms. Roe by preying on her use of alcohol and Ativan. He chooses to contrast his status as a doctor with when sneaking up to law enforcement in order to discredit Ms. Roe. As described above, there are no coincidences. Dr. Smith's defense tactics and explanations reveal his character. He exercised the particular resources to explain his actions that are consistent with his character. Dr. Smith wants to project that he is irresistible because of his personal and professional status. Based on his psychological profile, Dr. Smith would not choose to victimize someone he perceives as an "equal," as another doctor or wealthy woman could not be labeled by others with the same "agenda" as Ms. Roe. These elements and behaviors are a direct reflection of his character.

It is important to recognize that both of these pathways to offending, i.e., sexual deviance and character trait motivation, can coexist in the same offender. For example, a criminal, narcissist person also may be sexually aroused by a victim's lack of, or inability to, consent. When both pathways exist, the offender is even more dangerous. Determining the pathway is not as critical to prosecution as determining the offender's current behavior pattern. It may necessitate the use of an expert whose the offender behavior can be explained. An offender who is assured that offender behavior can be explained in terms of the offender's fulfillment of his needs should, in turn, explain this context to the jury. Sometimes offenders will claim that the offense was a consequence of a circumstance or accident. For instance, an offender will claim that he "accidentally" went too far with a victim.

DEFTS. MSJ C 322

54

misunderstanding her resistance or that she said "no." He might try to portray a rape as consensual act that occurred when using judgment. It was misread by victims in the face of such denials prosecutors can help to expose a defendant's true intent by revealing the choices the offender made to fulfill his needs. Prosecutors who want to expose the offender's behavior as purposeful and goal-driven. For example, the prosecutor can counter the offender's claims of rejection by exposing all the signs of planning in his behavior. As a result, jurors may more easily accept that the defendant has committed acts that they find abhorrent and antisocial rather than engage in victim-blaming.

## THE OFFENDER'S RELATIONSHIP WITH THE VICTIM: WHY DID HE PICK THIS VICTIM?

Non-stranger rapists generally select victims whom they perceive as particularly vulnerable. Non-stranger rapists often choose victims for their ability to connect, trust, and be prosocial. In addition, non-stranger rapists also may choose victims who are more "needy," accepting, or in need of companionship. Some victims may also simply be dependent on the offender, respond to the offender's authority, or already love the offender in some capacity.

The qualities that the offender looks for in a prospective victim are the same qualities that may prompt a victim to come forward. A "nice," trusting victim will not know how to react to being sexually assaulted by someone she once trusted. Offenders understand a basic principle of victimization: the more the victim is invested in her relationship with the offender, the less likely she is to disclose a

rape.[1] Often, victims of non-stranger rape are confused or unsure about whether they are truly victims.[1] They tend to blame themselves, focus on the "likeable" aspects of the offender, or love the offender for the benefit of the doubt, or feel the offender more because of his access to them. Because the victim is confused, betrayed, or distrustful of her own judgment about others. She may feel responsible for any negative circumstances. So the offender—i.e., that he is going to jail because she told, not because he raped her.

The victim may be convinced that she "led him on," or that any prior consensual activity with the offender means that she could not have been assaulted this time. The offender selects his victim hoping that all these possibilities will come true, and that the victim will not report it at all.

In the fact scenario, Ms. Roe's ambivalence about reporting is a typical victim behavior or Ms. Roe tells the nurse that she does not want to report. She fears she will not be believed, especially when compared to Dr. Smith, whom she perceives, perhaps accurately, as more credible in law enforcement's eyes. Further, she may struggle with shame and guilt about her sexuality. Remember, Ms. Roe was pressured to tell and might never have reported the rape, if not for her friend's persuasion and the nurse's mandatory report. These feelings are another clue to Ms. Roe's compliance. Ms. Roe's credibility benefit: Dr. Smith is an offender, and he counts on her behavior in his planning.

## OFFENDER SKILLS: HOW DOES THE MANIPULATE THE AUDIENCE?

The "audience" in a sexual assault case includes witnesses to the offender-victim relationship, the police, the prosecutor, the judge, the jury, and anyone else who is a witness to any part of the crime, its buildup,

or its aftermath. The non-stranger rapist may talk to his friends about how the victim has been "coming on to him." He may treat all of the victim's friends and family so politely that they never would believe he "could do a thing like that." He might get the victim really drunk at a party, and then claim that she was so drunk she cannot remember the truth. He may hold herself out as a person of status and authority who does not "need" to rape anyone and portray the victim as overtly, vindictive, or just plain wanting.

Generally, the non-stranger rapist has social skills and antisocial prosocial behavior; therefore, his behavior during the investigation or interview may appear to be very truthful and cooperative. He will attempt to convince the police that he has been wrongly accused. He may appear for an interview, answer questions consistently, and tell a story so close to the truth that it seems improbable that he would be lying. He may ask, "Why would I need to rape her?" clearly highlighting his own sexual success, her perceived interest, and willingness, the audience's biases, or the general denial that he—a good person—would ever commit a sexual assault. He will have prepared his audience to answer, "You wouldn't need to rape anyone. If allowed, the offender will groom the prosecution, the judge, and the jury in the same way.

In the fact pattern, Dr. Smith identifies a bartender who will "confirm" that women won't come on to him. He throws around money, and that he would never "need" to rape anyone. Witnesses like the bartender vocalize a defendant's defense for him. When he can have his choice of women, why would he choose rape? A good prosecution honors all of this question by highlighting the defendant's purposeful actions that demonstrate his need for coercive

rather than consensual sex. Based on his psychological profile, Dr. Smith is not excited by women who are his equals and consensual sex does not fulfill his needs.

Another powerful tool defendants use to groom or manipulate the audience is to be nice. A "nice" offender does not fit society's image of a rapist. Society wants all sexual offenders to be scary, dirty, and gross. Society also wants them to be strangers to the victim. The fact is that sexual offenders are people in easy access to the victim.[1] Most non-stranger rapists use their social skills to gain control of and cooperation from the victim with little effort. Offenders know how to exhibit the traits that most people use to determine whether someone is safe to be around. Niceness is a powerful weapon. When someone is nice, it is difficult to confront him, accuse him, or mistrust him. When the victim mistrusts the offender, she feels bad about herself for being suspicious. "Nice" comes through to juries and judges as well as to the victim. Offenders often produce character witnesses to testify that they are good citizens/coworkers/ church members. The defendant is counting on society to pre-judge the belief that a nice, honest person cannot commit sex crimes, and a violent, evil, or deviant "nice" guy must not be something like a "nice" offender by carefully deconstructing the image of the offender and demonstrating that each act of "niceness" benefited the offender. When an offender buys a victim a drink, he is impairing her. When he compliments the victim and offers to help her in a grooming, trust. Prosecutors can show the jury the perceived "nice" behavior benefits the offender each time. A prosecutor can also

can point out all the consequences that a victim would face if she were not nice in return, based upon the facts of the prosecutor's case.

In the scenario, Dr. Smith clearly exhibits a pattern of contrasting his "good" behavior against the victim's "bad" behavior. Dr. Smith's manipulates the bartender by being "nice" and tipping well so that the bartender vouches for his trustworthy character. Dr. Smith calls Ms. Roe crazy and suggests her "guilt" about the one-night stand. Not only does she degrade the victim, but it reveals that Dr. Smith is skilled and is willing to use Ms. Roe's use of a legitimate prescription medication (Ativan) against her. Dr. Smith panders Ms. Roe to drink alcohol, then pays upon the fact she was on medication. Dr. Smith is to sure that the focus will be on Ms. Roe's behavior rather than on his behavior that he claims he had consensual sex with her after the throw-up (not something a "nice" guy does). Ms. Roe's belief in Dr. Smith's "niceness" is a critical part of her victimization. She is a nice, trusting man because he is "nice," and therefore possesses a nice from him, ask him, nice her apartment, and tipping well. Not only does it allows him to keep up the nice character, he would not succeed in perpetrating his assault of the victim. Being nice is his best camouflage. In order to help camouflage his offenses, the non-stranger rapist stereotypes about rapists.[1] As he primarily discusses the way to look and act differently than the stereotypical perverted "rapist."

He will point out that there was no "real" force, like a weapon or overt physical violence. When perpetrating the assault, the offender's acts will be subtle and hidden from view, by an offender, thereby obscuring the need for him to use physical force. For example, the offender may use a

DEFTS. MSJ C 323

custody, battle, envy, sexual tension, or infidelity in describing this victim to explain the myth that "women cry rape" to retaliate against men.[?] The offender will say that he did not know the victim really wanted to stop or did not know that she had passed out. He will say he didn't need to rape, which happened was beyond his control. The offender will make these statements to reinforce the public's [incorrect] theory that rape is not need-driven.

## RECOMMENDATIONS AND CONCLUSIONS

On direct examination, the prosecutor should humanize the victim and provide a context for her behavior. The most important goal is to show that the "weakened ego" of the rapist constitutes normal human behavior on the part of the victim. Specifically, it was "normal" for Ms. Roe to drink alcohol, go to a speed during event, and to trust Dr. Smith. It was also normal for her to feel ashamed and be reluctant to report after the sexual assault. The direct examination of the judge should communicate this to the judge and jury by framing the "normal" behaviors in a sympathetic manner.

The prosecutor also should prepare the victim for cross-examination through a good direct. Her actions and justifications may be clear to the jury, for example, if the prosecutor gives the victim the opportunity to explain: "There is no way I would have screamed—I was afraid he'd choke me to death." This technique places the focus back where it belongs: on the offender's behavior.

In closing argument, it is highly effective to clearly describe the sexual assault as a process, starting as close to the beginning of the offender's predatory process as possible. Prosecutors should demonstrate that preparation for the rape begins long before penetration but it would have been good and right to lead her to the couch, make sure she was safe and well, and leave without sexually assaulting her. The offender's behavior is criminal, and the prosecutor should crack that behavior from start to finish.

All sexual assault is need-driven, intentional behavior. Prosecutors must attempt to identify the needs of the offender for the jury or at least explain that the offender has a need to offend. The prosecutor, therefore, should try to determine why and how she offended his victim so that the prosecutor may then explain that process to the jury. A rapist makes a relationship a dangerous place; the existence of the relationship confuses the victim, and complicates the prosecution. The prosecutor should look for ways in which the offender is able to use the context of the relationship to hide his crime. From and avoid judgment by his audience—the police, prosecutor, judge and jury. Offenders hide behind the context of their relationships with their victims. They mask themselves as "nice guys." They play upon society's biases and stereotypes. They use prosocial skills, social biases, and sarcoptes that surround rape to make sexual offenses covert.

Prosecutors can successfully expose rapists by communicating all of these ideas to the jury and portraying the so-called "nice" offender as the rapist that he is.

occurs. Prosecutors must ensure that their closing argument establish the purposefulness of the offender's conduct at the time of the rape as well as in the event leading up to it. The prosecutor should use each and every piece of evidence and act of the offender to construct his "nice" behavior with what is really good and right, for example, it was "nice" of Dr. Smith to drive Ms. Roe home when she was drunk too much.

*Editor's Note: This article was written to assist prosecutors who may not typically handle non-stranger rapes with the issues of psychological motivation and strategy on the part of the rapist. This article is not primarily intended to provide courtroom tips; please contact the National Center for the Prosecution of Violence Against Women for resources relating to trial practice.*

## FOOTNOTES

[footnotes text illegible]

~voice~ published by the American Prosecutors Research Council for the Prosecution of Violence Against Women. The American Prosecutors Research Institute is the nonprofit research and development affiliate of the National District Attorneys Association. Items may be reprinted if attributed to NDAA and APRI. Prosecutors Research Institute is the Prosecution of Violence Against Women. Please direct report on The News Division if you have inquiries or solicit suggestions at 703-549-1722.

National District Attorneys Association
American Prosecutors Research Institute
National Center for the Prosecution
of Violence Against Women
99 Canal Center Plaza, Suite 510
Alexandria, VA 22314

Nonprofit
US Postage
PAID
Merrifield, VA
Permit No. 795

56

DEFTS. MSJ C 324

EXHIBIT 4

DEFTS. MSJ C 325

57

 Gmail                                                    a@gmail.com>

## Meeting follow-up



Thu, Oct 10, 2019 at 9:23 PM

Dear Head Deputy Cagney,

I really appreciate you taking the time to hear me out. I understand from a prosecutor's standpoint you wanted to prove beyond a reasonable doubt, but I also understand that the duty of the prosecutor is to seek justice, not merely to convict. In cases which involve a serious threat to the community, the prosecutor should not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit persons accused of the particular kind of criminal act in question. I believe you will make the right decision and do the right thing for our community safety. I'm sure you understand when prosecutors take a strong stand against sexual assault, they can slowly change social perceptions, attitudes, and behaviors.

Although this case is challenging, I believe you will utilize traditionally "negative" facts in a positive manner assisting the jury to understand that these very factors are what make the victim a good victim choice for a predatory offender. In addition, I'm sure you remember expert witness is your powerful tool to convince the jury. It really doesn't matter what defense the offender would bring up if the prosecutor can prove the theme and context, then the jury will figure out what really happened that night (a classic date rape).

I understand you probably don't have time to go through every page of the documents that I sent you so I would like to highlight the following pages for your attention:

How to unmask and expose a predator
Page 1 – 6 of <Understanding the non-stranger rapist>
Page 69 – 84 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>
Page 142 – 145 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>
Page 212 – 216 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>
Page 11 – 12 of <Prosecuting_alcohol_facilitated_sexual_assault>
Page 18 of <Prosecuting_alcohol_facilitated_sexual_assault>
Page 3 – 4 of <AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010>

How to turn weakness/bad facts into good facts and a strong case
Page 300 – 301 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>

Offender-focused prosecution
Page 21 – 23 of <Prosecuting_alcohol_facilitated_sexual_assault>

Overcoming rape myths
Page 53 – 57 of <Prosecuting_alcohol_facilitated_sexual_assault>
Page 37 – 50 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>
Page 1 – 21 <Barriers_to_Credibility>

Common defenses
Page 20 – 24 of <National sexual assault investigation and prosecution guide>
Page 289 – 305 of <SEXUAL ASSAULT POLICY & PROCEDURE MANUAL>

**DEFTS. MSJ C 326**

58

Page 35 – 40 of <Prosecuting_alcohol_facilitated_sexual_assault>

<u>Framing the case / pay attention to the language of consent</u>
Page 15 – 16 of <National sexual assault investigation and prosecution guide>

The offender might exploit the mistaken view that delaying reporting of a crime increases the likelihood of fabrication. However, most rape
victims do not report the crime at all, SHANNON M. CATALANO, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION, 2004 10 (2005), and studies show that reporting rates are affected by victim demographics and assault characteristics, as well as victims' fear, shame, confusion, and self-blame. Can you imagine how hard it is to come forward for a 100 lb Asian woman who lives in a foreign country? I wanted to take this secret to my grave but I realized I had to do the right thing. Attached please find my statements for your reference.

Not sure if you have noticed but I would like to bring this to your attention that Aequitas provides technical assistance incorporating customized strategies (https://aequitasresource.org/consultations/) at no cost to you.

Thank you again for the opportunity to speak with you.

.      Ẽ

**3 attachments**

📄 **12. NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_11_2007.pdf**
   195K

📄 **complaint - updated.pdf**
   284K

📄 **Victim statement.pdf**
   235K

EXHIBIT 5

**DEFTS. MSJ C 328**

may result in suppression of the call.[158] A victim should never be compelled to participate in a pretext call, and an advocate should be present to provide support during and after the call.

### A Note on Prosecutorial Immunity

Typically, prosecutors enjoy absolute immunity in their actions to prosecute a case, as opposed to the qualified immunity under which investigators operate. Absolute immunity attaches for activities "intimately associated with the judicial phase of the criminal process," e.g., initiating a prosecution, determining probable cause for charging purposes, making charging decisions, drafting legal documents, litigating the case in the courtroom. However, to the extent prosecutors provide advice to law enforcement on their activities, or engage in law-enforcement type activities themselves, e.g., acting as an investigator, attesting to the truth in support of an arrest warrant, or signing a search warrant affidavit, they are covered by the same qualified immunity that law enforcement officers have.

Qualified immunity provides significant protection against civil liability for actions taken in the course of one's official duties. The prosecutor is immune from suit for discretionary actions so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

There is nothing inherently "wrong" in a prosecutor's stepping outside the cloak of absolute immunity to perform activities protected by qualified immunity. However, whether the prosecutor does so depends upon office policy and, in the absence of policy, an informed decision. Some offices may require prosecutors, as part of their jobs, to provide legal advice to officers in the performance of their duties. Some offices may limit or prohibit prosecutors from engaging in activities beyond those covered by absolute immunity. In the absence of a policy prohibiting it, a prosecutor may choose to give up absolute immunity for the purpose of supporting their law enforcement partners and obtaining better investigations with fewer legal problems arising later.

Guidance for making this determination include:

- Be aware of the difference between absolute and qualified immunity.
- Check with your office to see if there is a policy in place.
- Inform your supervisor of your desire to work closely with police on these cases and why.
- Seek guidance from your jurisdiction's legal representative (whichever entity represents your office and its employees in the event of a lawsuit—typically, the City or County Attorney)
- Look for other examples of police/prosecutor collaboration in your jurisdiction or others, e.g., other specialized units, any co-located police/prosecutor teams.

### 4.1-C.1. Corroboration is Valuable but Usually not a Legal Requirement.

*Corroborating victims helps victims. Any evidence that we can find that corroborates the fact that a rape occurred, that it was nonconsensual, that it was forcible, that there were injuries, whatever evidence there is – crime scene evidence, photos, witness interviews – that also helps victims. Again, it helps our cases as well, but if you can send a victim into court knowing that the entire case doesn't rest on the victim's shoulders, but that the police and prosecutors did a thorough job investigating every aspect of these cases, it really is helpful knowing that the system*

*worked the way it was supposed to, and that there is other evidence to corroborate what they're saying.[159]*

Corroboration is valuable, but usually not legally required, either for charging a case or for establishing the defendant's guilt at trial.[160] Investigators should, however, always strive to corroborate as many aspects of the case as possible. Corroborative evidence strengthens a case by providing additional evidence of the crimes charged and by supporting the credibility of witnesses. Victims will be gratified by the thoroughness of the investigation and relieved that the trial's outcome will not rest solely on their testimony. Corroborating evidence—especially important for a crime that happens in private and for which scientific evidence most often will be inconclusive on critical issues such as consent—can be found in a variety of sources:

- Witnesses
  - There may be witnesses who did not actually observe the assault but nevertheless can testify about events or conditions they have seen or heard. A witness may be able to testify to the victim's behavior, demeanor, or physical condition immediately before or after the assault or may be able to testify to the victim's statement to the witness about the assault. Witnesses may be able to testify to their observations of the victim's intoxication, the defendant's providing alcohol or drugs to the victim, the defendant's acts to isolate the victim, or other evidence of predatory behavior. Bartenders, cab drivers or other ride-hailing services, building security guards, and store clerks often can provide evidence relevant to the charges.
  - Video surveillance cameras, or video recorded by others before or after the assault, can help establish a timeline and document both the victim's and the offender's actions. Such evidence should be viewed with caution, as it may provide only a brief snapshot of what occurred; what appears to be a consensual social encounter may have been, in fact, coerced or may have later progressed from a consensual encounter to a forcible or coerced act of penetration.
  - Witnesses may also be able to testify to the long-term evidence of trauma following the assault (e.g., friends or family that can say, "before the assault, victim was outgoing and involved in school clubs and after victim would not go out and stopped returning phone calls from her closest friends." Please note, not all victims will exhibit indicators of trauma.
- Physical evidence that corroborates any details of the allegations. This can include seemingly ancillary details that in and of themselves do not establish that a sexual assault

DEFTS. MSJ C 329

EXHIBIT 6

DEFTS. MSJ C 330

*Standards of Conduct*

The person countermanding the original order shall notify, in writing, the person issuing the original order, indicating the action taken and the reason.

### 319.3.2 SUPERVISOR RESPONSIBILITIES
Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

(a) Failure to be reasonably aware of the performance of their subordinates or to provide appropriate guidance and control.

(b) Failure to promptly and fully report any known misconduct of a member to his/her immediate supervisor or to document such misconduct appropriately or as required by policy.

(c) Directing a subordinate to violate a policy or directive, acquiesce to such a violation, or are indifferent to any such violation by a subordinate.

(d) The unequal or disparate exercise of authority on the part of a supervisor toward any member for malicious or other improper purpose.

### 319.4 GENERAL STANDARDS
Members shall conduct themselves, whether on- or off-duty, in accordance with the United States and California Constitutions and all applicable laws, ordinances and rules enacted or established pursuant to legal authority.

