1    JANE DOE

2    11151 Valley Blvd #4886,

3    El Monte, CA 91734

4

5    Plaintiff in Pro Se

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   JANE DOE,                              No. 8:20-cv-00322-JWH-GJS

12            Plaintiff,

13        v.                                **PLAINTIFF'S OPPOSITION TO
                                            DEFENDANTS' MOTION FOR
14   COUNTY OF ORANGE; et al                SUMMARY JUDGMENT**

15            Defendants.

16                                          Action filed: 2/18/2020
                                            Trail Date: None
17

18

19

20

21

22

23

24

25

26

27

28

1

2

## TABLE OF CONTENT

3

4

I.    INTRODUCTION ................................................................................. 6

II.   STATEMENT OF RELEVANT FACTS ............................................. 6

III.  STANDARD OF REVIEW .................................................................. 7

IV.   FEDERAL CLAIMS ........................................................................... 8

V.    *MONELL* CLAIMS ............................................................................. 18

VI.   STATE LAW CAUSES OF ACTION ............................................... 21

VII.  CONCLUSION .................................................................................. 27

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ

**TABLE OF AUTHORITIES**

**PAGES**

**CASES**

*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196] ............................ 23

*Adickes v. S. H. Kress & Co*., 398 U. S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) ..................................................................................................................................... 7

*Agarwal v. Johnson* (1979) 25 Cal.3d 932 [160 Cal.Rptr. 141, 603 P.2d 58] ............................ 25

*Asbury v. Brown*, 2017 WL 1837024, at *6 (E.D. Cal. May 8, 2017) ...................................... 15

*Bailey v. Loggins*, 32 Cal.3d 907 (Cal. 1982) .......................................................................... 22

*Barner v. Leeds*, 24 Cal.4th 676 (Cal. 2000) ............................................................................ 26

*Batista v. Rodriguez*, 702 F.2d 393 (2d Cir.1983) .................................................................... 19

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397 (1997)................................. 20

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........................................................................ 8, 13, 21

*Birchfield v. North Dakota*, 136 S. Ct. 2160 (2016) ................................................................. 12

*Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397 (1997).......................................... 19

*Brigham City v. Stuart*, 547 U.S. 398 (2006)............................................................................ 12

*Bull v. City County of San Francisco*, 595 F.3d 964 (9th Cir. 2010)........................................ 14

*Castro v. Cty. of L.A*., 833 F.3d 1060 (9th Cir. 2016)............................................................... 18

*City of Canton v. Harris*, 489 U.S. 378 (1989).......................................................................... 20

*City of Springfield v. Kibbe*, 480 U.S. 257 (1987) .................................................................... 20

*Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) ........................................... 18

*Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. Cal. 2009) ....................................... 10

*Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172 (C.D. Cal. 2006) ........................... 13

*Cross v. Bonded Adjustment Bureau*, 48 Cal.App.4th 266 (1996) ............................................ 25

*Davidson v. City of Westminster* (1982) 32 Cal.3d 197 ............................................................ 25

*Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997)....................................................................... 10

*Doty v. County of Lassen*, 37 F.3d 540 (9th Cir.1994) ............................................................. 10

*Ess v. Eskaton Properties, Inc*. (2002) 97 Cal.App.4th 120 ..................................................... 25

*Estes-El v. State of New York*, 552 F.Supp. 885 (S.D.N.Y. 1982)............................................ 13

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................................... 9

*Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir.1986) ....................................................... 19

*Fontana v. Haskin*, 262 F.3d 871 (9th Cir. 2001)..................................................................... 25

*Frausto v. Dep't of the Cal. Highway Patrol*, 53 Cal.App.5th 973 (Cal. Ct. App. 2020) ...................................................................................................................................... 23

*Gary H. v. Hegstrom*, 831 F.2d 1430 (9th Cir. 1987)............................................................... 20

*Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468 Cal.Rptr.2d 470, 12 P.3d 720, 735 (2000) .......................................................................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Gillan v. City of San Mario*, 147 Cal.App.4th 1033 (Cal. Ct. App. 2007) ...................................26

*Gillette v. Delmore*, 979 F.2d 1342 (9th Cir. 1992)..................................................................19

*Giraldo v. Department of Corrections Rehabilitation* (2008) 168 Cal.App.4th 231 [85 Cal.Rptr.3d 371] ...............................................................................................................23

*Gordon v. Faber*, 800 F. Supp. 797 (N.D. Iowa 1992)...........................................................10

*Gordon v. Faber*, 973 F.2d 686 (8th Cir. 1992).....................................................................10

*Gray v. Hardy*, 826 F.3d 1000 (7th Cir. 2016) .....................................................................12

*Hailey v. Cal Physician's Serv.*, 158 Cal. App. 4th 452 (2007)..............................................25

*Hays v. Jefferson County*, 668 F.2d 869 (6th Cir.) ...............................................................20

*Helling v. McKinney*, 509 U. S. 25 (1993)..............................................................................8

*Hodges v. Stanley*, 712 F.2d 34 (2d Cir. 1983) ....................................................................13

*Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir.1982)....................................................................10

*Hudson v. Palmer*, 468 U. S. 517 (1984).................................................................................8

*Hydrick v. Hunter*, 500 F.3d 978 (9th Cir. 2007)..................................................................14

*Jean-Laurent v. Wilkenson*, 540 F. Supp. 2d 501 (S.D.N.Y 2008).......................................13

*Johnson v. State of California* (1968) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] .........................................................................................................................................26

*Johnson v. State*, 69 Cal.2d 782 (Cal. 1968) ........................................................................26

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) ........................................................................................15

*Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) ...............................................................15

*Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996)........................................................................11

*Kersh v. Gen. Council of the Assemblies of God*, 804 F.2d 546 (9th Cir.1986) .......................20

*Lareau v. Manson*, 651 F.2d 96 (2d Cir.1981)......................................................................10

*Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) ...................................................18

*Leonel v. Am. Airlines, Inc.*, 400 F.3d 702 (9th Cir. 2005).....................................................21

*Lopez v. Youngblood*, 609 F. Supp. 2d 1125 (E.D. Cal. 2009) ...............................................13

*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 93 Cal.Rptr.2d 1, 993 P.2d 334..........................................................................................22

*McCarthy v. Fuller*, 810 F.3d 456 (7th Cir. 2015)................................................................16

*McCorkle v. City of Los Angeles*, 70 Cal.2d 252 (Cal. 1969) ................................................26

*McDaniel v. Gile* (1991) 230 Cal.App.3d 363 [281 Cal.Rptr. 242]........................................25

*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116 .................23

*Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) ........................................................13

*Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001).....................................................................15

*Muskopf v. Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457] .........................................................................................................................26

*Owen v. City of Indep.*, 445 U.S. 622 (1980) ........................................................................18

4

1    *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)....................................15

2    *Pembaur v. City of Cincinnati* (1986), 475 U.S. 469, 106 S. Ct. 1292, 1299, 89 L.
Ed. 2d 452, 463 ..............................................................................................................19

3    *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001) ..........................................15