Members shall familiarize themselves with policies and procedures and are responsible for compliance with each. Members should seek clarification and guidance from supervisors in the event of any perceived ambiguity or uncertainty.

Discipline may be initiated for any good cause. It is not mandatory that a specific policy or rule violation be cited to sustain discipline. This policy is not intended to cover every possible type of misconduct.

### 319.5 CAUSES FOR DISCIPLINE
The following are illustrative of causes for disciplinary action. This list is not intended to cover every possible type of misconduct and does not preclude the recommendation of disciplinary action for violation of other rules, standards, ethics and specific action or inaction that is detrimental to efficient department service:

### 319.5.1 LAWS, RULES AND ORDERS

(a) Violation of, or ordering or instructing a subordinate to violate any policy, procedure, rule, order, directive, requirement or failure to follow instructions contained in department or City manuals.

(b) Disobedience of any legal directive or order issued by any department member of a higher rank.

(c) Violation of federal, state, local or administrative laws, rules or regulations.

DEFTS. MSJ C 331

63

*Standards of Conduct*

319.5.2 ETHICS

(a) Using or disclosing one's status as a member of the El Monte Police Department in any way that could reasonably be perceived as an attempt to gain influence or authority for non-department business or activity.

(b) The wrongful or unlawful exercise of authority on the part of any member for malicious purpose, personal gain, willful deceit or any other improper purpose.

(c) The receipt or acceptance of a reward, fee or gift from any person for service incident to the performance of the member's duties (lawful subpoena fees and authorized work permits excepted).

(d) Acceptance of fees, gifts or money contrary to the rules of this department and/or laws of the state.

(e) Offer or acceptance of a bribe or gratuity.

(f) Misappropriation or misuse of public funds, property, personnel or services.

(g) Any other failure to abide by the standards of ethical conduct.

319.5.3 DISCRIMINATION, OPPRESSION OR FAVORITISM

Discriminating against, oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex, sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical or mental disability, medical condition or other classification protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power or immunity, knowing the conduct is unlawful.

319.5.4 RELATIONSHIPS

(a) Unwelcome solicitation of a personal or sexual relationship while on-duty or through the use of one's official capacity.

(b) Engaging in on-duty sexual activity including, but not limited to, sexual intercourse, excessive displays of public affection or other sexual contact.

(c) Establishing or maintaining an inappropriate personal or financial relationship, as a result of an investigation, with a known victim, witness, suspect or defendant while a case is being investigated or prosecuted, or as a direct result of any official contact.

(d) Associating with or joining a criminal gang, organized crime and/or criminal syndicate when the member knows or reasonably should know of the criminal nature of the organization. This includes any organization involved in a definable criminal activity or enterprise, except as specifically directed and authorized by this department.

(e) Associating on a personal, rather than official basis with persons who demonstrate recurring involvement in serious violations of state or federal laws after the member knows, or reasonably should know of such criminal activities, except as specifically directed and authorized by this department.

Copyright Lexipol, LLC 2018/05/30, All Rights Reserved.
Published with permission by El Monte Police Department

**DEFTS. MSJ C 332**

64

## El Monte Police Department
POLICIES

Standards of Conduct

### 319.5.5 ATTENDANCE

(a)   Leaving the job to which the member is assigned during duty hours without reasonable excuse and proper permission and approval.

(b)   Unexcused or unauthorized absence or tardiness.

(c)   Excessive absenteeism or abuse of leave privileges.

(d)   Failure to report to work or to place of assignment at time specified and fully prepared to perform duties without reasonable excuse.

### 319.5.6 UNAUTHORIZED ACCESS, DISCLOSURE OR USE

(a)   Unauthorized and inappropriate intentional release of confidential or protected information, materials, data, forms or reports obtained as a result of the member's position with this department.

1.   Members of this department shall not disclose the name, address or image of any victim of human trafficking except as authorized by law (Penal Code § 293).

(b)   Disclosing to any unauthorized person any active investigation information.

(c)   The use of any information, photograph, video or other recording obtained or accessed as a result of employment or appointment to this department for personal or financial gain or without the express authorization of the Chief of Police or the authorized designee.

(d)   Loaning, selling, allowing unauthorized use, giving away or appropriating any El Monte Police Department badge, uniform, identification card or department property for personal use, personal gain or any other improper or unauthorized use or purpose.

(e)   Using department resources in association with any portion of an independent civil action. These resources include, but are not limited to, personnel, vehicles, equipment and non-subpoenaed records.

### 319.5.7 EFFICIENCY

(a)   Neglect of duty.

(b)   Unsatisfactory work performance including, but not limited to, failure, incompetence, inefficiency or delay in performing and/or carrying out proper orders, work assignments or the instructions of supervisors without a reasonable and bona fide excuse.

(c)   Concealing, attempting to conceal, removing or destroying defective or incompetent work.

(d)   Unauthorized sleeping during on-duty time or assignments.

(e)   Failure to notify the Department within 24 hours of any change in residence address, contact telephone numbers or marital status.

Copyright Lexipol, LLC 2018/05/30, All Rights Reserved.
Published with permission by El Monte Police Department

**DEFTS. MSJ C 333**

45

**El Monte Police Department**

POLICIES

*Standards of Conduct*

## 319.5.8 PERFORMANCE

(a) Failure to disclose or misrepresenting material facts, or making any false or misleading statement on any application, examination form, or other official document, report or form, or during the course of any work-related investigation.

(b) The falsification of any work-related records, making misleading entries or statements with the intent to deceive or the willful and unauthorized removal, alteration, destruction and/or mutilation of any department record, public record, book, paper or document.

(c) Failure to participate in, or giving false or misleading statements, or misrepresenting or omitting material information to a supervisor or other person in a position of authority, in connection with any investigation or in the reporting of any department -related business.

(d) Being untruthful or knowingly making false, misleading or malicious statements that are reasonably calculated to harm the reputation, authority or official standing of this department or its members.

(e) Disparaging remarks or conduct concerning duly constituted authority to the extent that such conduct disrupts the efficiency of this department or subverts the good order, efficiency and discipline of this department or that would tend to discredit any of its members.

(f) Unlawful gambling or unlawful betting at any time or any place. Legal gambling or betting under any of the following conditions:

    1. While on department premises.

    2. At any work site, while on-duty or while in uniform, or while using any department equipment or system.

    3. Gambling activity undertaken as part of an officer official duties and with the express knowledge and permission of a direct supervisor is exempt from this prohibition.

(g) Improper political activity including:

    1. Unauthorized attendance while on-duty at official legislative or political sessions.

    2. Solicitations, speeches or distribution of campaign literature for or against any political candidate or position while on-duty or, on department property except as expressly authorized by City policy, the memorandum of understanding, or the Chief of Police.

(h) Engaging in political activities during assigned working hours except as expressly authorized by City policy, the memorandum of understanding, or the Chief of Police.

(i) Any act on- or off-duty that brings discredit to this department.

## 319.5.9 CONDUCT

(a) Failure of any member to promptly and fully report activities on his/her part or the part of any other member where such activities resulted in contact with any other law

**DEFTS. MSJ C 334**

El Monte Police Department

POLICIES

enforcement agency or that may result in criminal prosecution or discipline under this policy.

(b) Unreasonable and unwarranted force to a person encountered or a person under arrest.

(c) Exceeding lawful peace officer powers by unreasonable, unlawful or excessive conduct.

(d) Unauthorized or unlawful fighting, threatening or attempting to inflict unlawful bodily harm on another.

(e) Engaging in horseplay that reasonably could result in injury or property damage.

(f) Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of this department or the City.

(g) Use of obscene, indecent, profane or derogatory language while on-duty or in uniform.

(h) Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

(i) Unauthorized possession of, loss of, or damage to department property or the property of others, or endangering it through carelessness or maliciousness.

(j) Attempted or actual theft of department property; misappropriation or misuse of public funds, property, personnel or the services or property of others; unauthorized removal or possession of department property or the property of another person.

(k) Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any memorandum of understanding or contract to include fraud in securing the appointment or hire.

(l) Initiating any civil action for recovery of any damages or injuries incurred in the course and scope of employment or appointment without first notifying the Chief of Police of such action.

(m) Any other on- or off-duty conduct which any member knows or reasonably should know is unbecoming a member of this department, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this department or its members.

319.5.10 SAFETY

(a) Failure to observe or violating department safety standards or safe working practices.

(b) Failure to maintain current licenses or certifications required for the assignment or position (e.g., driver license, first aid).

(c) Failure to maintain good physical condition sufficient to adequately and safely perform law enforcement duties.

(d) Unsafe firearm or other dangerous weapon handling to include loading or unloading firearms in an unsafe manner, either on- or off- duty.

(e) Carrying, while on the premises of the work place, any firearm or other lethal weapon that is not authorized by the member's appointing authority.

Copyright Lexipol, LLC 2018/05/30, All Rights Reserved.
Published with permission by El Monte Police Department

**DEFTS. MSJ C 335**

**El Monte Police Department**
POLICIES

# Sexual Assault Investigations

### 601.1 PURPOSE AND SCOPE
The purpose of this policy is to establish guidelines for the investigation of sexual assaults. These guidelines will address some of the unique aspects of such cases and the effects that these crimes have on the victims.

Mandatory notifications requirements are addressed in the Child Abuse and Adult Abuse policies.

601.1.1 DEFINITIONS
Definitions related to this policy include:

**Sexual assault** - Any crime or attempted crime of a sexual nature, to include, but not limited to, offenses defined in Penal Code § 243.4, Penal Code § 261 et seq., and Penal Code § 285 et seq.

**Sexual Assault Response Team (SART)** - A multidisciplinary team generally comprised of advocates; law enforcement officers; forensic medical examiners, including sexual assault forensic examiners (SAFEs) or sexual assault nurse examiners (SANEs) if possible; forensic laboratory personnel; and prosecutors. The team is designed to coordinate a broad response to sexual assault victims.

### 601.2 POLICY
It is the policy of the El Monte Police Department that its members, when responding to reports of sexual assaults, will strive to minimize the trauma experienced by the victims, and will aggressively investigate sexual assaults, pursue expeditious apprehension and conviction of perpetrators, and protect the safety of the victims and the community.

### 601.3 REPORTING
In all reported or suspected cases of sexual assault, a report should be written and assigned for follow-up investigation. This includes incidents in which the allegations appear unfounded or unsubstantiated.

### 601.4 QUALIFIED INVESTIGATORS
Qualified investigators should be available for assignment of sexual assault investigations. These investigators should:

(a) Have specialized training in, and be familiar with, interview techniques and the medical and legal issues that are specific to sexual assault investigations.

(b) Conduct follow-up interviews and investigation.

(c) Present appropriate cases of alleged sexual assault to the prosecutor for review.

(d) Coordinate with other enforcement agencies, social service agencies and medical personnel as needed.

(e) Provide referrals to therapy services, victim advocates and support for the victim.

Copyright Lexipol, LLC 2018/05/30, All Rights Reserved.
Published with permission by El Monte Police Department

**DEFTS. MSJ C 336**

El Monte Police Department

POLICIES

*Sexual Assault Investigations*

(f)   Participate in or coordinate with SART.

### 601.5   TRAINING

Subject to available resources, periodic training will be provided to:

(a)   Members who are first responders. Training should include:

1.   Initial response to sexual assaults.

2.   Legal issues.

3.   Victim advocacy.

4.   Victim's response to trauma.

(b)   Qualified investigators who should receive advanced training on additional topics. Advanced training should include:

1.   Interviewing sexual assault victims.

2.   SART.

3.   Medical and legal aspects of sexual assault investigations.

4.   Serial crimes investigations.

5.   Use of community and other federal and state investigative resources, such as the Violent Criminal Apprehension Program (ViCAP).

6.   Techniques for communicating with victims to minimize trauma.

### 601.6   RELEASING INFORMATION TO THE PUBLIC

In cases where the perpetrator is not known to the victim, and especially if there are multiple crimes where more than one appear to be related, consideration should be given to releasing information to the public whenever there is a reasonable likelihood that doing so may result in developing helpful investigative leads. The Detective Bureau supervisor should weigh the risk of alerting the suspect to the investigation with the need to protect the victim and the public, and to prevent more crimes.

### 601.7   VICTIM INTERVIEWS

The primary considerations in sexual assault investigations, which begin with the initial call to Dispatch, should be the health and safety of the victim, the preservation of evidence, and preliminary interviews to determine if a crime has been committed and to attempt to identify the suspect.

Whenever possible, a member of SART should be included in the initial victim interviews. An in-depth follow-up interview should not be conducted until after the medical and forensic examinations are completed and the personal needs of the victim have been met (e.g., change of clothes, bathing). The follow-up interview may be delayed to the following day based upon the circumstances. Whenever practicable, the follow-up interview should be conducted by a qualified investigator.

69

**DEFTS. MSJ C 337**

## Sexual Assault Investigations

No opinion of whether the case is unfounded shall be included in the report.

Victims shall not be asked or required to take a polygraph examination (34 USC § 10451; Penal Code § 637.4).

Victims should be apprised of applicable victim's rights provisions, as outlined in the Victim and Witness Assistance Policy.

### 601.7.1 VICTIM RIGHTS
Whenever there is an alleged sexual assault, the assigned officer shall accomplish the following:

(a) Advise the victim in writing of the right to have a victim advocate and a support person of the victim's choosing present at any interview or contact by law enforcement, any other rights of a sexual assault victim pursuant to Penal Code § 680.2 and the right to have a person of the same or opposite gender present in the room during any interview with a law enforcement official unless no such person is reasonably available (Penal Code § 679.04).

(b) If the victim is transported to a hospital for any medical evidentiary or physical examination, the officer shall immediately cause the local rape victim counseling center to be notified (Penal Code § 264.2).

    1. The officer shall not discourage a victim from receiving a medical evidentiary or physical examination (Penal Code § 697.04).

    2. A support person may be excluded from the examination by the officer or the medical provider if his/her presence would be detrimental to the purpose of the examination (Penal Code § 264.2).

### 601.7.2 VICTIM CONFIDENTIALITY
Officers investigating or receiving a report of an alleged sex offense shall inform the victim, or the victim's parent or guardian if the victim is a minor, that his/her name will become a matter of public record unless the victim requests that his/her name not be made public. The reporting officer shall document in his/her report that the victim was properly informed and shall include any related response made by the victim, or if a minor, any response made by the victim's parent or guardian (Penal Code § 293).

Except as authorized by law, members of this department shall not publicly disclose the name of any victim of a sex crime who has exercised his/her right to confidentiality (Penal Code § 293).

### 601.8 COLLECTION AND TESTING OF BIOLOGICAL EVIDENCE
Whenever possible, a SART member should be involved in the collection of forensic evidence from the victim.

When the facts of the case indicate that collection of biological evidence is warranted, it should be collected regardless of how much time has elapsed since the reported assault.

If a drug-facilitated sexual assault is suspected, urine and blood samples should be collected from the victim as soon as practicable.

Copyright Lexipol, LLC 2018/05/30, All Rights Reserved.
Published with permission by El Monte Police Department

**DEFTS. MSJ C 338**

Case 8:20-cv-00322-JWH-GJS   Document 139-7   Filed 05/13/22   Page 98 of 168   Page ID
#:2364
Case 2:20-cv-00797-JWH-GJS   Document 139-7   Filed 05/27/20   Page 70 of 94   Page ID #:71

EXHIBIT 7

DEFTS. MSJ C 339

# CODE OF ETHICS

*A*s a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

*I* will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

*I* will never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

*I* recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession - Law Enforcement.

**DEFTS. MSJ C 340**

Case 8:29-cv-00323-JWH-GJS   Document 189-7   Filed 05/13/22   Page 100 of 168   Page ID
Case 2:20-cv-09073-MCK-JDE   Document 189-7   Filed 01/25/23   Page 26 of 94   Page ID #:367
#:2366

EXHIBIT  8

**DEFTS. MSJ C 341**

13

## A.   AGAINST ADULT OR MINOR

### (i)   Rape

**1000. Rape or Spousal Rape by Force, Fear, or Threats (Pen. Code, § 261(a)(2), (6) & (7))**

The defendant is charged [in Count _____] with rape [of his wife] by force [in violation of Penal Code section 261(a)].

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant had sexual intercourse with a woman;

2. He and the woman were (not married/married) to each other at the time of the intercourse;

3. The woman did not consent to the intercourse;

AND

4. The defendant accomplished the intercourse by

*<Alternative 4A—force or fear>*

[force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the woman or to someone else.]

*<Alternative 4B—future threats of bodily harm>*

[threatening to retaliate in the future against the woman or someone else when there was a reasonable possibility that the defendant would carry out the threat. A *threat to retaliate* is a threat to kidnap, falsely imprison, or inflict extreme pain, serious bodily injury, or death.]

*<Alternative 4C—threat of official action>*

[threatening to use the authority of a public office to incarcerate, arrest, or deport someone. A *public official* is a person employed by federal, state, or local government who has authority to incarcerate, arrest, or deport. The woman must have reasonably believed that the defendant was a public official even if he was not.]

*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis. [Ejaculation is not required.]

[To *consent*, a woman must act freely and voluntarily and know the nature of the act.]

715

Copyright Judicial Council of California

74

CALCRIM No. 1000                                        SEX OFFENSES

[A woman who initially consents to an act of intercourse may change her mind during the act. If she does so, under the law, the act of intercourse is then committed without her consent if:

1. She communicated through words or acts to the defendant that she no longer consented to the act of intercourse;

2. A reasonable person would have understood that her words or acts expressed her lack of consent;

AND

3. The defendant forcibly continued the act of intercourse despite her objection.]

[It is not required that she physically resist or fight back in order to communicate her lack of consent.]

[Evidence that the defendant and the woman (dated/were married/had been married) is not enough by itself to constitute consent.]

[Evidence that the woman (requested/suggested/communicated) that the defendant use a condom or other birth control device is not enough by itself to constitute consent.]

[Intercourse is *accomplished by force* if a person uses enough physical force to overcome the woman's will.]

[*Duress* means a direct or implied threat of force, violence, danger, or retribution that would cause a reasonable person to do [or submit to] something that she would not do [or submit to] otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the woman's age and her relationship to the defendant.]

[*Retribution* is a form of payback or revenge.]

[*Menace* means a threat, statement, or act showing an intent to injure someone.]

[Intercourse is *accomplished by fear* if the woman is actually and reasonably afraid [or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it].]

[A woman must be alive at the time of the sexual intercourse for the crime of rape to occur.]

<Defense: Reasonable Belief in Consent>

[The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse [and actually and reasonably believed that she consented throughout the act of intercourse]. The People have the burden of proving beyond a

716

Copyright Judicial Council of California

75

DEFTS. MSJ C 343

　　　　　　　　**CALCRIM No. 1000**

**reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. If the People have not met this burden, you must find the defendant not guilty.]**

---

*New January 2006; Revised February 2013, February 2014*

## BENCH NOTES

### Instructional Duty

The court has a **sua sponte** duty to give an instruction defining the elements of rape or spousal rape. If spousal rape is charged, the court must include the appropriate bracketed language throughout the instruction to indicate that the parties were married.

The court should select the appropriate alternative in element 4 describing how the sexual intercourse was allegedly accomplished.

Rape requires that the victim be alive at the moment of intercourse. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1175–1177 [270 Cal.Rptr. 286, 791 P.2d 965]; *People v. Carpenter* (1997) 15 Cal.4th 312, 391 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Intercourse with a deceased victim may constitute attempted rape if the defendant intended to rape a live victim. (*People v. Kelly* (1992) 1 Cal.4th 495, 524–526 [3 Cal.Rptr.2d 677, 822 P.2d 385].) If this is an issue in the case, give the bracketed sentence that begins with "A woman must be alive . . ."

The defendant must continue to actually and reasonably believe in the victim's consent throughout the act. If the act of intercourse begins consensually and the victim then changes her mind, the victim must clearly and unequivocally communicate to the defendant her withdrawal of consent to the act. If, however, the defendant initiates the use of nonconsensual duress, menace, or force during the act, the victim's subsequent withdrawal of consent to the act may be inferred from the circumstances and need not be expressed. (*People v. Ireland* (2010) 188 Cal.App.4th 328, 338 [114 Cal.Rptr.3d 915]). If there is an issue regarding the defendant's continued belief in the victim's consent, give the second optional first sentence in the definition of "*Defense: Reasonable Belief in Consent.*"

### Defenses—Instructional Duty

The court has a **sua sponte** duty to instruct on the defense of reasonable belief in consent if there is "substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (See *People v. Williams* (1992) 4 Cal.4th 354]; *People v. Mayberry* (1975) 15 Cal.3d 143, 153–158 [125 Cal.Rptr. 745, 542 P.2d 1337].)