4    *Rhodes v. Chapman*, 452 U. S. 337 (1981)......................................................................8

*Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119 (2d Cir. 1991) ...............................20

5    *Sarus v. Rotundo*, 831 F.2d 397 (2d Cir.1987) ..............................................................19

6    *Sava v. Fuller* (1967) 249 Cal.App.2d 281 [57 Cal.Rptr. 312]......................................26

7    *Savitt v. Jordan*, 142 Cal.App.3d 820 (Cal. Ct. App. 1983) .........................................22

*St. Louis v. Praprotnik*, 485 U.S. 112 (1988)................................................................19

8    *Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997).........................................................15

9    *Tolan v. Cotton*, 572 U.S. 650 (2014) ..............................................................................8

10   *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996) ...............................................................19

*Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ........................15

11   *United States v. Hawkins*, 249 F.3d 867 (9th Cir. 2001) ...............................................16

12   *United States v. Lovasco*, 431 U. S. 783 (1977) ..............................................................8

13   *United States v. Russell*, 411 U. S. 423 (1973) ................................................................8

*White v. Ultramar*, Inc. (1999) 21 Cal.4th 563 [88 Cal.Rptr.2d 19, 981 P.2d 944]...................25

14   *Whitley v. Albers*, 475 U. S. 312 (1986)...........................................................................9

15   *Willis v. Bell*, 726 F. Supp. 1118 (N.D. Ill. 1989) ...........................................................9

16   *Wilson v. Seiter*, 501 U.S. 294 (1991)...............................................................................9

*Wilson v. Superior Court* (1975) 13 Cal.3d 652 ...........................................................22

17   **STATE STATUTES**

18   Evidence Code Division 5 Chapter 3 ...............................................................................18

19   Gov. Code section 820.2 ..................................................................................................27

Gov. Code section 820.8 ..................................................................................................27

20   Gov. Code section 844.6 ..................................................................................................22

21   Gov. Code, §820, subd. (a) ..............................................................................................23

22   Penal Code §4030 (a) .......................................................................................................24

Penal Code §4030(c)(3) ........................................................................................6, 12, 19

23   **CONSTITUTIONS**

24   Article 1, §1 of the California Constitution ..............................................................13, 21

25   Article 1, §13 of the California Constitution ...................................................................13

Eighth Amendment to Federal Constitution ..............................................................10, 20

26   Fourth Amendment to Federal Constitution .....................................................................16

27

28

## I. INTRODUCTION

In Women's Central Jail ("WCJ") operated by Orange County Sheriff's Department ("OCSD"), defendants took every possible opportunity to inflict unnecessary pain and punishment on inmates, created and maintained an inhumane environment to cause physical and psychological harm, and treated inmates as if they were animals. Defendants failed to justify excessive and constant group strip searches, forcing inmates to be completely naked for no legitimate reason, forcing Plaintiff to wear a bra in the hallway, conducting retaliation cell search, and maintaining unconstitutional condition and practice. All misconduct occurred under supervision after "training" which supports failure to supervise and train. Accordingly, Plaintiff respectfully request that Defendants' motion be denied.

## II. STATEMENT OF RELEVANT FACTS

Plaintiff's arrest was not pertaining to weapons or contraband. During my arrest Plaintiff was pat down searched. Doe Decl., ¶1. Plaintiff was denied any food the entire first day of her incarceration. Doe Decl., ¶6. While she saw other inmates eating, she repeatedly requested food but her requests were intentionally denied. The first day in WCJ Plaintiff spent 20 plus hours without food along with 12 plus hours in bone chillingly cold environment. Doe Decl., ¶7.

After being forced to be strip naked and take a mandatory shower in the view and presence of OCSD personnel and other inmates, between August 8 and 12, 2019 Plaintiff was strip searched for seven times despite she had no outside contact and was constantly supervised by WCJ staff. Doe Decl., ¶15-18. The searches, labeled by defendants as "routine extended correctional searches", were in fact strip searches defined by California Penal Code §4030(c)(3) which include visual inspection of the underclothing. During the first strip search, a deputy noticed Plaintiff was not wearing a bra, so the deputy called someone to get a bra for Plaintiff and ordered Plaintiff to wear the bra in the view and presence of OCSD personnel and other inmates without giving her any opportunity to use a bathroom. For each of seven strip searches in the hallway, Plaintiff had to take off her clothing, pull down her underwear, lift up her menstrual pad and twist it in front of deputies without any reasonable suspicion, all occurred while other inmates were present. Doe Decl., ¶15. On multiple occasions, Plaintiff was forced to be fully naked in the

6

1    view and presence of OCSD personnel and other inmates. Despite shampoo, one of the hygienic

2    supplies, was constitutionally required Plaintiff was not given any shampoo. During the four and

3    a half days in WCJ, other than the mandatory shower, Plaintiff was unable to take another shower

4    due to the horrific experience. Doe Decl., ¶27.

5          Through discovery, records show that there was no other midnight cell searches during the

6    entire discoverable period except the one conducted on August 11, 2019. The records also show

7    that on multiple occasions when altered razors were found, no one was written up a major

8    violation. However, during the midnight cell search on Aug 11, 2019 at issue, three inmates were

9    written up a major violation due to the altered razors which demonstrates that the written

10    violation was an arbitrary decision. Doe Decl., ¶20-21. During the shakedown on August 11,

11    2019 one deputy loudly announced that such searches would continue regularly unless and until

12    all inmates would keep quiet during the day. The deputy went on and declared in a degrading

13    manner that dayroom and phone service would be shut down unless and until all inmates would

14    shut up during the day. During the day on August 11, 2019 after breakfast, no one in the cell

15    dared to make a sound.

16          Defendants try to shift the blame to Plaintiff for her failure to complain about strip

17    searches, overcrowding condition, and other conditions. However, they forget how Plaintiff was

18    treated in the first place. Plaintiff was pushed and forced to sit down simply because she told the

19    deputies that she wanted to change pads. She was denied food and clothing to keep warm. Her

20    head was slapped. Doe Decl., ¶5. Because inmates talked during the day they received midnight

21    cell search. All this is evident that complaint will not be properly addressed and most likely will

22    cause retaliation.

23    **III.    STANDARD OF REVIEW**

24          Summary judgment is appropriate only if "the movant shows that there is no genuine issue

25    as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ.

26    Proc. 56(a). In making that determination, a court must view the evidence "in the light most

27    favorable to the opposing party." *Adickes v. S. H. Kress & Co*., 398 U. S. 144, 157, 90 S. Ct.

28    1598, 26 L. Ed. 2d 142 (1970). In addressing a qualified immunity argument, "courts may not

1  resolve genuine disputes of fact in favor of the party seeking summary judgment," and reiterating

2  that "a judge's function at summary judgment is not to weigh the evidence and determine the truth

3  of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572

4  U.S. 650,656 (2014).

5  **IV.   FEDERAL CLAIMS**

6      **A.  Fourteenth Amendment Violations**

7      The Fourteenth Amendment prohibits punishment of pretrial detainees. *Bell v. Wolfish*,

8  441 U.S. 520, 535 (1979). The Constitution "does not mandate comfortable prisons," *Rhodes v.*

9  *Chapman*, 452 U. S. 337, 349 (1981), but neither does it permit inhumane ones, and it is now

10  settled that "the treatment a prisoner receives in prison and the conditions under which he is

11  confined are subject to scrutiny under the Eighth Amendment," *Helling v. McKinney*, 509 U. S.