### Related Instructions

CALCRIM No. 1001, *Rape or Spousal Rape in Concert*, may be given in conjunction with this instruction, if appropriate.

Copyright Judicial Council of California

**DEFTS. MSJ C 344**

## 1003. Rape of Unconscious Woman or Spouse (Pen. Code, §§ 261(a)(4), 262(a)(3))

---

The defendant is charged [in Count _____] with raping (a woman/his wife) who was unconscious of the nature of the act [in violation of _____ <insert appropriate code section[s]>].

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant had sexual intercourse with a woman;

2. He and the woman were (not married/married) to each other at the time of the intercourse;

3. The woman was unable to resist because she was unconscious of the nature of the act;

AND

4. The defendant knew that the woman was unable to resist because she was unconscious of the nature of the act.

*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis. [Ejaculation is not required.]

A woman is *unconscious of the nature of the act* if she is (unconscious or asleep/ [or] not aware that the act is occurring/ [or] not aware of the essential characteristics of the act because the perpetrator tricked, lied to, or concealed information from her/ [or] not aware of the essential characteristics of the act because the perpetrator fraudulently represented that the sexual penetration served a professional purpose when it served no professional purpose).

---

*New January 2006; Revised August 2012, August 2013*

### BENCH NOTES

***Instructional Duty***

The court has a **sua sponte** duty to give an instruction defining the elements of the crime.

If spousal rape is charged, include the appropriate language throughout the instruction to indicate that the parties were married.

Select the appropriate language defining "unconscious of the nature of the act" based on the facts of the case.

***Related Instructions***

CALCRIM No. 1001, *Rape or Spousal Rape in Concert*, may be given in conjunction with this instruction, if appropriate.

728

Copyright Judicial Council of California

77

**DEFTS. MSJ C 345**

## AUTHORITY

- Elements.  Pen. Code, §§ 261(a)(4), 262(a)(3).

- Penetration Defined.  Pen. Code, § 263; *People v. Karsai* (1982) 131 Cal.App.3d 224, 233–234 [182 Cal.Rptr. 406], disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600 [250 Cal.Rptr. 635, 758 P.2d 1165].

- Unconscious of Nature of Act.  *People v. Howard* (1981) 117 Cal.App.3d 53, 55 [172 Cal.Rptr. 539] [total unconsciousness is not required]; see *Boro v. Superior Court* (1985) 163 Cal.App.3d 1224, 1229–1231 [210 Cal.Rptr. 122] [rape victim not unconscious of nature of act; fraud in the inducement].

- Assault.  Pen. Code, § 240.

- Battery.  Pen. Code, § 242; *People v. Guiterrez* (1991) 232 Cal.App.3d 1624, 1636 [284 Cal.Rptr. 230], disapproved on other grounds in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243]; but see *People v. Marshall* (1997) 15 Cal.4th 1, 38–39 [61 Cal.Rptr.2d 84, 931 P.2d 262] [battery not a lesser included offense of attempted rape].

- Perpetrator Must Impersonate Spouse of Married Woman Under Current Statute.  *People v. Morales* (2013) 212 Cal.App.4th 583, 594–595 [150 Cal.Rptr.3d 920].

### Secondary Sources

2 Witkin & Epstein, California Criminal Law (4th ed. 2012) Sex Offenses and Crimes Against Decency, §§ 1–8, 178.

6 Millman, Sevilla & Tarlow, California Criminal Defense Practice, Ch. 142, *Crimes Against the Person*, § 142.20[1][a], [5] (Matthew Bender).

Couzens & Bigelow, Sex Crimes: California Law and Procedure §§ 12:16, 12:17 (The Rutter Group).

## COMMENTARY

The statutory language describing unconsciousness includes "was not aware, knowing, perceiving, or cognizant that the act occurred." (See Pen. Code, §§ 261(a)(4)(B)–(D), 262(a)(3)(B), (C).) The committee did not discern any difference among the statutory terms and therefore used "aware" in the instruction. If there is an issue over a particular term, that term should be inserted in the instruction.

Gender-specific language is used because rape usually occurs between a man and a woman. In keeping with plain English principles, the committee used those terms to make the instruction clear and concrete.

## LESSER INCLUDED OFFENSES

- Attempted Rape of Unconscious Woman.  Pen. Code, §§ 663, 261(a)(4).

- Attempted Rape of Unconscious Spouse.  Pen. Code, §§ 663, 262(a)(3).

729

Copyright Judicial Council of California

78

DEFTS. MSJ C 346

Case 8:29-cv-00323-JWH-GJS Document 189-7 Filed 05/13/22 Page 106 of 168 Page ID #:2372

## RELATED ISSUES

### *Advance Consent*

Neither a woman's actual "advance consent" nor a man's belief in "advance consent" eliminates the wrongfulness of a man's conduct in knowingly depriving an unconscious woman of her freedom of choice both at the initiation of and during sexual intercourse. A person who commits the prohibited act necessarily acts with a wrongful intent. (*People v. Dancy* (2002) 102 Cal.App.4th 21, 37 [124 Cal.Rptr.2d 898].)

See the Related Issues section in CALCRIM No. 1000, *Rape or Spousal Rape by Force, Fear, or Threats.*

Copyright Judicial Council of California

79                                        **DEFTS. MSJ C 347**

Case 8:29-cv-00823-JWH-GJS Document 139-7 Filed 05/13/22 Page 107 of 168 Page ID
Case 2:20-cv-00973-JWH-GJS Document 139-7 Filed 01/25/23 Page 96 of 74 Page ID #:980
#:2373

EXHIBIT 9

DEFTS. MSJ C 348

 Gmail                                        

## Why I was told it was not a rape?

                                              Fri, Jun 7, 2019 at 10:23 AM



We have taken a report. Due to the confidential nature of what you have reported and the fact our emails can be viewed as public information I can't specifically comment on your case. You can come in and talk about your report. Although we are not defining at as a 261 at this time, that does not mean that circumstances will not change the coding of the report in the future. This will be forwarded to the detective bureau and they will have to conduct further follow up investigation. It would then be forwarded to the DA's office for filing consideration. As a department we take any victim reported crime seriously especially those involving a crime against a person. Please understand that these investigations are time consuming and detail oriented.

Your report number is 

Ernie


*Ernie Cramer #500*

*Lieutenant*

*El Monte Police Department*

*11333 Valley Blvd.,*

*El Monte, Ca. 91731*

*Office: (626) 580-2109*

*Email: ecramer@elmontepd.org*



81

**DEFTS. MSJ C 349**

**From:**
**Sent:** Friday, June 07, 2019 9:52 AM
**To:** Watch Commanders
**Subject:** Why I was told it was not a rape?

Hi,

I went to the station today and told the police someone I just met a few hours ago had sex with me when I passed out. After the interview I was told that it was not being considered a rape. Could you explain to me why it was not a rape when someone had sex with me when I was unable to know what I was doing? Is it DA's job to determine whether or not it was a rape?

In California a drunk night that ends in a sexual encounter can very well turn into lifetime sex offender registration and up to 8 years in prison. Many Californians are unaware of California Penal Code section 261 (a)(3), which reads:

*Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused.*

**"Date rape"** is a term commonly used to describe nonconsensual sexual intercourse that takes place between people who (1) are or were dating, or (2) are voluntarily spending time together. While **date rape** sounds more casual than a typical California rape charge, the two are, in fact, one and the same. Both are prosecuted and punished under Penal Code 261 PC, California's rape law.

Thanks.

82

**DEFTS. MSJ C 350**

EXHIBIT 10

DEFTS. MSJ C 351

626 309 7664                                    12:06:30   06-14-2019      7/12

D14 - 01541 - LJ4J U21

Officer Report for Incident [redacted]                          Page 3 of 4

**Narrative**
Officer M. Tate #578

Investigative Narrative

On Friday 06-7-19 at approximately 0825 hours I was assigned to the front lobby
as the desk officer. A female who identified herself as [redacted] walked in
to make a rape report.

I activated my department issued PUMA audio recorder and recorded my
conversation with [redacted] She told me her American name is [redacted]

[redacted] told me she met a man named "Charlie Suarez" on "We Chat" on 04 01 19. "We
Chat" is a messaging and social media application. She agreed to go out on a
date with him. On Monday 04-05-19 at 1800 hours they met for dinner at Ocean Bo
located at 3944 Peck Rd. Each of them drove themselves to the restaurant and
after dinner they went their own ways.

She said she went home and had a sip of wine and at approximately 2027 hours
they texted each other again. She agreed to meet him at her residence to go and
have drinks. She said he told her he had Japanese whiskey and Spanish wine. She
willingly gave him her address and he met her at her residence. She said she met
him outside and she left with him in his vehicle to go sight seeing from a
hilltop in Montebello. There she willingly drank whiskey with him. She said she
was not forced to drink the alcohol and she did not observe anything out of the
normal as he poured her drinks. He also drank whiskey with her.

At approximately 2300 hours on that same night, he drove her back to her
residence and parked his vehicle on the street at [redacted]
While both were seated inside the vehicle they drank wine. She wanted water so
she got out of the vehicle and walked into her residence and retrieved a bottle
of water while he remained inside the vehicle. She said she walked back out of
her residence and continued to drink wine with Charlie while inside his vehicle.

[redacted] said she must have passed out because she does not remember what occurred
after that. She said she woke up the next day 04-02-19 at approximately 0800
hours and was in bed inside of an unknown motel room with Charlie lying down
next to her. She said she was naked and her "vagina burned" and she felt
confused so she assumed she was raped. Charlie also woke up at the same time she
did. [redacted] told me she then had consentual vaginal sexual intercourse with Charlie
after they woke up. She said she gave consent and willingly had sexual
intercourse with him because she wanted to do so. She also told me it was
"pointless" to say no to him since she assumed she had already had sex with him
over night. [redacted] said Charlie then dropped her off at home. Later on that day at
approximately 1011 hours they sent texts to each other.

[redacted] and Charlie continued to text on "We Chat" and continued to have a
relationship. She said they went out to dinner again on 05-03-19 and were
supposed to meet at a motel in Los Angeles afterwards but she changed her mind
and did not meet with him at the motel. [redacted] stated she stopped talking to
Charlie on "We Chat" on 05-30-19 and agreed they both ended their relationship
mutually.

06/14/19

84

626 309 7664                                                          12:07:05   06-14-2019      9/12

Officer Report for Incident                                          Page 4 of 4

_____ showed me some texts on her cell phone between Charlie and her.  I read a
text in which he told her, "your pussy was so tight" and she replied "you
haven't been with Asian". She then text him, "I haven't been with someone for 4
years". He then told her, "maybe we can do anal next time to give your pussy a
break" and she replied "ok". She then messaged him "I can't wait to kiss you."

I asked _____ what made her think she was a victim of rape. She stated it was not
typical of her to sleep with someone on her first date, so when she woke up in
the morning and was naked at a motel she thought that she was raped. If she did
not remember what happened then she was unable to give consent. She also stated
no one threatened her or forced her to drink whiskey or wine or to see Charlie.
She never saw  Charlie or anyone else put anything into her drinks or into her
food.

_____ told me all she knows about Charlie is that he is  a Hispanic male,
approximately 33 years old who works at G&G Amament in South El Monte.

I ended my interview with _____ and subsequently down loaded the recording into
PUMA as evidence at the El Monte Police Department. I explained to _____ that a
miscellaneous report of the incident was taken.

END

06/14/19

85

DEFTS. MSJ C 353

Case 2:20-cv-00923-JWH-JDE   Document 139-7   Filed 01/27/20   Page 96 of 154   Page ID #:98:0

EXHIBIT 11

86

**DEFTS. MSJ C 354**

**A E**

*The Prosecutors' Newsletter on Violence Against Women*

Issue # 2 • July 2010

AEquitas

STRATEGIES Newsletter

ISSUE #2 • July 2010

# Educating Juries in Sexual Assault Cases

## Part I: Using Voir Dire to Eliminate Jury Bias

### By Christopher Mallios, JD and Toolsi Meisner, JD¹

Crimes of sexual violence continue to be misunderstood even though there has been significant research surrounding the dynamics of sexual assault and its impact on victims during the last three decades.¹ We now understand much more about these crimes, the people who commit them, and the way victims respond to trauma. Unfortunately, we cannot assume that the results of this research have infiltrated the minds of the average layperson, juror, or judge.

Too many people still believe the outdated and disproved mythology that surrounds sexual violence.² Rape myths shift the blame for the crime from the rapist to the victim.³ When a fact-finder in a sexual assault case accepts a rape myth as true, the prosecutor faces tremendous barriers to achieving justice for victims and holding offenders accountable for their crimes.

This article is the first in a series that will explain strategies to educate juries about sexual violence facts and overcome common misconceptions. In addition to providing data-driven information about sexual assault based on research, journal articles, and authoritative publications, this article will suggest ideas to improve jury selection techniques. Future articles in this series will provide additional material to provide prosecutors with information and strategies to educate, dispel common misconceptions, and convey the truth to fact finders through other aspects of trial practice, including opening statements, direct examination, calling expert witnesses, and closing arguments.⁴

To be effective in prosecuting crimes of sexual violence, prosecutors must understand the research and statistics about sexual assault in order to educate judges and juries about sexual assault dynamics and common victim responses. Although much of the data in this area is not generally admissible in a criminal case, prosecutors can benefit from a thorough understanding of the dynamics of sexual assault because it will aid them when devising trial strategies, anticipating defenses, preparing victims, and developing effective cross-examinations and arguments.

Further, prosecutors who truly understand sexual violence can better identify jurors who might harbor mistaken beliefs and accept false mythology about sexual violence and poison the rest of the jury with misinformation. When the prosecution selects jurors who have a more realistic understanding of the dynamics of sexual assault, they are more likely to be fair and perhaps even help educate other jurors during deliberation.

## VOIR DIRE PRACTICE AND LEGAL AUTHORITY

Voir dire practice can differ depending on what state, county, and judge has jurisdiction over the case. Most jurisdictions have appellate case law addressing the defendant's right to conduct voir dire and the prosecutor's ability to be fair and follow the law. Appellate courts, however, have few opportunities to address the prosecutor's right to question jurors about the mistaken beliefs about rape they possess that would interfere with their ability to follow the law.⁵ Prosecutors can make a persuasive argument that jurors with firmly held but mistaken beliefs about rape are unlikely to be able to follow the court's instructions in the law⁶ and that specific questioning in this area is the only way to ascertain the prevalence of rape myths in the jury panel.⁷ Despite considerable research and publications in professional and popular journals concerning rape, [rape] myths continue to persist in common law reasoning.⁸

Traditional voir dire questions regarding jurors' abilities to follow the law, assess witness credibility, understand the burden of proof, and other common areas of inquiry might not sufficiently address potential jurors' emotional reactions to sexual assault cases. An increasing number of jurisdictions are curtailing the ability of prosecutors and defense attorneys to conduct meaningful voir dire of jurors in the name of "judicial economy." The prevalence of rape myths, however, weighs in favor of judges creating exceptions to the general rule of strictly limiting juror voir dire in sexual assault cases.⁹

## GOALS OF VOIR DIRE IN SEXUAL ASSAULT CASES

In the general sense, the goal of voir dire is to select a jury that can be fair to both sides and render a verdict based on an application of the facts as the jury finds them and the law as the judge instructs them. Through a process where each side questions potential jurors and strikes jurors that appear to be biased against them, a fair jury emerges. In sexual assault cases, however, there are additional goals. For example, jurors do not harbor "robbery myths" that stand in the way of justice for robbery victims. In a sexual assault case, another goal of jury selection is to delve into juror rape myth acceptance and begin to redefine these problematic beliefs into juror competence. Jury selection should also begin to prepare the jury for the evidence, touch on difficult facts, and prepare the jury for the use of graphic terminology and evidence. Another goal, when possible, is to use a jurors' life experiences to educate the other jurors about friends or family members who have been victims of sexual assault and discuss their reactions to being victimized. This can set the stage for later evidence and arguments about victim behavior.

## SUGGESTIONS FOR VOIR DIRE IN SEXUAL ASSAULT CASES

A victim is more likely to be sexually assaulted by someone s/he knows – friend, date, intimate partner, classmate, neighbor, or relative – than by a stranger.¹⁰ Sexual violence can occur at any time and there is no way to adequately predict who might be a perpetrator. Unfortunately, non-strangers and familiar places are often the most dangerous to victims. According to a large study of women who were raped or sexually assaulted during 2002, sixty-seven percent identified the assailant as a non-stranger.¹¹ Another study found that 8 out of 10 victims know the people who raped them.¹² Another study found that nearly 6 out of 10 sexual assault incidents occurred in the victim's home or at the home of a friend, relative, or neighbor.¹³ These studies, which are all based on statistics compiled by the U.S. Department of Justice, conclusively support the fact that most rapists are non-strangers.

There is no racial, socio-economic, professional, or other demographic profile that typifies a rapist. This type of criminal is not physically identifiable and often appears friendly and non-threatening.¹⁴ Researchers and sexual violence experts spend considerable time undermining the rapists, but their messages are often undermined by the images perpetuated by popular media coverage of sexual assault cases. It is understandable, therefore, that jurors are commonly reluctant to convict attractive and sociable sexual assault defendants who are known to their victims.

87

DEFTS. MSJ C 355

Case 8:20-cv-00323-JWK-GJS Document 189-7 Filed 05/13/22 Page 154 of 168 Page ID #:2381

Sexual assault defendants commonly appear in court well groomed and well dressed. They might also be married and have children. Jurors confronted with this image may be reluctant to convict without a constant reminder that the defendant is purposeful and dangerous. When the defendant is also a friend or family member of the victim and uses that relationship to gain, and then betray the victim's trust, jurors may need to be informed in order to recognize and understand the defendant's predatory behavior.[6]

In jurisdictions where prosecutors are permitted to ask questions of potential jurors during voir dire, it might be appropriate to ask whether a potential juror would be less likely to convict a defendant of rape if that defendant were a partner, friend, or acquaintance of the victim. The answer to this question provides insight into whether the juror knows that the majority of rapes even if the victim was drinking, whether they view non-strangers as seriously as those committed by strangers. A juror who understands the prevalence of non-stranger sexual assaults can also educate ill-informed jurors on the panel.

Another question to pose to jurors deals with their abilities to follow the judge's instructions regarding the definition of rape regardless of their personal beliefs. If the victim and defendant were in a relationship prior to or during the rape, tell prospective jurors that they will bear evidence about that relationship would concern them when deciding the case. As always, follow-up questions regarding whether the juror expects rapists to be strangers and whether they can follow the law in this area would be useful to probe the beliefs behind the juror's answers.

Sexual violence is never the victim's fault. No other crime victim is looked upon with the degree of blameworthiness, suspicion, and doubt as a rape victim. Victim blaming is unfortunately common and is one of the most significant barriers to justice and offender accountability.

Victim blaming can be expressed in several themes: victim masochism (e.g., she enjoyed it or wanted it), victim precipitation (e.g., she asked for it or brought it on herself), or victim fabrication (e.g., she lied or exaggerated).[7] In a criminal trial, the defense might appeal to some or all of these common victim-blaming biases to help the defendant avoid accountability. Further, it can translate into jurors blaming victims for their choices in an attempt to distance

---

themselves from the victim and the crime thereby preserving the perception that they are safe if they do not make the same choices as the victim.

When allowed, prosecutors may consider asking questions to determine whether potential jurors understand the importance of holding the offender and not the victim accountable for crimes of sexual violence. For example, prosecutors could ask jurors whether they believe that a victim can be raped even if that victim consented to some other measure of intimate contact before the rape occurred.

In some cases it may be important to gauge whether jurors will still follow the law when the facts do not present the most sympathetic victim. Prosecutors may need to ask questions to determine whether jurors believe that a defendant can commit the crime of rape even if the victim was drinking, using drugs, dressed in a way that the jurors perceive as provocative, being prostituted, or engaged in any other behavior that may inappropriately cause victim blaming. Prosecutors should directly address victim behavior that jurors might consider problematic by preparing them for such behavior during the voir dire process. Through certain voir dire questions, prosecutors can also inform jurors that they will bear evidence regarding the victim's behavior before or after the assault that might cause jurors concern. For example, prosecutors may consider asking whether certain behaviors would cause the jurors unease and interfere with their ability to follow the court's instructions and render a fair verdict.

Prosecutors can counter victim-blaming myths throughout the trial by stressing that without consent, "No" means "No," no matter what the situation or circumstances. It doesn't matter if the victim was drinking or using drugs, out at night alone, gay or lesbian, sexually exploited, on a date with the perpetrator, or if the jurors believe the victim was dressed seductively. No one asks to be raped. The responsibility and blame lie with the perpetrator who took advantage of a vulnerable victim or violated the victim's trust to commit a crime of sexual violence.