12  25, 31 (1993). The Amendment also imposes duties on these officials, who must provide humane

13  conditions of confinement; prison officials must ensure that inmates receive adequate food,

14  clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of

15  the inmates," *Hudson v. Palmer*, 468 U. S. 517, 526-527 (1984).

16      "If a restriction or condition is not reasonably related to a legitimate goal — if it is

17  arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental

18  action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell*

19  *v. Wolfish*, 441 U.S. 520, 539 (1979). Courts must be mindful that these inquiries spring from

20  constitutional requirements and that judicial answers to them must reflect that fact rather than a

21  court's idea of how best to operate a detention facility. Cf. *United States v. Lovasco*, 431 U. S.

22  783, 790 (1977); *United States v. Russell*, 411 U. S. 423, 435 (1973).

23      Plaintiff was entitled to constitutional protection since the first minute she walked into

24  WCJ instead of when she was booked. Our constitution does not permit WCJ to delay the

25  booking process to deprive inmates of their constitutional rights.

26      **1.  Deprivation of Food and Life Necessities**

27      Defendants try to minimize the deprivation by alleging Plaintiff was denied only one

28  meal. However, Plaintiff was not denied a breakfast and was able to catch up and have a lunch

1    couple hours later. Doe Decl., ¶6. Plaintiff was taken into custody in the morning of Aug 8, 2019

2    so she was supposed to have two meals that day. See Cal. Code Regs. tit. 15, §3050(a)(2) (2000)

3    (requiring that inmates "shall be provided three meals a day, two of which shall be served hot").

4           20 plus hours without food along with 12 plus hours in bone chillingly cold environment,

5    which is not routine discomfort, constituted an impermissible imposition of punishment. See

6    *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (deprivations denying "the minimal civilized measure

7    of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation);

8    *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding officials may be liable for deliberate

9    indifference where they are aware of, and disregard, facts informing them of a substantial risk to

10   inmate health or safety); *Willis v. Bell*, 726 F. Supp. 1118, 1122 (N.D. Ill. 1989) (holding that

11   while deprivation of food for 12 hours may not strike defendants as particularly harsh, no

12   legitimate governmental purpose has been (or could be) offered as justification for that

13   deprivation. Certainly the trier of fact could reasonably find the deprivation of food here was

14   intentional and calculated to punish.)

15          Further, when denying Plaintiff's repeated request for food, laughing at Plaintiff's plea for

16   something to keep warm, yelling at Plaintiff "This is jail. Don't come to jail next time." despite

17   Plaintiff informed jail staff she was cold to death, Doe Decl., ¶6-7, Defendants acted with

18   "deliberate indifference" to inmate health that served no legitimate goal or government interest

19   but to cause unnecessary pain.

20          **2.  WCJ Was Kept At Bone Chilling Temperature to Cause Unnecessary Pain**

21          First, Plaintiff is not the only inmate who can testify as to the bone chilling temperature

22   kept by WCJ. Doe Decl., ¶2. Second, when being informed that Plaintiff was cold to death, WCJ

23   staff's response was "It's JAIL. Don't come to jail next time." Such language is sufficient for a

24   factfinder to infer prison officials' state of mind to inflict unnecessary pain which is "more than

25   ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U. S. 312,

26   319 (1986). As a direct result, Plaintiff's pulse dropped from 90 to 57, supported her health record

27   in WCJ. Doe Decl., ¶7. Whether WCJ was kept at room temperature is less relevant since WCJ

28   staff was informed that Plaintiff was cold to death. Defendants tried to downplay their deliberate

indifference by alleging the bone-chillingly cold is a temporary condition but over 12 hours in freezing cold environment is not temporary. The Eighth Amendment entitles prisoners "not to be confined in a cell at so low a temperature as to cause severe discomfort". *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997). Less than two hours' exposure to subfreezing outdoor weather without hats and gloves violated the Eighth Amendment. *Gordon v. Faber*, 973 F.2d 686, 687-88 (8th Cir. 1992). The deprivation of hats and gloves to inmates exercising outside in sub-freezing weather was "extreme" and denied these inmates the "minimal civilized measure of life's necessities." *Gordon v. Faber*, 800 F. Supp. 797, 798 (N.D. Iowa 1992).

Defendants also mischaracterize Plaintiff's claim as a request for a "comfortable" temperature. In fact, what temperature was kept is irrelevant as long as Plaintiff's was provided something to keep warm after she informed jail staff that she was cold to death.

### 3. WCJ Was Overcrowded Supported By The Data Of Board Of State And Community Corrections Which was the Root of Impermissible Noise

"Crowding" refers to the presence in a facility or prison system of a prisoner population exceeding that facility or system's capacity. See, e.g., *Doty v. County of Lassen*, 37 F.3d 540, 543 (9th Cir.1994) (finding overcrowding where a jail's actual population exceeded its design capacity by an average of approximately fifty percent); *Hoptowit v. Ray*, 682 F.2d 1237, 1248–49 (9th Cir.1982) (finding a penitentiary overcrowded where its population exceeded its design capacity); see also *Lareau v. Manson*, 651 F.2d 96, 99–100 (2d Cir.1981); cf. *Random House Webster's Unabridged Dictionary 482* (2d ed. 1998) (defining "crowded" as "filled to excess"). "A prison system's capacity is not defined by square footage alone; it is also determined by the system's resources and its ability to provide inmates with essential services such as food, air, and temperature and noise control." *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 921 (E.D. Cal. 2009).

Title 24 Minimum Standards for Local Detention Facilities, §1231.2.8 Dormitories, requires a minimum of 70 square feet (7 m2) per inmate for a double-bed unit. §1231.2.9 requires a dayrooms must contain 35 square feet (3.3 m2) of floor area per inmate in width in front of cells/rooms. According to minimum standards, the dorm area for 40 women should have been at

10

least 2800 square feet and the dayroom should have been at least 1400 square feet. No meaningful

indoor activities or stimulation could be achieved in a 360 sq. ft. cramped space for 40 women. It

is a misrepresentation that Plaintiff had access to the 360 square foot dayroom because Plaintiff

was not the only inmate who had access to the dayroom. If only 50% of inmates went to the

dayroom at the same time on average, each inmate had only 18 sq. ft. space when she was in the

dayroom. Doe Decl., ¶3.

     Not only WCJ does not meet the minimal space requirement, the overcrowding condition

is the root of the all night long toilet flushing. There was an informal rule to prohibit flushing

toilets when any deputy was present because the noise of flushing toilet was extremely loud. Doe

Decl., ¶28. Even if 50% of the women used the toilet for only one time after midnight that would

be 20 flushes of toilet each night because Plaintiff's cell held 40 women. Putting 40 women

together sharing 4 toilets to cause all night long toilet flushing is inhuman.