Rape is an act of violence and aggression in which the perpetrator uses sex as a weapon to gain power and control over the victim. It is a common defense tactic in rape trials to redefine the rape as sex and try to capitalize on the mistaken belief that rape is an act of passion that is primarily sexually motivated. It is important to draw the

---

legal and common sense distinction between rape and sex.

There is no situation in which an individual cannot control his sexual urges.[8] Sexual excitement does not justify forced sex and a victim who engages in kissing, hugging or other sexual touching maintains the right to refuse sexual intercourse. Rapists do not rape because they want to have sex and many rapists also may have partners with whom they engage in consensual sex. Sexual deviance and character traits form the motives for rapists' behaviors.[9] Their sexual deviance may cause them to be aroused by exploiting the physical and/or psychological vulnerabilities in their victims, whether they result from intoxication or physical or mental disabilities. Rapists are also motivated by character traits common to many criminals.

When an offender has a criminal, narcissistic, or otherwise interpersonally and socially compromised personality, he can be motivated to offend for a variety of reasons. He may lack the internal barriers that prevent offending, like guilt, remorse, empathy, or compassion. He may maintain a belief system, which devalues the rights of others and over-values his rights. He may be indifferent to, or aroused by, the pain, suffering, injury, or humiliation of others. The offender also may feel that the rules of society do not apply to him.[10]

When conducting voir dire, prosecutors should look out for any answers that indicate that a potential juror might confuse sex with sexual violence and aggression. If a juror harbors attitudes that excuse sexual violence as something that men "simply can't control", they will not be able to deliberate fairly.

There is no "typical" sexual assault victim. Sexual violence can happen to anyone, regardless of sex, race, age, sexual orientation, socio-economic status, ability or religion. Prosecutors might come across jurors who think that "real" sexual assault victims are attractive, young or sexually inexperienced. This particular stereotype of sexual assault victims is often related to the mistaken belief that rape is about sex, rather than violence, and that the attractiveness of the victim is one of the "causes" of the assault.

---

Although there is no typical sexual assault victim, studies indicate that certain groups are victimized at higher rates than others. One study found that people with disabilities have an age-adjusted rate of rape or sexual assault that was more than twice the rate for people without disabilities.[11] For individuals with psychiatric disabilities, the rate of violent criminal victimization including sexual assault was two times greater than in the general population.[12] American Indian and Alaska Native women and girls are victims of rape or sexual assault at a rate that is double that of other racial groups.[13]

The elderly, boys and men, sexually exploited women, or persons with disabilities challenge many jurors' beliefs about rape. Questioning potential jurors about their expectations of rape victims and whether they would be able follow the law and render a verdict of guilty, even if the victim does not fit their idea of what a "typical" rape victim should be, will help identify misinformed jurors who may need to be eliminated or educated.

Most victims do not incur physical injuries from sexual assaults. Many of the unwanted and forced acts that take place during a sexual assault do not result in visible non-genital injuries. Most adult rape victims do not have any non-genital injuries from sexual assaults. According to a study examining the prevalence of injuries from rape, only 5 percent of forcible rape victims had serious physical injuries and only 33 percent had minor injuries.[14] This study also showed that most victims of rape, attempted rape, and sexual assault do not receive medical treatment for their injuries. Furthermore, the presence or absence of genital injuries following a rape is not necessarily significant when evaluating a case. Early studies of rape examinations found that most rape victims did not have any genital injuries.[15] These initial studies, which relied on direct visualization without any magnification or staining techniques, found genital injury rates between 5 and 40 percent.[16] In jurisdictions where forensic sexual assault examiners use only direct visualization techniques without magnification or staining, injury rates would be expected to fall within the range of those studies.

Using the latest examination techniques, including direct visualization, colposcopy, staining techniques, and digital imaging, studies indicate the occurrence of genital injury after rape to be between 50 and 90 percent.[17] These newer examination techniques allow examiners to document

many more minor injuries, however, more research is necessary to determine the prevalence of genital injuries after consensual sexual activity and the relevance, if any, of injury patterns in sexual assault examinations.

Jurors must understand that rape is a life-threatening event and victims make split-second decisions about how to react to sexual violence in order to survive. Some victims respond to the severe trauma of sexual violence through the psychological phenomenon of dissociation, which is sometimes described as "leaving one's body," while some others describe a state of "frozen fright," in which they become powerless and completely passive. Physical resistance is unlikely in victims who experience dissociation or frozen fright or among victims who were drinking or using drugs before being assaulted.[A] To a rape victim, a threat of violence or death is immediate regardless of whether the rapist uses a deadly weapon. The absence of injuries might suggest to some jurors that the victim failed to resist and, therefore, must have consented. The fact that a victim ceased resistance to the assault for fear of greater harm or chose not to resist at all does not mean that the victim gave consent. Each rape victim does whatever is necessary to do at the time in order to survive. The victim's decisions about whether to resist during a sexual assault can lead to jurors victim-blaming or perceiving the victim as less credible and must therefore be directly addressed by prosecutors.

In conducting voir dire, prosecutors may be able to ask questions to probe potential jurors' expectations that sexual assault victims must have suffered serious injuries. In cases involving a victim who has minor or no injuries, prosecutors may consider asking potential jurors whether they would not believe that a victim had been raped if the rapist did not use a deadly weapon or inflict serious injuries. To gain additional insights into the beliefs of potential jurors in this area, prosecutors may even consider asking whether jurors believe that a certain level of resistance is necessary for the crime of rape to occur. Furthermore, if the prosecution intends to call an expert to explain the lack of injuries, it may be important to ask whether potential jurors might be inherently distrustful of expert testimony.

A related issue pertains to jurors' unrealistic expectations and demands for other types of forensic evidence such as fingerprints and scientific testing such as criminalistics and DNA tests. Many prosecutors believe based on first-hand

experience that the "CSI Effect" is one of the most significant barriers to justice in sexual assault cases.[A] In cases in which jurors might have heightened expectations regarding the availability of scientific evidence, it might be appropriate during voir dire to inquire into those expectations and begin to educate the jurors about why such evidence might not be available or probative based on the facts of the case.

Most rape victims delay reporting their victimization to law enforcement or never report at all. Victims of sexual assaults respond in various ways, including the manner in which they report incidents, if at all. Many victims choose not to report their victimization because they believe that it is a private or personal matter, fear the defendant, or believe the police are biased against them.[A] Some victims may be embarrassed or distrust law enforcement or the court process. The same reasons cause many victims who do file police reports to do so after some time has passed.

Studies show that sexual assault is one of the most underreported crimes, with 60 percent still being unreported.[A] The closer the relationship between the victim and the perpetrator, the less likely the victim was to report the crime to the police.[A] When the perpetrator is a current or former husband or boyfriend, that rate of reporting drops to approximately 25 percent.[A] Males are the least likely to report a sexual assault, though males make up approximately 10 percent of all victims.[A]

Victims may exhibit a range of emotional responses to assault: calm, hysteria, laughter, anger, apathy, or shock. Each victim copes with the trauma of the assault in a different way. Victims of sexual assault are three times more likely than the rest of the population to suffer from depression, six times more likely to suffer from post-traumatic stress disorder, thirteen times more likely to abuse alcohol, twenty-six times more likely to abuse drugs, and four times more likely to contemplate suicide.[A]

Depending on the facts of the case and how the victim acted after the assault, prosecutors may need to question jurors to ascertain whether specific victim behaviors would concern them and cause them to make adverse prejudgments about victim credibility. Additional questions about whether jurors could fairly consider expert testimony regarding victim behavior might be appropriate in cases in which the prosecution will introduce expert testimony.

Victim credibility is often the primary issue in sexual assault prosecutions and this is especially so in non-stranger cases. Some people are so skeptical of sexual assault allegations that they assume that most victims are lying when they report their victimization to law enforcement. The mistaken belief that most sexual assault allegations are false is unfortunately common. Significantly, methodologically reliable research indicates that only 2 to 8 percent of sexual assault cases involve false reporting.[A] This research conclusively disproves a common myth that most rape victims lie about being raped; nevertheless, defense attorneys may design a defense strategy to appeal to jurors who believe the oft-repeated myth that most rape victims lie. Expert testimony about the credibility of a witness is inadmissible and prosecutors will unlikely be allowed to ask potential jurors about their pre-conceived ideas about the credibility of a witness. Nevertheless, to the extent that the court will permit the prosecution to explore whether potential jurors harbor a general belief that most rape allegations are false, some questioning in this area could reveal anti-victim biases that could interfere with the juror's ability to be fair. Questions about whether a juror will wait and bearing all of the evidence - including expert testimony regarding common victim reactions to sexual assault - to decide the credibility of a witness can help reveal biased potential jurors and identify those who may be able to educate other members of the jury.

## CONCLUSION

The jury selection process is the first opportunity for a prosecutor to begin educating jurors in a sexual violence case and allows prosecutors to identify and strike jurors whose biases will interfere with their ability to follow the law and render a fair verdict. Using deliberate and thoughtful language when explaining the facts of the case, providing context for victim behavior, and inquiring about jurors' life experiences can help prosecutors dispel myths and counter the defense strategies that seek to exploit them.

Successful juror education begins with voir dire, continues throughout the entire trial, and culminates with a strong closing argument. An appreciation of the facts about sexual violence is key to that success. A skillful jury selection is only the initial step in an effective prosecution strategy that will yield the best possible result in prosecuting these difficult cases. An effective strategy in these cases must continue with the collection and presentation of all corroborating

evidence, application of solid trial advocacy skills, and the use of expert witnesses, where appropriate, to maximize offender accountability, and achieve justice.

Forthcoming articles in this series will further discuss the topic of juror education. In the meantime, please visit www.aequitasresource.org for additional information and resources related to the prosecution of sexual assault and other violence against women and related cases.⚥

## UPCOMING TRAINING EVENTS

National Institute on the Prosecution of Sexual Violence II

November 16–19, 2010 in Washington, DC

This institute is presented in partnership with the Pennsylvania Coalition Against Rape and the US Department of Justice, Office on Violence Against Women. Seating is limited; to apply, this course is open to all prosecutors and advocates. There is no charge; however, priority will be given to SDVC attorneys who have previously attended NIPSV. There is no limit to the number of attendees from any jurisdiction.

---

National Institute on the Prosecution of Sexual Violence I

January 11–15, 2011 in Washington, DC

This institute is presented in partnership with the Pennsylvania Coalition Against Rape and the US Department of Justice, Office on Violence Against Women. Seating is limited; to apply, this course is open to all prosecutors and advocates. There is no charge; however, priority will be given to SDVC attorneys who will be first in the number of attendees from any jurisdiction.

For additional information please visit: http://www.aequitasresource.org/training.cfm

DEFTS. MSJ C 357

EXHIBIT 12

**DEFTS. MSJ C 358**



<div style="text-align:right">

3360 Shelby Street
Ontario, CA 91764

Telephone (909)860-0696
Fax (909)590-2938
www.adminsure.com

</div>

December 02, 2019



Reference:    Principal:           City of El Monte
                Loss Date:        06/07/2019
                Claim(s) Made:   12/03/2019
                Claimant(s):
                Our File Number:

Dear Ms.

We are the Third Party Administrators handling the liability claims for the City of El Monte.

This is an acknowledgment of the claim you presented to the City of El Monte on 12/03/2019. In the future, you should address all information and inquiries to my attention.

Our investigation has begun and we will be communicating with you in the near future in regard to this matter.

Should you have any questions or wish to discuss this matter, please do not hesitate to contact the undersigned.

Sincerely,

David Trautz
Liability Administrator
(909)978-1124
dtrautz@adminsure.com

cc:    City of El Monte

<div style="text-align:right"><strong>DEFTS. MSJ C 359</strong></div>



█@gmail.com>

**File** █████████████████

Wed, Jan 22, 2020 at 11:05 AM

Since 45 days have been passed I'm not going to wait for your investigation result. I will take my legal action pretty soon.

On Wed, Jan 22, 2020, 10:03 AM David Trautz <DTrautz@adminsure.com> wrote:

Good morning

I hope you received our claim acknowledgement letter sent by mail on 12/02/19. Our investigation is still ongoing, and we will let you know once our investigation is complete.

Thank you for your patience,

David Trautz, AIC, ARM-P, SIA, WCCP, WCCA

Liability Supervisor

AdminSure Inc.

3380 Shelby Street

Ontario, CA 91764-5566

Phone 909-978-1124 | Fax 909-860-3995

dtrautz@adminsure.com

www.adminsure.com

**From:** ███████████████
**Sent:** Tuesday, January 21, 2020 9:30 PM
**To:** David Trautz <DTrautz@adminsure.com>
**Subject:** File #19-145601

CAUTION: This message originated from outside AdminSure's email system. If you don't recognize the sender's name AND email address, DO NOT reply to or forward the email or click on any links or attachments.

Hi David,

I have filed a gov claim against City of El Monte on December 3, 2019. It has been over 45 days but I have not received any notice regarding your action. Looking forward to hearing from you.

92

**DEFTS. MSJ C 360**

EXHIBIT 13

DEFTS. MSJ C 361



# COUNTY OF LOS ANGELES
## OFFICE OF THE COUNTY COUNSEL
648 KENNETH HAHN HALL OF ADMINISTRATION
500 WEST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012-2713

TELEPHONE
(213) 974-1913
FACSIMILE
(213) 687-8822
TDD
(213) 633-0901

MARY C. WICKHAM
County Counsel

January 13, 2020



Re:   **Claim Presented:**        **December 5, 2019**
      **File Number:**

Dear Claimant:

Notice is hereby given that the claim that you presented to the County of Los Angeles, Board of Supervisors on **December 5, 2019**, was rejected on **December 24, 2019**.

An investigation of this matter fails to indicate any liability on the part of the County of Los Angeles, its officers, agents, or employees. Accordingly, your claim was rejected on that basis. No further action will be taken on this matter.

## WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. (See Government Code section 945.6.)

This time limitation applies only to causes of action for which Government Code Sections 900 - 915.4 require you to present a claim. Other causes of action, including those arising under federal law, may have different time limitations.

HOA.102759891.1

94

**DEFTS. MSJ C 362**

FILED
CLERK, U.S. DISTRICT COURT

5/20/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ DD ____ DEPUTY

1    JANE DOE

2

3

4

5    Plaintiff in Pro Se

**EXHIBIT**

**2**

5.6.22 S. Almaguer-Miller, CSR #8767

6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11   **JANE DOE**, an individual,                No.   2:20-cv-04525-JAK(PVCx)

12              Plaintiff,

13      v.                                        **COMPLAINT FOR DECLARATORY AND
                                                  INJUNCTIVE RELIEF**
14   **GAVIN NEWSOM**, in his official
     capacity as the Governor of California;
15   **XAVIER BECERRA**, in his official
     capacity as the Attorney General of
16   California,

17              Defendants.

RECEIVED
CLERK, U.S. DISTRICT COURT

5/18/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ DD ____ DEPUTY

18

19

20

21        Plaintiff JANE DOE ("Plaintiff") alleges and complains the following, on information and

22   belief except for information identified as being based on personal knowledge.

23

24                                **INTRODUCTION**

25        1.      Cal. Penal Code §739 bans private citizens to pursue justice in the criminal courts

26   by initiating a criminal case themselves and leaves them zero alternative remedy in cases where

27   law enforcement personnel have failed crime victims.

28        2.      California, of course, is free to decide whether or not to prosecute against a

                                              1

                                                        **DEFTS. MSJ C 363**

1  suspect. But it cannot shut crime victims out of criminal justice system, especially in a manner

2  that discriminates against them.

3      3.      Cal. Penal Code §739 discriminates against Plaintiff in her exercise of a

4  fundamental right without adequate justification.

5      4.      Plaintiff now brings this case to vindicate her constitutional right to equal

6  protection of the law, and to vindicate the rights of all other crime victims in California who no

7  longer feel secure in their community because of law enforcement personnel's egregious

8  indifference toward their safety.

9      5.      In this action, Plaintiff seeks a declaration invalidating, and order enjoining,

10  enforcement of Cal. Penal Code §739 against crime victims for criminal prosecution initiation.

11  This statute discriminates against crime victims, and obstructs their ability to pursue criminal

12  justice and seek accountability. It therefore violates the Equal Protection Clause of the

13  Constitution.

14      6.      As described in more detail below, law enforcement personnel's response to a

15  heinous crime – rape is conscience shocking. Law enforcement personnel's response includes

16  their discriminatory practice and ill will, their betrayal of public trust, and failure to protect

17  residents from victimization by rapists. Our law enforcement's response to rapes sends a

18  catastrophic message to the whole of our society. To rape victims: bringing a complaint is useless.

19  To rapists: you're allowed to rape as many women as you want and there will be no consequence!

20      7.      The enforcement of Cal. Penal Code §739 and law enforcement personnel's failure

21  on their duties subject Plaintiff and other crime victims to continued risk at the hands of

22  perpetrators who are never held accountable.

23

24                          **PARTIES**

25      8.      Plaintiff, JANE DOE ("Plaintiff"), is a resident of ▮▮▮▮▮▮

26  ▮▮▮▮▮▮

27      9.      Defendant Gavin Newsom ("Newsom") is the Governor of the State of California

28  (the "State") and is being sued in his official capacity. Newsom has "[t]he supreme executive

2

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 364**

1    power" of the State and is charged with "see[ing] that the law is faithfully executed." CAL.

2    CONST. Art. V, § 1. As head of the Executive Branch, he has a duty to "supervise the official

3    conduct of all executive and ministerial officers," including the Attorney General. CAL. GOV'T

4    CODE § 12010. In light of these duties, Newsom has responsibility for enforcing Cal. Penal Code

5    §739.

6          10.    Defendant Xavier Becerra ("Becerra") is made a party to this action in his official

7    capacity as the Attorney General of California. Under California law he is the chief law

8    enforcement officer with supervision over all law enforcement agencies in the state. CAL.

9    CONST. Art. V, § 13.

10

11                      **JURISDICTION AND VENUE**

12          11.    This Court has jurisdiction under 28 U.S.C. § 1331 because whether Cal. Penal

13    Code §739 violates the United States Constitution is a federal question.

14          12.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's

15    request for relief because that claim is "so related to claims in the action within [this Court's]

16    original jurisdiction that [it] form[s] part of the same case or controversy." 28 U.S.C. § 1367(a).

17          13.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial

18    part of the events or omissions that give rise to this action occurred within this district and state.

19

20               **CAL. PENAL CODE §739 AND IT'S EFFECT**

21          14.    Cal. Penal Code §739 provides that "When a defendant has been examined and

22    committed, as provided in Section 872, it shall be the duty of the district attorney of the county in

23    which the offense is triable to file in the superior court of that county within 15 days after the

24    commitment, an information against the defendant which may charge the defendant with either

25    the offense or offenses named in the order of commitment or any offense or offenses shown by

26    the evidence taken before the magistrate to have been committed. The information shall be in the

27    name of the people of the State of California and subscribed by the district attorney."

28          15.    Cal. Penal Code §739 offers no exceptions to its blanket prohibition on private

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prosecution. When the state monopolizes a certain area, certain positive duties should be and are

imposed on it. Thus, when the state employs prosecutors to initiate prosecutions, and the

prosecutors fail to fulfill their duties, the harmed individuals should be allowed to bring an action.

16.     A tort victim can initiate an action against their infringer but a crime victim has no

say on prosecution of their assailant.

17.     Cal. Penal Code §739 has both the purpose and effect of depriving crime victims

of equal protection when law enforcement personnel conspire and practice discriminatory under-

policing and selective under-enforcement against crime victims, including Plaintiff. Crime

victims are being shut out of criminal justice system by Cal. Penal Code §739.

18.     The monopoly on criminal prosecution achieves no compelling state interest and

undermines the quality of justice.

### CRIMINAL PROSECUTION AND SYSTEMIC FAILURE IN CALIFORNIA

19.     As the United States Supreme Court has explained, the prosecutor represents "a

sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at

all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that

justice shall be done." A prosecutor is held to a standard higher than that imposed on other

attorneys because of the unique function he or she performs in representing the interests, and in

exercising the sovereign power, of the state.

20.     American Bar Association Criminal Justice Standards for the Prosecution

Function: Standard 3-1.2 Functions and Duties of the Prosecutor (b) The primary duty of the

prosecutor is to seek justice within the bounds of the law, not merely to convict. Standard 3-4.4

Discretion in Filing, Declining, Maintaining, and Dismissing Criminal Charges (c) A prosecutor

may file and maintain charges even if juries in the jurisdiction have tended to acquit persons

accused of the particular kind of criminal act in question.