     Plaintiff was never permitted to have outdoor recreation time on the patio up to three

times per week as defendants falsely allege. Doe Decl., ¶22. The dayroom was a room next to the

toilets within the same cell. Doe Decl., ¶23. It is a misrepresentation to allege that Plaintiff was

permitted to leave her cell to use the dayroom from 6:00 a.m. to 11:00 p.m. everyday. The

overcrowding condition is supported by the Data of Board of State and Community Corrections.

Doe Decl., ¶3-4.

### 4. Impermissible Light Annoyance

     Being scared or Plaintiff's prior sleeping issue was not the only reason that kept Plaintiff

from sleeping. The light over Plaintiff's bed was not low-wattage lighting. The same light was on

all day and night and bright enough to read. Doe Decl., ¶28. *Keenan v. Hall*, 83 F.3d 1083, 1090

(9th Cir. 1996) (leaving the lights on in an inmate's cell all day and night is unconstitutional.)

Defendants falsely allege that the only lights that were left on were in the security areas where the

guards were for safety. The light was left on over Plaintiff's bed was obviously not in the security

area.

### 5. Plaintiff Was Not Given Adequate Hygienic Supplies

     WCJ's basic Welfare Pack does not include shampoo. Doe Decl., ¶11. Any basic hygienic

supplies, including shampoo, should have been provided to inmates free of charge as food.
"Hygienic supplies sufficient to meet basic needs are constitutionally required; it is not enough
for the prison to "allow" inmates to purchase them." *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th
Cir. 2016). It is undisputed that washing hair is basic human need. It is also undisputed that
shampoo is one of the basic hygienic supplies. Such deprivation served no legitimate goal or
government interest.

Plaintiff was never informed that if she ran out of hygienic items and could not afford
more, WCJ would provide them for free. Instead, Plaintiff was informed to purchase them at her
own cost. Inmates never received indigent pack (welfare pack) even after they requested it. Doe
Decl., ¶5.

**B.  Constant and Excessive Strip Searches and Forced Exposure of Inmates' Naked
Body Were Unreasonable**

The "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v.
Stuart*, 547 U.S. 398, 403 (2006). A citizen's Fourth Amendment right to be free from
"unreasonable searches" does not disappear upon arrest. … An officer is not authorized to
conduct all of these searches simply because he has arrested someone. Each search must be
separately analyzed to determine its reasonableness. *Birchfield v. North Dakota*, 136 S. Ct. 2160,
2187 (2016). The burden is not satisfied by a general assertion of safety or security reason.
Defendants not only bear the burden to justify each search, but also the manner and frequency of
each search.

Pursuant to California Penal Code §4030(c)(3) effective in 2019, "strip search" means a
search which requires a person to remove or arrange some or all of his or her clothing so as to
permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person.
OCSD's strip search policy violates California Penal Code §4030(c)(3) by specifically excluding
visual inspection of the underclothing of an inmate. So that they can mislabel "strip searches" as
"body searches" or "Extended Correctional Searches" while in fact the searches they conducted
already met the definition of strip searches under California Penal Code §4030(c)(3). See Don
Barnes' Responses To Request For Admissions (Set Two). During the first strip search Plaintiff

1    was not wearing a bra and was ordered to wear a bra in the view and presence of OCSD personnel

2    and other inmates without giving a chance to use the bathroom. The Fourth Amendment does

3    apply to the invasion of bodily privacy in prisons. See *Michenfelder v. Sumner*, 860 F.2d 328, 332

4    (9th Cir. 1988). Plaintiff was forced to be fully naked at WCJ for no legitimate safety reason. She

5    was subject to strip searches even after the court granted her release and right before leaving

6    WCJ. Doe Decl., ¶9-18.

7           Allegation of a strip search that was unnecessary because it immediately followed another

8    strip search stated a Fourth Amendment claim. *Hodges v. Stanley*, 712 F.2d 34, 35 (2d Cir. 1983).

9    A second-strip search was unconstitutional because the inmate was under constant supervision of

10   guards since the first search. *Jean-Laurent v. Wilkenson*, 540 F. Supp. 2d 501 (S.D.N.Y 2008).

11   California courts have held that a blanket strip search policy for arrestees after returning from

12   court is unconstitutional. As to arrestees returning from court entitled to release, blanket policies

13   of conducting strip searches violates the Fourth Amendment, Article 1, §1 of the California

14   Constitution, and Article 1, §13 of the California Constitution. *Craft v. County of San*

15   *Bernardino*, 468 F. Supp. 2d 1172 (C.D. Cal. 2006). In *Lopez v. Youngblood*, 609 F. Supp. 2d

16   1125 (E.D. Cal. 2009), the court held it was unconstitutional to strip search detainees in a group.

17   Strip search without privacy presented a factual issue of reasonableness. *Estes-El v. State of New*

18   *York*, 552 F.Supp. 885, 889 (S.D.N.Y. 1982).

19          In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court created a balancing test for

20   determining if a person's Fourth Amendment right to be free from unreasonable searches in the

21   carceral context has been violated. Courts assess the constitutionality of a strip search by

22   balancing "the need for the particular search against the invasion of personal rights that the search

23   entails." Id. at 559. This requires courts to weigh "the scope of the particular intrusion, the

24   manner in which it is conducted, the justification for initiating it, and the place in which it is

25   conducted." Id. Applying this balancing test, California courts have held that a blanket strip

26   search policy for arrestees after returning from court is unconstitutional. *Craft v. County of San*

27   *Bernardino*, 468 F. Supp. 2d 1172, 1179 (C.D. Cal. 2006) (policy of strip searching all arrestees

28   who are returned to a jail facility from court violates the Fourth Amendment).

The Ninth Circuit has, since 1963, recognized a Fourteenth Amendment right to bodily privacy. In the Ninth Circuit, "[i]t is clearly established that the Fourteenth Amendment protects a sphere of privacy, and the most 'basic subject of privacy . . . the naked body.'" *Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007), cert. granted, judgment vacated on other grounds, 556 U.S. 1256 (2009) (quoting *Grummet*, 779 F.2d at 494); see also *Sepulveda*, 967 F.2d at 1416 ("The right to bodily privacy is fundamental. . . . and was clearly established at the time. . . .")

In *Bull v. City County of San Francisco*, 595 F.3d 964, 975 (9th Cir. 2010), officials conducted strip searches in a professional manner and in a place that afforded privacy. The circumstances justifying their strip searches were a pervasive and serious problem with contraband inside San Francisco's jails, as well as numerous instances in which contraband was found during a search. *Id*. That is not the case here. No contraband or weapon was ever found during the group strip searches in WCJ. Doe Decl., ¶20. Defendants failed to meet their burden to justify the searches conducted in hallway and in groups.

Peering by strangers without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy. Let alone a woman's bloody menstrual pad. Strip searches are inherently harmful, humiliating, and degrading, not to mention Plaintiff was forced to expose her breasts three times and genital for two times. Doe Decl., ¶9, 12, 18.