(https://www.americanbar.org/groups/criminal_justice/standards/ProsecutionFunctionFourthEditi

on/ )

21.     In cases which involve a **serious threat** to the community, the prosecutor should

4

DEFTS. MSJ C 366

1   not be deterred from prosecution by the fact that in the jurisdiction juries have tended to acquit

2   persons accused of the particular kind of criminal act in question because prosecutors have an

3   ethical obligation to pursue difficult cases for public safety reasons.

4        22.    According to National District Attorneys Association ("NDAA"), rape cases rarely

5   have physical evidence that conclusively proves that a rape occurred. The evidence need not

6   **conclusively** prove that a rape occurred; rather, it must give the jury a sufficient **context** in which

7   to evaluate the victim's credibility. (http://atixa.org/wordpress/wp-

8   content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf)

9        23.    Physical evidence can prove that the intercourse happened, but not the absence of

10   consent. When there's no issue about who the assailant is DNA doesn't really contribute

11   anything. Victim's reaction or whether or not victim stays contact with the perpetrator is not a

12   crime element. It's prosecutor's duty to educate the jury the right way to identify whether or not a

13   crime occurred.

14        24.    In 2018 in California the arrest rate of rape is as low as 16.4% while arrest rate of

15   aggravated assault is 85.5%. (https://data-openjustice.doj.ca.gov/sites/default/files/2019-

16   07/Crime%20In%20CA%202018%2020190701.pdf)

| Law Enforcement Agency | Arrest rate between 2014 and 2018 | |
| --- | --- | --- |
| | Rape | Aggravated Assault |
| Cotati Police Depart ("Cotati PD") | 33% | 58% |
| Concord Police Depart ("Concord PD") | 18% | 83% |
| Los Angeles County Sheriff's Depart ("LASD") | 34% | 62% |

21        25.    California law enforcement agencies have reported rape at "unfounded" rates in

22   recent years as <u>high</u> as 55% in Concord, 53% in Berkeley, and a statewide clearance rate

23   of <u>40.8%</u> in 2016 (higher than the national average of 37%). These fundamental investigative

24   problems still remain today.

25   (https://www.buzzfeednews.com/article/alexcampbell/unfounded#.wa7gk54Zr)

26        26.    Los Angeles County District Attorney's Office ("LADA") declares that their

27   office's top priority is the prosecution of violent and dangerous criminals – murders, rapists, gang

28   members, child abusers and robbers among them. (http://da.lacounty.gov/about/office-overview)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 367

27.     Jackie Lacey ("Lacey", Los Angeles County District Attorney) adopts "no policy" policy. As the largest local prosecutorial office in the nation, no written policies relating to prosecution of rape exists which suggests deliberate indifference to rape victims safety and a general disinterest in prosecuting sexual assaults due to bias (Lacey has publicly been criticized for inaction in the case of four women who report having been raped by actor Danny Masterson. Lacey has been aware that a pattern and custom of unconstitutional violations exists). The lack of written policy allows LADA Officials to make wholly arbitrary decisions.

28.     Lacey also enforces a "non-law", falsely requiring corroboration and evidence of force to establish rape, a requirement that is not required by law or jury instruction; (Lacey openly said acquaintance cases are particularly difficult to prove, unless the accused admits what happened, makes incriminating statements, or the victim's account can be corroborated with independent evidence, reflecting higher criteria compared to other crimes with no showing of valid state interest but solely aiming at conviction rate for prosecutor's own personal interest. (https://www.nbclosangeles.com/news/local/former-socal-police-officer-will-not-face-rape-charge/2227236/)

29.     Lacey consciously manipulates prosecution for political purposes. (https://variety.com/2020/politics/news/weinstein-rape-charges-los-angeles-1203461860/)

30.     Lacey employs disparate unwritten policy to rape cases compared to other type of crimes. According to prosecution data obtained by NBC4's I-Team, in LA County, in 2018 police presented 815 forcible rape investigations to prosecutors. Charges were filed in 188 reflecting an extremely low prosecution rate of 23%. This compares to a higher rate at every stage for non-rape crimes, reflecting the lowest priority of LADA's efforts.

31.     Contra Costa County District Attorney ("CCDA") declares that their office's mission is to seek justice and enhance public safety for all their residents by fairly, ethically, aggressively and efficiently prosecuting those who violate the law, and by working to prevent crime. (https://www.contracosta.ca.gov/7284/District-Attorney)

32.     Between 2017 and 2018, CCDA's prosecution rate of rape is as low as 34% although few sex crimes referred for prosecution by police and sheriff.

6

DEFTS. MSJ C 368

1       33.    District Attorney's Office of Sonoma County ("SDA")'s mission statement

2  indicates that "We shall seek truth and justice in a professional manner, while maintaining the

3  highest ethical standards." (http://da.sonoma-county.org/content.aspx?sid=1023&id=1379)

4       34.    Between 2017 and 2018 SDA's prosecution rate of rape is 31%, even lower than

5  CCDA.

6       35.    Neither CCDA nor SDA adopts any written policies regarding prosecution of

7  sexual assault.

8       36.    AEquitas is a national technical assistance provider that specializes in the

9  prosecution of gender-based violence and human trafficking crimes. AEquitas is a nonprofit

10  organization that brings decades of prosecution experience and collaborative approach to offer

11  law enforcement advice and resources across disciplines at no cost. (https://aequitasresource.org/)

12       37.    Corroboration is not required by law for conviction.

13  (https://aequitasresource.org/wp-content/uploads/2018/09/Model-Response-to-Sexual-Violence-

14  for-Prosecutors-RSVP-An-Invitation-to-Lead.pdf)

15       38.    When LADA, CCDA, and SDA were asked to adopt "offender-focused approach"

16  and "expert witness strategy" that are recommended by NDAA they maliciously refused, giving

17  an ostensible reason that the case cannot be proved beyond a reasonable doubt and falsely told

18  Plaintiff that jury would not believe expert witness. Bias against rape victims could not be clearer.

19  <Prosecuting Alcohol-Facilitated Sexual Assault> (http://atixa.org/wordpress/wp-

20  content/uploads/2014/04/pub_prosecuting_alcohol_facilitated_sexual_assault.pdf), <Cold Case

21  Alcohol- and Drug-Facilitated Sexual Assault> (https://www.sakitta.org/toolkit/docs/Cold-Case-

22  Alcohol-and-Drug-Facilitated-Sexual-Assault.pdf), <Understanding the non-stranger rapist>

23  (http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_1

24  1_2007.pdf)

25       39.    The low number of arrests and prosecutions for sexual assault is not a statistical

26  anomaly. The fact that so few people are arrested and held accountable for sexual assault is a

27  direct result of a persistent pattern of indifference toward and disregard for the safety of rape

28  victims by law enforcement personnel.

7

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 369

40. The failure to properly investigate and prosecute sexual assault cases has been motivated at least in part by animus toward women reporting rape. Rape cases are deemed unworthy to investigate and prosecute and rapists are provided favoritism and leniency.

41. Law enforcement personnel's actions or inactions, protocol and procedures, disproportionately affect female sexual assault victims generally and violated Plaintiff's equal protection rights. Law enforcement personnel's intentional acts and their policies and procedures have created the danger of an increased risk of harm to Plaintiff and other victims of sexual assault who are disproportionately women. All these failures come from a "long-standing refusal" to properly investigate and effectively prosecute sexual assault crimes against women.

42. As described in more detail below, the following actions by prosecutors are neither in state's interest nor legitimate decisions of judgment but deplorable intentional antithesis of exercise of judgment:

    a. Willfully refuse to perform their duties pursuant to professional standards;

    b. Intentionally and consistently credit the suspect's version over Plaintiff's account because she is a rape victim, notwithstanding objective evidence;

    c. Put their own interest ahead of the state which they serve;

    d. Callously disregard victim and community safety by using absolute immunity as a badge and shield for their discriminatory practice with no showing of a valid state interest;

    e. Deter Plaintiff from pursuing truth and justice by falsely telling her that there was not enough evidence and creating purported reasons to justify their discriminatory and unconstitutional treatment to Plaintiff because she is a woman reporting rape;

    f. Made multiple untrue statements to Plaintiff that were far departure from professional standards, jury instruction, and prosecution guidelines which is a strong indicator that discriminatory intent was a motivating factor for prosecutors' wild spread custom;

    g. Maliciously ignore the fact that a victim's testimony alone is legally sufficient evidence for filing charges but falsely told Plaintiff that there was no

8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 370

1        corroboration, reflecting rape cases are less "worthy" of prosecution than other

2        crime cases; and

3          h.   Use "insufficient evidence" as a disguise to deprive Plaintiff of her constitutional

4            rights.

5      43.    Other failures by law enforcement personnel:

6      Prosecutors declined to bring charges against officers who fatally shot an unarmed man.

7  (https://www.scpr.org/news/2017/02/13/69009/appeals-court-dismisses-suit-over-gardena-police-

8  s/)

9      Victim family and activists demand criminal charges. (https://abc7.com/kenneth-ross-jr.-

10  gardena-police-shooting-ois-michael-robbins/5872326/)

11      No charges against officer who fatally shot an apparently intoxicated college student.

12  (https://www.presstelegram.com/2017/09/12/no-charges-against-long-beach-officer-involved-in-

13  2015-shooting-of-woodland-hills-student-feras-morad/)

14

15                **PRIVATE PROSECUTION OUTSIDE CALIFORNIA**

16      44.    South Carolina: a private citizen may initiate a criminal case by approaching a

17  magistrate.

18      45.    Maryland: a private citizen has the right and the ability to appear before a District

19  Court Commissioner and write out an affidavit that lodges criminal charges against another

20  individual.

21      46.    Georgia: criminal process may be issued based on a request by a private citizen,

22  though only after a "warrant application hearing" at which the potential accused has an

23  opportunity to argue that charges should not be issued.

24

25                  **SEXUAL AND DOMESTIC VIOLENCE**

26      47.    It is a common misconception that most sexual assaults are committed by

27  strangers. In reality, sexual assault can be perpetrated by anybody. A woman is more likely to be

28  sexually assaulted by someone she knows— a friend, partner, date, classmate, neighbor or

**DEFTS. MSJ C 371**

1    relative—than by a stranger in a dark alley. <Understand the Nature and Dynamics of Sexual

2    Violence> (https://www.mocadsv.org/FileStream.aspx?FileID=3)

3    <Dynamics of Sexual Violence> (https://www.youtube.com/watch?v=gSh7CmWGa58)

4         48.    Five categories of sexual violence (https://ndaa.org/wp-content/uploads/NDAA-

5    DV-White-Paper-FINAL-revised-July-17-2017-1.pdf):

6              a.   Rape or penetration of victim;

7              b.   Victim made to penetrate someone else;

8              c.   Non-physically pressured unwanted penetration;

9              d.   Unwanted sexual contact, defined as the "intentional touching of the victim or

10                  making the victim touch the perpetrator, either directly or through clothing . . .

11                  without the victim's consent";

12             e.   Non-contact unwanted sexual experiences, defined as the "unwanted exposure

13                  to sexual situations (e.g., pornography); verbal or behavioral sexual

14                  harassment; threats of sexual violence to accomplish some other end; and /or

15                  unwanted filming, taking, or disseminating photographs of a sexual nature of

16                  another person".

17        49.    The real threat of sexual assault that is posed not by strangers but rather by people

18    we know and trust. <Characteristics of Sexual Assault: What Does It Really Look Like?>

19    (https://www.evawintl.org/Library/DocumentLibraryHandler.ashx?id=42)

20        50.    A woman initially trusts the person who rapes her and welcomes him into her

21    home or accepts an invitation from him. She is then blamed for his actions and, sadly, often

22    blames herself, especially if her prior understanding of rape was based on more myth than fact.

23    And if the rapist is her husband, or partner, she may not anticipate that anyone, including herself,

24    would define that as rape. <Dynamics of Sexual Assault>

25         (http://www.ncdsv.org/images/Sexual%20Assault%20Dynamics%20for%20DV%20Advo

26    cates%20and%20Agency%20Responders%20-%20Tucker%205.28.08.pdf)

27        51.    Researches show that distorted thoughts is one of the main reasons women stay in

28    abusive relationships. Being controlled and hurt is traumatizing, and this leads to confusion,

10

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 372

1  doubts, and even self-blame. For example, women shared: "I believed I deserved it." Others

2  minimized the abuse as a way to cope with it, saying: "[I stayed] because I didn't think that

3  emotional and financial abuse was really abuse. Because words don't leave bruises,'' and,

4  "Because I didn't know what my boyfriend did to me was rape."

5  (http://www.ncdsv.org/images/Investigating%20and%20Prosecuting%20Intimate%20Partner%20

6  Sexual%20Assa….pdf); (https://law.lclark.edu/live/files/17491-countering-common-

7  misperceptions-of-sa-victims)

8      52.    When prevailing myths go unchallenged rape is supported, justified, and even

9  condoned. Myths tend to be victim blaming; instead of holding the perpetrator responsible for his

10  behaviour, the victim is blamed and held responsible for the assault, especially in cases where the

11  victim knows the perpetrator. Often victims of sexual violence are simply not believed. These

12  circumstances make it much more difficult for victims to seek help and recover from their

13  experience. <Sexual violence: prevalence, dynamics and consequences>

14      (https://www.who.int/violence_injury_prevention/resources/publications/en/guidelines_ch

15  ap2.pdf)

16      53.    Intimate partner sexual violence is as dangerous or problematic to the community

17  as other violent crimes. <Intimate Partner Sexual Violence>

18  (https://player.vimeo.com/video/120390159)

19      54.    When NFL linebacker Ray Rice knocked his fiancée Janay Palmer unconscious in

20  an elevator in 2014, it didn't initially get much attention. He was accused of domestic violence

21  and suspended for two games. After a few weeks, he was formally charged, but he and Palmer

22  were married the next day. A security video quickly went viral showing Janay Palmer knocked

23  down and roughly dragged out of the elevator by Rice. Victim's staying with their abuser does

24  not erase the crime committed by the abuser.

25      55.    Both rape and battery are domestic violence and they should be treated the same

26  way. No law requires a victim breaking up with their attacker to establish battery or rape.

27

28  **RAPE KIT BACKLOG**

56.    In 2009, Human Rights Watch uncovered a backlog of at least 12,669 untested rape kits in County of Los Angeles (including Los Angeles Police Department, LASD, and 47 independent police departments in Los Angeles County), the largest known backlog in the United States at that time. (https://www.hrw.org/report/2009/03/31/testing-justice/rape-kit-backlog-los-angeles-city-and-county) In 2015 there were 2400 untested rape kit found in Contra Costa County. However, there was never ever any backlog of DNA testing for murder or other crimes.

57.    The discriminatory practice against rape victims is long-standing, wildspread, and well settled. (https://www.huffpost.com/entry/the-rape-kit-backlog-shows-exactly-how-we-regard-women-in-this-country_n_5acfb5e1e4b016a07e9a8c65)

58.    The devaluation of sexual assaults burdens a particular set of victims. The laws against violence were not and will not be uniformly enforced. Because the vast majority of victims of sexual assault are women, discriminatory practice has an unjustified disparate impact on women. Rape is the most under-reported crime. 63% of sexual assaults are not reported to police. <Statistics about sexual violence>
https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf)

59.    Discrimination against rape victims puts victims at a unique disadvantage in the criminal justice system, decreasing the rate of reporting rape and increasing the rate of claims withdrawn by victims. <Rape and Sexual Assault in the Legal System>
https://www.womenslawproject.org/wp-content/uploads/2016/04/Rape-and-Sexual-Assault-in-the-Legal-System-FINAL.pdf)

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

60.    Plaintiff grew up in a traditional household in a foreign county with long-standing social prohibitions on talking about sexual matters.

### *Rapes between 2013 and 2014*

61.    In 2013 Edward Weamer ("Weamer") was a police officer at Sonoma University Police Department. In Nov 2013 via an online app "POF" Weamer friended Plaintiff and started

12

DEFTS. MSJ C 374

1    chatting with her online.

2        62.    Before Plaintiff met Weamer in person she made a clear statement via text

3    messages that she didn't want to rush sex and insisted to stick to her traditional culture. Weamer

4    agreed to respect Plaintiff so Plaintiff decided to meet him in person.

5        63.    Once Plaintiff met Weamer in person, he didn't keep his words and forced himself

6    on top of Plaintiff around ten times between 2013 and 2014.

7        64.    Via Plaintiff's message conversations with Weamer he acknowledged that each

8    time Plaintiff said no and resisted. Plaintiff also accused Weamer that he set her up but she was

9    not able to recognize what Weamer had done to her was a crime due to her confusion about rape.

10   Plaintiff mistakenly thought rape was a crime committed by a stranger. < Understanding and

11   Countering Rape Myths >

12   (https://www.nationalguard.mil/Portals/31/Documents/J1/SAPR/SARCVATraining/Barriers_to_

13   Credibility.pdf)

14       65.    In Aug 2014 Plaintiff broke up with Weamer and never had contact with him

15   again. Over the years Plaintiff has been broken, and experienced depression, anxiety, and low

16   self-esteem but she didn't know where those came from until Oct 2019.

17       66.    In Oct 2019 Plaintiff met with LADA prosecutor Peter Cagney ("Cagney") and he

18   explained to Plaintiff what rape was. Plaintiff has realized what Weamer had done to her was in

19   fact rape.

20       67.    In 2013 Plaintiff was raped in Cotati. In 2014 Weamer raped Plaintiff in Concord.

21   Plaintiff filed the police reports with Cotati PD and Concord PD respectively on Oct 18, 2019.

22               *Cotati PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

23       68.    After the initial report was filed on Oct 18, 2019 Cotati PD Officer Bennet Knight

24   ("Knight") informed Plaintiff of victims rights and followed up with Plaintiff the following week.

25   However, approximately three months after Plaintiff first reported the assaults Weamer was still

26   not contacted by Knight for investigation.

27       69.    Since Weamer refused to make a statement to Cotati PD he faced no investigation

28   or scrutiny from law enforcement. After little to no investigation conducted Knight maliciously

                                         13
DEFTS. MSJ C 375

1   concluded the incidents were consensual and the case was subsequently submitted to SDA.

2        70.    Plaintiff obtained a copy of the incident report prepared by Knight and asked

3   Sergeant Baudelia Gallo ("Gallo") for an explanation but Gallo endorsed or approved those

4   failures by taking no correction action.

5          *Concord PD's Failure to Investigate Plaintiff's Sexual Assault Claim*

6        71.    After the initial interview with Concord PD Officer Shasta Vanetti on Oct 18,

7   2019, the following month Plaintiff heard nothing from CONCORD PD, no follow-up and

8   literally nothing.

9        72.    Sometime in November 2019 Plaintiff left voice mail to Detective Renenlle-Rey

10   Valeros ("Valeros") but still heard nothing from CONCORD PD in the following month.

11        73.    In December 2019 after Plaintiff reached out to Sgt Cody Harrison ("Harrison")

12   she finally got a phone call from Detective Valeros.

13        74.    Rather than ask relevant questions regarding crime elements the first thing Valeros

14   wanted to confirm was "So are you still living in Southern California?" Perhaps he thought he

15   could treat this case less seriously because the victim lived far away.

16        75.    Then Plaintiff was asked by Valeros what's her ultimate goal. Such humiliating

17   and degrading question strongly suggests his discriminatory animus towards Plaintiff as a rape

18   victim. Such question demonstrates that Valeros thought Plaintiff came forward for something

19   else other than justice. A victim of other crimes would not be asked about their goal to come

20   forward.

21        76.    Plaintiff was shocked to find out the suspect was not contacted nearly two months

22   after she reported the crime.

23        77.    Despite there is no statute of limitations for rape Valeros told Plaintiff this

24   happened five years ago. Even though Weamer admitted through texts that each time Plaintiff

25   said no and resisted Valeros told Plaintiff he could not prove it was Weamer who was texting.

26        78.    No useful information was extracted during Plaintiff's conversation with Valeros.

27   No question regarding the crime element was asked. The "investigation" conducted by Valeros

28   was meaningless with respect to proving a crime. Instead, Valeros' language reflects how he

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 376**

1   deterred Plaintiff from pursuing the case.

2        79.    Despite pretext phonecall is a commonly used technique to obtain confession from

3   the offender Valero opt not to use it, not to mention he would not spend any effort finding out if

4   there would be more women victimized by Weamer.