### C.  <u>There Is Solid Evidence to Prove Harassing Cell Search</u>

First and foremost, it is objectively unreasonable for a deputy to conduct a cell search while all inmates are asleep because such action is obviously not for the purposes to find potential narcotics or weapons in the interest of safety for inmates and deputies. Other than the 7 hours sleep time there are 17 hours available if deputies want to search narcotics or weapons.

As the court allows only one month's 24 hr jail logs to be discoverable, the assumption is that this one month's jail logs is a complete representation of the practice in WCJ. From the records, there was no midnight cell search during the entire discoverable period prior to Plaintiff was detained which can be inferred that midnight search was not common practice in WCJ. The records also show that on multiple occasions when altered razors were found no one was written

1    up a major violation. However, during the midnight cell search on Aug 11, 2019 at issue, three

2    inmates were written up a major violation due to the altered razors which demonstrates that the

3    written violation was an arbitrary decision. Coupled with the oral announcement, such searches

4    would continue regularly unless and until all inmates would keep quiet during the day, a

5    reasonable jury could infer that the midnight search was for the purpose of retaliation. Doe Decl.,

6    ¶20-21.

7         As the magistrate judge stated in his report and recommendation RE: MTD, Orange

8    County is not the only county in this district with a jail and the other jails seem to be able to run

9    safely without searching cells in the middle of the night. Dkt. 42 at p. 8. So far, WCJ provided no

10   evidence showing that midnight cell search was common practice and necessary to maintain

11   security. *Jordan v. Gardner*, 986 F.2d 1521, 1524 (9th Cir. 1993) (en banc) (the "Fourth

12   Amendment guarantees the right of the people to be secure against unreasonable searches, and its

13   protections are not extinguished upon incarceration"); *Thompson v. Souza*, 111 F.3d 694, 699 (9th

14   Cir. 1997) (same).

15        **D.  Plaintiff's First Amendment Rights Were Violated**

16        Defendants' reliance on *Asbury v. Brown*, 2017 WL 1837024, at *6 (E.D. Cal. May 8,

17   2017) is misplaced. Prisoners retain their First Amendment right to receive information while

18   incarcerated. *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("Prison

19   walls do not form a barrier separating prison inmates from the protections of the Constitution.");

20   *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (holding that a prison regulation

21   banning standard-rate mail "implicates both Publisher's and Prisoners' First Amendment rights");

22   see also *Morrison v. Hall*, 261 F.3d 896, 906 (9th Cir. 2001) ("The Supreme Court has repeatedly

23   recognized that restrictions on the delivery of mail burden an inmate's ability to exercise his or

24   her First Amendment rights."). This First Amendment right is operative unless it is "inconsistent

25   with [a person's] status as a prisoner or with the legitimate penological objectives of the

26   corrections system." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97

27   S.Ct. 2532, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800,

28   41 L.Ed.2d 495 (1974)).

The Supreme Court in *Turner* established a four factor test to determine whether a prison policy serves legitimate penological objectives:

(1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open to the inmates to exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

Here, there was no legitimate or neutral governmental objective to restrict inmates to talk to each other unless there were verbal provocation that would lead to physical violence; there were no alternative avenues that remained open to exercise the right since Plaintiff and other inmates received retaliation if they kept talking to each other; there was no negative impact to allow inmates to talk to each other; the retaliation clearly indicated that the restriction was an exaggerated response by WCJ officials.

Defendants' assertion that Plaintiff was not personally talking during the cell search has no merit. Fact 57. "'Prior restraint' is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated." *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015). Telling all 40 inmates to shut up during the day constitutes censorship. Through a midnight cell search to deliver this censorship message constitutes retaliation. Doe Decl., ¶2, 19.

**E.  Individual and Deputy Defendants are Not Entitled to Qualified Immunity**

"A search and seizure is conducted without a warrant is per se unreasonable under the Fourth Amendment – subject to only a few specifically established and well delineated exceptions. The burden is on the Government to persuade the court that a search comes under on of a few specifically established exceptions to the warrant requirement. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001) (internal citations omitted). The burden is on Defendants to persuade the court why seven strip searches on Plaintiff were necessary, especially after a pat-down search when Plaintiff was arrested and mandatory shower in the view of deputies. The burden is on Defendants to show how many narcotics or weapons Defendants had yielded over

16

1    the years through group strip searches in WCJ in order to justify such unconstitutional blanket

2    policy imposed on pre-trial detainees. It's also Defendants' burden to show what justified forcing

3    inmates to be completely naked and forcing Plaintiff to wear a bra in the hall way.

4         Defendants could have established risk assessment mechanism. Defendants could have

5    divided detainees by their level of risk. Defendants could have utilized body scanner instead of

6    group strip search. Defendants could have set up separate detention facility for non-dangerous

7    and low-risk pre-trail detainees rather than throw all detainees and prisoners all together to

8    provide opportunities for correctional officials' abuse of power and authority. Separating and

9    dividing detainees is not only beneficial for prison safety but also cost effective. Imposing

10   unnecessary and excessive blanket policy not only constitutes punishment but also a waste of tax

11   dollars. Plaintiff was neither convicted nor sentenced while she was in custody of WCJ. An

12   inmate does not deserve punishment exceeding his or her sentence. A pre-trial detainee does not

13   deserve any harm outside of the inherent discomforts of confinement. Loss of freedom is more

14   than enough. Plaintiff, a pre-trial detainee in a vulnerable position, did not deserve what she went

15   through in WCJ. The facts that prove individual Defendants specifically created or endorsed the

16   group strip search policy are all strip searches were conducted routinely and massively.

17        Further, Defendants have maintained unconstitutional practice in WCJ for years prior to

18   Plaintiff's incarceration. Doe Decl., ¶2-5, 32, 36.

19        **F.  <u>Individual Defendants Had Direct Involvement</u>**

20        Sheriff Don Barnes was personally involved in the formulation and implementation of

21   policies at County Jails. Assistant Sheriff William Baker was responsible for the planning,

22   directing, coordinating, and controlling of all activities of OCSD's custody operations, and the

23   formulation of rules and procedures necessary to carry out the policies and directives of Barnes.

24   Commander Joe Balicki was responsible and liable for policy utilization and implementation.

25   Captain Mark Stichter planned, organized, controlled and directed the work of WCJ and was

26   responsible for the daily conditions and operations of WCJ, including the training and supervision

27   of floor deputies. Captain Mark Stichter was even on the service list of BSCC's inspection for

28   cycle 2016-2018 that indicates overcrowding issues in all OCSD facilities. Doe Decl., ¶32-33.

1    Under California Evidence Code Division 5 Chapter 3 Presumptions and Inferences, it is

2    presumed that official duty has been regularly performed. The supervisors who establish,

3    implement, and foster unconstitutional policy, practice, and custom should be held liable. The

4    supervisors who maintain the unconstitutional condition in WCJ should be held liable. Here, all

5    supervisors had actual or constructive knowledge of all violations stated herein. Doe Decl., ¶3.