5        80.    In December 2019 Plaintiff was really concerned by Valeros' attitude and she

6   reached out to Sgt Harrison again. However, despite there is no statute of limitations for rape and

7   physical evidence is not required by law or jury instruction, Harrison falsely announced to

8   Plaintiff that the case was six years old and there was no physical evidence at all for filing

9   charges. Harrison didn't stop there. He further falsely told Plaintiff that there was no indication of

10  any type of sexual assault and appeared quite consensual which strongly suggests how

11  CONCORD PD Officers detered Plaintiff from pursuing justice and CONCORD PD Officers'

12  discriminatory intent to discount and dismiss Plaintiff's allegation.

13       81.    After the horrifying interactions with Valero and Harrison Plaintiff reached out to

14  Lieutenant Tamra Roberts ("Roberts").

15       82.    Despite victim's testimony is legally enough to file charges Roberts falsely told

16  Plaintiff that her testimony was absolutely not enough and there was no evidence of sexual

17  assault.

18       83.    When there's no issue about who the assailant is DNA doesn't really contribute

19  anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says

20  on jury instruction, Roberts falsely told Plaintiff "There needs to be physical evidence, uh, either

21  DNA evidence or a confession from the suspect. Um, and we don't have any of those things. In

22  this case, there's no DNA evidence."

23       84.    The crime of battery (e.g. a punch) is established based solely on the perpetrator's

24  actions and/or intent. The victim's response to being punched is irrelevant. The victim need not

25  resist nor express unwillingness to being punched to establish a crime, nor is a victim's history of

26  being punched relevant. The relationship between the assailant and the victim does not make the

27  crime less seriously or make the victim suffer less.

28       85.    While Plaintiff pointed out that Weamer acknowledged each time Plaintiff said no

15

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1 and resisted but Roberts challenged Plaintiff "But then you got back together with him and

2 continued." It's obvious that Roberts treat rape completely different from other crimes.

3     86.     There is no law requires victim act in certain way in order to prove she was raped.

4 Roberts' stereotype about how victims should behave constitutes unlawful discrimination.

5 Roberts' language also reflects her discriminatory intent to discredit Plaintiff and discard

6 Plaintiff's allegation. Roberts' announcement left Plaintiff feeling coming forward was a

7 punishment to herself and she should not have reported the incident to the police at all. Such

8 victim blaming does not occur with other types of crimes. Moreover, according to Roberts' theory

9 a man is entitled to rape a woman if they are in a relationship, suggesting a strong purposeful

10 animus towards Plaintiff.

11     87.     Although victim's reaction is not a crime element Roberts twisted Plaintiff's

12 account of story and announced to Plaintiff "You were okay with having sex." by ignoring how a

13 victim would process trauma. Then Roberts falsely told Plaintiff the text messages would only

14 work in the suspect's favor and there was no evidence of sexual assault.

15     88.     Battery and rape are both domestic violence. The law does not require a victim

16 break up with the assailant to establish battery but Roberts told Plaintiff "This is a different

17 situation. You continue to get together with him." Roberts imposed a non-law to require Plaintiff

18 break up with the suspect to establish rape. Roberts flat out told Plaintiff "Most people, if they got

19 raped, they wouldn't get together with that person again." Such remarks strongly suggest an

20 intention to treat sexual assault cases less seriously than other assaults, as well as an animus

21 against rape victims. Roberts' pro-defendant attitude is capable of several interpretations: perhaps

22 she believed that men are always entitled to sex in a relationship, that Plaintiff was not entirely

23 blameless because she stayed contact with the attacker, that such assault was less severe and

24 traumatic because she was dating this suspect, or that state officials should not intrude upon

25 dating violence. Whatever the reason, Roberts' language reflects an outdated misconception

26 concerning rapes that cannot be used as a source of differential treatment. Roberts' statement also

27 demonstrates her discriminatory intent to devalue Plaintiff's allegation.

28     89.     When Plaintiff pointed out rape should be treated the same way as battery Roberts

16

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 378

1    responded "I don't think I can understand what you are saying."

2        90.    Regardless Plaintiff say no and resisted each time Roberts twisted it as sexual play.
3    Roberts also declared "A district attorney would have a very hard time convincing a jury of 11
4    people."

5        91.    The language and attitude of CONCORD PD Officers suggests that they made
6    minimal or maybe no effort to investigate the suspect in Plaintiff's case. None has been done to
7    see if there are more women victimized by the suspect. None has been done in order to support
8    Plaintiff's allegation.

9        92.    Roberts went on and told Plaintiff "The district attorney's office won't prosecute
10   on a case like this." "If we don't have any evidence, then we don't submit the case to the district
11   attorney." "It is here in Contra Costa County, the district attorney's office would never file a case
12   like this. Um, I've been doing this for 18 years. I've worked sexual assault for five years. Um,
13   they will never file a case like this."

14       93.    Since Weamer refused to make a statement to Concord PD he faced no
15   investigation or scrutiny from law enforcement.

16       94.    In December 2019 Plaintiff filed a complaint with Concord Police Chief Guy
17   Swanger ("Swanger") but Plaintiff never received any investigation result. Swanger took no
18   action to correct Valero's failures or to discipline him for his malfeasance.

19       95.    CONCORD PD personnel did not inform Plaintiff of victims' rights as set forth in
20   California constitution. At that time, and at all relevant times, CONCORD PD personnel had full
21   knowledge of CONCORD PD's mission and awareness of proper investigation protocol.

22       96.    By failing to discipline or act, Swanger endorsed or approved the unconstitutional
23   conduct of individual officers.

24       97.    Plaintiff requested CONCORD PD's policy and procedures regarding sexual
25   assault investigation but no such thing existed.

26               *CCDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

27       98.    In January 2020 CCDA declined to file charges against Weamer. Before the non-
28   prosecution decision was made none of any member of CCDA met with Plaintiff in person, nor

<div align="center">17

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</div>

DEFTS. MSJ C 379

1   did they ever speak to her about the alleged assaults.

2       99.   Given the way how law enforcement personnel responded to rapes, Plaintiff asked

3   herself "Can you imagine how many victims didn't get the justice they deserved?"

4       100.   On Jan 7, 2020 during a recorded phone call conversation Colleen Gleason

5   ("Gleason", CCDA prosecutor) told Plaintiff this was a he said she said case by ignoring the

6   objective evidence. Gleason announced that there was NO EVIDENCE to prove it was not

7   consensual by invaliding Plaintiff's testimony. By intentionally ignoring the context Gleason

8   falsely told Plaintiff that the jury would interpret it as rough sex and Plaintiff came forward

9   because she was upset about Weamer chasing other girls. Gleason took every word of Weamer as

10   true even though a normal person, through inference, could easily tell Weamer was lying. By

11   ignoring the fact that Plaintiff texted Weamer he set her up Gleason credited Weamer because

12   Weamer falsely said Plaintiff enjoyed the sex and put his penis in her vagina.

13       101.   At the end of the phone conversation with Gleason Plaintiff requested to speak

14   with her supervisor, Walpole. At that time, and at all relevant times, Gleason was aware of

15   CCDA's mission and her role as a prosecutor.

16       102.   In Jan 2020 Plaintiff notified Diana Becton ("Becton", District Attorney of Contra

17   Costa County) of the constitution violation.

18       103.   On Jan 8, 2020 during a recorded phone call conversation Christopher Walpole

19   ("Walpole", CCDA prosecutor) declared that it was their filing standard to file cases they

20   believed they could win. "We wouldn't file cases if we don't get a guilty verdict." "It's a big

21   hurdle." Walpole also announced that they would need strong corroboration despite it was not

22   required by law.

23       104.   In 2018 in California the conviction rate of violent offenses is 56.8% (https://data-

24   openjustice.doj.ca.gov/sites/default/files/2019-

25   07/Crime%20In%20CA%202018%2020190701.pdf). However, Walpole flat out told Plaintiff

26   "We only file cases we believe we can win. That's our filing standard."

27       105.   When Plaintiff questioned about the use of expert witness Walpole falsely told her

28   many times jury would disagree with the expert. Despite stereotype about how victims should

DEFTS. MSJ C 380

1  behave is unlawful discrimination and it's a prosecutor's job to select unbiased jury Walpole

2  falsely told Plaintiff the jury would say "If I was in her shoes, I wouldn't have had the

3  relationship."

4      106.    By invaliding Plaintiff's testimony Walpole valued Weamer's version because

5  Weamer falsely said Plaintiff put his penis inside her and being upset about Weamer seeing other

6  women was Plaintiff's motive to pursue this case. Walpole also declared this was part of the

7  #Metoo movement.

8      107.    Although Plaintiff's motive is not a crime element Walpole attacked Plaintiff's

9  motive of coming forward was the suspect seeing other women. Motive of victims of other

10  assaults would not be attacked as a target.

11      108.    The entire time Walpole tried his best to derail Plaintiff from pursuing the truth

12  and justice, reflecting Walpole's conscious choice not to overcome common defenses. Rather

13  than uphold the law, educate the jury, and overcome common defenses, Walpole chose to act as

14  the suspect's advocate. At that time, and at all relevant times, Walpole was aware of CCDA's

15  mission and his role as a prosecutor and supervisor.

16      109.    On Jan 25, 2020 Plaintiff filed a complaint with CCDA regarding the

17  constitutional violation and Becton was put on notice.

18      110.    Plaintiff requested CCDA's policy and procedures regarding sexual assault

19  prosecution but no such thing was available.

20      111.    BECTON failed to draft or implement procedures in the District Attorney's Office

21  to ensure proper investigation of rape cases and proper review and handling of sexual assault

22  prosecutions.

23          *SDA's Failure to Prosecute Plaintiff's Sexual Assault Case*

24      112.    In Feb 2020 SDA declined to file charges against Weamer. Before the non-

25  prosecution decision was made none of any member of SDA met with Plaintiff in person, nor did

26  they ever speak to her about the alleged assaults.

27      113.    On Feb 10, 2020 during a recorded phone call conversation Laura Passaglia

28  ("Passaglia", SDA prosecutor) told Plaintiff this case was fairly old regardless of no statute of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 381**

1   limitation for rape. Despite corroboration is not require by law Passaglia announced "We don't

2   have any opportunity to do any investigation or find any corroboration".

3       114.    Passaglia went on and told Plaintiff "It's not enough for me to say conclusively

4   what exactly occurred" and such statement is completely opposite to the prosecution guideline set

5   forth by NDAA. Despite sexual assault cases rarely have witnesses Passaglia declared "There is

6   no opportunity to interview any witnesses and talk to people in real time."

7       115.    On Feb 15, 2020 Plaintiff emailed Anne Masterson ("Masterson", SDA

8   prosecutor) and encourage her to follow the prosecution guidelines but Plaintiff's email was

9   ignored, reflecting SDA's dismissive attitude.

10       116.    At that time, and at all relevant times, Passaglia and Masterson were aware of

11   SDA's mission and their role as a prosecutor.

12       117.    In Feb 2020 Plaintiff filed complaint with Jill Ravitch ("Ravitch", District

13   Attorney of Sonoma County) but no action was taken.

14       118.    By failing to discipline or act, Sonoma County and Ravitch endorsed or approved

15   the unconstitutional conduct of individual employees.

16       119.    Plaintiff requested SDA's prosecution policy for sexual assault but no such thing

17   exists as Missoula County Attorney's Office does. <MISSOULA COUNTY ATTORNEY'S

18   OFFICE SEXUAL ASSAULT POLICY & PROCEDURE MANUAL> (https://dojmt.gov/wp-

19   content/uploads/SEXUAL-ASSAULT-POLICY-AND-PROCEDURE-MANUAL.pdf )

20       120.    RAVITCH failed to draft or implement procedures in the District Attorney's

21   Office to ensure proper investigation of rape cases and proper review and handling of sexual

22   assault prosecutions.

23                                        *Rape in 2019*

24       121.    On or about April 1, 2019 Carlos Suarez (aka Charlie Suarez, hereinafter

25   "Suarez") friended Plaintiff via a mobile app "Wechat". After a few days of chatting, on or about

26   April 5, 2019, Suarez invited Plaintiff out for a dinner date. Plaintiff went home after a two-hour

27   dinner with Suarez but later Suarez brought over Japanese whiskey and Spanish wine. Plaintiff

28   and Suarez had been drinking in Suarez's car for about three hours. Plaintiff eventually lost

DEFTS. MSJ C 382

1   consciousness after consuming a lot of alcohol.

2       122.    On or about April 6, 2019 at around 8:00 am Plaintiff woke up in an unfamiliar

3   place, naked with a sore vagina. Suarez was also naked lying in bed next to Plaintiff. Plaintiff was

4   still drunk and confused about what had happened. Suarez inserted his penis into Plaintiff's

5   vagina but she didn't know what to say or what to do. Plaintiff was completely lost and everything

6   was way beyond her comprehension. She didn't resist because she's afraid of any confrontation

7   and escalated situation. She remained silent and went along with what the offender wanted

8   because she reasonably believed that Suarez would commit violence against her if the situation

9   was escalated. Plaintiff never gave her consent to sexual contact with Suarez while she was

10  awake not to mention when she was unconscious.

11      123.    On or about May 3, 2019 Plaintiff lured Suarez to a hotel and stood him up which

12  was the last time Plaintiff saw Suarez. Between April 7, 2019 and May 3, 2019 Plaintiff not only

13  had no sexual contact with Suarez but also declined his sexual advances.

14              *EMPD and LASD's Failure to Investigate Plaintiff's Sexual Assault Claim*

15      124.    Plaintiff finally gathered her courage to come forward on June 7, 2019. At the time

16  she believed that coming forward would be her first step to heal and it was her obligation to

17  report it to stop it. However, it turned out she was completely wrong and her life has been turned

18  upside down.

19      125.    On June 7, 2019 plaintiff was interviewed by Martha Tate ("Tate", police officer)

20  at El Monte Police Department ("EMPD"). During the interview no victim services personnel

21  was present and Plaintiff was not informed that she had the right to request a victim advocate.

22  However, EMPD's policy states that "Whenever possible, a member of SART should be included

23  in the initial victim interviews."

24      126.    The first session of the interview was not recorded and during that session Plaintiff

25  told Tate she was afraid to upset Suarez when she woke up in an unfamiliar place in the morning

26  of Apr 6, 2019. When Tate told Plaintiff to retell the story for recording purposes Plaintiff was

27  very frustrated. Plaintiff was re-traumatized by recounting the incident twice. Throughout the

28  interview Plaintiff noticed Tate's fake smile and the way Tate looked at her with skepticism.

                                    21

DEFTS. MSJ C 383

127. Despite the crime was facilitated by alcohol Tate asked Plaintiff "Did he force you?" Nobody needs force to rape an unconscious woman. Nobody needs force to rape a woman who's in shock and fear. Alcohol is a weapon of choice by perpetrators. Regardless of silence is not consent, by asking irrelevant questions Tate focused on physical force instead of the absence of consent. From the very outset Tate had no intention to uncover the truth that there was no word or conduct indicating Plaintiff's freely given agreement to sexual contact.

128. At the end of the interview, without any investigation, Tate willfully smirked and announced to Plaintiff that it was not a rape. Tate's statement was like a bombshell that caused Plaintiff to raise her voice and yell "he admitted it." Tate didn't care and showed Plaintiff out. Tate's comment suggests that she believed this was just a drunken night rather than a crime. It is not a policy of EMPD to tell victims of burglaries or attempted murder that their allegations are NOT a crime. The power of Tate's announcement was no different than a bullet shot in Plaintiff's head.

129. After the initial interview Tate falsified her incident report by fabricating Plaintiff gave consent and willingly had sexual intercourse with Suarez because Plaintiff wanted to do so. This action reflects Tate's discriminatory intent to dismiss Plaintiff's allegation.

130. Plaintiff, after waking up naked in an unfamiliar place with a sore vagina, told her simple and plain narrative to Tate: she didn't know what to do and she was afraid to upset the attacker which implies she's afraid of the consequence of confrontation and escalated situation. Tate twisted the story, bypassing the appropriate context and substituting instead the more familiar account of a sexual encounter. Having preempted Plaintiff's story with one of her own, Tate's falsified report made sense given the premises of her announcement. In other words, before any investigation, Tate had drawn her own conclusion: this was not a rape. Tate's willful denial of what Plaintiff had experienced was the result of stereotyped assumption about the truth of a reported sexual assault, that women are likely to report "regretted sex" as rape.

131. Plaintiff told her narrative to Tate on tape: she didn't say no, she didn't say yes when Suarez had sex with her after she woke up. Having sex was not what she wanted. Tate distorted the story with her discriminatory mind, again replacing Plaintiff's story with one of her

22

DEFTS. MSJ C 384

1    own, Tate wrote in her report that Plaintiff gave consent and willingly had sexual intercourse with

2    Suarez because she wanted to do so.

3        132.    Plaintiff told her narrative to Tate: Suarez told Plaintiff to book a hotel. Plaintiff

4    didn't do so because she didn't want to have sex with Suarez in the first place, but she went out for

5    dinner with Suarez. Plaintiff went home straight after dinner with Suarez. Tate distorted the story,

6    again replacing Plaintiff's story with one of her own, Tate wrote in her report that Plaintiff was

7    supposed to meet Suarez in a motel but she changed her mind.

8        133.    Plaintiff showed Tate Suarez's indirect confession stating that "I felt like you were

9    a virgin and I was stretching you out." However, Tate maliciously omitted this most important

10   text message in her report.

11       134.    Tate's willful refusal to take Plaintiff at her words - that she had been raped - and

12   Tate's malicious conclusion are symptomatic of a widely recognized stereotype: law

13   enforcement's deep-seated distrust of rape victims.

14       135.    After the second time Plaintiff recounted her story, Tate's question "What brings

15   you here today?" reflects her doubt about Plaintiff's allegation and explains Tate's initial motive

16   to falsify her report. A victim of other types of crime would not be asked the same question.

17       136.    Tate asked Plaintiff what made her think she was a victim of rape based on Tate's

18   assumption about sexual assault victims are lying. Victims of other type of crimes would not be

19   asked the same question. Such humiliating and degrading question strongly suggests her

20   discriminatory animus towards rape victims.

21       137.    Tate's incident report is a summary of her version of events from her

22   discriminatory perspective instead of Plaintiff's.

23       138.    Tate did not inform Plaintiff of victims' rights. At that time, and at all relevant

24   times, Tate was aware of her duties as an EMPD police officer, specifically adherence to EMPD's

25   policy regarding Sexual Assault Investigations.

26       139.    Although Plaintiff filed internal complaint against Tate she has remained on her

27   job without any discipline. Tate's conduct was approved and/or endorsed by EMPD.

28       140.    On or about June 12, 2019 Plaintiff had a phone conversation with EMPD

DEFTS. MSJ C 385

1  Detective Art Saenz ("Saenz"). Right off the bat, without asking any meaningful question, Saenz

2  assumed Plaintiff didn't remember giving consent. Plaintiff immediately raised her voice and

3  responded "He confessed."

4     141.   On or about June 13, 2019, days after Plaintiff's encounter with Tate, while

5  struggling immensely with Tate's announcement, Plaintiff ended up in urgent care for severe

6  sleep disorder.

7     142.   Because of jurisdiction Plaintiff's case was forwarded to LASD by EMPD.

8     143.   On or about July 2, 2019 Plaintiff arrived at LASD's city of Industry station for the

9  appointment with Liliana Jara ("Jara", LASD detective). While Jara showed Plaintiff the way to

10  Jara's office Plaintiff told Jara that she was on medication for depression.

11     144.   After Plaintiff sat down in Jara's office Jara asked Plaintiff to recount her story but

12  not long after Plaintiff started Jara assumed that Plaintiff didn't remember giving consent. Jara

13  ignored Plaintiff telling her it was not the case. Jara refused to take Plaintiff's answer and grilled

14  Plaintiff "you ever had this situation that your friend told you that you danced last night when you

15  were drunk and you don't remember?" Plaintiff had to raise her voice and respond "NEVER". It

16  came across Jara was so intimidating and bullying. It also demonstrates how Jara coerced Plaintiff

17  to recant her allegation of rape, reflecting her malicious and discriminatory intent.

18     145.   After Plaintiff refused to recant her allegation, Jara's question - "What do you want

19  here?" - indicates that she believed that Plaintiff was making a false allegation to gain something

20  else. Jara's humiliating and degrading question was nowhere to be found in LASD's standard

21  operating procedures or investigation guide. Her question is simply a good starting point to

22  devalue Plaintiff's credibility. "What do you want here?" is the main theme of Jara's investigation

23  right from the outset. Victims of other type of crimes would not be asked the same question.