6    OCSD's official duties establish supervisor defendants' connection to the violations.

7        In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), the court explained that to

8    be held liable, the supervisor need not be "directly and personally involved in the same way as are

9    the individual officers who are on the scene inflicting constitutional injury." The supervisor's

10   participation could include his "own culpable action or inaction in the training, supervision, or

11   control of his subordinates," "his acquiescence in the constitutional deprivations of which the

12   complaint is made," or "conduct that showed a reckless or callous indifference to the rights of

13   others. Id. at 646. Supervisors of WCJ need not to be at the scene to be held liable.

14       **G.  A Public Entity is Liable for Unconstitutional Practice, Policy or Custom**

15       As stated below, Plaintiff does not sue the County solely for employing a tortfeasor.

16   **V.    *MONELL* CLAIMS**

17       **A.  Constitutional Violations are Obvious**

18       While a government official who violates the constitution will be protected if his or her

19   actions were reasonable in light of clearly established law and the information the official

20   possessed when he or she acted, municipalities enjoy no such shield. See *Owen v. City of Indep.*,

21   445 U.S. 622, 638 (1980).

22       **B.  Custom, Policy, or Practice that Amounts to Deliberate Indifference**

23       Under *Monell*, municipal liability under section 1983 may be based on (1) acts of

24   "commission," where the government implements official policies or established customs that

25   inflict constitutional injury, (2) acts of "omission," when those omissions amount to the local

26   government's own official policy, or (3) acts of or ratification by an official with final

27   policymaking authority. *Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir.

28   2010), overruled on other grounds by *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016).

1    Ratification of the decisions of a subordinate by an official with final decision-making

2    authority can also be a policy for purposes of municipal liability under §1983. See *St. Louis v.*

3    *Praprotnik*, 485 U.S. 112, 127 (1988); *Trevino v. Gates*, 99 F.3d 911, 920–21 (9th Cir. 1996);

4    *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992); *St. Louis v. Praprotnik*, 485 U.S.

5    112, 127 (1988) (Holding that a municipality can be held liable for an isolated constitutional

6    violation if a final policymaker ratified a subordinate's actions.) Here, Sheriff Don Barnes ratified

7    his subordinate's actions by defending them in this lawsuit.

8    Where the conduct of high level officials responsible for establishing policy causes the

9    deprivation, municipal policy is conclusively established without a showing of repeated instances

10   of similar conduct. *Pembaur v. City of Cincinnati* (1986), 475 U.S. 469, 480-81, 106 S. Ct. 1292,

11   1299, 89 L. Ed. 2d 452, 463. Here, implementing a policy that clearly violated California Penal

12   Code §4030(c)(3) amounts to reckless disregard for or deliberate indifference to the rights of

13   inmates. ACLU and BSCC's reports clearly show that similar misconduct and unconstitutional

14   condition had happened prior to Plaintiff's incarceration. Doe., Decl., ¶5, 32. It was a widespread

15   practice to disregard inmates' constitutional rights in WCJ. A pattern of similar constitutional

16   violations is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure

17   to train. Policymakers' "continued adherence to an approach that they know or should know has

18   failed to prevent tortious conduct by employees may establish the conscious disregard for the

19   consequences of their action—the 'deliberate indifference'—necessary to trigger municipal

20   liability." *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407-409 (1997).

21   "[A] municipal policy that merely permits or tolerates unconstitutional acts by city

22   employees [can serve as] the basis for municipal liability under §1983." *Fiacco v. City of*

23   *Rensselaer*, 783 F.2d 319, 326 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S. Ct. 1384, 94 L.

24   Ed. 2d 698 (1987); *Sarus v. Rotundo*, 831 F.2d 397, 401 (2d Cir.1987). Such tolerance in the form

25   of failure to investigate, discipline or correct violations suggests an adoption of a policy

26   supporting such violations. "[M]unicipal inaction such as the persistent failure to discipline

27   subordinates who violate civil rights could give rise to an inference of an unlawful municipal

28   policy of ratification of unconstitutional conduct within the meaning of *Monell*." *Batista v.*

19

1     *Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983) (citing *Turpin v. Mailet*, 619 F.2d 196, 201-202 (2d

2     Cir.), cert. denied, 449 U.S. 1016, 101 S. Ct. 577, 66 L. Ed. 2d 475 (1980)); *Sarus*, 831 F.2d at

3     401. "The inference that a policy existed may ... be drawn from circumstantial proof, such as ...

4     evidence that the municipality had notice of but repeatedly failed to make any meaningful

5     investigation into charges that police officers had used excessive force in violation of the

6     complainants' civil rights." *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991).

7         An "official policy" may be established in one of three ways: (1) "when the appropriate

8     officer or entity promulgates a generally applicable statement of policy and the subsequent act

9     complained of is simply an implementation of that policy; (2) where no rule has been announced

10    as 'policy' but federal law has been violated by an act of the policymaker itself; and (3) even

11    where the policymaker has failed to act affirmatively at all, so long as the need to take some

12    action to control the agents of the government 'is so obvious, and the inadequacy [of existing

13    practice] so likely to result in the violation of constitutional rights, that the policymaker... can

14    reasonably be said to have been deliberately indifferent to the need.'" *Bd. of Cty. Comm'rs of*

15    *Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 417-19 (1997) (Souter, J., dissenting), (quoting *City of*

16    *Canton v. Harris*, 489 U.S. 378, 390 (1989)).

17         Supervisor or municipality may be held liable where there is essentially a complete failure

18    to train, or training that is so reckless or grossly negligent that future misconduct is almost

19    inevitable. *Hays v. Jefferson County*, 668 F.2d 869, 873-74 (6th Cir.), cert. denied, 459 U.S. 833,

20    103 S.Ct. 75, 74 L.Ed.2d 73 (1982). See *City of Springfield v. Kibbe*, 480 U.S. 257 (1987)

21    (O'Connor, J., dissenting) (arguing that inadequate police training is actionable under section

22    1983 only if it amounts to reckless disregard for or deliberate indifference to the rights of persons

23    within the city's domain).

24         Deputy Defendants admit that they were supervised by trained staff while on duty. Dkt.

25    139-3 at p. 62. However, none of any violations were stopped by any supervisors. "Inaction in the

26    form of a failure to supervise can ... result in secondary liability," known as the "indirect

27    participation rule." *Kersh v. Gen. Council of the Assemblies of God*, 804 F.2d 546, 550 (9th

28    Cir.1986).

"The status of the detainees determines the appropriate standard for evaluating conditions of confinement." *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987). "Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." *Bell v. Wolfish*, 441 U.S. 520, 537 n.16, (1979). However, the County maintained a policy, practice, or custom that a pretrial detainee can be punished. Doe Decl., ¶36.