24  Jara's question caused Plaintiff to raise her voice in shock and answer "I want JUSTICE."

25     146.   When Jara was reading Plaintiff's conversations with Suarez she stated "It doesn't

26  look like you were raped." Jara's stereotyped remarks reveal her stereotypical distrust towards

27  rape victims. Such stereotype about how victims should behave violates the Equal Protection

28  Clause, United States v. Virginia, 518 U.S. 515, 517 (1996), and interferes with the ability of

<div align="center">24

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</div>

1    investigators to find the truth. Then Jara questioned Plaintiff again "Why did you say 'I can make

2    you lose your job'?" Jara never missed a chance to challenge Plaintiff's every word and action.

3         147.    Plaintiff insisted that Suarez confessed he was stretching her out. Jara further

4    intimidated Plaintiff "That's not a confession. Did he say he raped you?" Jara expected that there

5    was only one form of confession.

6         148.    Jara also argued that a woman's vagina would not be loosened when they are

7    aroused. Then Plaintiff asked her how a woman would give birth. After Plaintiff got home she

8    had to send Jara a medical article describing how a woman's vagina changes under different

9    circumstances to enrich her knowledge about a woman's body part.

10        149.    Jara questioned Plaintiff's intent to come forward. She concluded that Plaintiff

11   came forward because she found out Suarez was cheating and she was mad. Again, Plaintiff had

12   to raise her voice to deny Jara's accusation.

13        150.    Jara said founding out his cheating could be Suarez's defense. Plaintiff flat out

14   said "that's not a valid defense" but in response she said "yes it is". The entire time Jara was

15   trying to discourage Plaintiff following through her allegation rather than discover the truth.

16        151.    Text messages showed that Suarez put words in Plaintiff's mouth and invited

17   himself over but Jara concluded that Plaintiff invited him over. Jara kept challenging Plaintiff

18   why she did this/that as if she was a criminal. Jara said Plaintiff's text messages after April 6

19   looked like she was ok with having sex in the motel by ignoring how Plaintiff processed trauma.

20        152.    Plaintiff showed Jara some articles that finally made her come forward but Jara

21   didn't bother to know what they were about and attacked Plaintiff that she printed them out after

22   the police report was filed despite the fact that nowadays most people read on screen instead of

23   paper, reflecting Jara's dismissive attitude. The entire time Jara put Plaintiff into a defense mode

24   that Plaintiff had to defend herself although she was a crime victim.

25        153.    Jara's assumptions made Plaintiff reach the point that she had to yell multiple

26   times "I date him does not mean I want to have sex with him. How come I did not have sex with

27   him after April 6?" Jara put Plaintiff in a position that she was extremely frustrated to the level

28   that she couldn't express herself and wanted the "interview" to end as quickly as possible because

1     the entire "interview" was conducted in a very accusatory manner, very threatening.

2        154.    Jara kept saying this case was going nowhere, this case had a lot of problems. She
3     also said "if all you want is to arrest this guy it is not gonna happen. I will not make an arrest."
4     Jara's announcement reflects her discriminatory intent to invalidate Plaintiff's allegation.

5        155.    It is not a policy of LASD to constantly tell victims of burglaries or attempted
6     murder that their allegations are problematic and impossible to prove beyond a reasonable doubt.

7        156.    At the end of the interrogation Jara told Plaintiff "I will get his phone and see if
8     there's more messages." Her statement again reflects her presumption that Plaintiff was lying or
9     hiding something else. Her statement also implies "If you are lying you will get arrested."

10       157.    Plaintiff suffered a sexual attack while she was unconscious after drinking.
11     Against this backdrop, Jara's demeaning and accusatory tone of questioning was suspect and
12     suggestive of discrimination. Jara's discriminatory attitude explained why she assumed that
13     Plaintiff did not remember giving consent and stated that "It doesn't look like you were raped."
14     Jara's conduct reflects she discredited Plaintiff's statements because Plaintiff consumed alcohol.

15       158.    No useful information was extracted during Plaintiff's encounter with Jara. No
16     question regarding the crime element was asked. Instead, the only motive of this "interview" was
17     to challenge Plaintiff's every word and reaction. The only intent of this "interview" was to
18     invalidate and dismiss Plaintiff's allegation. Rather than work with the victim and gather
19     evidence according to each element of the crime Jara repeatedly declared that this type of case
20     was problematic which could not be proven beyond a reasonable doubt. The "interview"
21     conducted by Jara was meaningless with respect to proving a crime.

22       159.    Jara did not inform Plaintiff of victims' rights as set forth in California
23     constitution.

24       160.    After the "interview" with Jara Plaintiff's depression and anxiety have been
25     exacerbated to a whole new level.

26       161.    Again and again, Plaintiff has not been treated like the victim in this case. The
27     trauma Plaintiff has experienced at the hands of law enforcement personnel prevented her from
28     having any kind of normal life.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 388

162. On or about July 3, 2019 Plaintiff was really concerned by Jara's attitude and she believed that Jara was not able to appropriately manage her case. Plaintiff reached out Richard Ruiz ("Ruiz", LASD lieutenant) and requested another detective to work on her case but her attempt was not successful. Jara remained on Plaintiff's case.

163. In July 2019 Plaintiff filed separate complaints against Jara and Special Victims Bureau with both LASD and Inspector General. Jara has remained on her job without any discipline and now she has been promoted as a sergeant. Plaintiff never received any results of the internal investigation. Jara's conduct was approved and/or endorsed by LASD.

164. In July 2020 Plaintiff also reported her experience to Newsom but her voice fell on deaf ears.

165. On or about July 22, 2019, while Jara was on vacation, Plaintiff reached out Ruiz to get her phone back. Over the phone while discussing the case Plaintiff was challenged by Ruiz "How did you not know you were violated?" His question left Plaintiff feeling coming forward was a punishment to herself and she should not have reported the incident to the police at all. Such victim blaming does not occur with other types of crimes.

166. On Aug 6, 2019 Jara arranged a follow-up interview with Plaintiff on Aug 8, 2019 at City of Industry Station.

167. On Aug 8, 2019, upon arrival at City of Industry Station Plaintiff was arrested by Santa Ana Police. Plaintiff had been really concerned because she thought she missed the follow-up interview with Jara.

168. On Aug 12, 2019 Plaintiff was charged with misdemeanor but she has not been convicted.

169. Despite pretext phonecall is a commonly used technique to obtain confession from the offender Jara opted not to use it but on or about Aug 14, 2019 she told Plaintiff she had done everything she could. Plaintiff was never notified after law enforcement contact with the suspect reflecting a serious disregard for Plaintiff's safety.

170. On or about Aug 14, 2019 Plaintiff phoned Ruiz to inquire the investigation but in an intimidating manner Plaintiff was challenged by Ruiz about her gofundme page which was her

27

**DEFTS. MSJ C 389**

1    private business and had nothing to do with the crime in question. It reveals that LASD Officers'

2    true motive was to spend more energy and time on proving Plaintiff was filing a false claim rather

3    than prove there was a crime occurred. It demonstrates how LASD Officers misused state

4    resources to conduct illegal search and seizure.

5          171.   In August 2019 Plaintiff's complaint against Jara was turned into a service

6    comment report and being investigated by Ruiz.

7          172.   The language and attitude of Jara and Ruiz suggests that LASD Officers made

8    minimal or maybe no effort to interrogate or investigate the suspect in Plaintiff's case.

9          173.   On or about Aug 16, 2019 Plaintiff ended up in ER for dysfunctional menstrual

10   bleeding. In Plaintiff's entire life it was her very first time to visit ER.

11         174.   On or about Aug 23, 2019 LADA declined to file charges against Suarez. Plaintiff

12   finally realized there was no follow-up interview with Jara in the first place. The follow-up

13   interview was a trap set up by Jara for Plaintiff's arrest by Santa Ana Police.

14         175.   On Aug 23, 2019 Plaintiff called LADA and requested to speak with the

15   prosecutor in her case. It is prosecutor's duty to educate juries that just because a woman has an

16   open criminal case it doesn't mean that she is not a victim of sexual assault. Despite simply filing

17   a motion to limine can keep out irrelevant or prejudicial evidence June Chung ("Chung", LADA

18   prosecutor) falsely told Plaintiff that the open case in Orange County against Plaintiff affected her

19   credibility and made the filing charges against Suarez impossible which was a clear deprivation

20   of Plaintiff's rights secured to her under Fourteenth Amendment. At the time Plaintiff was not

21   convicted and was charged with misdemeanor. The choice of misdemeanor over felony is a

22   callous disregard for victim and community safety, reflecting Chung's dismissive attitude towards

23   rape victims. Having an open criminal case does not justify the deprivation of a victim's

24   fundamental rights. A victim of attempted murder or other crime would not be told his/her open

25   criminal case would affect his/her credibility.

26         176.   Regardless of corroboration the ostensible reason for non-prosecution given by

27   Chung was that Plaintiff's case was a "he said she said" case. Given the fact that the suspect

28   admitted he tore apart Plaintiff's vagina this is obviously an untrue statement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 390

177. Despite alcohol is a weapon of choice another purported reason for non-prosecution given by Chung was "You also voluntarily consumed alcohol, correct?" which suggests a strong purposeful animus towards Plaintiff. A burglary allegation would not be dismissed because the victim forgot to lock the door or close the window.

178. Plaintiff was concerned by Chung's attitude and requested to speak with her supervisor.

179. On Aug 23, 2019, Chung's supervisor, Karen Thorp ("Thorp"), called Plaintiff and during the phone call Thorp was reading Tate's falsified report. Thorp's statement - "We can't prove it in court to a jury that **a jury is not likely to convict**." – is a far departure from professional standards. **"If someone thinks they were raped** and then they have consensual sex with someone, then they have a relationship and they only go to the police after the breakup." Thorp's stereotype about how victims should behave constitutes purposeful unlawful discrimination.

180. When there's no issue about who the assailant is DNA doesn't really contribute anything. Despite the suspect is known and admitted having sex with Plaintiff, despite what says on jury instruction, Thorp falsely told Plaintiff that in order to prove a case "We need **a forensic medical exam**. We need his semen. We need **evidence of force**."

181. By intentionally ignoring all the circumstantial evidence Thorp made an untrue statement "We need something more than **the victim alone saying that this happened.**" "**But it's the way the law is.**"

182. Despite most sexual assault victims either delay reporting or never report the crime Thorp made a statement "If you're raped you go to the police right away." Thorp's stereotype about how victims should behave constitutes unlawful discrimination.

183. Thorp kept going "It doesn't sound like you were raped." "If I was raped …" A victim of robbery wouldn't be told "It doesn't sound like you were robbed."

184. When Plaintiff pointed out Suarez's predatory behavior to ply her with alcohol Thorp's statement - **"It doesn't matter. You drank it."** – suggests a strong animus towards rape victims because a victim of burglary would not be told "It doesn't matter. You didn't lock your

29

DEFTS. MSJ C 391

1    door." Thorp's language also reflects her discriminatory intent to discard Plaintiff's allegation and

2    her eager to shut Plaintiff out of criminal justice system.

3        185.    At that time, and at all relevant times, Thorp was aware of LADA's mission and

4    her role as a prosecutor and supervisor. At all times Plaintiff has been wondering what a victim

5    means to LADA Officials.

6        186.    Plaintiff finally experienced the despair and emotional distress of living with the

7    knowledge that her rapist would never be held accountable for his act, and nothing was stopping

8    him from assaulting others. Plaintiff's rapist was well protected by law enforcement while she

9    was not and he walks free with the confidence that he can rape other women with no

10   repercussions.

11       187.    On or about Aug 30, 2019, as a direct result of injustice and unlawful

12   discrimination after sexual assault Plaintiff felt hopeless and worthless, therefore she was

13   transported to the hospital and put on suicidal watch for five days.

14       188.    On or about Sep 15, 2019 Plaintiff moved out to a new home for fear of her safety.

15       189.    On or about Sep 27, 2019, Plaintiff obtained a copy of the incident report prepared

16   by Tate from Special Victims Bureau. Plaintiff was dumbfounded when reading that Tate wrote

17   in her report "She gave consent and willingly had sexual intercourse with him because she wanted

18   to do so." At that moment Plaintiff's world just went black.

19       190.    Immediately Plaintiff went to EMPD and the watch commander on duty was

20   Michael Buckhannon ("Buckhannon") at the time. Buckhannon agreed to replay the interview

21   type in front of Plaintiff and two victim advocates from Peace over Violence. During Plaintiff's

22   interview with Buckhannon, by repeating Tate's pattern (telling the victim it was not a rape before

23   any investigation), before carefully and completely listening to the entire interview tape, before

24   going into any details or facts, Buckhannon started applying double standard and steadfastly

25   defending Tate, and told Plaintiff it was not fair to Tate to make an allegation against her.

26   Buckhannon also justified a falsified police report by telling Plaintiff that Tate would need just a

27   little bit training.

28       191.    In the waiting room, looking at the falsified police report, Plaintiff asked her

30

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   victim advocate Anne "Can you imagine how many victims didn't get the justice they deserved?"

2       192.    Out of the blue, Buckhannon asked Plaintiff "Were you married?" Plaintiff

3   answered "No" with confusion. Then Buckhannon declared that he had been married for twenty

4   years and he did not ask for consent each time he had sex with his wife. (which implies "I have

5   been raping my wife for twenty years but she didn't file a complaint so you shouldn't have filed

6   this complaint.") Such remarks strongly suggest an intention to treat sexual assault cases less

7   seriously than other assaults, as well as an animus against rape victims. Buckhannon's pro-

8   defendant attitude is capable of several interpretations: perhaps he believed that women cry rape,

9   that men are always entitled to sex in a relationship, that Plaintiff was not entirely blameless

10   because she was dating the attacker, that such assault was less severe and traumatic because she

11   knew the perpetrator, or that state officials should not intrude upon non-stranger sexual assaults.

12   Whatever the reason, Buckhannon's language reflects an outdated misconception concerning

13   sexual assaults that cannot be used as a source of differential treatment. Buckhannon's statement

14   also demonstrates his discriminatory intent to devalue Plaintiff's allegation.

15       193.    After Plaintiff stepped out of Buckhannon's office she immediately realized that

16   she forgot her document on his desk. Therefore, Plaintiff returned and retrieved her document on

17   Buckhannon's desk. Despite the document belonged to Plaintiff Buckhannon told her it was

18   disrespectful to take something from his desk without asking. However, Buckhannon thinks it is

19   fine for a man to put his penis in Plaintiff's vagina without asking for consent. It demonstrates

20   how Buckhannon devalues Plaintiff's bodily integrity.

21       194.    At that time, and at all relevant times, Buckhannon was aware of his duties as a

22   EMPD member and his role as a supervisor.

23       195.    On Sep 27, 2019, in the presence of Plaintiff's victim advocate, EMPD Officer

24   Carlos Tello conducted a supplemental interview in a hostile manner which caused Plaintiff's

25   victim advocate to pause the interview for a couple of times.

26       196.    Finally Plaintiff realized why Tate smirked and told her it was not a rape. Tate's

27   falsified report and omission of material fact was not a legitimate exercise of discretion. Tate's

28   falsified report and omission of material fact was highly unlikely to have been a product of

DEFTS. MSJ C 393

1   random mistake but was a clear reflection of her ill will and discriminatory animus towards

2   Plaintiff because of her status as a woman reporting rape. Little did Plaintiff know, at the time

3   Tate was a senior police officer that was too senior to be able to make such "mistake".

4   (https://transparentcalifornia.com/salaries/2018/el-monte/martha-tate/) In fact, Tate and

5   Buckhannon were implementing EMPD's discriminatory custom rather than frustrate EMPD's

6   written policy.

7       197.    On or about Oct 4, 2019 Plaintiff filed a police misconduct complaint against Tate

8   but Plaintiff received neither any acknowledgement from EMPD that they have received her

9   complaint nor any results of the internal investigation.

10      198.    Officer misconduct complaints are not used to identify possible problematic trends

11  within EMPD and failure to discipline officers has been permitted and tolerated for years which

12  resulted in continuing violations of citizens' constitutional rights.

13  (https://www.sgvtribune.com/2018/08/15/el-monte-west-covina-police-departments-criticized-

14  for-citizen-complaint-processes/)

15      199.    In October 2019 Plaintiff and her victim advocate met with Cagney and Chung.

16  Cagney assured Plaintiff that he would personally look into the case.

17      200.    In October and November 2019 Plaintiff repeatedly requested the investigative

18  report prepared by Jara but her requests were denied by Lieutenant Michael Burse with Special

19  Victims Bureau and she was told she would need a subpoena and attorney for the said purposes.

20      201.    In November 2019 Plaintiff filed a complaint against Officer Tate with LADA's

21  justice system integrity division but her complaint was referred back to EMPD.

22      202.    On or about Nov 28, 2019 Plaintiff attempted suicide by trying to overdose

23  sleeping aid. The life-long devastating harm caused by sexual assault is profound and exacerbated

24  by law enforcement personnel's deprivation of Plaintiff's fundamental rights secured to her by

25  laws.

26      203.    In December 2019 Plaintiff requested LASD's policies and procedures regarding

27  sexual assault investigation but her request was denied.

28      204.    After Plaintiff's repeated inquiries and Cagney's delaying tactic, on Jan 7, 2020

32

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 394

1   Plaintiff received a joint phone call from Cagney, Thorp, and Chung. Despite Plaintiff never gave

2   her consent to Suarez the ostensible reason for non-prosecution given by Cagney was "You had

3   sex with him. You had contact with him." Despite most rape victims either delay reporting or

4   never report the crime, especially the perpetrator is non-stranger, Cagney falsely told Plaintiff the

5   case was not able to prove beyond a reasonable doubt because "You delayed reporting.",

6   reflecting LADA Officials' dismissive attitude. The insufficient evidence although purporting to

7   be reasonable but in fact was a disguise and pretext for intentional discriminatory under-

8   enforcement against rape victims.

9

10                              *Selective under-enforcement*

11       205.    The American Bar Association standard related to Prosecution Function says that

12   the duty of the prosecutor is to seek justice, not merely to convict. However, prosecutors tend to

13   avoid losing at trial simply because rape cases are hard to win and they pick easy cases to make

14   their personal conviction rates look good for their resumes (their powerful incentive to

15   discriminate against rape victims).

16       206.    Plaintiff finally experienced the despair and emotional distress of living with the

17   knowledge that her rapists would never be held accountable for their acts, and nothing was

18   stopping them from assaulting others. Plaintiff's rapists were well protected by law enforcement

19   while she was not and they walk free with the confidence that they can rape other women with no

20   repercussions. A rapist's words prevail and conquer in every aspect but none of Plaintiff's words

21   ever counts.

22       207.    The depth of law enforcement personnel's discriminatory treatment of sexual

23   assault victims is all the more troubling given the recent expansion of societal awareness of and

24   sensitivity to sexual assault.

25       208.    The current organizational structure of the said law enforcement agencies is not

26   capable of adequately addressing the victimization and lifetime damage inflicted on sexual assault

27   victims or to stop repeat perpetrators, particularly those who sexually assault women they know

28   or who use drugs/alcohol to commit their sexual assaults.

33

DEFTS. MSJ C 395

1 &lt;Educating Juries in Sexual Assault Cases&gt;

2 http://www.ncdsv.org/images/AEquitas_EducatingJuriesInSexualAssaultCasesPart1_7-2010.pdf)

3

4 **FIRST CAUSE OF ACTION**

5 **Equal Protection Clause of Fourteenth Amendment to U.S. Constitution**

6     209.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

7 the paragraphs above.

8     210.   The Fourteenth Amendment prohibits the states from denying to all persons within

9 its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and

10 denying the equal protection of the laws includes the omission to protect.

11     211.   Cal. Penal Code §739 discriminates against crime victims by depriving their rights

12 to criminal justice for protection and accountability.

13     212.   Plaintiff has no adequate remedy at law and will suffer serious and irreparable

14 harm to her constitutional rights unless this Court grants her injunctive relief.

15

16 **SECOND CAUSE OF ACTION**

17 **Violation of Cal. Const. Art. I, § 7 – Equal Protection**

18     213.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

19 the paragraphs above.

20     214.   Cal. Penal Code §739 monopolizes criminal prosecution and constitutes a violation

21 of Article 1, § 7 of the California Constitution.

22

23 **THIRD CAUSE OF ACTION**

24 **Violation of Cal. Const. Art. I, § 28 (a)**

25     215.   Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

26 the paragraphs above.

27     216.   As California Constitution Art. I, § 28 defines, a "victim" is a person who suffers

28 direct or threatened physical, psychological, or financial harm as a result of the commission or

**DEFTS. MSJ C 396**

1    attempted commission of a crime or delinquent act. The term "victim" also includes the person's

2    spouse, parents, children, siblings, or guardian, and includes a lawful representative of a crime

3    victim who is deceased, a minor, or physically or psychologically incapacitated.