### C. Individual and Deputy Defendants were Inadequately Disciplined, Trained and Supervised

Although each declaration attached to Defendants' MSJ contains the same general language that each of the declarant received training on the WCJ policies related to overcrowding in WCJ, sleep deprivation of inmates, sound and light policies, the temperature, body searches, hygiene productions given to and available to inmates for purchase, and FAST and cell searches, OCSD's training records include nothing adequate related to inmates' constitutional rights at issue here. Doe Decl., ¶20. Nor did their responses to Plaintiff's interrogatory indicate they received sufficient training, especially inmates' first amendment right and the definition of strip search under Penal Code §4030. Defendants general and bare assertion of training provided no information about whom provided the training, when, or the specific content of training to validate the training information and assess the sufficiency of training. All violations occurred under supervision constitutes failure to supervise.

## VI.   STATE LAW CAUSES OF ACTION

### A. The Right of Privacy and the Right to Free Speech are Broader and More Protective under California Constitution

The Ninth Circuit has held that Article I, section I of the California Constitution contains an explicit guarantee of the right of "privacy" which is broader and more protective in scope than that of the United States Constitution. *Leonel v. Am. Airlines, Inc*., 400 F.3d 702, 711 (9th Cir. 2005).

None of the cases cited by Defendants address the same scope of intrusion, same manner and same place how and where the searches conducted by WCJ. Nor did they address forcing

1    inmates to be completely naked for no legitimate prison safety reason. The circumstances of those

2    cases are meaningfully distinguishable from those presented here.

3            The liberty of speech clause of the California Constitution, "is broader and more

4    protective than the free speech clause of the First Amendment. [Citations.]" *Los Angeles Alliance*

5    *for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366–367, 93 Cal.Rptr.2d 1, 993 P.2d

6    334; *Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]. See

7    also *Gerawan Farming, Inc. v. Lyons*, 24 Cal.4th 468, 101 Cal.Rptr.2d 470, 12 P.3d 720, 735

8    (2000) (stating that the California right to free speech, unlike the First Amendment, runs against

9    the world and is unlimited in scope.)

10            The Department of Corrections does not have total or arbitrary power, but must exercise

11   its authority even-handedly and with sensitivity to the values protected by the First Amendment

12   and corresponding California constitutional and statutory provisions. *Bailey v. Loggins*, 32 Cal.3d

13   907, 922 (Cal. 1982).

14           **B.  Individual Defendants are Liable for Negligent Supervision/Training/ Hiring**

15           "Section 844.6 provides that public entities, but not public employees, are immune from

16   liability for '[a]n injury proximately caused by any prisoner.' … The immunity in section 844.6

17   applies to public entities rather than public employees (see subd. (d)), and makes no distinction

18   between discretionary and ministerial acts." *Savitt v. Jordan*, 142 Cal.App.3d 820, 821-822 (Cal.

19   Ct. App. 1983).

20           Section 844.6 in its entirety states as follows:

21           (a) Notwithstanding any other provision of this part, except as provided in this section and

22   in Sections 814, 814.2, 845.4, and 845.6, or in Title 2.1 (commencing with Section 3500) of Part

23   3 of the Penal Code, a public entity is not liable for:

24           (1) An injury proximately caused by any prisoner.

25           (2) An injury to any prisoner.

26           (b) Nothing in this section affects the liability of a public entity under Article 1

27   (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code.

28           (c) Except for an injury to a prisoner, nothing in this section prevents recovery from the

22

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ

1    public entity for an injury resulting from the dangerous condition of public property under

2    Chapter 2 (commencing with Section 830) of this part.

3        (d) Nothing in this section exonerates <u>a public employee</u> from liability for injury

4    proximately caused by his negligent or wrongful act or omission. The public entity may but is not

5    required to pay any judgment, compromise or settlement, or may but is not required to indemnify

6    any public employee, in any case where the public entity is immune from liability under this

7    section; except that the public entity shall pay, as provided in Article 4 (commencing with Section

8    825) of Chapter 1 of this part, any judgment based on a claim against a public employee who is

9    lawfully engaged in the practice of one of the healing arts under any law of this state for

10   malpractice arising from an act or omission in the scope of his employment, and shall pay any

11   compromise or settlement of a claim or action, based on such malpractice, to which the public

12   entity has agreed.

13       "[E]xcept as otherwise provided by statute . . ., a public employee is liable for injury

14   caused by his act or omission to the same extent as a private person." Gov. Code, §820, subd. (a).

15       Where a legal duty is not created by statute, the question of whether a legal duty exists is

16   analyzed under general principles of tort law. [Citation.] [¶ "A tort, . . . involves a violation of a

17   legal duty . . . owed by the defendant to the person injured. Without such a duty, any injury is

18   'damnum absque injuria' — injury without wrong. [Citations.]" [Citation.]'" *Adams v. City of*

19   *Fremont* (1998) 68 Cal.App.4th 243, 264, fn. omitted [80 Cal.Rptr.2d 196]. The "existence and

20   scope of duty are legal questions for the court." *Merrill v. Navegar, Inc*. (2001) 26 Cal.4th 465,

21   477, 110 Cal.Rptr.2d 370, 28 P.3d 116.

22       "There is a special relationship between jailer and prisoner, imposing on the former a duty

23   of care to the latter." *Giraldo v. Department of Corrections Rehabilitation* (2008) 168

24   Cal.App.4th 231, 250 [85 Cal.Rptr.3d 371]. "[I]mportant factors in determining whether a

25   relationship is 'special' include vulnerability and dependence. Prisoners are vulnerable. And

26   dependent. Moreover, the relationship between them is protective by nature, such that the jailer

27   has control over the prisoner, who is deprived of the normal opportunity to protect himself from

28   harm inflicted by others." *Ibid*. See also *Frausto v. Dep't of the Cal. Highway Patrol*, 53

Cal.App.5th 973 (Cal. Ct. App. 2020) (Affirming jury verdict in favor of arrestee in custody for negligence.)

Here, individual Defendants had a duty of care to protect Plaintiff from harm and they breached that duty.

### C.  Violation of Penal Code section 4030

California Penal Code §4030 (a)  states, in relevant part, (1) that the Legislature finds and declares that law enforcement policies and practices for conducting strip searches of detained persons vary widely throughout California. Consequently, some people have been arbitrarily subjected to unnecessary strip searches after arrests for minor misdemeanor and infraction offenses. Some present search practices violate state and federal constitutional rights to privacy and freedom from unreasonable searches and seizures; (2) it is the intent of the Legislature in enacting this section to protect the state and federal constitutional rights of the people of California by establishing a statewide policy strictly limiting strip and body cavity searches.

Penal Code §4030(l) provides that all strip searches shall be conducted in an area of privacy so that the search cannot be observed by persons not participating in the search. Persons are considered to be participating in the search if their official duties relative to search procedure require them to be present at the time the search is conducted. Penal Code §4030(o) states that any person who suffers damage or harm as a result of a violation of this section may bring a civil action to recover actual damages, or one thousand dollars ($1,000), whichever is greater. In addition, the court may, in its discretion, award punitive damages, equitable relief as it deems necessary and proper, and costs, including reasonable attorney's fees.

As stated above, individual defendants enabled, aided, and abetted the violation of Penal Code §4030. Mark Stichter also admits that his superiors and subordinates assisted and participated in all jail activities. Dkt. 139-8 at p. 2. Defendants also admit that deputies were supervised by trained staff while on duty. Fact 67. Without supervisors' direct or indirect participation the group strip searches would not have implemented.