4        217.    California Constitution Art. I, § 28 (a) (2) provides that "Victims of crime are

5    entitled to have the criminal justice system view criminal acts as serious threats to the safety and

6    welfare of the people of California. The enactment of comprehensive provisions and laws

7    ensuring a bill of rights for victims of crime, including safeguards in the criminal justice system

8    fully protecting those rights and ensuring that crime victims are treated with respect and dignity,

9    is a matter of high public importance. California's victims of crime are largely dependent upon

10   the proper functioning of government, upon the criminal justice system and upon the expeditious

11   enforcement of the rights of victims of crime described herein, in order to protect the public

12   safety and to secure justice when the public safety has been compromised by criminal activity."

13       218.    California Constitution Art. I, § 28 (a) (4) provides that "The rights of victims also

14   include broader shared collective rights that are held in common with all of the People of the

15   State of California and that are enforceable through the enactment of laws and through good-faith

16   efforts and actions of California's elected, appointed, and publicly employed officials. These

17   rights encompass the expectation shared with all of the people of California that persons who

18   commit felonious acts causing injury to innocent victims will be appropriately and thoroughly

19   investigated, appropriately detained in custody, brought before the courts of California even if

20   arrested outside the State, tried by the courts in a timely manner, sentenced, and sufficiently

21   punished so that the public safety is protected and encouraged as a goal of highest importance."

22       219.    California Constitution Art. I, § 28 (a) (8) provides that "To accomplish the goals

23   it is necessary that the laws of California relating to the criminal justice process be amended in

24   order to protect the legitimate rights of victims of crime."

25       220.    Cal. Penal Code §739, without recognition of the profound failure of the present

26   criminal justice system, does not promote the purpose of constitution.

27

28                               **FOURTH CAUSE OF ACTION**

35

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

DEFTS. MSJ C 397

1      **Violation of Cal. Const. Art. I, § 28 (b) – Victims' Bill of Rights**

2          221.    Plaintiff re-alleges and herein incorporates by reference the allegations set forth in

3      the paragraphs above.

4          222.    California Constitution Art. I, § 28 (b) (1) provides that a victim shall be entitled

5      "to be treated with fairness and respect for his or her privacy and dignity, and to be free from

6      intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."

7          223.    The monopoly on criminal prosecution, without regard to crime victims'

8      fundamental rights, has violated the rights of Plaintiff to be treated with fairness and respect of

9      her dignity.

10

11                                **PRAYER FOR RELIEF**

12         WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

13     1.    Declaring that Cal. Penal Code §739 violates Equal Protection Clause of Fourteenth

14             Amendments to the U.S. Constitution and Cal. Const. Art. I, §§ 7 and 28 (a) & (b);

15     2.    Preliminarily and permanently compelling Defendants to appoint seasoned and

16             competent prosecutors with sexual assault prosecution expertise to file criminal

17             charges against Edward Weamer and Carlos Suarez;

18     3.    Preliminarily and permanently enjoining Defendants, as well as their successors,

19             agents, and employees, from enforcing Cal. Penal Code §739 against private citizens

20             to initiate criminal prosecution;

21     4.    Awarding attorney's fees and costs as permitted by law; and

22     5.    Granting such other and further relief or sanction as this Court may deem just,

23             proper, and appropriate.

24

25     Dated: May 14, 2020

26

27

28                                              JANE DOE, Plaintiff in Pro Se

                                      36
                    COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**DEFTS. MSJ C 398**



Civil Intake Clerk's Office
255 East Temple St, Suite TS-
Los Angeles, CA 90012

1  JANE DOE

2

3

4

5  JANE DOE, IN PRO PER

6

7

F I L E D

MAY - 7 2020

K. RIFKIN CLERK OF THE COURT
SUPERIOR COURT OF CALIFORNIA
COUNTY OF CONTRA COSTA
D. WAGNER

**EXHIBIT**

**3**

5.6.22 S. Almaguer-Miller, CSR #8767

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF CONTRA COSTA

10

11  JANE DOE                              ) Case No.: **C 2 0 - 0 0 8 2 7**
                                          )
12              Plaintiff,                 ) **COMPLAINT FOR DAMAGES**
                                          )
13     vs.                                 )
                                          )                    PER LOCAL RULE. THIS
14  EDWARD WEAMER,                         )                    CASE IS ASSIGNED TO
                                          )                    DEPT **21**, FOR ALL
15                                         )                    PURPOSES.
              Defendant.                   )                    SUMMONS ISSUED
16                                         )
                                          ) UNLIMITED JURISDICTION
17                                         ) **JURY TRIAL DEMANDED**
                                          )
18                                         )
                                          )
19  _____

20     Plaintiff, Jane Doe ("Plaintiff"), alleges as follows:

21

22                          **INTRODUCTION**

23     1.      This action arises out of the result of discovering Plaintiff's injuries resulting from

24  Defendant's sexual abuse acts.

25     2.      In Oct 2019, with the assistance of Los Angeles County District Attorney's Office

26  Plaintiff was finally able to identify the crimes committed on her and causally connect her long-

27  term pain and suffering to Defendant's sexual violence against her.

28     3.      Plaintiff now brings this lawsuit and seeks remedy.

- 1 -

COMPLAINT FOR DAMAGES

Scanned with Car

**DEFTS' MSJ C 400**

**PARTIES**

4.     Plaintiff Jane Doe is an individual who is a resident of ███████████, State of California. At all relevant and material times, Plaintiff was a visitor in the County of Sonoma and Contra Costa, State of California. Plaintiff is suing under a pseudonym in order to protect her privacy.

5.     Defendant Edward Weamer ("Defendant") is an individual who, upon information and belief, is a resident of County of Contra Costa, California.

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction to hear the subject matter of this complaint. This Court has jurisdiction over Defendant because he resides in Contra Costa County, California.

7.     Plaintiff seeks to recover damages in excess of $25, 000, exclusive of interest and costs.

8.     Venue is proper in this Court because all or some of the violations of law alleged herein occurred in the County of Contra Costa.

**SEXUAL AND DOMESTIC VIOLENCE**

9.     It is a common misconception that most sexual assaults are committed by strangers. In reality, sexual assault can be perpetrated by anybody. A woman is more likely to be sexually assaulted by someone she knows— a friend, partner, date, classmate, neighbor or relative—than by a stranger in a dark alley. <Understand the Nature and Dynamics of Sexual Violence> (https://www.mocadsv.org/FileStream.aspx?FileID=3)

<Dynamics of Sexual Violence> (https://www.youtube.com/watch?v=gSh7CmWGa58)

10.    Five categories of sexual violence (https://ndaa.org/wp-content/uploads/NDAA-DV-White-Paper-FINAL-revised-July-17-2017-1.pdf):

    a.  Rape or penetration of victim;

    b.  Victim made to penetrate someone else;

    c.  Non-physically pressured unwanted penetration;

- 2 -

COMPLAINT FOR DAMAGES

**DEFTS. MSJ C 401**

d.  Unwanted sexual contact, defined as the "intentional touching of the victim or making the victim touch the perpetrator, either directly or through clothing . . . without the victim's consent";

e.  Non-contact unwanted sexual experiences, defined as the "unwanted exposure to sexual situations (e.g., pornography); verbal or behavioral sexual harassment; threats of sexual violence to accomplish some other end; and /or unwanted filming, taking, or disseminating photographs of a sexual nature of another person".

11.  The real threat of sexual assault that is posed not by strangers but rather by people we know and trust. <Characteristics of Sexual Assault: What Does It Really Look Like?> (https://www.evawintl.org/Library/DocumentLibraryHandler.ashx?id=42)

12.  A woman initially trusts the person who rapes her and welcomes him into her home or accepts an invitation from him. She is then blamed for his actions and, sadly, often blames herself, especially if her prior understanding of rape was based on more myth than fact. And if the rapist is her husband, or partner, she may not anticipate that anyone, including herself, would define that as rape. <Dynamics of Sexual Assault> (http://www.ncdsv.org/images/Sexual%20Assault%20Dynamics%20for%20DV%20Advocates%20 and%20Agency%20Responders%20-%20Tucker%205.28.08.pdf)

13.  Researches show that distorted thoughts is one of the main reasons women stay in abusive relationships. Being controlled and hurt is traumatizing, and this leads to confusion, doubts, and even self-blame. For example, women shared: "I believed I deserved it." Others minimized the abuse as a way to cope with it, saying: "[I stayed] because I didn't think that emotional and financial abuse was really abuse. Because words don't leave bruises,'' and, "Because I didn't know what my boyfriend did to me was rape." (http://www.ncdsv.org/images/Investigating%20and%20Prosecuting%20Intimate%20Partner%20S exual%20Assa....pdf)

14.  When prevailing myths go unchallenged rape is supported, justified, and even condoned. Myths tend to be victim blaming; instead of holding the perpetrator responsible for his behaviour, the victim is blamed and held responsible for the assault, especially in cases where the

1   victim knows the perpetrator. Often victims of sexual violence are simply not believed. These
2   circumstances make it much more difficult for victims to seek help and recover from their
3   experience. <Sexual violence: prevalence, dynamics and consequences>
4   (https://www.who.int/violence_injury_prevention/resources/publications/en/guidelines_chap2.pdf)

5       15.     Intimate partner sexual violence is as dangerous or problematic to the community as
6   other          violent          crimes.          <Intimate          Partner          Sexual          Violence>
7   (https://player.vimeo.com/video/120390159)

8
9                           **THE IMPACT OF SEXUAL VIOLENCE**

10      16.     While not every instance of sexual violence necessarily results in severe (or
11  prolonged) physical harm, sexual trauma results in dysregulation of the stress response and disrupts
12  the balance between the sympathetic nervous system and parasympathetic nervous system.

13      17.     The gravity that sets sexual violence apart from even other severe traumatic incidents
14  is the unique disruption of personhood that results from a deprivation of agency and control over
15  one's own body. In addition, sexual violence causes destabilization by undermining feelings of
16  individual security, while the victim is rendered powerless to control what is happening to her. This
17  effect of defenseless incapacity may become a chronic state. Rape and sexual violence do disrupt
18  profoundly the senses or the personality through neurological, behavioral, social, and other means.

19      18.     Labeling of unwanted sexual experiences is generally a gradual process, and one of
20  the hallmarks of PTSD is emotional or behavioral avoidance of reminders of the trauma. In fact,
21  75% of the people who contact Rape Crisis center are seeking support for an assault that took place
22  at least a year earlier. A number of social and psychological factors keep sexual assault victims
23  from processing their experiences immediately.

24      19.     One key aspect is that many people aren't sure if what happened to them was 'really'
25  rape. Legally, definitions vary by country, even by state. These varied laws reflect an equally
26  confused – and evolving – cultural understanding of what rape is. And those narratives themselves
27  can make someone even more unsure of what they experienced. The persistent stereotype of 'real
28  rape' involves a male stranger with a weapon violently penetrating a resisting woman at night in a

1 public place and a seriously injured woman. When sexual assault doesn't match that narrative, it can

2 make it difficult for even the survivor to recognise that it still was, in fact, sexual assault. The brain,

3 after all, categorises experiences according to what we have been taught about what they mean. But

4 one of the biggest problems with this narrative is that it is a myth. Rape not only includes a number

5 of other circumstances, but it usually is a different circumstance, than the stranger-in-an-alley story.

6 <Understanding and Countering Rape Myths >

7 (https://www.nationalguard.mil/Portals/31/Documents/J1/SAPR/SARCVATraining/Barriers_to_Cr

8 edibility.pdf)

9 <Understanding the non-stranger rapist>

10 (http://www.ncdsv.org/images/NDAA_UnderstandingNonstrangerRapist_TheVoice_vol_1_no_11_

11 2007.pdf)

12    20.    Zoe Peterson ("Peterson"), a clinical psychologist who leads Indiana University's

13 Kinsey Institute Sexual Assault Research Initiative, and her colleague Charlene Muehlenhard found,

14 in a study of 77 female college students who'd been non-consensually vaginally penetrated, varied

15 reasons why the women didn't classify their experiences as rape. These included: (a) The attacker

16 didn't match their expectations of a rapist ("he was my friend and everyone loved him"); (b) They

17 worried that their behavior didn't match a 'normal' victim's ("it was my fault to be that

18 intoxicated"); and (c) There hadn't been physical violence or resistance ("he wasn't beating me").

19    21.    Some stereotypical rape scripts may apply more in situations of conflict,

20 displacement, and natural disasters, when reports of outdoor rape by armed strangers become more

21 frequent. Rape is well-known as a weapon of war. When order breaks down generally, sexual

22 violence increases. This prevalence can itself lead to the cultural definition of 'rape' narrowing even

23 further. But whatever the context, Peterson cautions that "it's really important to be clear that

24 whether or not someone labels a sexual assault or rape as a sexual assault or rape, it doesn't

25 necessarily influence whether or not it's traumatic".

26    22.    Responses to trauma vary based on individuals' existing belief systems. Sexual

27 assault is a blow to beliefs about, for instance, certain men (like a husband or a friend) being

28 trustworthy. Some people who are assaulted will reject this threat to their beliefs.

23.     The litany of psychological diseases demonstrates that rape and sexual violence are indisputably injurious to the mind in ways that often last for the course of the victim's lifetime.

## FACTUAL ALLEGATIONS

24.     Plaintiff grew up in a traditional household in a foreign county with long-standing social prohibitions on talking about sexual matters.

25.     In 2013 Defendant was a police officer at Sonoma University Police Department. In Nov 2013 via an online app "POF" Defendant friended Plaintiff and started chatting with her online.

26.     Before Plaintiff met Defendant in person she made a clear statement via text messages that she didn't want to rush sex and insisted to stick to her traditional culture. Defendant agreed to respect Plaintiff. Defendant gained Plaintiff's trust by a ploy that made Plaintiff believe he was a gentleman looking for serious relationship. Therefore, Plaintiff decided to meet him in person.

27.     In Nov 2013 around noon Defendant picked up Plaintiff and took her to his residence in Cotati. While in Defendant's bedroom he showed Plaintiff that he owned more than ten guns.

28.     At one point in Defendant's bed he initiated touching and pulled off Plaintiff's pants. Plaintiff kept her legs closely tight and said no. However, the more Plaintiff resisted the harder Defendant tried. Defendant told Plaintiff he would not penetrate her in order to make her legs open. Plaintiff trusted Defendant because he was a police officer. Plaintiff relaxed her legs but Defendant abruptly penetrated Plaintiff with his penis.

29.     Plaintiff was confused and shocked. Defendant was a police officer and he seemed nice to Plaintiff. Plaintiff couldn't make a connection between a police officer and a rape. Plaintiff couldn't believe, or acknowledge, that she was assaulted due to the perception of stranger-in-an-alley story. Plaintiff was unclear if forcible sex by a date (non a stranger) was a normal thing. She was uncomfortable, but not alarmed. She neither reported to authority nor stopped contact with Defendant.

30.     In Dec 2013 while Plaintiff was sleeping in a guest room on second floor at

**DEFTS. MSJ C 405**
COMPLAINT FOR DAMAGES

Defendant's residence Defendant came to Plaintiff's room and dragged her to his bedroom on third floor. Defendant pushed Plaintiff down onto his bed and forcibly penetrated her with his penis despite Plaintiff resisted and said no.

31.     In 2014 via Plaintiff's message conversations with Defendant he acknowledged that each time Plaintiff said no and resisted. Plaintiff also accused Defendant that he set her up by penetrating her without her consent but she still didn't recognize what Defendant had done to her was a crime.

32.     In Jul 2014 Defendant bought round trip tickets to fly Plaintiff from Los Angeles to his residence in Concord.

33.     On or about Aug 4, 2014 around 4:00 am Defendant got up for work. While Plaintiff was still asleep in Defendant's bedroom he pulled off her pants and forced himself on her. Plaintiff was waken up and screaming. Defendant covered Plaintiff's mouth with his hand and penetrated Plaintiff without her consent.

34.     On or about Aug 7, 2014 Plaintiff broke up with Defendant and never had contact with him again.

35.     Between 2013 and 2014 Plaintiff was forced to have sex with Defendant around ten times. Plaintiff tried to forget all of them but the incidents described above stood out and keep haunting Plaintiff.

*Life after Aug 2014*

36.     From time to time Plaintiff cries for no reason. Sadness follows her everywhere. She feels distant from others and has lost emotional closeness with family members. She is unable to relax or socialize without being tense.

37.     Plaintiff feels irritable, on-guard with low self-esteem. She is confused with her mood swings. Her emotions surfaces out of nowhere and she is paralyzed with fear. She has struggled with intense anger and dissatisfaction. She feels unexpected detachment and anxiety.

38.     At times Plaintiff has a difficult time focusing. She oftentimes struggles with decision making, even in simple things like what brand of milk to buy. She has been unable to enjoy her life.

**DEFTS. MSJ C 406**

39.     Occasionally Plaintiff feels like she is outside of her own body. She views herself as lacking worth. She feels there is no one she could trust. Over the years Plaintiff has been broken and confused since she didn't know where those feelings came from until Oct 2019.

40.     In Oct 2019 Plaintiff met with Los Angeles County prosecutor Peter Cagney and he explained to Plaintiff what rape was. With the assistance of Mr Cagney, Plaintiff has recognized what Defendant had done to her was in fact rape and all the trauma she has experienced over the years is the result of rape.

41.     On Oct 18, 2019 Plaintiff reported the aforementioned incidents respectively to Cotati and Concord Police Department.

42.     On Nov 28, 2019 Plaintiff attempted suicide by trying to overdose sleeping aid.

43.     Until today, Plaintiff still feels Defendant's power over her every single day. Pretending to be nice, creating false impression, playing upon society's biases, raping Plaintiff under the guise of dating is the mark of a predator.

## FIRST CAUSE OF ACTION

### Sexual Battery in Violation of Cal Civ Code § 1708.5 against Defendant Weamer

44.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

45.     Defendant had sexual contact and intercourse with Plaintiff and did so without her consent.

46.     Plaintiff suffered damages as a result of Defendant's battery, as described herein.

## SECOND CAUSE OF ACTION

### Gender Violence in Violation of Cal Civ Code § 52.4 against Defendant Weamer

47.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

48.     Defendant committed acts of gender violence upon Plaintiff through the use or attempted use of physical force against her person, committed at least in part based on Plaintiff's

**DEFTS. MSJ C 407**

gender.

49.     Defendant engaged in physical intrusion or physical invasion of a sexual nature under coercive conditions.

## THIRD CAUSE OF ACTION

**Ralphs Civil Rights Act – Violation of Cal Civ Code § 51.7 against Defendant Weamer**

50.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

51.     At all times mentioned herein, Plaintiff had the right to be free from any violence, or intimidation by threat of violence, committed against her person on account of her sex.

## FORTH CAUSE OF ACTION

**Interference with Exercise of Civil Rights – Violation of Cal Civ Code § 52.1**

**Against Defendant Weamer**

52.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

53.     As alleged hereinabove, Defendant intentionally interfered with or attempted to interfere with Plaintiff's clearly established rights guaranteed under United States and California laws, including but not limited to Plaintiff's right of protection from battery, assault, gender violence, and rape by threats, intimidation, and coercion.

## FIFTH CAUSE OF ACTION

**Intentional Infliction of Emotional Distress against Defendant Weamer**

54.     Plaintiff re-alleges and herein incorporates by reference the allegations set forth in the paragraphs above.

55.     Defendant's conduct in sexually assaulting and battering Plaintiff was intentional and deliberate disregard for the high degree of probability that Plaintiff would suffer emotional distress as a result.

**DEFTS. MSJ C 408**
COMPLAINT FOR DAMAGES

56.     Defendant's conduct in sexually assaulting and battering Plaintiff was extreme and outrageous.

57.     Defendant's conduct and actions were the direct and proximate cause of severe emotional distress to Plaintiff.

## PRAYER FOR RELIEF

58.     WHEREFORE, Plaintiff prays for judgment in her favor against Defendant and that Plaintiff be awarded:

    a.    General and special damages caused by Defendant's unlawful actions in an amount according to proof;

    b.    Punitive and exemplary damages according to proof;

    c.    Medical and related expenses according to proof;

    d.    Additional statutory civil penalty pursuant to Cal Civ Code §§ 52(b) and 52.1(b);

    e.    Interest, including pre judgment interest, in accordance with applicable law;

    f.    For costs of suit and attorney fees herein incurrent; and

    g.    Such other and further relief to which Plaintiff is entitled or additional relief as is just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands trial of all issues by jury.

DATED: 4/10/20

JANE DOE
In Pro Per

- 10 -

**DEFTS. MSJ C 409**

COMPLAINT FOR DAMAGES