### D.  Plaintiff's Claim For IIED Does not Fail

The defendant officer told the plaintiff she had nice legs, put his arm around her,

1   massaged her shoulders, told her he could be her "older man," and made other sexual comments.

2   Despite the officer argued he did not violate any of the plaintiff's constitutional rights as a matter

3   of law the court found his alleged behavior as "abuse of power." *Fontana v. Haskin*, 262 F.3d

4   871, 881 (9th Cir. 2001).

5       The tort calls for intentional, or at least reckless conduct—conduct intended to inflict

6   injury or engaged in with the realization that injury will result. *Davidson v. City of Westminster*

7   (1982) 32 Cal.3d 197, 210; *Ess v. Eskaton Properties, Inc*. (2002) 97 Cal.App.4th 120, 130-131.

8       "Behavior may be considered outrageous if a defendant (1) abuses a relation or position

9   which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to

10   injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that

11   the acts are likely to result in illness through mental distress." *Agarwal v. Johnson* (1979) 25

12   Cal.3d 932, 946 [160 Cal.Rptr. 141, 603 P.2d 58], disapproved on another ground in *White v.*

13   *Ultramar*, Inc. (1999) 21 Cal.4th 563, 575, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *McDaniel v.*

14   *Gile* (1991) 230 Cal.App.3d 363, 372 [281 Cal.Rptr. 242].) "Moreover, [t]he extreme and

15   outrageous character of the conduct may arise from an abuse by the actor of a position, or a

16   relation with the other, which gives him actual or apparent authority over the other, or power to

17   affect his interests. . . . [¶ The extreme and outrageous character of the conduct may arise from

18   the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of

19   some physical or mental condition or peculiarity. The conduct may become heartless, flagrant,

20   and outrageous when the actor proceeds in the face of such knowledge, where it would not be so

21   if he did not know." *McDaniel*, at p. 372, italics added.

22       Therefore, the extreme and outrageous nature of conduct for purposes of establishing IIED

23   may arise from injuries facilitated by a defendant's abuse of power he or she exerts over a

24   particular plaintiff. See *Hailey v. Cal Physician's Serv*., 158 Cal. App. 4th 452, 474 (2007). A

25   defendant's abuse of a position of power to injure the plaintiff's interests can rise to the level of

26   extreme and outrageous conduct. See *Cross v. Bonded Adjustment Bureau*, 48 Cal.App.4th 266,

27   283 (1996).

28       As stated above, a prisoner is vulnerable. The abuse of a position of power by defendants

25

1  is too obvious to ignore.

2        Defendants' assertion has no merit that Plaintiff's incarceration at the WCJ is not the

3  actual and proximate cause of her distress. Plaintiff's health care providers and friends have no

4  trouble testifying how the incarceration affected her in the way medical records do not reflect

5  sufficiently. Doe Decl.,  ¶26-28, 30-31. Lu Decl., ¶3-4.

6        **E.**  **Individual and Deputy Defendants are Not Immune per Gov. Code  §§ 820.2 or**

7          **820.8**

8        Not all acts requiring a public employee to choose among alternatives entail the use of

9  "discretion" within the meaning of section 820.2 . *Barner v. Leeds*, 24 Cal.4th 676, 684-85 (Cal.

10  2000). Whether or not a public employee is immune from liability under section 820.2 depends in

11  many cases upon whether the act in question was "discretionary" or "ministerial," respectively.

12  *Muskopf v. Corning Hospital Dist*. (1961) 55 Cal.2d 211, 220 [11 Cal.Rptr. 89, 359 P.2d 457].

13        The principle is that, although a basic policy decision may be discretionary and hence

14  warrant governmental immunity, subsequent ministerial actions in the implementation of that

15  basic decision still must face case-by-case adjudication on the question of negligence. *Johnson v.*

16  *State*, 69 Cal.2d 782, 797 (Cal. 1968).

17        Classification of the act of a public employee as "discretionary" will not produce

18  immunity under section 820.2 if the injury to another results, not from the employee's exercise of

19  "discretion vested in him" to undertake the act, but from his negligence in performing it after

20  having made the discretionary decision to do so. *Johnson v. State of California* (1968) 69 Cal.2d

21  782, 796-797 [73 Cal.Rptr. 240, 447 P.2d 352]; *Sava v. Fuller* (1967) 249 Cal.App.2d 281, 285-

22  291 [57 Cal.Rptr. 312]. See also *McCorkle v. City of Los Angeles*, 70 Cal.2d 252 (Cal. 1969)

23  (Holding that, even if a police officer made a discretionary decision to undertake an investigation,

24  the officer's subsequent negligent acts in performing the investigation were not protected by

25  discretionary immunity.)

26        First, Defendants provide no policy to support that random cell search can be conducted

27  during midnight and in fact no other midnight cell search was ever conducted. Doe Decl., ¶20.

28  The deliberate choice to conduct a midnight cell search was not immune under section 820.2.

1   See *Gillan v. City of San Mario*, 147 Cal.App.4th 1033, 1051 (Cal. Ct. App. 2007) (holding that

2   the decision to arrest the plaintiff was not a basic policy decision, but only an operational decision

3   by the police purporting to apply the law. The immunity provided by Gov. Code section 820.2

4   therefore does not apply.) Second, Defendants fail to justify the reasonableness of a midnight cell

5   search. A loss or diminution of a right is sufficient to constitute an actual injury. Defendants'

6   refusal to recognize violations of Plaintiff's First and Fourth Amendments rights as real injuries

7   does not produce immunity.

8        Gov. Code section 820.8 , which provides that a public employee "is not liable for an

9   injury caused by the act or omission of another person" is inapplicable because the injury is

10  alleged to have been caused by the public employee's own negligence and misconduct. Indeed,

11  Government Code section 820.8 concludes, "Nothing in this section exonerates a public employee

12  from liability for injury proximately caused by his own negligent or wrongful act or omission."

13  As stated above, individual defendants are sued for their own negligence and misconduct.

14  **VII.    CONCLUSION**

15       For the foregoing reasons, Plaintiff requests this court deny defendants' motion and set the

16  case for trial.

17       Dated: June 3, 2022

18       Respectfully submitted.

19                                          */s/ JANE DOE*

20                                          JANE DOE

21                                          Plaintiff in Pro Se

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3          I, JANE DOE, declare and say as follows:

4          I am over the age of eighteen years of age and am a party to this action. I reside in the

5   County of Los Angeles, State of California. My business address is 11151 Valley Blvd #4886, El

6   Monte, CA 91734, in said county and state.

7          I electronically filed the following document(s):

8          Plaintiff's Opposition to Defendants' Motion For Summary Judgment

9          with the United States District Court, Central District of California. Participants in the

10  case who are registered CM/ECF users will be served by the CM/ECF system.

11

12         Dated: 6/3/2022

13

14                                                              */s/ JANE DOE*

15                                                              JANE DOE

16                                                              Plaintiff in Pro Se

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MSJ