1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11    JANE DOE,                          Case No. 8:20-cv-00322-JWH (GJS)

12              Plaintiff

13         v.                            **REPORT AND
                                         RECOMMENDATION OF
14    COUNTY OF ORANGE, et al.,          UNITED STATES MAGISTRATE
                                         JUDGE**
15              Defendants.

16

17         This Report and Recommendation is submitted to United States District Judge

18    John W. Holcomb, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the

19    United States District Court for the Central District of California.

20

21                        **PROCEDURAL BACKGROUND**

22         Plaintiff Jane Doe[1] brought this action on February 18, 2020.  Following

23    screening and various motions to dismiss, the currently operative version of

24    Plaintiff's complaint is the Fourth Amended Complaint filed on December 1, 2020.

25    [Dkt. 56, "Complaint."]  The named Defendants answered the Complaint on

26    December 14, 2020.  [Dkt. 57.]

27

28    _____

      [1]     Plaintiff is being allowed to proceed under a pseudonym in this case.

                                          1

The Complaint is brought against ten named Defendants,[2] who are:  the County of Orange ("County"); Don Barnes, alleged to be the Sheriff of the Orange County Sheriff's Department ("OCSD") at the relevant time ("Barnes"); William Baker, alleged to be the OCSD's Assistant Sheriff at the relevant time ("Baker"); Joe Balicki, alleged to be the Commander in Charger of OCSD's custody operations at the relevant time ("Balicki"); Mark Stichter, alleged to be the Captain of the County's Women's Central Jail ("Jail") at the relevant time; and Reyna Rivera ("Rivera"), Devonna Falconer ("Falconer"), Kassandra Mayer ("Mayer"), Elia Rodriguez ("Rodriguez"), and Rachel Addington ("Addington"), who apparently were Jail employees at the relevant time.  The Complaint pleads the following 16 claims:

*Claim One*:  a Fourteenth Amendment claim brought under 42 U.S.C. § 1983 ("Section 1983") for "[o]utright denials of life necessities" against Defendant County;

*Claim Two*:  a Fourteenth Amendment claim brought under Section 1983 for "[o]vercrowding and sleep deprivation" against Defendants County, Barnes, Baker, Balicki, and Stichter;

*Claim Three*:  a Fourth Amendment and Fourteenth Amendment claim brought under Section 1983 for "[s]trip search and bodily privacy" against Defendants County, Barnes, Baker, Balicki, and Stichter;

*Claim Four*:  a Fourth Amendment claim brought under Section 1983 for "[h]arassing cell search" against Defendants Rivera, Falconer, Mayer, Rodriguez, and Addington;

*Claim Five*:  a First Amendment claim brought under Section 1983 for "Freedom of Expression" against Defendants Rivera, Falconer, Mayer, Rodriguez,

---

[2]     Although the Complaint also sues "DOES 1-10," Plaintiff has not identified any such fictitiously-named defendants.  Moreover, the time for service of process, under Fed. R. Civ. P. 4(m), passed a long time ago.  Accordingly, there is no extant issue regarding the "DOE" defendants, who by this juncture, are not and will not be parties to this case.

and Addington;[3]

*Claim Seven*:  a claim brought under Section 1983 for municipal liability for "Unconstitutional Custom or Policy" against Defendant County;

*Claim Eight*:  a claim brought under Section 1983 for municipal liability for "Failure to Train and Supervise" against Defendant County;

*Claim Nine*:  a claim brought under Cal. Const. Art. I, § 7 for "[d]enial of life necessities" against Defendant County;

*Claim Ten*:  a claim brought under Cal. Const. Art. I, § 7 for "[o]vercrowding and sleep deprivation" against Defendants County, Barnes, Baker, Balicki, and Stichter;

*Claim Eleven*:  a claim brought under Cal. Const. Art. I § 13 for "[s]trip search" against Defendants County, Barnes, Baker, Balicki, and Stichter;

*Claim Twelve*:  a claim brought under Cal. Const. Art. I, § 13 for "[h]arassing cell search" against Defendants Rivera, Falconer, Mayer, Rodriguez, and Addington;

*Claim Thirteen*:  a claim brought under Cal. Const. Art. I, § 2 for "Freedom of Expression" against Defendants Rivera, Falconer, Mayer, Rodriguez, and Addington;

*Claim Fourteen*:  a claim brought under Cal. Const. Art. I, § 1 for "Right of Privacy" against al Defendants;

*Claim Fifteen*:  a claim for "Negligent Supervising, Training, Disciplining, and Retaining Employees" against Defendants County, Barnes, Baker, Balicki, and Stichter;

*Claim Sixteen*:  a claim brought under California Penal Code § 4030 against Defendants Barnes, Baker, Balicki, and Stichter; and

*Claim Seventeen*:  a claim for intentional infliction of emotional distress against all Defendants.

On May 13, 2022, Defendants filed a motion for summary judgment, or

---

[3]    The Complaint does not allege a Claim Six.

1    alternatively, partial summary judgment [Dkt. 139], along with a memorandum of
2    points and authorities [Dkt. 139-1], a request for judicial notice [Dkt. 139-2], a joint
3    statement of undisputed facts and genuine disputes [Dkt. 139-3, "Joint Statement"],
4    an exhibit table of contents [Dkt. 139-4], and joint exhibits A-E [Dkts. 139-5 through
5    139-9, "Joint Ex."] (collectively, the "Motion").  On May 16, 2022, the Court issued
6    a Notice and Order setting a briefing schedule for the Motion and informing Plaintiff
7    of her obligations in responding to a motion for summary judgment [Dkt. 141].  *See*
8    *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).  On May 26, 2022, Defendants filed
9    a supplemental joint statement of undisputed facts and genuine disputes.  [Dkt. 144,
10   "Supplemental Joint Statement."]  On June 3, 2022, Plaintiff filed her opposition to
11   the Motion [Dkt. 149], which included her statement of genuine disputes of material
12   fact [Dkt. 149-1, "Plaintiff's Statement"], her declaration [Dkt. 149-2, "Plaintiff's
13   Declaration"], a declaration from a third party [Dkt. 149-3, "Lixuan Lu Declaration"],
14   and Plaintiff's objections to evidence [Dkt. 149-4, "Plaintiff's Evidentiary
15   Objections"] (collectively, the "Opposition").  On June 13, 2022, Defendants filed
16   their reply [Dkt. 153], which included a reply to Plaintiff's Evidentiary Objections
17   [Dkt. 153-1], Defendants' reply to Plaintiff's Statement [Dkt. 153-2], and
18   Defendants' objections to Plaintiff's Declaration and the Lixuan Lu Declaration
19   [Dkts. 153-3 through 153-4] (collectively, the "Reply").
20        The Motion is fully briefed and under submission to the Court.
21
22        **SUMMARY OF THE RELEVANT ALLEGATIONS AND FACTS**
23        The Court's discussion below focuses on the facts that are relevant to
24   resolving the summary judgment issues presented by the Motion, *i.e.*, those that are
25   "material" for purposes of Rule 56(a) of the Federal Rules of Civil Procedure.  The
26   parties do not agree upon a number of facts and issues they have identified, but
27   many of them are not relevant to resolving the summary judgment question.  For
28   example, the parties have presented evidence that bears on damages issues, such as

whether the emotional distress and other mental and physical harms Plaintiff claims resulted from her four and a half day-time at the Jail were pre-existing or not.  While the Court has reviewed all of the evidence submitted by the parties, it finds that some of that evidence is not necessary or relevant to the resolution of the Motion.  If the Court has not discussed or referenced a particular item of evidence, this means that the Court has concluded that it is not relevant to any material fact within the meaning of Rule 56(a), and thus, it is of no moment that the related facts may be disputed and/or that objections to the underlying evidence may have been made.  Where the objected-to evidence is unnecessary to the resolution of the summary judgment motion or supports facts not in dispute, the Court need not resolve those objections here.  To the extent the Court relies on objected-to evidence without discussion in this Order, those objections are OVERRULED.  *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1122 (E.D. Cal. 2006) (proceeding with only necessary rulings on evidentiary objections).

In its discussion below, the Court sets forth only the material facts that are undisputed (unless otherwise noted) when the evidence, as a whole, is fairly considered.[4]

---

[4]    Plaintiff has indicated "Disputed" or "Irrelevant" in response to most of the proposed facts proffered by Defendants in the Joint Statement and Supplemental Joint Statement, and in other instances, she has not indicated whether she disputes a proposed fact or not and instead asserts or argues a factual or legal point she wishes to make.  In addition, Plaintiff subsequently modified nine of her responses to Defendants' proposed facts [Dkt. 149-1] and Defendants thereafter responded to those modifications [ Dkt. 153-2], rendering it even more difficult to determine just what is undisputed and what is disputed by the parties and why, given that their positions are spread out amongst, and must be cross-checked as between, four separate documents. Many of Plaintiff's attempts to dispute facts established by the evidence before the Court are ineffective, because her "dispute" is based on assertions that are unrelated or not responsive to the proposed "fact."  For example, Joint Statement Fact. No. 40 simply sets forth the Jail's definition of an "Extended Custodial Search" as set forth in its Rules – something that would not seem to be open to legitimate dispute, in that the definition says what it says.  Nonetheless, Plaintiff disputes Fact No. 40 by citing to several of Defendant Barnes' responses to requests for admissions that pertain to a *different* type of search under the Jail's Rules, none of which provide any tenable basis for disputing Fact. No. 40.  As another example, Fact. No. 33 states that shampoo could have been

On August 8, 2019, Plaintiff was arrested by Santa Ana Police Department personnel. She alleges[5] that she was taken to and arrived at the Jail at approximately 10:50 a.m. [Complaint ¶¶22-23; *see also* Plaintiff's Declaration ¶6 (stating that she was taken to the Jail "in the morning" but not specifying a time).] Plaintiff alleges that the areas in which she was kept prior to booking were "bone chillingly cold" and that a deputy and two nurses ignored her complaints that she was cold and related requests for a blanket or clothing in a rude manner. [Complaint ¶¶26-29; Plaintiff's Declaration ¶7.] In her deposition testimony, Plaintiff clarified that she did not experience this extreme cold once she was placed in her Jail module on the second floor after being booked,[6] and that the coldness she experienced occurred in the booking area on the first floor and only on the day of her arrest (August 8, 2019) and on the last day she was at the Jail for an unspecified period of time after returning from court. [Joint Ex. A at 37; Joint Ex. C at 263-65; Plaintiff's Declaration ¶17.][7]

Prior to her arrest on August 8, 2019, Plaintiff had a small breakfast around 7:00 a.m., but was not given any food at the Jail that same day, despite three requests to be fed that she made between 5:00 p.m. and 9:00 p.m. and despite being

---

ordered from the commissary – a fact that is supported by uncontroverted evidence. Nonetheless, Plaintiff disputes this fact simply by asserting that the Jail was "constitutionally required" to provide shampoo. Thus, when Plaintiff has indicated "Disputed" or "Irrelevant" in response to a proposed fact that the Court has determined is supported by competent evidence, or otherwise fails to address the actual substance of the proposed fact, and she also does not provide any responsive competent evidence to controvert that proposed fact, the Court will consider it to be undisputed.

[5]      The Complaint is not verified. Therefore, its allegations are not evidence, but they are cited here when needed to fill in a gap or uncertainty in the relevant narrative established by the proffered competent evidence and undisputed facts.

[6]      It is undisputed that Plaintiff was formally booked into the Jail at approximately 4:46 p.m. on August 8, 2019, and, sometime later, was placed in her Jail module. [Joint Ex. A at 19-23, 106.]

[7]      In its discussion of Plaintiff's claims based on the cold she experienced, the Court will address the evidence submitted by Defendants regarding the Jail temperature.

1   told she would get food later.  [Plaintiff's Declaration ¶6; Joint Ex. B at 156.]

2   According to the Orange County Jail Rules produced in connection with the Motion

3   ("Jail Rules"), once booked into the Jail, inmates are provided three meals a day – at

4   5:00 a.m. (breakfast), at 11:00 a.m. (lunch), and at 4:00 p.m. (dinner).  [Joint

5   Statement, Undisputed Fact No. 1; Joint Ex. B at 222; Joint Ex. D at 410-16,

6   Declaration of Defendant Mark Stichter ("Stichter Decl.") ¶¶5, 15.]  Based on the

7   record before the Court, it is undisputed that Plaintiff did not receive any food at the

8   Jail on August 8, 2019, but she received breakfast the next morning (August 9,

9   2019), her remaining meals that day, and three meals a day thereafter.  [Joint Ex. C

10  at 266.]

11       At some point on August 8, 2019, before being placed in her cell module,

12  Plaintiff was taken to a shower room in which other female inmates and female Jail

13  personnel were present.  She was not allowed to decline to shower, was required to

14  take her clothes off, shower, and then put on a jail uniform.  Plaintiff does not

15  dispute that she was given a standard jail uniform – which consists of a bra,

16  underwear, t-shirt, socks, jumpsuit or pants or shirt, and shoes – but claims that the

17  bra she was given was dirty,[8] so she chose not to put it on.  [Plaintiff's Declaration

18  ¶¶9-10; Joint Ex. A at 7; Joint Ex. B at 183; Stichter Decl. ¶7.]  Under the Jail Rules,

19  inmates are required to shower at least once a week to prevent an unhealthful and

20  offensive state of body hygiene.  [Joint Ex. B at 191.]  The Jail requires inmates to

21  shower before entering the general population to prevent infection and promote

22  good hygiene.  [Stichter Decl. ¶10.]

23       As discussed in more detail *infra*, Plaintiff contends that she was subjected to

24  multiple "strip searches" while at the Jail.  The first search she describes occurred

25  on April 8, 2019, after Plaintiff had completed the booking process.  Plaintiff and a

26

27  [8]     In her deposition testimony, Plaintiff clarified that she assumed the bra was dirty, because

28  it was grey, ugly and wrinkled and looked old, but she acknowledged that it could have been
    discolored from use even if washed.  [Joint Ex. A at 9-11.]

group of inmates were told to go upstairs, to line up shoulder to shoulder, to remove their clothing but leave on their underwear, and to shake their hair. A deputy noticed that Plaintiff was not wearing a bra and obtained one for her, which Plaintiff put on. Because Plaintiff was on her period, she was told to pull down her underwear and lift and twist her menstrual pad in front of the Jail deputy to expose her underwear beneath it, and then place it back. [Joint Ex. A at 12, 16-18, 23; Plaintiff's Declaration ¶15.] Plaintiff testified that the search took more than a minute, but could not say if it lasted less than, or more than, five minutes. [Joint Ex. A at 30.]

For this search on August 8, 2019, and the later searches alleged, Plaintiff admits that only female deputies were present. [Joint Ex. A at 52; Joint Ex. B at 113, 121.] Plaintiff also admits that, with respect to all the searches, she was never fully naked and remained in her bra and underwear, was never asked to expose her genital region, and her genital areas were never fully exposed or touched. [Joint Ex. A at 30; Joint Ex. B at 112-13, 120.] Plaintiff contends that she was subjected to six more searches similar to the above-described initial search on August 8, 2019, *i.e.*, in which she remained in her bra and underwear and in which neither her breasts nor genitalia were exposed or touched. In each of the searches, she had to lift and twist her menstrual pad so that a deputy could inspect underneath it and see that nothing was in the pad. [Plaintiff's Declaration ¶15.] The second and third searches occurred on August 10, 2019, in a hallway, before and after Plaintiff went up to an outside roof/patio area. The fourth, fifth, and sixth searches occurred on August 12, 2019, before Plaintiff went to court, when she arrived there, and after her return, having been approved for release on her own recognizance. The seventh, and final, search occurred on August 12, 2019, right before Plaintiff was released from the Jail. [Complaint ¶33; Plaintiff's Declaration ¶¶13-14.]

The Jail Rules define "body search" to mean either a "pat down/grasping search" or an "Extended Correctional Search," which requires inmates to remove all

garments except their underwear (bras and panties for female inmates).  The Jail

Rules distinguish these two types of "body searches" from "strip/visual body cavity

searches," which require "an inmate to remove or arrange some of all of their

clothing to permit a visual inspection of their breasts, buttocks, or genitalia."[9]  [Joint

Ex. B at 213-15.)  Under the Jail Rules, Extended Correctional Searches may be

used to search a group of inmates of the same gender and on a routine or random

basis without a threshold level of suspicion.  [*Id.* at 215.]  Under Jail policy,

Extended Correctional Searches are conducted of inmates upon arrival at the Jail,

before going to court, and upon return to court, for the purpose of preventing the

entry of contraband or weapons into or out of the Jail facility and to protect Jail staff

and inmates.  [Stichter Decl. ¶17.]

After the above-described initial search on August 8, 2019, Plaintiff was

taken to her Jail cell module.  She was given a mattress, sheets, blanket, towels,

underwear, comb, toothbrush, toothpaste, soap, and possibly a pad.  If an inmate

runs out of these standard "Welfare Pack" personal hygiene items provided at

booking, the items will be provided for free upon request, and inmates without funds

can order a Welfare Pack once a week.  [Joint Ex. A at 31-32; Joint Ex. B at 191,

201-02; Stichter Decl. ¶13.][10]  The Jail provided Plaintiff with pads at no charge

during her incarceration.  [Plaintiff's Declaration ¶24; *see also* Stichter Decl. ¶13

and Joint Ex. B at 202 (feminine hygiene items such as tampons and pads are

---

[9]     As discussed *infra*, Plaintiff insists that the Extended Correctional Searches she
experienced at the Jail are "strip searches."

[10]     Plaintiff states that she was not informed she could obtain additional hygiene items for free
and "was informed to purchase hygienic items once the first pack was run out" (she does not say
whether another inmate or a Jail employee so informed her).  [Plaintiff's Declaration ¶11.]
Plaintiff, however, does not allege that she ran out of any such items during her Jail stay.  And
while Plaintiff complains that "only" menstrual pads were provided for free in her module, she
does not allege (and has not shown) that she wanted or needed, but was denied, tampons.  Thus,
whether or not Plaintiff was informed or otherwise knew she could obtain additional toothpaste,
soap, tampons, etc. for free and/or was unable to do so is irrelevant.

provided to inmates at no charge upon request).]  Inmates are not allowed to keep shaving razors in their cell module but are permitted to shave daily upon request and will be provided with an electric razor or safety razor to use.  [*Id.*]  Inmates can order shampoo from the commissary.  [Stichter Decl. ¶14; Joint Ex. A at 104-05.]

There were approximately 40 inmates in Plaintiff's cell module.  [Joint Statement, Undisputed Fact No. 15.]  The dorm area of the module is approximately 1,000 square feet, the attached dayroom area of the module is approximately 360 square feet, the bathroom is 176 square feet, and there are two showers.  The dayroom area is available to inmates from 6:00 a.m. to 11:00 p.m.  [Stichter Decl. ¶8; Joint Ex. D at 420.][11]

The Jail Rules provide that inmates have the right to at least three hours of indoor and outdoor recreational opportunity and equipment a week.  [Joint Ex. B. at 202.]  At the Jail, outdoor recreational opportunity means access to the roof "patio," [Stichter Decl. ¶8.]  Plaintiff states that "[t]hey" told her patio access was allowed one time per week.  [Plaintiff's Declaration ¶22.]  Plaintiff accessed the roof patio one time (for about 45 minutes) during the four days she spent at the Jail after she was booked.  [Joint Ex. A at 121.]

Under the Jail Rules, between the hours of lights out and "reveille," inmates are required to remain on their assigned bunks quietly, except when they need to use the toilet.  [Joint Ex. A at 186.]  According to Plaintiff, full lights in the cell module are turned on when the inmates are called for breakfast and some of the lights are turned off at night, but the direct light over her bed was not low-wattage and was bright enough to allow her to read.  [Joint Ex. A. at 69; Plaintiff's Declaration ¶28.]  This light plus the sound of inmates flushing the toilets interfered with her sleep.  [*Id.*]  Defendants Stichter, Addington, Falconer, Mayer, Rivera, and Rodriguez declare that under typical practice and procedure, the lights in the inmate sleeping

---

[11]    Plaintiff "disputes" these clearly established facts by asserting only that the dorm and day rooms areas are required to be at least 4,200 square feet.

area are turned off at night with the exception of low-wattage lights in the area where deputies are located, which remain on for deputy safety and the safety of inmates who need to get up to use the restroom at night.  [Joint Ex. D at 424, 430, 434-35, 440, 446; Stichter Decl. ¶9.]  Under the Minimum Standards for Local Detention Facilities of the State of California Board of State and Community Corrections, night lighting in housing units "shall be sufficient to give good visibility for purposes of supervision."  [Joint Ex. B at 241.][12]

On August 11, 2019, at approximately 12:16 a.m., Defendants Addington, Falconer, Mayer, Rivera, and Rodriguez (hereafter, the "Deputy Defendants") conducted a search of Plaintiff's Jail module.  This type of search is what is known as a Facility Assigned Search Team ("FAST") search.  The search yielded various unauthorized items in violation of Jail Rules, including three altered razors.  [Joint Ex. B at 181.]  Under the Jail Rules, a FAST search "is the process of picking a random area (tank, series of cells, etc.) to search."  [Joint Ex. B at 213.]  FAST searches are conducted twice a day (once during each shift) to prevent the unauthorized possession of or use of weapons, contraband, or drugs.  Jail modules are chosen at random unless there is reasonable suspicion as to a particular module or inmate.  Inmates are required to line up in their Jail-issue clothing and are subjected to a custodial search, and bunks and surrounding areas are searched.  Once the search is completed, inmates return to their bunks.  The August 11, 2019 FAST search was random and not targeted at Plaintiff.  [Joint Ex. B at 424-26, 430-31, 435-36, 440-42, 447-48.]

In connection with the August 11, 2019 FAST search, the inmates were told to go into the day room, and then deputies conducted a search of their bedding.  [Joint Ex. A at 83.]  Plaintiff does not know whether the August 11, 2019 FAST

---

[12]    Pursuant to Defendants' request for judicial notice [Dkt. 139-2], the Court takes judicial notice of this portion of these Minimum Standards, a copy of which is included within the Joint Exhibits.

1   search was pre-scheduled, but disputes that it was a routine search, because in her

2   view, there was no reasonable suspicion as to any inmate and there cannot be any

3   valid reason to search after midnight, after inmates have gone to sleep.  According

4   to Plaintiff, searches should only be done during daylight hours.  Plaintiff states that,

5   during the search, a deputy announced that searches would continue regularly, and

6   dayroom and phone service would be shut down, unless inmates kept quiet during

7   the day.  Plaintiff does not know who made this statement.  [*Id.* at 84-89; Plaintiff's

8   Declaration ¶19.]  None of the Deputy Defendants have any independent

9   recollection of the August 11, 2019 search.  [Joint Ex. B at 424, 431, 435, 441, 447.]

10

11                          **EVIDENTIARY OBJECTIONS**

12          Both Plaintiff and Defendants have raised various objections to evidence

13   proffered by the other side.

14

15          *Plaintiff's Objections:*

16          In her objections [Dkt. 149-4], Plaintiff objects to the Declaration of Dave

17   O'Connell submitted by Defendants [Dkt. 139-8 at ECF #2442-#2445].  Since

18   December 20, 2019, O'Connell has been the Administrative Manager II for the

19   County's Sheriff's-Coroner Department Facilities Operations.  In his Declaration,

20   O'Connell sets forth information regarding the Jail's air conditioning system and the

21   spatial measurements of the components of the Jail module in which Plaintiff was

22   incarcerated.  Plaintiff objects to the O'Connell Declaration on the grounds that:  it

23   lacks foundation and personal knowledge, because O'Connell started in his current

24   position approximately four months after her Jail incarceration; it constitutes

25   improper lay opinion; it misstates the evidence and therefore is unduly prejudicial;

26   and it constitutes improper expert opinion.  Plaintiff also objects to the portion of the

27   O'Connell Declaration addressing the Jail's air conditioning system as "irrelevant"

28   on the ground that she told Jail staff she was cold on the day she was booked.

1   Plaintiff also objects to the Declaration of Defendant Falconer [Dkt. 1398- at ECF

2   #2446-#2451] on the ground that "it was not signed."

3         Plaintiff's objections to the O'Connell Declaration are overruled.  O'Connell

4   plainly states that he has "personal knowledge" of the facts set forth in his

5   Declaration and of the operations of Facilities Operations at the Jail.  There is no

6   reason to discredit this assertion, because O'Connell's description of his job duties

7   is broad enough to encompass personal knowledge of the facts set forth in his

8   Declaration regarding the Jail's air conditioning system and the module's spatial

9   dimensions.  O'Connell's declaration is made as a lay witness – not as an expert

10  witness – and he is competent to make the factual assertions set forth in his

11  declaration.  The Court does not find the fact that his current job position started

12  several months after Plaintiff's stay at the Jail to be of concern, given that there is no

13  evidence that the air conditioning system in effect in August 2019 was different that

14  that in effect in December 2019, or that the module in which Plaintiff was housed

15  was remodeled and/or expanded between August 2019 and December 2019.

16  Plaintiff's irrelevancy objection is frivolous, because she has placed the Jail's

17  temperature in issue through the Complaint's allegations and claims, and moreover,

18  that she complained she was cold plainly does not render O'Connell's description of

19  the functioning of the system irrelevant.  Finally, with respect to Plaintiff's assertion

20  of misstatements of the evidence and prejudice, she does not identify a single

21  misstatement of the evidence in the O'Connell Declaration, and none is apparent,

22  nor does she identify any undue prejudice resulting from the Declaration.

23        With respect to the Falconer Declaration's asserted lack of signature,

24  Falconer's signature is typed in place, which is a common practice with

25  electronically submitted and filed declarations.  Defendants' counsel has represented

26  that this constitutes Falconer's electronic signature and is the manner in which

27  Falconer signed and returned the Declaration to counsel.  [Dkt. 153-1 at 6.]  There is

28  no reason to believe that Falconer did not sign her Declaration.  Interestingly,

1  Plaintiff's Declaration suffers from this *same* purported defect, *viz.*, a typed
2  signature versus a handwritten signature [*see* Dkt. 149-2 at ECF #2632], and yet, the
3  Court has considered her Declaration as if it had been hand signed.  This objection is
4  overruled as well.

6      *Defendants' Objections:*

7      Defendants object to Plaintiff's Declaration and the related exhibits she
8  attaches across the board, interposing a host of objections.  Some of these objections
9  have merit and some do not.  Much of the matter objected to does not involve a
10 material fact for Rule 56 purposes and resolving this Motion.  Accordingly, rather
11 than address the 27 pages of Objections on an item-by-item basis here, in its
12 discussion below of Plaintiff's claims and the portions of Plaintiff's Declaration that
13 are "material" to the resolution of the Motion as to each claim, the Court will note if
14 an objection warrants disregarding any portion of Plaintiff's Declaration.  If a
15 particular portion of Plaintiff's Declaration and/or its attached exhibits are not
16 addressed below, this is because the Court did not find such evidence to be material,
17 and thus, it did not rely on this evidence in its final analysis.[13]

19                    **THE GOVERNING STANDARD**

20      Summary judgment is appropriate when there is no genuine dispute as to any
21 material fact and the moving party is entitled to judgment as a matter of law.  Fed.
22 R. Civ. P. 56(a).  The moving party bears the initial burden of informing the court of
23 the basis for the motion and identifying portions of the pleadings, depositions,
24 answers to interrogatories, admissions, or affidavits that it believes demonstrate the

---

26 [13]    Illustrating such an instance, Defendants filed a separate Objection to the Lixuan Lu
27 Declaration proffered by Plaintiff [Dkt. 153-4].  The Court has reviewed the portions of that
   Declaration that are in English and concluded that it does not provide any information that is
28 material to the resolution of the Motion, and as a result, it need not be considered further.  Thus,
   Defendants' Objection has been mooted.

absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party has met its burden, the burden shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  *Id.* at 324.  The nonmoving party is "required to present significant probative evidence tending to support [its] allegations."  *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (internal quotation omitted).

Where a genuine dispute of material fact exists, the court draws reasonable inferences in favor of the non-moving party.  *Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  When assessing whether the nonmoving party has raised a genuine issue, with certain exceptions, the court must believe the nonmoving party's evidence and draw all justifiable inferences in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[14]

"The mere existence of a scintilla of evidence" is insufficient to raise a genuine issue of material fact.  *Anderson*, 477 U.S. at 252.  When the record, taken

---

[14]    There are exceptions.  For example, if the nonmoving party relies on her own declaration that is inconsistent with and/or contradicted by other facts she has alleged (*e.g.*, in her pleadings, discovery responses, or in testimony), a court may, in an appropriate case, find that the declaration does not give rise to a genuine issue of material fact.  *See Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011).

In addition, a district court may properly refuse to find a genuine issue of fact when the only evidence presented by the nonmoving party is her own uncorroborated and self-serving testimony.  *Villiarimo v. Aloha Island Air. Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002); *see also Lum v. City of Grants Pass*, 2012 WL 1665871, at *1 (9th Cir. May 14, 2012); *Coapland v. Long*, 2012 WL 8664, at *1 (9th Cir. Jan. 3, 2012); *Trujillo v. Tally*, 2011 WL 6122583, at *1 (9th Cir. Dec, 9, 2011).

Further, conclusory and/or speculative testimony in affidavits and deposition testimony that is unsupported by specific facts is insufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979); *see also FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").  "Conclusory allegations unsupported by factual data cannot defeat summary judgment."  *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003); *see also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (same).

1  as a whole, could not lead a rational trier of fact to find for the nonmoving party,

2  there is no genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd.  v. Zenith*

3  *Radio Corp.*, 475 U.S. 574, 587 (1986); *see also T.W. Elec. Service, Inc. v. Pacific*

4  *Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) ("the court's ultimate

5  inquiry is to determine whether the 'specific facts' set forth by the nonmoving party,

6  coupled with undisputed background or contextual facts, are such that a rational or

7  reasonable jury might return a verdict in its favor based on that evidence").

8      Finally, "[i]t is well settled that only admissible evidence may be considered

9  by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman*

10 *Security Srvcs.*, 854 F.2d 1179, 1181 (9th Cir. 1988) (citing Fed. R. Civ. P. 56(e)).

11

12                              **DISCUSSION**

13     As indicated above, this action stems from Plaintiff's slightly over four day

14 experience at the Jail in early August 2019, and her allegations that her conditions of

15 confinement were unduly harsh in numerous respects.  Plaintiff asserts that these

16 conditions of confinement violated the United States Constitution in various respects

17 and brings Section 1983 claims as a result, as well as parallel claims under

18 provisions of the California Constitution, a couple of state law tort claims, and a

19 claim under the California Penal Code.

20     The standards governing Plaintiff's state law-based claims will be discussed

21 in connection with each such claim.  With respect to Plaintiff's Section 1983 claims,

22 the Court notes that a pretrial detainee's claim based on her conditions of

23 confinement arises under the Due Process Clause of the Fourteenth Amendment

24 (except as noted below), rather than under the Eighth Amendment.  *Bell v. Wolfish*,

25 441 U.S. 520, 535 n.16 (1979); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25

26 (9th Cir. 2018).  As with Eighth Amendment claims brought by convicted prisoners,

27 a pretrial detainee challenging a condition of confinement must show deliberate

28 indifferent on the defendant's part, but the test for establishing deliberate

indifference under the Fourteenth Amendment is "purely objective"; there is no subjective component. *See id; see also Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015); *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).[15]

Since *Kingsley*, how deliberate or intentional a defendant's conduct must be to give rise to Section 1983 liability in connection with the various possible conditions of confinement claims that can be brought by pretrial detainees has been an issue that is not entirely settled. The Ninth Circuit has said that "a pretrial detainee who asserts a due process claim" must "prove more than negligence but less than subjective intent – something akin to reckless disregard." *Castro*, 833 F.3d at 1071. Similarly, the Supreme Court has noted that constitutional deprivations which result from mere negligence or accident are not actionable. *Kingsley*, 576 U.S. at 396; *see also County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process"; *Daniels v. Williams*, 474 U.S. 327, 331-32 (1986) (a deliberate decision by a government office is required to establish a due process violation). The Ninth Circuit has indicated that the following four-part test applies: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances

---

[15] In *Kingsley*, the Supreme Court found the subjective deliberate indifference element required to be proven in prisoner Eighth Amendment claims to be inapplicable to pretrial detainee excessive force claims brought under the Fourteenth Amendment. 576 U.S. at 397. Since then, the Ninth Circuit has extended *Kingsley's* holding to pretrial detainee claims based on failure to protect and inadequate medical care theories. While neither the Supreme Court nor the Ninth Circuit has as yet expressly extended the objective deliberate indifference standard to *all* pretrial detainee condition of confinement claims, the Ninth Circuit has hinted that it favors such an extension. *See Gordon*, 888 F.3d at 1120, 1124 & n.2 (*citing Darnell v. Pineiro*, 849 F.3d 17, 36 (2d Cir. 2017) (extending objective deliberate indifference standard to all pretrial detainee conditions of confinement claims)). For purposes of the Court's analysis herein, it will assume that the objective deliberate indifference standard applies to all of Plaintiff's Fourteenth Amendment-based Section 1983 claims.

1   would have appreciated the high degree of risk involved; and (4) by not taking such

2   measures, the defendant caused the plaintiff's injuries.  *See Roman v. Wolf*, 977 F.3d

3   935, 943 (9th Cir. 2020); *see also Sandoval v. Cnty. of San Diego*, 985 F.3d 657,

4   669 (9th Cir. 2021) (applying similar test to pretrial detainee's claim of inadequate

5   medical care); *Castro*, 833 F.3d at 1071 (applying similar test to pretrial detainee's

6   failure to protect claim).

7          Whether the conditions and conduct rise to the level of a constitutional

8   violation is an objective assessment that turns on the facts and circumstances of each

9   particular case.  *Gordon*, 888 F.3d at 1125; *Hearns v. Terhune*, 413 F.3d 1036, 1042

10  (9th Cir. 2005).  A "de minimis level of imposition" is insufficient to establish a

11  violation.  *Bell*, 441 U.S. at 539 n.21.

12         In ascertaining whether a due process violation has resulted from a pretrial

13  detainee's condition of confinement, courts consider whether the challenged

14  condition amounted to punishment, causing harm or disability significantly

15  exceeding or independent of the inherent discomforts of confinement, or whether the

16  condition merely resulted from some legitimate governmental purpose.  *See Doe v.

17  Kelly*, 878 F.3d 710, 714 (9th Cir. 2017); *see also Kingsley*, 576 U.S. at 398 ("a

18  pretrial detainee can prevail by providing only objective evidence that the

19  challenged governmental action is not rationally related to a legitimate

20  governmental objective or that it is excessive in relation to that purpose"); *Bell*, 441

21  U.S. at 535, 538-39 ("A court must decide whether the disability is imposed for the

22  purpose of punishment or whether it is but an incident of some other legitimate

23  governmental purpose," and "if a particular condition or restriction of pretrial

24  detention is reasonably related to a legitimate governmental objective, it does not,

25  without more, amount to 'punishment'").  "Maintaining institutional security and

26  preserving internal order and discipline are essential goals that may require

27  limitation or retraction of the retained constitutional rights of both convicted and

28  pretrial detainees."  *Id.* at 546.  "There is no basis for concluding that pretrial

18

detainees pose any lesser security risk than convicted inmates." *Id.* at 546 n.28. "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting." *Id.* at 540.

The Court now turns to each of Plaintiff's claims and the question of whether summary judgment for Defendants is appropriate or not.

## I.      Plaintiff's Claims Based On Food Deprivation And Cold Temperature

Claim 1 is a Section 1983 claim based on Plaintiff's assertions that:  she experienced an unduly cold temperature on August 8, 2019 (the day she arrived at the Jail) while she was on the first floor while she awaited booking; it also was unduly cold for an unspecified period of time on August 12, 2019, when she was placed on the first floor after she returned from court[16]; and she did not receive a meal or a snack on August 8, 2019.  Claim 9 is based on the same assertions but is brought under California Constitution, Art. I, § 7.  Both claims are asserted only against the County.[17]

### A.      Food Deprivation

Plaintiff claims that she was deprived of federal due process and her state constitutional rights, because she was not provided with any food on the day she

---

[16]      The Court notes that Plaintiff did not include her allegation about being cold on August 12, 2019 in the Complaint and, instead, only made the claim later on when she was deposed and then again in her Declaration filed in opposition to the Motion.  Normally, a party cannot amend a claim through argument in a brief opposing summary judgment.  *See, e.g., Powell v. County of Orange*, No. 8:21-cv-00801-JVS (DFMx), 2022 WL 3574282, at *3 (C.D. Cal. July 7, 2022) (collecting cases).  Given, however, that Plaintiff made this assertion in her deposition – while discovery remained open – the Court will consider it as being a part of Claim 1.

[17]      In the Motion, Defendants treat Claim 1 as alleging a third extant claim based on a denial of clothing theory.  The Court finds that no such distinct claim is pleaded in the Complaint.  Rather, Plaintiff complains of an unduly cold temperature that remained unmitigated because her request for something to keep her warm was disregarded.

1  arrived at the Jail, which was August 8, 2019.  For evidentiary support, Plaintiff

2  relies on:  her Declaration statement that she asked for food at least three times but

3  each such request was denied [Plaintiff's Declaration ¶6]; and her interrogatory

4  response stating that, between 5:00 p.m. and 9:00 p.m., she asked for food and was

5  told by unspecified Jail personnel that she would get food later, although this did not

6  happen [Joint Ex. B at 156].  While Plaintiff's allegations about what Jail personnel

7  said in response to her requests for food are not consistent, it is undisputed that once

8  Plaintiff arrived at the Jail some time on August 8, 2019 (apparently late morning),

9  she asked for food at some point but was not fed until the next morning at the

10  scheduled 5:00 a.m. breakfast time.[18]

11

12  **1.  Section 1983 Claim**

13  For purposes of Plaintiff's Section 1983 claim, pretrial detainees are

14  constitutionally entitled to receive adequate food.  *See, e.g.*, *Alvarez-Machain v.*

15  *United States*, 107 F.3d 696, 701 (9th Cir. 1996); *cf. Lemaire v. Maas*, 12 F.3d

16  1444, 1456 (9th Cir. 1993) (under the Eighth Amendment, a prisoner has a right to

17  receive food "adequate to maintain health").  Plaintiff missed the Jail's regularly-

18  scheduled lunch and dinner services on August 8, 2019, because she had not yet

19  been booked.  Under the Jail Rules, it appears that she should have been offered

20  food at some point while she was on the First Floor of the Jail waiting to be booked.

21  [*See* Joint Ex. B at 222:  "Inmates in the booking or transfer process on the first

22  floor will be offered a sandwich or sack lunch."]  There is no evidence before the

23  Court as to why this did not happen.  But a failure to comply with an institutional

24  rule does not equate to a constitutional violation.  *See Cousins v. Lockyer*, 568 F.3d

25  1063, 1070 (9th Cir. 2009) (violations of "CDCR operations manual" or other "state

26  departmental regulations," without more, "do not establish a federal *constitutional*

27  ───────────────

28  [18]     Defendants do not claim that Plaintiff actually received food on August 8, 2019, and admit
that her first meal at the Jail was breakfast early the next morning.

1    violation"); *Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001)

2    (without more, violation of otherwise constitutional state statute, regulation, or

3    internal prison policy does not establish liability under Section 1983 for deprivation

4    of federal constitutional right); *see also Gardner v. Howard*, 109 F.3d 427, 430 (8th

5    Cir. 1997) ("there is no § 1983 liability for violating prison policy. [Plaintiff] must

6    prove that [the official] violated his constitutional right"); *Myers v. Klevenhagen*, 97

7    F.3d 91, 94 (5th Cir. 1996) ("a prison official's failure to follow the prison's own

8    policies, procedures or regulations does not constitute a violation of due process, if

9    constitutional minima are nevertheless met").

10        Instead, the caselaw addressing constitutional claims based on meal

11    deprivation in this Circuit has focused on the nature of the overall deprivation over

12    time, *i.e.*, whether the food deprivation has been "repeated" and/or "sustained" and

13    has resulted in pain or harm.  *See Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir.

14    2009); *see also Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1259-60 (9th Cir.

15    2016); *Billy Driver v. Doe*, No. CV 19-3791-GW (AGR), 2020 WL 9848690, at *3

16    (C.D. Cal. Jan. 2, 2020) (noting that the "sustained deprivation of food" can be

17    constitutionally violative, but "[o]n the other hand, occasional deprivations of food

18    may not state a claim absent any allegation of effect on health").

19        For example, in *Foster*, the denial of 16 meals in 23 days was found to be

20    sufficiently serious to give rise to constitutional concerns, but the separate denial of

21    two meals over a nine-week period "did not rise to the level of a constitutional

22    violation."  554 F.3d at 812-13 & n.1.  In *Garrett v. Gonzales*, No. 1:11-cv-00686-

23    SAB, 2014 WL 12539696, at *3 (E.D. Cal. March 7, 2014), an allegation that

24    plaintiff was deprived of three consecutive meals over an 18-hour period, namely,

25    dinner on one day and then breakfast and lunch on the next, was found to be

26    insufficient to constitute a constitutional violation.  The Ninth Circuit affirmed,

27    concluding that "[t]he district court properly dismissed Garrett's action because

28    Garrett failed to allege facts sufficient to show that the deprivation of food resulted

in any pain or injury to his health."  588 Fed. Appx. 692 (9th Cir. Dec. 18, 2014).  In *Mateo Cortez v. Solano Cnty. Sheriff's Off.*, No. 2:20-CV-0392 KJN P, 2020 WL 1503439, at *3 (E.D. Cal. Mar. 30, 2020), a pretrial detainee was deprived of meals on two occasions; one, because the kitchen was closed; and two, a dinner three days later.  The Court concluded that, "[w]hile plaintiff certainly suffered the discomfort from going hungry on two days, such deprivation fails to rise to the level of a civil rights violation" based on the Due Process Clause.  *See also Massaquoi v. McConaughay*, No. 3:17-cv-938, 2020 WL 1908495, at *7 (M.D. Pa. Jan. 24, 2020) (deprivation of a single meal, even though intentional, did not rise to the level of a constitutional violation), adopted by 2020 WL 1904895 (Jan. 24, 2020).

Here, Plaintiff admits that following the missed meals on August 8, 2019, once she was booked, she thereafter received all three scheduled daily meals.  Thus, the missed meals on August 8, 2019 during booking was a one-time occurrence. Plaintiff does not allege that she had a medical condition that required her to eat three meals a day or suffer adverse health consequences, nor does she allege that she actually suffered any adverse health consequences or harm or was left with inadequate nutrition to maintain her health based on the failure to receive lunch and dinner on August 8, 2019.  While the Jail Rules indicate that Plaintiff should have been offered a sandwich or sack lunch, and at least one or more Jail officers were aware that Plaintiff had requested food, there is no evidence (or, indeed, allegation) that Plaintiff was at substantial risk of suffering serious harm if she did not receive a sandwich or sack lunch or that reasonable Jail officials should have known of any such substantial risk.  While the Court does not condone the failure to comply with a Jail Rule in this instance, that failure did not rise to the level of unconstitutional punishment for due process purposes.[19]

---

[19]    The Court is aware that Plaintiff relies on *Willis v. Brown*, 726 F. Supp. 1118 (N.D. Ill. 1989).  The Court, however, finds that the *Willis* decision is not consistent with Ninth Circuit authorities on this topic and is factually distinguishable.

1    The Court finds that there was no federal due process violation based on the

2    two missed meals on August 8, 2019.  Thus, as there was no constitutional violation,

3    there is no basis for holding the County – the sole Defendant for this claim – liable.

4    *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) ("Neither a

5    municipality nor a supervisor . . . can be held liable under § 1983 where no injury or

6    constitutional violation has occurred.").  But even if, *arguendo*, an individual Jail

7    employee could be said to have violated due process in this respect, the County

8    nonetheless would be entitled to summary judgment on this Section 1983 claim,

9    because no basis for *Monell* liability exists.

10    The County is a municipal entity.  To possess a a viable Section 1983 claim

11    against a municipal entity, the Complaint must satisfy the well-established

12    requirements of *Monell v. Dep't of Social Services*, 436 U.S. 658, 693-95 (1978).

13    To prevail on her Claim 1 Section 1983 claim against the County, Plaintiff must

14    show that a County custom or policy was the moving force behind the asserted

15    constitutional violations committed by Jail employees.  *Id.*  This is because a

16    municipal entity "may not be sued under § 1983 for an injury inflicted solely by its

17    employees or agents.  Instead, it is when execution of a government's policy or

18    custom, whether made by its lawmakers or by those whose edicts or acts may fairly

19    be said to represent official policy, inflicts the injury that the government as an

20    entity is responsible under § 1983." *Id.* at 694.  Absent the existence of an explicit

21    policy, a plaintiff may show that a permanent and well-settled practice by the

22    County gave rise to the alleged violation.  *City of St. Louis v. Praprotnik,* 485 U.S.

23    112, 127 (1988).  "Liability for improper custom may not be predicated on isolated

24    or sporadic incidents; it must be founded upon practices of sufficient duration,

25    frequency, and consistency that the conduct has become a traditional method of

26    carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *see also*

27    *Navarro v. Block,* 72 F.3d 712, 714-15 (9th Cir. 1996) (random acts, or single

28    instances of misconduct are insufficient to establish a municipal custom).  Thus, the

County may not be held liable under Section 1983 for the conduct alleged in the Complaint unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers," or if the alleged constitutional deprivation was "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91.

Plaintiff fails to present any competent evidence – indeed, any evidence at all – of any policy statements, regulations, officially adopted or promulgated decisions, customs, or practices of the County that caused Plaintiff to be denied meals on August 8, 2019.  This alone dooms her Section 1983 food deprivation claim.  Moreover, and critically, the County *did* have a policy to provide inmates in Plaintiff's situation with food while they awaited booking, namely, the above-noted Jail Rule that a sandwich or sack lunch be offered.  At most, all that the undisputed record shows is that one or more individual Jail employees did not follow that policy on the day in question.  This is the opposite of a basis for *Monell* municipal liability, namely, the claim rests on a contention that an employee acted in violation of a municipality's policies or established practices, not that the municipal entity's policy, practice, or custom itself was the cause of the constitutional violation committed by an employee.  No viable basis for Section 1983 liability on the part of the County has been shown nor can it be.  Accordingly, the County is entitled to summary judgment on this Section 1983 portion of Claim 1.

## 2.  California Constitution Claim

The food deprivation claim alleged in Claim 9 – Plaintiff's parallel claim brought under California Constitution, Art. I, § 7 ("Section 7") – fares no better.  Plaintiff's inability to show a federal due process violation precludes finding a state due process violation, as the federal and state due process clauses essentially are the

1   same.  *See, e.g.*, *Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178, 1191

2   n.15 (9th Cir. 2015), as amended on denial of reh'g and reh'g en banc (Jan. 29,

3   2016) ("The language of Article I § 7 of the California Constitution is 'virtually

4   identical' to the Due Process Clause of the United States Constitution, with the

5   caveat that California courts place a higher significance on the dignitary interest

6   inherent in providing proper procedure."); *Vaquero Energy, Inc. v. Cnty. of Kern*, 42

7   Cal. App. 5th 312, 333 (2019) ("federal and state due process clauses provide the

8   same level of protection").

9        In addition, Plaintiff seeks only damages in connection with Claim 9.

10  [Complaint at 27-28.]  Numerous federal district courts in California have concluded

11  that a plaintiff cannot recover monetary damages for an asserted violation of Section

12  7, and thus, any such claim is not cognizable and must be dismissed.  *See, e.g.,*

13  *Shorter v. Cnty. of Los Angeles*, No. CV 21-3347-CJC (KK), 2022 WL 3636687, at

14  *9 (C.D. Cal. July 12, 2022), adopted by 2022 WL 3636333 (Aug. 23, 2022)

15  (dismissing claim for violation of Section 7, because this constitutional provision

16  does not give rise to a claim for monetary damages); *Sarafyan v. Elson*, No. CV 18-

17  9574-GW, 2019 WL 3308770, at *7 (C.D. Cal. Feb. 21, 2019) (finding that there is

18  no private right of action for a violation of Section 7); *Tarkington v. Cnty. of Los*

19  *Angeles*, No. CV 18-07636-CJC, 2019 WL 1002516, at *9-*10 (C.D. Cal. Jan. 16,

20  2019) (dismissing due process claim brought under Article I, § 7, because "the

21  California Supreme Court has expressly stated that section 7 of the California

22  Constitution alone does not confer a right to money damages"); *Cohen v. Cnty. of*

23  *Santa Cruz*, No. 16-CV-06404-LHK, 2017 WL 467846, at *6 (N.D. Cal. Feb. 3,

24  2017) (dismissing monetary damages claim brought under Section 7); *Roy v. Cnty.*

25  *of Los Angeles*, 114 F. Supp. 3d 1030, 1042 (C.D. Cal. 2015) (holding that Section 7

26  does "not permit actions for monetary damages"); *Lopez v. Youngblood*, 609 F.

27  Supp. 2d 1125, 1142 (E.D. Cal. 2009) ("As Plaintiffs cannot assert an independent

28  cause of action for violation of section[] 7, Plaintiffs are not entitled to summary

judgment as to their third cause of action.").[20]  *See also Katzberg v. Regents of Univ. of Cal.*, 29 Cal. 4th 300, 326 (2002) (finding that a monetary damages claim cannot be brought under Section 7 based on a due process liberty interest theory); *Javor v. Taggart*, 98 Cal. App. 4th 795, 807 (2002), as modified (May 23, 2002) ("It is beyond question that a plaintiff is not entitled to damages for a violation of the due process clause or the equal protection clause of the state Constitution.").

Accordingly, for all of the foregoing reasons, the Court concludes that Defendant County is entitled to summary judgment with respect to the food deprivation claims alleged in Claim 1 and Claim 9.

### 3. Hygienic Supplies

Claims 1 and 9 are labeled "denial of life necessities," but as pleaded, the two claims reference expressly only the above-discussed food deprivation and cold temperature claims raised by Plaintiff.  The Court notes, however, that in the earlier body of the Complaint, Plaintiff alleges that:  the Jail provides only a two-day supply of hygienic supplies (soap and toothpaste) for free; after that two-day supply runs out, inmates are required to buy their own hygienic supplies and the purchase price for such supplies is higher than at stores outside the Jail; and shampoo is not included in the initial free two-day supplies given to inmates.  Plaintiff alleges that this situation is unconstitutional.  [Complaint ¶¶59-60.]  Even though Plaintiff did not expressly include this hygienic supplies claim within Claims 1 and 9, the parties have discussed it in their briefing, and so the Court will address it as well.

As a threshold matter, some of the above allegations by Plaintiff are contrary

---

[20]     This is just a sampling of the California District Court cases so holding.  The Court is aware that, in his August 20, 2020 Report and Recommendation addressing Defendants' motion to dismiss, the formerly-assigned Magistrate Judge concluded that Defendants had not adequately analyzed this issue and therefore allowed Claim 9 to proceed.  The case now is in a summary judgment posture, and this Court concludes that the wealth and weight of decisional law requires the dismissal of Claim 9 on the basis that a monetary damages claim cannot be brought under Section 7.

1   to the evidence of record.  As discussed earlier, Defendants have presented evidence

2   that that at booking, all inmates are provided with a "Welfare Pack" of personal

3   hygiene items, which includes a comb, toothbrush, toothpaste, and soap.  Should an

4   inmate run out of these items, they will be provided for free upon request, and a new

5   Welfare Pack could be ordered every week by inmates lacking sufficient funds to

6   buy items from the Commissary.  Plaintiff claims that no one told her she could ask

7   for more of these items and that she "was informed" to buy more once her first

8   Welfare Pack ran out.  Plaintiff does not identify who so informed her – another

9   inmate or Jail staff? – and more importantly, does not allege that she actually ran out

10  of these items.  Given Plaintiff's allegation that, after the initial mandatory shower

11  at booking, she purposely did not shower for her remaining time at the Jail, it seems

12  highly likely that she would have had adequate soap and not needed shampoo.  In

13  any event, had Plaintiff run out of the free soap provided to her, the record shows

14  that she would have been given more had she but asked.

15        A constitutional violation may arise if a correctional institution fails to

16  provide for prisoners' basic needs, including adequate sanitation.  *Hoptowit v. Ray*,

17  682 F.3d 1237, 1246 (9th Cir. 1982).  Numerous courts have found that this

18  constitutional obligation does not extend to shampoo.  *See, e.g., Like v. Wallace*, No.

19  1:15CV172ACL, 2017 WL 1954629, at *4 (E.D. Mo. May 11, 2017) (granting

20  defense summary judgment on inmate's claim that he was unconstitutionally

21  deprived of hygiene supplies when the bar of soap provided each week did not last a

22  week and he was not provided with shampoo or allowed to buy it from the canteen,

23  because: if he needed more soap and had asked for it, jail staff were expressly

24  permitted to provide it to him; and the denial of shampoo does not violate the

25  Constitution); *Poulin v. Jeter*, No. 6:08-cv-299-Orl-31KRS, 2010 WL 3701384, at

26  *10 (M.D. Fla. Sept. 15, 2010) ("Plaintiff's claim that the Jail has failed to provide

27  him with shampoo does not rise to the level of a constitutional violation."); *Shannon*

28  *v. Graves*, No. CIV.A.98-3395-KHV, 2000 WL 206315, t *11 (D. Kan. Jan. 5.

2000) ("the failure to provide shampoo is not cruel and unusual," because it is not an essential human need), *aff'd* 257 F.3d 1164 (10th Cir. 2001); *Scher v. Purkett*, 758 F. supp. 1316, 1317 (E.D. Mo. 1991) (the denial of shampoo does not violate the Constitution).

Here, given Plaintiff's adamant assertion that she did not shower and would not have showered during her Jail stint, she has not shown that she actually would have used shampoo even if it had been provided to her, whether for free or at a cost she believes was consistent with non-Jail retail stores. In any event, Plaintiff had no constitutional right to receive shampoo for free or at a price she believes was appropriate. In addition, Plaintiff has not shown that she actually ran out of soap or toothpaste, or that had she done so and asked for more, she would not have received them. Instead, the evidence of record shows otherwise, *i.e.,* that she could have obtained additional free soap and toothpaste. There is no genuine dispute as to any material fact with respect to Plaintiff's apparent claim that she was deprived of hygienic supplies to which she was constitutionally entitled. Defendants are entitled to summary judgment on this "claim."

### B.    Cold Temperature

As discussed earlier, Plaintiff contends that on the day she arrived at the Jail and awaited booking and transfer to her assigned module and on the last day she was at the Jail (for an unspecified period of time after she returned from court), she experienced a "bone chilling cold" temperature. She alleges that on that first booking day, she spoke with three persons at the Jail (a deputy and two nurses) and complained about the cold and requested a blanket or clothing, and her complaint/requests either were ignored or dismissed in a rude manner. The evidence to support these allegations consists solely of Plaintiff's deposition

testimony and her own Declaration.[21]

Defendants have produced evidence describing the Jail's climate control system, both heating and cooling, which delivers fresh conditioned air to the various "zones" in the Jail building, each of which has a thermostat or temperature sensor that regulates temperature.  The climate control system is monitored and controlled by a computerized energy management system.  While the temperatures will vary from zone to zone, the average temperature system set point is 70 degrees.  [Joint Ex. D (O'Connell Declaration) at 149.]  Plaintiff's disputes this evidence solely by asserting that the Jail's "temperature monitor might not correctly display the temperature."  [Joint Statement at 9.]  Plaintiff's speculative assertion, devoid of evidentiary support, does not render the evidence of an average Jail temperature of 70 degrees disputed.

As the Ninth Circuit has explained:  "the 'Eighth Amendment guarantees adequate heating' but not necessarily a 'comfortable' temperature[,] *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996) [and] [o]ne measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses 'a substantial risk of serious harm[,]' *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)."  *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010).  As a

---

[21]     Plaintiff vaguely asserts that she "is not the only inmate who can testify" about the cold temperature [Opposition at 9], but she does not identify any person who can so testify and, more importantly for Rule 56 purposes, has not provided any declaration from any other inmate.  Vague allegations that other evidence exists are insufficient to meet a summary judgment opponent's burden when, as discussed here, the moving party has produced sufficient evidence initially to shift the burden.

        Plaintiff also asserts that her "pulse dropped from 90 to 57" due to the cold temperature. [Opposition at 9; Plaintiff's Declaration §7 (citing Dkt. 93-1 at 2).]  The only evidentiary support she proffers is her own assertion that her normal pulse is 90 and a document filed under seal that lists the "vital signs" for someone (name redacted) taken at 4:06 p.m. on August 8, 2019, which included a pulse of 57.  Plaintiff's uncorroborated assertion as to her "normal" pulse and this document are insufficient to establish that she (1) actually suffered the asserted pulse drop due, and, more importantly, (2) that it actually was due to an unduly cold temperature as opposed to physical inactivity.

1   pretrial detainee, Plaintiff was entitled to no less, namely, a temperature that was

2   adequate but not one that was comfortable.  Thus, for example, in *Keenan*, the Ninth

3   Circuit upheld a grant of summary judgment against an inmate who alleged that the

4   average temperature in his cell was well above or well below room temperature,

5   because this suggested only that the temperature was not comfortable, which was

6   not enough to establish a constitutional violation.  83 F.3d at 1091.  In *Frost v.*

7   *Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998), the Ninth Circuit affirmed a grant of

8   summary judgment against a pretrial detainee on his due process claim based on the

9   temperature in his cell, because he had not shown that the temperature ultimately

10  deprived him of the "'minimal civilized measures of life's necessities' (cit. om.)."

11      Under the record before the Court, the evidence indicates that the temperature

12  on the First Floor of the Jail – both on the day on which Plaintiff was booked and on

13  a later day after she returned from court – was an average of 70 degrees.  Plainly,

14  this is not a bone chillingly cold temperature; Plaintiff's "uncorroborated and self-

15  serving" statement otherwise is insufficient to create a genuine issue of disputed

16  fact.  *Villiarimo*, 281 F.3d at 1061.  Plaintiff asserts that the fact that the actual Jail

17  average temperature of 70 degrees was "irrelevant," because she told Jail personnel

18  that "she was cold to death."  [Opposition at 9-10.]  That Plaintiff may have

19  personally experienced an average temperature of 70 degrees to be "bone chillingly

20  cold," and so told several staff members, however, is not enough to support finding

21  a possible constitutional violation.  Again, the question is whether the temperature

22  Plaintiff experienced was one that subjected her to a substantial risk of serious harm,

23  not whether she experienced discomfort.  *Graves*, 623 F.3d at 1049.  Under the

24  earlier-noted four-part test espoused by the Ninth Circuit, the challenged condition

25  must be one that put the plaintiff at substantial risk of suffering serious harm and a

26  reasonable official would have appreciated that high risk, and the official's failure to

27  take reasonable available measures to abate that risk must have caused the plaintiff

28  to be injured.  Given the average 70 degree temperature, a reasonable Jail official

could have concluded that Plaintiff was not at substantial risk of suffering serious harm, notwithstanding her complaints of being cold.  That several Jail employees either responded rudely to, or ignored, Plaintiff's complaints of being cold and requests for a blanket or additional clothing is not enough to turn this situation into one that violated due process, given that there is no genuine dispute that the temperature averaged 70 degrees and that no resulting serious harm to Plaintiff has been shown.[22]

The Court concludes that the record before it does not raise a genuine disputed issue of material fact and that no due process violation can be found based on the cold temperature Plaintiff claims she experienced on the First Floor of the Jail on two occasions.  Therefore, Defendant County is entitled to summary judgment on the cold temperature aspect of Plaintiff's Claim 1 Section 1983 claim.

Even if, *arguendo*, there was any genuine disputed issue of fact regarding whether due process was violated by the temperature Plaintiff claims she experienced, her Section 1983 claim would fail for the same reason that her food deprivation claim fails, namely, the lack of any basis for finding that the County can be held liable under the above-described *Monell* requirements.  As before, Plaintiff has not proffered any evidence of the existence of a policy, practice, or custom on the County's part that caused her to experience undue cold on the two days in question.  Plaintiff has not shown that there is any genuine disputed issue of material fact in this respect.  As a result, Plaintiff's Section 1983 cold temperature claim necessarily fails for this additional reason.

Finally, the Court's prior discussion of why Plaintiff's California

---

[22]   Plaintiff relies on two out of Circuit decisions – *Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997), and *Gordon v. Faber*, 973 F.2d 686 (8th Cir. 1992) – to support her contention that the cold she experienced was unconstitutional.  *Dixon* involved a three-year incarceration with an average temperature of 40 degrees and with ice forming on the cell walls.  *Gordon* involved inmates forced outside in subfreezing weather without hats and gloves.  Neither situation bears any relevance to that involved here.

1   Constitution/Section 7 food deprivation fails applies equally to her California

2   Constitution/Section 7 cold temperature claim.  Having failed to show a federal due

3   process violation on the part of the County, Plaintiff's counterpart claim brought

4   under Section 7's state due process clause fails for the same reason.  Moreover,

5   Plaintiff's monetary damages claims is not viable under prevailing federal

6   authorities.  *See, e.g.*, *Cabral v. County of Glenn*, 624 F. Supp. 2d 1184, 1196 (E.D.

7   Cal. 2009).

8                          *    *    *    *    *

9           In sum, the Motion should be granted with respect to Claims 1 and 9 and

10   summary judgment should be awarded in Defendant County's favor on both claims.

11

12   **II.    Plaintiff's Claims Based On "Strip Searches"**

13           Plaintiff brings four claims based on the above-described seven "strip

14   searches" she alleges, namely:  the search after she was booked and before she was

15   placed in her module; two days later, the searches before and after she went to the

16   Jail's outdoor roof/patio area; and another two days later, the searches before, at,

17   and after she went to court and upon her release from the Jail.  Claim 3 is a Section

18   1983 claim alleging Fourth Amendment and due process violations based on

19   unreasonable search and seizure and violation of privacy theories and is brought

20   against Defendants County, Barnes, Baker, Balicki, and Stichter.  Claim 11 is

21   brought under California Constitution, Art. I, § 13 ("Section 13") based on an

22   unreasonable search and seizure theory against the same five Defendants.  Claim 14

23   is brought under California Constitution, Art. I, § 1 ("Section 1") based on a

24   violation of right of privacy theory against all ten Defendants.  Claim 16 is brought

25   under California Penal Code § 4030 against Defendants Barnes, Baker, Balicki, and

26   Stichter.

27           The record shows, without genuine dispute, that Plaintiff was not naked in

28   any of these searches and wore a bra and panties, her breasts nor genitals were not

exposed or touched, she had to lift her menstrual pad each time and twist it to show that there was nothing hidden in it, and the searches were conducted in groups of female inmates by female deputies in hallway areas.[23]  As noted earlier, these searches were what are considered "Extended Correctional Searches" under the Jail Rules and are done to prevent the entry of contraband or weapons into the Jail and to protect Jail staff and inmates.  The Jail Rules distinguish the types of searches Plaintiff experienced from "strip searches," which are defined as requiring "an inmate to remove or arrange some or all of their clothing to permit a visual inspection of their breasts, buttocks, or genitalia."  [Joint Ex. B at 215.]  Plaintiff insists that she was subjected to "strip searches," relying on the definition of "strip search" set forth in California Penal Code § 4030(c)(3), namely, "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person."  Defendants dispute that the seven searches in issue were "strip searches," relying on the above-noted Jail Rule definitions.  Whatever their labels, the searches of which Plaintiff complains through her four claims were neither unconstitutional nor illegal, for the following reasons.

---

[23]      Plaintiff's attempts to manufacture disputed issues of fact in this respect are disingenuous and ultimately ineffective.  For example, even though Plaintiff admitted in her deposition that she remained in her bra and underwear at each search, she now disputes the proposed fact that she was never asked to remove her underwear by noting that she had to pull her underwear out to show that there was nothing beneath or in her menstrual pad.  This effort to dispute a plainly established and admitted fact is disingenuous.  Having admitted in her deposition that she was never asked to expose her genitals and that her genitals were never fully exposed or touched, Plaintiff now disputes the proposed fact that her breasts and genital areas were never touched by another person or exposed by asserting that at the first search, she was ordered to wear a bra and thus her breasts were exposed.  Plaintiff, however, neglects to acknowledge that she *had* been given a bra to wear but had refused to wear it, which was the reason why her breasts were exposed for a brief period of time when she took off her shirt until a deputy promptly obtained another bra and directed her to put it on.  In her deposition, Plaintiff admitted that she was never *fully* naked in any of the searches, but now disputes that proposed fact by noting that she was directed to put a bra on during the first search due to her prior refusal to wear one – another wholly disingenuous effort.

A.      **Section 1983**

Strip searches that are reasonable do not violate the Fourth Amendment rights of pretrial detainees.  *See Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1998).  Strip searches that are "excessive, vindictive, harassing, or unrelated to any legitimate penological interest," however, may be unconstitutional.  *Id.*  In determining whether strip search policies pass constitutional muster, courts typically employ the balancing test articulated in *Bell*:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place which it is conducted.

441 U.S. at 559.  Courts also sometimes consider whether, under the framework of *Turner v. Safley*, 482 U.S. 78 (1987), the search was reasonably related to legitimate penological interests.  *See Bull v. City and County of San Francisco*, 595 F.3d 964, 973-74 (9th Cir. 2010) (en banc) (finding it appropriate to consider jail strip search procedure for pretrial detainees under both *Bell* and *Turner* tests).

Plaintiff describes seven visual searches that did not involve the touching of her person or invasive physical contact by a Jail employee, such as a bodily cavity search.  She, thus, does not present any basis for finding excessive force.  Plaintiff also does not allege that there was any sexual component to the searches, *i.e.*, that they were conducted in a sexually abusive or sexually harassing manner or for untoward sexual purposes.  Plaintiff remained in her bra and underwear during the searches and alleges, at most, that when she was required to display her menstrual pad to show that nothing was hidden in or under it, she had to pull her underwear out for a moment, which theoretically could have allowed the Jail employee conducting the search (and no one else) to see a portion of her pubic area adjacent to the menstrual pad.  Plaintiff does not allege that the searches were prolonged in

34

duration.  She does not contend that she was singled out for searching or treated differently than other inmates in connection with the searches.  The undisputed record shows that the searches were performed in compliance with the Jail Rules for Extended Correctional Searches, which are conducted to prevent the entry of contraband or weapons into the Jail and to protect Jail staff and inmates, and occurred only after Plaintiff was booked and thereafter in connection with her use of the outdoor roof area, court appearance, and release from Jail.

Federal courts frequently have upheld the validity of routine strip searches conducted after events such as contact visits, admittance to jail, movement between units or jail areas, and returns from court, even in the absence of probable cause or reasonable suspicion.  *See, e.g., Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 332 (2012) (upholding visual body cavity search upon admission to jail); *Bell*, 441 U.S. at 558-60 (holding that a routine visual strip search of pretrial detainees "after every contact visit with a person outside the institution" was constitutional); *United States v. Fowlkes*, 804 F.3d 954, 961 (9th Cir. 2015) (upholding warrantless visual strip searches of inmates during the jail intake process); *Bull*, 595 F.3d at 974-75 (noting that "*Bell* held that a mandatory, routine strip search policy applied to prisoners 'after every contact visit with a person from outside the institution,' without individualized suspicion, was facially constitutional," and finding a jail policy of conducting visual strip searches of arrestees for contraband was "not meaningfully different from the scope, manner, and justification for the strip search policy in *Bell*, and therefore constitutional"); *Rickman v. Avaniti*, 854 F.2d 327, 327 (9th Cir. 1988) (upholding practice of conducting visual strip searches of inmates leaving their cells in disciplinary segregation units for prison safety and to prevent the spread of contraband); *Michenfelder*, 860 F.2d at 332 (finding visual strip searches were constitutional where the prisoners were housed in the most restrictive unit and were "searched both coming and leaving their cells, even when traveling only within the unit while

35

1   under escort and in chains at all times"); *see also Cunningham v. Multnomah Cty.,*

2   737 F. App'x 814, 816-17 (9th Cir. 2018) (holding that jail's policy of conducting a

3   visual strip search of the kitchen crew was reasonable, because inmates could obtain

4   contraband from the kitchen).

5          The undisputed facts of record show that the seven searches Plaintiff

6   describes fell well within the types of routine searches of inmates that the Supreme

7   Court and the Ninth Circuit have repeatedly found to be constitutionally permissible.

8   The justification for the searches – to prevent the entry of contraband or weapons

9   into the Jail so as to protect Jail staff and inmates – is a penological justification that

10  is well accepted under the existing case law.  *See, e.g., Florence*, 566 U.S. at 327

11  ("Policies designed to keep contraband out of jails and prisons have been upheld in

12  cases decided since *Bell*."); *Hudson v. Palmer*, 468 U.S. 517, 527 (1984) ("attempts

13  to introduce drugs and other contraband into [prison] premises ... is one of the most

14  perplexing problems of prisons"); *Bell*, 441 U.S. at 559 ("A detention facility is a

15  unique place fraught with serious security dangers. Smuggling of money, drugs,

16  weapons, and other contraband is all too common an occurrence."); *Bull*, 595 F.3d

17  at 966 (summarizing caselaw).

18         Plaintiff does not dispute the validity of this penological goal as a general

19  matter, but she posits that the Jail should have used alternative methods to meet the

20  goal, such as building separate detention facilities for high risk versus low risk

21  pretrial detainees and prisoners, or using body scanners.  In *Florence*, the Supreme

22  Court rejected similarly suggested alternatives urged to serve as a reason for finding

23  a strip and visual bodily cavity search of an arrestee to be constitutionally violative.

24  As the Supreme Court noted, contraband and weapons often go undetected by a

25  metal detector and those arrested for minor offenses can be as devious, and have the

26  same incentives to smuggle in prohibited items, as those arrested for serious and

27  violent offenses, or may be coerced into doing so.  In addition, the Court noted the

28  inherent difficulties during the intake process in making assessments as to which

inmates should be searched and which should not, and it rejected the notion that jail officials should be required to exempt certain detainees from the jail's blanket strip/visual body cavity search policy absent individualized reasonable suspicions of concealed contraband or weapon.  566 U.S. at 334-37.

Equally importantly, the deference which the Supreme Court has made clear is owed under the *Bell* and *Turner* standards to prison officials' experience and expertise in formulating a policy to meet this security goal cautions against substituting Plaintiff's lay opinion on what would have been a better Jail practice in place of that of correctional experts.  *See Turner*, 482 U.S. at 84-85 ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."); *see also id.* at 86 ("judgments regarding prison security 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters' [cit. om.]"); *Block v. Rutherford*, 468 U.S. 576, 580 (1984) ("reaffirm[ing] that 'proper deference to the informed discretion of prison authorities demands that they, and not the courts, make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of the detainees'"; quoting *Bell*, 441 U.S. at 557 n.38).

As the Ninth Circuit explained in its *en banc* decision in *Bull*,

> [In *Bell*], [t]he Court explained that "the principle of deference" to officials' discretion in running corrections institutions is not dependent on the "happenstance" of

whether the inmates are pretrial detainees or convicted prisoners.  *Id.*  Rather, courts owe corrections officials deference on the grounds that "the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch."

595 F.3d at 972; *see also id.* at 975, 980 ("even if we 'disagree[ ] with the judgment of [corrections] officials about the extent of the security interests affected and the means required to further those interests,' [cit. om.], we may not engage in 'an impermissible substitution of [our] view on the proper administration of [a corrections facility] for that of the experienced administrators of that facility.' [cit. om.]"; and further noting the need to adhere to "the Supreme Court's warning that federal courts must avoid substituting their judgment for the 'professional expertise of corrections officials' in 'determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion' [cit. om.]").

Plaintiff complains that some of the searches took place too close in time to each other and/or after she had been supervised by a guard following the prior search.  In *Michenfelder*, 860 F.2d at 332, the Ninth Circuit rejected a similar claim, finding that even though the frequency of visual strip searches of prisoners who were "searched both coming and leaving their cells, even when traveling only within the unit while under escort and in chains at all times" was "very high," because plaintiff has not shown that the searches were conducted in the absence of possible opportunities to obtain contraband or a weapon, he had failed to show that the searches were exaggerated or excessive means of enforcing security.  The two out-of-Circuit decisions on which Plaintiff relies are not persuasive, especially in light of applicable Ninth Circuit authority otherwise.

Plaintiff also relies on *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172 (C.D. Cal. 2006), to support her contention that a blanket search policy for

38

inmates returning from court who have received an order of release necessarily violates the Fourth Amendment.  In *Craft*, the Court held that under the facts before it, the strip and visual body cavity searches performed on arrestees when returned to jail after a court appearance finding them entitled to release were unreasonable under the Fourth Amendment.  Those searches required the arrestees to remove all clothing, raise breasts and testicles, and bend forward at the waist and spread their buttocks so that officers could examine anuses and vaginas for objects.  *Id.* at 1174.  At most, *Craft* might have some relevance only for the sixth and  seventh searches Plaintiff alleges (after she had been ordered released) and not to the other five searches.  However, the searches at issue in *Craft*, which involved complete nudity and required the arrestee/detainee to expose her body cavities and for them to be inspected, were grossly more intrusive than the two searches Plaintiff alleges that she experienced on August 12, 2019, and the decision is too dissimilar factually to provide any guidance.  *Craft* does not alter the reasonableness of the actual searches at issue here under the Supreme Court and Ninth Circuit authorities discussed above.

Plaintiff also contends that the searches were unreasonable because they took place as a group search in hallways, relying on *Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1130, 1139 (E.D. Cal. 2009).  In *Lopez*, the Court found group searches of detainees entitled to release following a court appearance, which required detainees to bend over and spread their buttocks, squat or otherwise expose their bodily orifices and for jail officers to conduct a visual inspection of their anus and vaginal areas, to be unreasonable under the Fourth Amendment.  Those searches, like in *Craft*, were substantially more intrusive than the searches at issue here and, again, the decision applies only to post-court order of release searches.  Moreover, the Court in *Lopez* found that when no facts were alleged or shown to indicate that the visual body orifice searches were done in a group setting as a means to punish inmates, there was no due process violation.  *Id.* at 1140-41.  Similarly here, there is

nothing in the record that could give rise to a basis for finding that the seven searches Plaintiff experienced were done in a group for the purposes of punishing Plaintiff and the other Jail inmates.  More generally, the mere fact that other inmates were present and also subjected to the searches is insufficient to serve as a basis for finding a Fourth Amendment or due process violation.  The Ninth Circuit has upheld group strip searches of five to ten inmates.  *Cunningham*, 737 F. App'x at 817; *see also Thompson v. Souza*, 111 F.3d 694, 701 (9th Cir. 1997) (rejecting the argument that strip and visual body cavity search must be conducted in a private area "out of view of the other prisoners").  While Plaintiff alleges that other inmates were "present" during these seven searches, she does not allege, much less proffer evidence, that any of them actually were looking at her during the searches as she stood there in a bra and underwear or could see anything private at all when the searching officer inspected her menstrual pad.  That the strip searches may have caused Plaintiff emotional distress is an insufficient basis for finding a constitutional violation.  *See Bull*, 595 F.2d at 975 (acknowledging that while strip searches are "invasive and embarrassing," this alone does not render them unreasonable).

Finally, Plaintiff argues that, regardless of the stated penological goal for the Jail's search policy, the seven searches were unreasonable as conducted, because, according to her, no contraband or weapon was found in any of the searches.[24]  She contends that, as a result, the searches had no justification.  As the foregoing authorities make clear, however, particularized suspicion is not required for searches of this type to pass constitutional muster when a blanket policy is implemented to prevent the introduction of contrabands and/or weapons into a facility.  That the seven particular searches may not have yielded any contraband or weapon does not

---

[24]     Plaintiff's assertion is based on her own review of jail logs, which are not before the Court.  [Plaintiff's Declaration ¶20.]  She also asserts, without any evidentiary support, that "[t]here has not been a lot of violence at" the Jail and that there is no "real security reason" to support the Jail's Extended Correctional Search policy.  Plaintiff's assertions, bereft of evidentiary support, do not raise a genuine disputed issue with respect to the penological basis for the Jail's search rules.

render such a policy constitutionally violative when its supporting penological justification is valid and reasonably related to the policy. *See Florence*, 566 U.S. at 326-27 (noting that in *Bell*, the jail policy of routine visual body cavity searches of pretrial detainees every time they had contact with someone outside the institution (even when they had been under surveillance the whole time) was upheld even though there "had been but one instance in which an inmate attempted to sneak contraband back into the facility," because the Court deferred to the "judgment of correctional officials that the inspections served not only to discover but also to deter the smuggling of weapons, drugs, and other prohibited items inside"); *see also Bell*, 441 at 559, 560-61 (observing "[t]hat there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises" and concluding that upon balancing the significant and legitimate security interest of the institution against the privacy rights of the inmates, the challenged blanket visual body cavity policy was reasonable under the Fourth Amendment and did not constitute punishment for due process purposes).

Under the guiding caselaw and the undisputed material issues of genuine fact, there is no basis here for finding a Fourth Amendment or due process violation based on the seven searches Plaintiff experienced at the Jail.

The Court notes that, as alleged in the Complaint, Claim 3 explicitly references only "strip searches" as the basis for the claim, but does include within the body of the claim a vague allusion to "involuntary exposure in states of partial or total nudity." In her Opposition, Plaintiff indicates that Claim 3 is based not only on the "strip searches" but also on the above-described shower she was required to take at booking, along with an allegation that upon release, she had to take off her Jail-issued clothing to change back into her own clothing and, thus, was naked in front

1   of other inmates and Jail staff when she did so.  [*See* Complaint ¶67; Opposition at
2   14; Plaintiff's Declaration ¶¶ 9, 18.]  Plaintiff appears to contend that these two
3   events violated her constitutional right of privacy.  Assuming that these two events
4   are properly a part of Claim 3, they do not establish a possible a federal
5   constitutional violation.

6          Prisoners retain a limited right to bodily privacy, as do pretrial detainees.  *See*
7   *Byrd v. Maricopa County Board of* Supervisors, 845 F.3d 919, 923 (9th Cir. 2017);
8   *see also Michenfelder*, 860 F.2d at 333.  The Ninth Circuit has opined that the naked
9   body is "the most basic subject of privacy" as protected by the Fourteenth
10  Amendment, and while the "circumstances of institutional life demand that privacy
11  may be limited, a "gratuitous" invasion of privacy may violate the Fourteenth
12  Amendment.  *Hydrick v. Hunter*, 500 F.3d 978, 1000 (9th Cir. 2007), judgment
13  vacated on other grounds by *Hunter v. Hydrick*, 556 U.S. 1256 (2009).  "Shielding
14  one's unclothed figure from the view of strangers, particularly strangers of the
15  opposite sex[,] is impelled by elementary self-respect and personal dignity."
16  *Michenfelder*, 860 F.2d at 333.  Although prisoners and pretrial detainees "do not
17  forfeit all their privacy rights at the jailhouse steps," "they do have those rights
18  severely curtailed."  *United States v. Van Poyck*, 77 F.3d 285, 291 & n.10 (9th Cir.
19  1996).

20         As noted earlier, the Jail's purpose in requiring newly-booked inmates to
21  shower before entering the general population to prevent infection and promote
22  good hygiene.  "The admission of inmates creates numerous risks for facility staff,
23  for the existing detainee population, and for a new detainee himself or herself. The
24  danger of introducing lice or contagious infections, for example, is well
25  documented."  *Florence*, 566 U.S. at 330-31 (citations omitted) (finding no Fourth
26  or Fourteenth Amendment violation when arrestee was required to shower with a
27  delousing agent at the first jail he was taken to, as well as submit to a visual body
28  cavity search).  Plaintiff alleges that she had to take off her clothing, walk across the

room to the shower unit, which had a translucent curtain, and then after her shower, walk back across the room, receive her clothing, and get dressed, while other naked female inmates were present.  Plaintiff states that it was "traumatic" for her to see a group of naked women.  [Plaintiff's Declaration ¶9.]

While this experience undoubtedly was unpleasant, the Court concludes that any invasion of her privacy in this respect was not gratuitous given the circumstances, including the short duration involved, and the legitimate penological goal underlying the Jail's policy of requiring newly-booked inmates to shower.  *See, e.g., Litmon v. Santa Clara County*, No. C 03-2054 RMW, 2009 WL 890884, at *4 (N.D. Cal. March 31, 2009) (granting summary judgment for defense on civil detainee's claim that requiring him to shower in front of, and thus expose his nude body, to criminal inmates violated his constitutional right of privacy, given that his nudity was exposed only when he entered and exited the shower, which had a blurred glass door, and the exposure was for a short time).  Moreover, this was not a situation of a cross-gender viewing of Plaintiff's naked body, *i.e.*, by a jail officer of the opposite gender, which in itself, has been found on multiple occasions not to violate an inmate's Fourth or Fourteenth Amendment privacy rights when, as here, it involves a limited circumstance.  *See, e.g., Whittington v. California Dep't of Corrections & Rehabilitation*, No. C 09-2636 SI, 2010 WL 761314, at *2 (N.D. Cal. March 3, 2010) (finding no Fourth or Fourteenth Amendment violation based on inmate's claim "that he was required to shower on two occasions in a shower that was unscreened, so that his genitals were not shielded from view of passers-by," because this involved "only the casual and occasional viewing by a correctional officer of the opposite sex that has previously been determined not to violate a prisoner's constitutional rights") (citing *Michenfelder, supra*, and other decisions).

In sum, the Court finds that the single instance shower circumstance alleged by Plaintiff does not rise to the level of punishment or violate her right to bodily privacy in violation of the Fourth Amendment or due process.  The Court draws the

1   same conclusion as to Plaintiff's claim based on having to change clothes in a non-

2   private area prior to release.  The parties devote little to no discussion of this issue,

3   but crediting Plaintiff's allegations as true, she alleges a short period of nudity in the

4   presence of other inmates and Jail staff when the women waiting to be released

5   changed out of their Jail-issued clothing into their personal clothing.  While Plaintiff

6   asserts that the only reason for this event was "humiliation," she has not adduced

7   any evidence to support a finding that the Jail's purpose was to humiliate her and the

8   other inmates.  While this event may have been embarrassing, the facts alleged are

9   not gratuitous or excessive as to rise to the level of punishment or a constitutional

10  violation.

11      Even when Plaintiff's descriptions of the seven searches, booking-related

12  shower, and release-related clothing change are credited in full, this is not enough to

13  raise Fourth Amendment concerns.  Nor do these events give rise to any basis for

14  finding any due process privacy violations.  The Court has no doubt that these

15  events were uncomfortable, unpleasant and upsetting, but this is not enough to

16  transform them into unconstitutional "punishment" for due process purposes,

17  especially given the valid penological purposes behind them and their nature.  As no

18  constitutional violation could be found based on the undisputed issues of material

19  fact, there is no basis for liability under Section 1983, and Defendants are entitled to

20  summary judgment on Claim 3 as a matter of law.

21      In addition, as with the foregoing Section 1983 claims, Claim 3 fails

22  specifically against Defendant County because Plaintiff has failed to establish any

23  genuine issue of disputed material fact on the *Monell* issue.  Put otherwise, Plaintiff

24  has failed to raise the specter that any basis for *Monell* liability could exist were

25  Claim 3 to survive summary judgment and proceed to trial.  While the challenged

26  strip searches and shower occurred pursuant to a Jail policy, the Court has found

27  that that policy does not violate the Fourth Amendment or due process.  Thus, when

28  Jail employees implemented this search and shower policy as to Plaintiff, they did

1   not violate her federal constitutional rights.  A municipality cannot be liable under

2   *Monell* absent a constitutional violation committed by one of its officers, employees

3   or agents.  *See, e.g., City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per

4   curiam) ("this was an action for damages, and neither *Monell* . . ., nor any other of

5   our cases authorizes the award of damages against a municipal corporation based on

6   the actions of one of its officers when in fact the jury has concluded that the officer

7   inflicted no constitutional harm," and further concluding that even if the

8   municipality's regulations might have allowed unconstitutional action "is quite

9   beside the point" if, in fact, nothing unconstitutional actually happened); *Jackson*,

10   268 F.3d at 653.  As to the clothes changing/nudity incident, the Court above found

11   that no constitutional violation occurred, but even if it had, "[p]roof of a single

12   incident of unconstitutional activity is not sufficient to impose liability under

13   *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *see also*

14   *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 796 (9th Cir. 2016) (a single

15   unconstitutional incident, without more, does not establish that a municipality failed

16   to provide proper training).  Plaintiff does not allege, or present any evidence of,

17   custom, policy, or practice, or a failure to train, with respect to this one-time event.

18   Thus, there is no basis of record for finding the County liable for the actions of its

19   Jail employees in connection with this incident.  Plaintiff's failure to raise any

20   genuine issue of disputed material fact on the *Monell* requirement for holding the

21   County liable is yet another basis for awarding the County summary judgment on

22   Claim 3.

23

24       **B.**   **California Constitution Claims**

25       Claim 11 alleges that the seven searches constituted unreasonable searches

26   and seizures under Section 13.  Claim 14 alleges that the same matters at issue in

27   Claim 3 – the seven searches, the required shower after booking, and the nudity

28   while changing back into Plaintiff's own clothes in connection with release –

1    violated Plaintiff's right of privacy under Section 1.

2        As a threshold matter, Claim 14 is overly broad, as it is brought against all ten

3    named Defendants, including non-management Jail employees Rivera, Falconer,

4    Mayer, Rodriguez, and Addington, *i.e.*, the Deputy Defendants.  Plaintiff, however,

5    does not allege or contend that any of the five Deputy Defendants had anything to

6    do with the challenged seven searches, the shower, or the clothing change events,

7    whether in actually conducting such searches or the setting of Jail policy in this

8    respect.  Not has Plaintiff proffered any evidence that even hints at these five

9    Defendants having had any involvement in those events.  No factual basis for

10   holding the five Deputy Defendants liable under Claim 14 exists on the record, and

11   these five Defendants are entitled to summary judgment on this claim.

12       Turning next to Claim 11, "Article I, section 13 guarantees the right to be free

13   from unreasonable searches and seizures." *Roy v. County of Los Angeles*, 114 F.

14   Supp. 3d 1030, 1042 (C.D. Cal. 2015).  If a policy violates the Fourth Amendment,

15   then it necessarily also violates Section 13. *Craft*, 468 F. Supp, 2d at 1180.

16   California courts treat Section 13 "as 'substantially equivalent' to the Supreme

17   Court's construction of the Fourth Amendment." *Yourke v. City & County of San*

18   *Francisco*, No. C 03-03105 CRB, 2010 WL 3701789, at *5 (N.D. Cal. Sept. 16,

19   2010) (citations omitted).  While "California courts have found that section 13

20   provides greater protection than the Fourth Amendment in at least some contexts ...,

21   these cases did not involve searches in the custodial detention setting, where

22   expectations of privacy are substantially diminished and the security concerns of the

23   correctional facility are paramount." *Id.* (citations omitted).

24       As discussed above, the Court has concluded that no Fourth Amendment

25   violation can be found based on the seven searches alleged by Plaintiff and the

26   undisputed material facts.  As a result, the same conclusion follows as to the

27   asserted Section 13 violation raised by Claim 11.  For this reason alone, Defendants

28   are entitled to summary judgment on Claim 11.  There is an additional, alternate

reason that could warrant summary judgment on this claim.  Earlier in the case,
Defendants moved to dismiss Claim 11 on the ground that there is no private right
of action to sue for money damages under Section 13.  The prior Magistrate Judge
noted that California District Courts have reached differing conclusion in this
respect, that the question must be resolved by engaging in the analysis set forth in
*Katzberg v. Regents of the University of California*, 29 Cal. 4th 300 (2002), and that
Defendants' motion lacked such an analysis and so declined to dismiss the claim.
[Dkt. 42 at 8-9.]

Numerous California District Courts have concluded that Section 13 does not
provide for a money damages remedy.  Some of those decisions have been brief and
others detailed, including a *Katzberg* analysis.  *See, e.g., Roy*, 114 F. Supp. 3d at
1042-43 (collecting cases finding no damages remedy available under Section 13,
finding that the decision of *Wigfall v. City and County of San Francisco*, No. C 06-
4698-VRW, 2007 WL 174434, at *5 (N.D. Cal. Jan 22, 2007), did engage in a
*Katzberg* analysis and found no damages remedy available, and agreeing with and
following its reasoning in concluding that no damages remedy exists under Section
13); *see also Astorga v. Cnty. of Los Angeles*, No. 22-cv-09805-AB, 2022 WL
3449810, at *4 (C.D. Cal. Feb. 9, 2022) (same); *Novel v. Los Angeles Cnty. Sheriffs
Dep't*, No. 2:19-cv-01922, 2019 WL 7940676, at *6 (C.D. Cal. July 23, 2019)
(same); *Buzayan v. City of Davis Police Dep't*, No. CV 06-01576, 2007 WL
22888334, at *8-*9 (E.D. Cal. Aug. 8, 2007) (same); *see further Libby v. City of
Gridley*, No. 2:21-cv-00017-JAM-AC, 2022 WL 493079, at *3 (E.D. Cal. Feb. 17,
2022) (finding that the "weight of authority" in the Eastern District "leans in favor"
of finding that no damages remedy exists under Section 13).  Some District Courts
have concluded otherwise and allowed a Section 13 claim seeking damages to
proceed.  *See Ordonez v. Stanley*, 495 F. Supp. 3d 855, 867 (C.D. Cal. 2020);
*Garcia v. Cnty. of Riverside*, No. EDCV 13-616-JGB, 2017 WL 11631219, at *5
(C.D. Cal. April 28, 2017).

1    The Court finds the weight of authority concluding that no damages remedy

2    exists under Section 13 to be persuasive.  If those decisions are followed, this

3    constitutes an alternative reason why Claim 11 fails and why summary judgment for

4    Defendants is warranted as to Claim 11.

5    Turning to Claim 14, Plaintiff's Section 1 state constitution privacy claim,

6    "within the context of search and seizure, the article I, section 1 privacy clause [of

7    the California Constitution] has never been held to establish a broader protection

8    than that provided by the Fourth Amendment of the United States Constitution or

9    article I, section 13 of the California Constitution."  *Yourke*, 2010 WL 3701789, at

10    *4 (finding that when Section 13 claim challenging jail search policy failed because

11    the policy was reasonable under the Fourth Amendment, so did the Section 1 claim)

12    (internal quotation marks omitted).  Thus, to the extent that Claim 14 seeks relief as

13    to the events alleged on the basis that they constituted unreasonable searches, the

14    claim necessarily fails, because the Court already has found that the events did not

15    violate the Fourth Amendment.  To the extent that the claim seeks relief based on a

16    Fourth Amendment or due process privacy interest basis, the claim fails, because

17    there is no right to sue under Section 1 for money damages, and Plaintiff seeks only

18    money damages. *See Blanco v. County of Kings*, 142 F. Supp. 3d 986, 1000-01

19    (E.D. Cal. 2015) ("the California Constitutional right to privacy contained in article

20    I, section 1 does not give rise to a cause of action for money damages"); *see also*

21    *Shorter v. Baca*, No. CV 21-3347-JC (KK), 2022 WL 3636687, at *9 (C.D. Cal.

22    July 12, 2022) (finding that Section 1 does not give rise to claims for monetary

23    damages), adopted by 2022 WL 3636333 (Aug. 23, 2022); *Novel*, 2019 WL

24    7940676, at *6 ("a plaintiff may not recover monetary damages for the violation of"

25    Section 1) (citations omitted).

26    Accordingly, for all these reasons, Defendants are entitled to summary

27    judgment on Claim 11 and Claim 14.

28

1

## C.   California Penal Code § 4030

2      In Claim 16, Plaintiff contends that the seven searches at issue violated

3 California Penal Code § 4030 ("Section 4030").  This statute places limits on the

4 scope of strip and body cavity searches to be conducted with respect to

5 "prearraignment detainees arrested for infraction or misdemeanor offenses and to

6 any minor detained" under certain circumstances.  Section 4030(b).  Section 4030(e)

7 provides that such detainees "shall not be subjected to a strip search or visual body

8 cavity search prior to placement in the general jail population, unless a peace officer

9 has determined there is reasonable suspicion, based on specific and articulable facts,

10 to believe that person is concealing a weapon or contraband, and a strip search will

11 result in the discovery of the weapon or contraband."

12      Plaintiff's Section 4030 claim fails for an obvious reason.  The statute applies

13 *only* to searches conducted "prior to placement in the general jail population."

14 Crediting Plaintiff's assertions as true, the first of the seven searches occurred *after*

15 she had completed the booking process and, along with other inmates, was being

16 taken upstairs to her Jail module, a general population cell.  [*See* Joint Ex. A at 12,

17 16; Plaintiff's Statement Undisputed Fact No. 43.]  The remaining six searches,

18 obviously, also occurred after Plaintiff had been placed in the general Jail

19 population.

20      There is no genuine issue of material fact in dispute here as to Plaintiff's

21 placement in the general Jail population at the time of the first search and thereafter.

22 *See Yourke*, 2010 WL 3701789, at *4 (characterizing Section 4030 issue as whether

23 the detainee was destined for placement in the general jail population and finding

24 that the plaintiff "was actually destined for the general jail population when,

25 approximately eight (8) hours after his arrest and six (6) hours after being placed in

26 a holding cell, he was classified for custodial housing, strip searched, and dressed in

27 an orange jump suit in preparation for transfer into the general jail population," and

28 thus, the defendants were entitled to summary judgment on plaintiff's Section 4030

49

1   claim).  Section 4030 has no application to the searches alleged by Plaintiff, and

2   Defendants, therefore, are entitled to summary judgment on Claim 16.

3

4   ### III.   Plaintiff's Claims Based On Overcrowding And Sleep Deprivation

5   In Claim 2, Plaintiff complains that that her Jail module was overcrowded,

6   which prevented her from receiving adequate sleep, in violation of her due process

7   right not to be punished.  More specifically, Plaintiff contends that due to the

8   overcrowding, too many inmates needed to use the toilets within the module at night

9   (every 30 minutes or so), which generated enough noise to interfere with her

10  sleeping.  As Plaintiff puts it, "[p]utting 40 women together sharing 40 toilets to

11  cause all night long toilet flushing is inhuman."  [Opposition at 11.]  She sues the

12  County and Defendants Barnes, Baker, Balicki, and Stichter (collectively, the

13  "Management/Supervisor Defendants").  In Claim 10, Plaintiff sues these same five

14  Defendants under Section 7 (California Constitution) based on both the asserted

15  overcrowding as well as her contention that the lights in the Jail module were left on

16  24 hours a day, with both circumstances preventing her from obtaining adequate

17  sleep.  Plaintiff contends that the light over her bed was not low-wattage lighting,

18  was bright enough that she could read by it, and was left on all day and night.

19  [Plaintiff's Declaration ¶28.]

20

21  ### A. Section 1983 Claim/Overcrowding

22  As noted earlier, the Jail module in which Plaintiff was housed has a dorm

23  area of approximately 1,000 square feet containing bunk type beds, a day room of

24  approximately 360 square feet, and a bathroom area of 176 square feet.[25]  The

25  module holds 40 inmates and they may use the dayroom from 6:00 a.m. to 11:00

26  p.m.

27

28  [25]   Plaintiff incorrectly alleges that the dorm area is 800 square feet and the day room is 150 square feet.  [Complaint ¶52.]

1    Plaintiff contends that her Jail module was unconstitutionally overcrowded

2    during her four-day incarceration, because its square footage does not meet the

3    standards set forth in certain California regulations.  Plaintiff represents that the

4    "Title 24 Minimum Standards for Local Detention Facilities" ("Standards") require

5    that a dormitory area for 40 inmates must be at least 70 square feet per inmate for a

6    double bed units and a dayroom must be at least 35 square feet per inmate in width

7    in front of cells/room.  [Opposition at 10-11.]

8    Plaintiff has not produced a copy of the Standards showing the square footage

9    requirements she describes.  The Court has reviewed them at the website of the

10   Board of State and Community Corrections <www/bssc.ca.gov>.  The Standards in

11   issue here are a part of the California Building Standards Code and pertain to the

12   design and construction of new correctional facilities.  See Part 1, Section 13-102(b)

13   ("Title 24 of the California Code of Regulations, Sections 13-102 and 2-1013 which

14   pertain to planning and design of detention facilities shall be applicable to facilities

15   for which architectural drawings have been submitted to the Board for review.

16   These requirements shall not be applicable to facilities which were constructed in

17   conformance with the standards of the Board in effect at the time of initial

18   architectural planning.").  Under Part 2, Section 1231, the square footage standards

19   for new builds as to dormitories are as Plaintiffs states, which is a minimum of 70

20   square feet per inmate for a double-bed unit, with 35 square feet of floor area per

21   inmate in width in front of cells or rooms.

22   Thus, as Plaintiff asserts, the Jail module in which she was confined did not

23   meet the above standards for new facilities with respect to her module to the extent

24   that it contained 40 inmates in double beds.  Plaintiff has not shown that the

25   Standards were in effect when the Jail module was built.  Even if she had, however,

26   noncompliance with a state regulation, without more, does not equate to a federal

27   constitutional violation.  *See Cousins*, 568 F.3d at 1070; *Case*, 249 F.3d at 930.

28   Under well established law, overcrowding in a correctional facility in itself

does not violate the Eighth Amendment or due process.  Something more than mere overcrowding must be shown to raise constitutional concerns.  As the Supreme Court has cautioned, there is no "'one man, one cell' principle lurking in the Due Process Clause," and while the space standards established by professional associations (such as the Standards that Plaintiff relies on here) "may be instructive in certain cases, they simply do not establish the constitutional minima." *Bell*, 441 U.S. at 542, 543 n.27; *see also Rhodes v. Chapman*, 452 U.S. 337, 348-49 (1981) (with respect to claim that overcrowding due to double cell was unconstitutional punishment, concluding that factors relied on by lower courts – that the institution housed 38% more inmates than its "design capacity," that several studies had recommended that each inmate have at least 50-55 square feet of living quarters, that double-celled inmates spend most of their time in their cells with their cellmates, and that double celling was not a temporary condition – fell "far short" of showing unconstitutionality); *Hoptowit v. Ray*, 682 F.2d 1237, 1248-49 (9th Cir. 1982) (finding that district court erroneously "constitutionalized" correctional association square footage standards by finding that noncompliance with such standards resulted in a constitutional violation).

Overcrowding does not give rise to a potential constitutional violation unless crowding itself has caused "concomitant problems," such as increased violence or inadequate staffing, or has reduced the provision of other constitutionally required services, or has rendered the institution no longer fit for human habitation.  *Balla v. Idaho State Bd. Of Corr.*, 869 F.2d 461, 471 (9th Cir. 1989) (while the prison was 50% overcrowded, "this fact has no constitutional significance standing alone"); *Hoptowit*, 682 F.2d at 1248-49 (noting that overcrowding itself is not an Eighth Amendment violation, but that it can, under certain circumstances, result in special effects which can form the basis for a constitutional violation); *see also Rhodes*, 452 U.S. at 348-49 (overcrowding claim based on theory that double celling was unconstitutional punishment failed, because the situation "did not lead to

1    deprivations of essential food, medical care, or sanitation, [n]or did it increase

2    violence among inmates or create other conditions intolerable for prison

3    confinement"); *Doty v. Cnty. of* Lassen, 37 F.3d 540, 544 n.1 (9th Cir. 1994)

4    ("While overcrowding itself is not a violation of the Eighth Amendment,

5    overcrowding can, under certain circumstances, cause effects, *e.g.*, unsanitary

6    conditions or high levels of violence, that violate the Eighth Amendment.").

7            The "special effect" that Plaintiff relies on primarily to establish that

8    overcrowding in her Jail module was unconstitutional is excessive toilet flushing

9    during the night.  Plaintiff alleges that during sleeping hours, her "sleep was

10   constantly interrupted by the flushing sound of the toilet," which she describes as

11   loud and estimates hypothetically could occur as much as 20 flushes a night.

12   [Plaintiff's Declaration ¶28.]  When deposed 15 months earlier, however, Plaintiff

13   testified that toilet flushing occurred either every hour or every couple hours, she

14   could not recall which, "just here and there."  [Joint Ex. A at 74.]  Plaintiff also

15   complains that the dayroom was "cramped" if even half of the inmates used it at one

16   time, which caused her to have "no desire" to use the dayroom.  [*Id.* ¶3.][26]  Plaintiff

17   also complains that even if the Jail policy is to permit inmates to use the outdoor

18   recreation area on the rooftop patio up to three times a week, other inmates told her

19   they only had been allowed to use the patio once a week, and she only accessed the

20   patio once during her four-day stay.  [Plaintiff's Declaration ¶22.]

21           The Court concludes that Plaintiff's allegations, even if fully credited, are

22   insufficient to establish that the toilet flushing that occurred in the bathroom area of

23   her module during the night was unconstitutional punishment that caused harm

24   significantly excessing that inherent in the discomforts of incarceration.  *See*

25   _____

26   [26]     Plaintiff also states that overcrowding in her cell "caused general limitation of movement
     as well as unnecessary physical and mental pain."  [Plaintiff's Declaration ¶4.]  This vague and
27   conclusory statement, bereft of any specific facts, is inadequate to establish a "special effect"
     within the meaning of the foregoing Supreme Court and Ninth Circuit decisions.  *See* Note 14,
28   *supra*, and cases cited therein.

1    *Rhodes*, 452 U.S. at 349 ("the Constitution does not mandate comfortable prisons").

2    Plaintiff suffered four nights of interrupted sleep while at the Jail, but as she

3    admitted in her deposition, she did get some sleep.  [Joint Ex. A at 78.]  Thus, this is

4    not a situation of someone who was deprived of sleep entirely for a prolonged

5    period of time.  While the Court does not take Plaintiff's allegations of impaired

6    sleep for four nights lightly, this circumstance is one inherent in the nature of

7    incarceration, in which toilets, by necessity for security reasons, must be located

8    within the cell or dormitory in which the inmate is housed.  As Plaintiff herself

9    conceded in her deposition, it would be "inhuman" to "force people not to use the

10   bathroom at night."  [Joint Ex. A at 75-76.]  Here, there were four toilets located in

11   the bathroom area of the Jail module.[27]  Even if the Jail module in which Plaintiff

12   was housed had less inmates assigned to it, say half, those inmates still would have

13   needed to use toilet facilities during the night and Plaintiff's sleep still would have

14   been interrupted.  Absent being put in her own private cell/private jail area situation

15   – which plainly is not constitutionally required (*see Rhodes*, 452 U.S. at 347-49) –

16   Plaintiff's sleep would have been interrupted due to the bodily needs of other

17   inmates no matter how overcrowded or uncrowded her Jail module was for the four

18   days she was at the Jail.  This is just a fact of life that inmates like Plaintiff have to

19   deal with while incarcerated in a shared housing situation, however uncomfortable

20   or unpleasant that may be.  The Court finds that the toilet situation at Plaintiff's Jail

21   module did not result in an unconstitutional overcrowding situation that violated her

22   due process rights.

23       Plaintiff's complaints that the dayroom was too crowded for her liking and

24   that she only visited the outdoor patio roof area once in her four day stay at the Jail

---

26   [27]     The Court does not find persuasive Plaintiff's contention made in her deposition that the

27   County should have replaced the toilets in her module with "normal toilets," rather than using
     those designed for industrial use  [Joint Ex. A at 76.]  At a minimum, she has not presented any
     evidence to show that this would have been feasible as a security matter, much less practically and

28   economically.

does not warrant any different conclusion.  While Plaintiff posits how much space each inmate would have if half the inmates in her module were in the dayroom at the same time, Plaintiff does not allege, much less show, that this ever occurred or prevented her from using the dayroom.  [Plaintiff's Declaration ¶3.]  Rather, she simply labels the space "cramped" and states that she therefore chose not to make use of it, with the exception of a single visit to make a phone call.  [*Id.*]  Plaintiff's vague and barebones allegations are insufficient to show that the area of the dayroom was so unconstitutionally small that it caused any of the "special effects" that the Supreme Court and the Ninth Circuit have said might raise constitutional concerns.  With respect to outdoor patio usage, Plaintiff was able to access the patio once during her four-day stay at the Jail.  That she did not receive additional visits is insufficient to raise a constitutional concern.  *See May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (holding that "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation" of constitutional rights, in response to allegation that prisoner was not allowed to exercise outdoors for 21 days).  Whether or not other inmates believed they were unable to access the roof area more than once a week is not relevant; Plaintiff was incarcerated for just over four days.  That Plaintiff was in her Jail module at all other times, besides the day in which she went to court (August 12, 2019) is not a circumstance that, in itself, renders the Jail Module unconstitutionally overcrowded.

Plaintiff has not raised a genuine dispute of material fact with respect to her claim that due process was violated by overcrowding in her Jail module, and she has not proffered sufficient evidence to believe that she could demonstrate that the alleged overcrowding resulted in "special effects" upon her that violated due process if this claim were to proceed.  *See, e.g., Slice v. Lappin*, No. C 09-3253 PJH, 2012 WL 12906155, at *6 (N.D. Cal. March 23, 2012) (granting summary judgment on overcrowding claim because inmate failed to show that is alleged overcrowding existed, "it had special effects upon her that violated the Eighth Amendment"), *aff'd*

1  536 Fed. App'x 702 (9th Cir. Aug. 2, 2013).

2  Plaintiff also has not shown any basis for municipal liability on the County's

3  part within the requirements of *Monell*.  As noted earlier, when no constitutional

4  violation has occurred, there can be no municipal liability under *Monell*.  *Jackson*,

5  268 F.3d at 653.

6  Accordingly, Defendants are entitled to summary judgment on Claim 2.

7

8  **B. California Constitution Claim**

9  Claim 10 is brought under the previously-discussed Section 7 provision of the

10  California Constitution and is based on the same overcrowding theory and evidence

11  as Claim 2, as well as Plaintiff's further contention that the light in the Jail module

12  above her bed was left on 24 hours a day and that its brightness, like the toilet

13  flushing, interfered with her sleep.

14  As discussed previously, Plaintiff's failure to show a federal due process

15  violation with respect to alleged overcrowding dooms her parallel attempt to claim

16  that the asserted overcrowding constitutes a state due process violation under

17  Section 7.  *Nozzi*, 806 F.3d at 1191 n.15; *Vaquero Energy, Inc.*, 42 Cal. App. 5th at

18  333.  The Court's finding as to Claim 2 calls for the same finding under Plaintiff's

19  Section 7 claim as to her complaints of overcrowding.

20  With respect to Plaintiff's lighting complaint, there is authority that exposing

21  an inmate to constant illumination – who then suffers injury as a result – without a

22  proper penological purpose may result in a federal constitutional violation.  *See,*

23  *e.g., Keenan*, 83 F.3d at (9th Cir. 1996) (allegation that, for six months, large

24  florescent lights directly in front of and behind inmate's cell shone into his cell 24

25  hours a day, so that his cell was constantly illuminated and he could not discern

26  night from day, which caused him "grave sleeping problems" and other mental and

27  psychological problems, coupled with defendants' failure to proffer any penological

28  justification for this practice, held to raise a triable issue of material fact); *Grenning*

1   *v. Miller-Stout*, 739 F.3d 1235. 1240-41 (9th Cir. 2014) (triable issue remained

2   when inmate exposed to constant illumination for 13 days suffered headaches,

3   disorientation, and an inability to sleep, questions remained as to degree of

4   illumination, and defendants did not establish any penological justification relevant

5   to the inmate).  At the same time, "neither the Ninth Circuit nor any other federal

6   court has held that prisoners have a right to sleep in complete darkness, . . . [and]

7   other courts have held that continuous low-wattage lighting is permissible in jails or

8   prisons."  *Walker v. Woodford*, 454 F. Supp. 2d, 1014 (S.D. Cal. 2006) (citations

9   omitted) (granting summary judgment for the defense on claim that subjecting the

10  inmate to 24-hour low-wattage illumination was unconstitutional), *aff'd by* 393 Fed.

11  App'x 513, 515-16 (9th Cir. Aug. 10, 2010).  "[E]ven if 24-hour lighting infringed

12  on a prisoner's Constitutional rights, it may nevertheless be valid if it is reasonably

13  related to legitimate penological interests" and "[c]ontinous low-wattage lighting

14  may therefore be permissible where it is based on legitimate prison security

15  concerns."  *Id.* 1015 (citations omitted).

16      In her Complaint [¶54], Plaintiff alleges that in the Jail module, "the lights

17  were never off" and, inconsistently, that "at night some of the lights were off but

18  some of the lights were 24-hours on and the lighting was bright enough to read."  In

19  response to the Motion, Plaintiff asserts that the direct light over her bed was never

20  turned off, was not low-wattage, was bright enough to read by, and made it

21  "difficult to fall asleep."  [Plaintiff's Declaration ¶28.]  In her deposition, Plaintiff

22  testified that:  some of the lights were turned off at night; the light that remained was

23  enough to read by; she covered her face with a sheet so that she could sleep; and

24  lights were turned back on at breakfast call.  [Joint Ex. A at 69-72.]  Plaintiff admits

25  that, prior to her incarceration, she had difficulty sleeping and that if she did not use

26  a sleeping aid, she would wake up three to five hours after she fell asleep.  [*Id.*]  In

27  her deposition, Plaintiff admitted that:  she had sleeping issues before she arrived at

28  the Jail and would sleep only "a few minutes here and there" unless she took

1    sleeping medication; it was around midnight when she arrived at the Jail module and

2    some of the lights in the module were off, although the one above her bed was on,

3    and some of the inmates were asleep; and that she could not sleep the first night

4    because she was scared, but she did get some sleep over the course of her four days

5    of incarceration. [Joint Ex. A at 33-35, 74, 78; Joint Ex. C at 262.]

6        Under the earlier-discussed Standards, night lighting is required for security

7    purposes. *See* Title 24, § 1231.6 ("Night lighting in [housing cells or rooms] shall

8    be sufficient to give good visibility for purposes of supervision.") [Joint Ex. B at

9    241.] Defendants have presented evidence that at the Jail, it is typical practice and

10   procedure to turn off all lights in inmate sleeping areas from 11:00 p.m. to 5:00 a.m.,

11   with the exception of low-wattage lights "in case inmates need to get up to use the

12   restroom at night for theirs and the deputies' safety." These low-wattage lights are

13   not pointed directly at inmates and are on in a security area where deputies are

14   located, again for guard and inmate safety. [Joint Ex. D at 413, 424, 430, 434-35,

15   440, 446.]

16       Plaintiff disputes that the light above her bed was turned off at night or was

17   low-wattage, offering only her own declaration statement as support. Regardless of

18   whether the light above her bed actually was on or not, or was not low-wattage, or it

19   was low-wattage but she perceived it not to be, any such factual dispute does not

20   preclude finding that summary judgment is warranted as to her lighting claim. Even

21   if, *arguendo*, the light above Plaintiff's bed was on and not dimmed to a low

22   wattage level, she alleges under oath only that the light made it hard to fall asleep

23   and that she was able to get some sleep. As Plaintiff testified, she was able to use a

24   sheet to cover her face. Unlike the plaintiffs in *Grenning* and *Keenan* noted above,

25   Plaintiff has not shown that the lighting has impacted her health at all or actually

26   caused her to suffer any "physical or psychological harm" whatsoever. As Plaintiff

27   has admitted, absent sleep medication, she was a problem sleeper before her four-

28   day incarceration at the Jail and remained a problem sleeper during that

58

incarceration.  While in Jail, she experienced the same thing she already had been experiencing, that is, difficulty sleeping without the aid of sleep medication.[28]  The allegedly too bright lighting Plaintiff experienced, therefore, did not give rise to a harm that is of constitutional concern.  *See Walker*, 393 Fed. App'x 513, at 516 (affirming the grant of summary judgment to the defense on plaintiff's lighting claim, noting that the evidence of record showed that the night lights at issue would not cause insomnia or other health problems and that the inmate's medical records showed that he suffered from insomnia, stress, and depression before the night light policy was instituted and that he continued to complain of insomnia when he was transferred to a prison that did not use night lights); *Hampton v. Arizona*, No. CV 03-1706-PHX, 2006 WL 3497780, at *13 (D. Ariz. Dec. 4, 2006) (granting defense summary judgment on lighting claim), *aff'd by* 288 Fed. App'x 404, 405 (9th Cir. Aug. 4, 2008) (affirming "because [the inmate] failed to raise a triable issue as to whether the lighting level in his cell caused him to suffer psychological or physical harm").

In addition to a lack of causation, the Court also finds significant the limited duration of the alleged hardship that Plaintiff claims she experienced.  Under her sworn statements, Plaintiff had difficulty falling asleep for four nights, although she slept some.  While experiencing poor sleep over a four-night period undoubtedly is unpleasant and likely miserable, the temporary and relatively brief nature of this circumstance does not rise to the level of punishment.  *See Jones v. Neven*, 678 F. App'x 490, 493 (9th Cir. 2017) (finding defendants entitled to qualified immunity on prisoner's claim that he experienced constant lighting in his cell for a period of

---

[28]    The Court is aware that Plaintiff's Complaint [¶57] alleges that the sleep deprivation and disturbance she experienced "created significant negative impacts on" her ability to function, such as making her more sensitive to physical pain, impairing her immune system, and impairing her cognitively.  These allegations are vague at best and are unverified, and thus, are not evidence. They alone are not sufficient to raise a genuine issue of material fact, especially given Plaintiff's failure to bolster them by proffering relevant and competent supporting evidence in opposition to the Motion.  *See* Note 14, *supra*.

96 hours, because it was not clearly established that subjecting a prisoner to illumination for four days violated the Eighth Amendment); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1059 (9th Cir. 2013) (expressing doubt that constitutional violation could be found in instance in which prisoner was subjected to continuous lighting "for only seven days" and did not claim the was deprived of sleep or intentionally kept awake and there was evidence of a legitimate penological purpose for the lighting).  Moreover, Plaintiff has not competently disputed the legitimate penological purpose shown by Defendants for the nighttime lighting practice.  In her deposition, Plaintiff disputed that leaving some lights on was related to safety and that lights were needed so that the security cameras could see within the cell at night; she suggested that, instead, deputies should use a flashlight or turn on the lights in full if needed rather than having low-wattage lighting on at night. [Joint Ex. A at 70-71.]  Plaintiff has not presented any evidence that supports her personal opinion as to appropriate Jail security practices, including showing why her personal opinion should trump the low-wattage lighting at night security requirement of the pertinent regulation promulgated by the State of California Board of State and Community Corrections

In sum, Plaintiff's assertions about experiencing lighting at night that was too bright do not give rise to a basis for finding a federal constitutional violation.  For that reason, the County is entitled to summary judgment on this aspect of Claim Two.  Further, as no federal constitutional violation exists, there is no basis for imposing municipal liability on the County under *Monell*.  *Jackson*, 268 F.3d at 653.

As Plaintiff has failed to establish any federal constitutional violation based on her lighting allegations, they cannot establish a Section 7 state constitutional violation, and Claim 10 necessarily fails on that basis.  In addition, as discussed earlier, the weight of authority indicates that when, as here, a plaintiff seeks only monetary damages pursuant to a Section 7 claim, the claim is not cognizable.  Claim 10 seeks only monetary damages.  Thus, even if Plaintiff had raised a triable

1   genuine issue of material fact as to whether the alleged overcrowding and lighting

2   experiences she had during her four-day stay at the Jail violated federal and/or state

3   due process, she could not prevail on Claim 10, because her monetary damages

4   claim is not allowable.

5         Accordingly, Defendants also are entitled to summary judgment on Claim 10.

6

7   **IV.   Plaintiff's Claims Based On "Harassing" Cell Search**

8         As noted earlier, at approximately 12:16 a.m. on August 11, 2019, a FAST

9   search occurred in Plaintiff's Jail module, which yielded unauthorized items,

10  including three altered razors.  FAST searches are done to prevent unauthorized

11  possession or use of weapons, contraband, and drugs and search sites are randomly

12  selected (absent any reasonable suspicion as to a particular module or inmate).  The

13  August 11, 2019 FAST search was a random search and was not targeted at

14  Plaintiff.  She contends that the August 11, 2019 search violated her Fourth

15  Amendment rights, because conducting it right after midnight when there has been

16  no showing of misbehavior was unreasonable, and thus, the only purpose had to

17  have been harassment (Claim 4).  Plaintiff raises a parallel state constitutional claim

18  under Section 13 (Claim 12).  Plaintiff also contends that the FAST search violated

19  the First Amendment, because it was conducted in retaliation for "Plaintiff and other

20  inmates' expression during the day" (Claim 5).  Plaintiff raises a parallel state

21  constitutional claim under California Constitution, Art. I, § 1 (Claim 13).  These

22  four claims are brought against the County and the five Deputy Defendants.

23

24       **A. Fourth Amendment and Related State Law Section 13 Claim**

25         Claim 4 is brought only under the Fourth Amendment and rests on the

26  contention that the FAST search of Plaintiff's cell on August 11, 2019 was an

27  unreasonable search under the Fourth Amendment.  Claim 12 also rests on a theory

28

of "unreasonable search and seizure" under California's parallel constitutional

provision, Section 13.

In *Hudson*, *supra*, when confronted with a prisoner's claim that a

"shakedown" cell search violated his Fourth Amendment privacy rights, the

Supreme Court observed that:

> A right of privacy in traditional Fourth Amendment
> terms is fundamentally incompatible with the close and
> continual surveillance of inmates and their cells required
> to ensure institutional security and internal order.[]  We
> are satisfied that society would insist that the prisoner's
> expectation of privacy always yield to what must be
> considered the paramount interest in institutional
> security.

468 U.S. at 527-28.  The Supreme Court then held that:

> [S]ociety is not prepared to recognize as legitimate any
> subjective expectation of privacy that a prisoner might
> have in his prison cell and that, accordingly, *the Fourth*
> *Amendment proscription against unreasonable searches*
> *does not apply within the confines of the prison cell*. The
> recognition of privacy rights for prisoners in their
> individual cells simply cannot be reconciled with the
> concept of incarceration and the needs and objectives of
> penal institutions.

*Id.* at 526 (emphasis added); *see also id* at 530 ("we conclude that prisoners have no

legitimate expectation of privacy and that the Fourth Amendment's prohibition on

unreasonable searches does not apply in prison cell").  The Supreme Court expressly

rejected utilizing the Fourth Amendment as a source of protection against even those

cell searches claimed to be part of a pattern of harassment, positing that other

provisions (such as the Eighth Amendment or state tort or common law) might serve

as an appropriate source of protection for claims involving "calculated harassment

unrelated to prison needs."  *Id.*

Previously in *Bell*, *supra*, the Supreme Court had made clear that inmates

such as pretrial detainees have, at most, a diminished expectation of privacy under

the Fourth Amendment.

It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person. *Cf. Lanza v. New York*, 370 U.S. 139, 143-144, 82 S.Ct. 1218, 1220-1221, 8 L.Ed.2d 384 (1962). In any case, given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retained necessarily would be of a diminished scope. *Id.*, at 143, 82 S.Ct., at 1220.

441 U.S. at 556-57. *Bell* involved a claim that pretrial detainees' Fourth Amendment rights were violated by unannounced searches of inmate living areas at irregular intervals, described as "formal unit shakedowns" during which all inmates are cleared of the residential units, and a team of guards searches each room. Inmates were not permitted to watch these searches, because according to jail officials, "permitting inmates to observe room inspections would lead to friction between the inmates and security guards and would allow the inmates to attempt to frustrate the search by distracting personnel and moving contraband from one room to another ahead of the search team." *Id.* at 555. The Supreme Court held that the searches did not violate the Fourth Amendment, because the detainees' "drawers, beds, and personal items may be searched" and the detainees' Fourth Amendment diminished privacy interests were not infringed by precluding them from observing the searches given that the "room searches represent an appropriate security measure." *Id.* at 558.

Five years later in *Block*, *supra*, the Supreme Court considered a similar claim based on random cell searches conducted while pretrial detainee inmates were elsewhere, which were alleged to violate their due process rights. The Supreme Court flatly rejected the due process claim, noting that while *Bell* primarily had considered a Fourth Amendment claim, its substance also foreclosed any such due process claim. *Block*, 468 U.S. at 590-91 (citing *Bell*, 441 U.S. at 560-61, for the Court's explicit rejection of the contention that "the room search rule, including the

1   feature of the rule prohibiting observation of the searches by the detainees, violated

2   the detainees' due process rights").

3       *Bell* and *Block* preclude Plaintiff's Fourth Amendment and parallel Section 13

4   claims resting on the proposition that the FAST search was unreasonable, as well as

5   any attempt to convert them to due-process-based claims.  Plaintiff has admitted that

6   the objective of FAST searches is to "detect, control, and prevent the intake and

7   introduction of weapons, contraband, and illegal items into" the Jail.  [Joint

8   Statement, Undisputed Fact No. 53.]  She has not shown that the FAST search in

9   question did not advance this legitimate security goal, especially given that three

10  altered razors were found during the search and confiscated, thereby preventing any

11  potentially harmful use of them.  Thus, Plaintiff's assertion that the sole purpose of

12  this search was harassment rings hollow.  Moreover, she has not proffered any

13  competent evidence that harassment was the goal of this particular search, as

14  discussed in the next Section below.  And in any event, *Hudson*, *Bell*, and *Block*

15  make clear that her harassment theory claim is not properly raised under the rubric

16  of the Fourth Amendment or due process.

17      The single permissible cell search in issue here, which met its goal of

18  increasing institutional safety by resulting in the location and confiscation of three

19  altered razors, was not unreasonable as to Plaintiff for Fourth Amendment purposes.

20  She does not allege, much less, show, that *she* was targeted or that she suffered any

21  cognizable harm other than a brief interruption of sleep.  Plaintiff's attempt to

22  recover monetary damages for this event fails under the Fourth Amendment, as well

23  as under Section 13's parallel unreasonable search and seizure proscription.[29]  There

24  is no genuine dispute of material fact in this respect.  Defendants are entitled to

25  summary judgment on Claims 4 and 12.

26

27  _____

28  [29]     In addition, as discussed earlier in Section II.B., there is ample authority that a claim for monetary damages under Section 13 is not cognizable.

**B. First Amendment and Related State Law Constitution Claims**

Through Claims 5 and 13, Plaintiff attacks the August 11, 2019 FAST search on First Amendment "freedom of expression" grounds.  She alleges that during the search, an unidentified deputy loudly stated that "such searches would continue regularly unless and until all inmates would keep quiet during the day" and that "dayroom and phone service would be shut down unless and until all inmates shut up during the day."  [Plaintiff's Declaration ¶19.]

As pleaded in the Complaint, Claims 5 and 13 are labeled "Freedom of expression" claims and are based on the theory that the FAST search was done in retaliation for the exercise by Plaintiff and other inmates of their First Amendment right of "expression."  [Complaint ¶¶14, 101, 128.]  In her Opposition to the Motion, however, Plaintiff has changed the theory of her claim, alleging instead that the search violated the First Amendment because it interfered with the inmates' right to "receive information while incarcerated."  [See Opposition at 15, relying on caselaw regarding prison regulations that restrict prisoner rights to receive mail as impairing the prisoner's First Amendment rights.]  It is not clear that prison mail cases of the type on which Plaintiff relies have anything to do with Claims 5 and 13, as this is not a mail restriction situation.  But in any event, as noted earlier [Note 16], an attempt to amend a claim through a brief opposing summary judgment generally is inappropriate and ineffective.  The Complaint alleged that Plaintiff's First Amendment right to express herself, *i.e.*, to speak, was violated as a result of the FAST search, not that the search violated her First Amendment right to receive information.  She has raised this new theory of liability well after discovery closed. Accordingly, the Court is not inclined to consider this new type of claim and, instead, will consider the two claims actually pleaded through Claims 5 and 13.  *See, e.g., Johnson v. Cnty. of San Bernardino*, 2021 WL 4810646, at *1 (9th Cir. Oct. 15, 2021) (when complaint alleged excessive force based on a beating by hand, fists, feet, and a metal object, affirming as "proper" the district judge's refusal on

65

summary judgment to consider opposition argument that plaintiff also had been tasered, observing that when "a plaintiff 'fail[s] to allege [a given] theory of liability' in his complaint, he 'is barred from proceeding on [such novel] theory.... at the summary judgment stage,'" citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000)).

In the prison context, not all speech is protected speech, and a prisoner does not have the same First Amendment rights as a non-prisoner. *See Bell*, 441 U.S. at 545. "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Thus, a prisoner's First Amendment claim, "must be analyzed in terms of the legitimate policies and goals of the corrections system ...." *Id.*

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). Adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity. *Pinard v. Clatskanie School District*, 467 F.3d 755, 770 (9th Cir. 2006). An adverse action may be a harm or a threat of harm, and may be explicit or implied. *See Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009). Though an adverse action need not be an independent constitutional violation, inconsequential or *de minimis* harms do not constitute adverse actions. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (to support a claim, a harm must be "more than minimal").

As to element (2) – causation – "mere speculation that defendants acted out of retaliation is not sufficient." *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014). A plaintiff must show that her protected conduct was "the 'substantial' or 'motivating'

factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271.  The causation must be but-for causation: in other words, without the retaliatory animus, the adverse action would not have been taken.  *Hartman v. Moore*, 547 U.S. 250, 260 (2005).  A plaintiff bears the burden of demonstrating that her exercise of her First Amendment rights was the substantial or motivating factor behind the August 11, 2019 FAST search.  *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).  The plaintiff must show "a causal connection between the adverse action and the protected conduct."  *Watison*, 668 F.3d at 1114.  "Retaliation is not proven by simply showing that a defendant ... took adverse action after he knew that the plaintiff prisoner had engaged in constitutionally protected activity."  *Marvellous Afrikan Warrior v. Santiago*, No. 1:16-cv-01504-AWI-GSA-PC, 2018 U.S. Dist. LEXIS 22742, 2018 WL 827616 (E.D. Cal. Feb. 11, 2018) (*quoting Estrada v. Gomez*, 1998 U.S. Dist. LEXIS 12831, 1998 WL 514068, at *3 (N.D. Cal. Aug. 13, 1998).  Rather, "[o]ne must look at the overall circumstances of the alleged retaliation, and not simply at the order of events."  *Estrada*, 1998 U.S. Dist. LEXIS 12831, 1998 WL 514068, at *3.

With respect to element (5), the plaintiff bears the burden of proving the absence of a legitimate correctional goal for the conduct of which she complains.  *Pratt v. Rowland*, 65 F. 3d 802, 806 (9th Cir. 1995).

Thus, to ultimately prevail on these claims, Plaintiff must show that (1) the August 11, 2018 FAST search – the asserted adverse action – happened (2) because (3) Plaintiff had engaged in her First Amendment right of expression and that (4) the FAST search chilled her future exercise of her First Amendment rights and (5) did not reasonably advance a legitimate correctional goal.

Plaintiff does not dispute the correctional goal of FAST searches in general.  [Joint Statement Fact No. 53.]  Nor can she satisfy element (5) here, because the FAST search plainly advanced a legitimate correctional goal – it yielded the

1    recovery and destruction of three altered razors, a potential weapons source.

2    Nonetheless, Plaintiff contends that the impetus for the August 11, 2019 FAST

3    search could not have been to further that goal and insists that the sole purpose of

4    the search was retaliation.  Plaintiff relies on three things to show that the August

5    11, 2019 FAST search was not a legitimate correctional search but, rather, a

6    retaliatory search:  (1) that the search occurred after midnight; (2) that an

7    unidentified deputy made the above-noted comments about inmate noise during the

8    day; and (3) that inmates were written up with a major rules violation for the three

9    altered razors found during the August 11, 2019 FAST search but that, on other

10   occasions when altered razors were found, no inmate was written up.

11        As a threshold matter, the Court must ask, retaliation for what?  Plaintiff does

12   not clearly identify the reason for the purported retaliatory animus.  She plainly does

13   not allege, and has not shown, that the search happened because of anything *she*

14   said, did, or failed to do, *i.e.,* that the search was retaliatory as to *her* personally.

15   The Court can only assume that Plaintiff believes the search was retaliation for

16   inmates making too much noise in her module during the day, based on her

17   allegation of the above-noted comments made by an unidentified deputy to the

18   effect that the inmates in the module were too loud during the day and warning that

19   there would be consequences unless they "shut up" and kept quiet.

20        With respect to the timing of the FAST search – shortly after midnight – the

21   fact that the search occurred several hours after the typical evening FAST search

22   time window does not alter the fact that the search satisfied the correctional goal for

23   these types of searches, namely, it yielded contraband items that could be used as

24   weapons.  Plaintiff, however, contends that conducting a FAST search at around

25   midnight, when inmates were sleeping, was not a common practice rendering it

26   retaliatory instead, because her review of the Jail logs produced for the one month

27   period before she was incarcerated do not show any such searches being done after

28   midnight.  [Opposition at 14; Plaintiff's Declaration ¶20.]  The Court has reviewed

these same logs and notes that in the 30 days preceding Plaintiff's incarceration, FAST searches typically were done twice a day, with the first search in the morning or early afternoon and the second in the evening between 7:00 p.m. and 10:00 p.m. [Dkt. 93-1 at ECF #1142-#1205.]  However, on the day before the FAST search in question – August 10, 2019 – no FAST searches were performed, and on the next day, three FAST searches were performed, including that challenged here.  [*Id.* at ECF # 1114-#1118.]  While the inference could be drawn that the FAST search in question was a make up search given the failure to conduct the typical two a day searches on the day before, doing so would be speculative given the lack of evidence in this respect, just as it is wholly speculative to conclude that the search was retaliatory simply because it took place a few hours later than typical evening searches, as Plaintiff posits.

With respect to the comments made by an unidentified deputy, these comments appear to express frustration at daytime noise levels in Plaintiff's module, with a threat that consequences would ensue if inmates were not more quiet. Plaintiff has not shown that any such threatened consequence actually happened. The only evidence of this alleged utterance is Plaintiff's self-serving Declaration; her assertion that other inmates could say the same at trial is meaningless, given her burden in connection with this Motion.  Plaintiff cannot seriously contend that the Jail was not entitled to conduct a random FAST search of her module, just as the above-noted records show happened to other Jail modules and locations frequently. Plaintiff also cannot seriously contend that a correctional institution is not entitled to require inmates to keep noise levels at a reasonable level for security and safety purposes and to warn that consequences will follow if this does not happen.  That the deputy happened to voice her frustration about this situation in, as Plaintiff puts it, a "degrading manner" does not vitiate that the FAST search was a permissible search or violate the Constitution.  Generally, verbal harassment, including "disrespectful and assaultive comments" or vulgar language, does not constitute a

1   constitutional violation. *See Keenan*, 83 F.3d at 1092; *Oltarzewski v. Ruggiero*, 830

2   F.2d 136, 139 (9th Cir. 1987) (collecting cases). The same is true as to mere threats.

3   *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (finding a prisoner's claim

4   against prison guard for threatening physical violence not sufficient a deprivation to

5   warrant protection by the Eighth Amendment and stating "we find no case that

6   squarely holds a threat to do an act prohibited by the Constitution is equivalent to

7   doing the act itself. Under the circumstances of this case, we are not prepared to

8   create an exception to this pattern"); *see also Corales v. Bennett*, 567 F.3d 554, 564–

9   565 (9th Cir. 2009) (upholding and applying *Gaut* for the principle that mere threats

10  cannot demonstrate constitutional deprivation).

11      Moreover, and critically, there is no evidence that any of the five named

12  Deputy Defendants made the comments Plaintiff alleges. Even if the unidentified

13  deputy's comments could be perceived as indicative of a retaliatory animus (and the

14  Court does not believe so), they do not show that any of the Deputy Defendants

15  performed the FAST search for the purpose of retaliation.

16      With respect to Plaintiff's allegation that other inmates were not written up

17  when altered razors were found during FAST searches, she complains that,

18  therefore, the write up for the altered razors found on August 11, 2019 "was an

19  arbitrary decision." Plaintiff just alludes vaguely to the daily records produced for

20  this proposition. The Court has reviewed those same records and notes that while

21  there are several notations that altered razors were found during FAST searches

22  without corresponding entries for inmate write-ups, there are two entries indicating

23  that altered razors were found and the inmates were written up [Dkt 93-1 at ECF

24  ##1191 and 1194 (August 1 and 2, 2019 FAST searches)] and two entries indicating

25  that unspecified contraband was found and that inmates were written up as a result

26  [Dkt. 93-1 at ECF ##1171 and 1173 (July 22 and 23, 2019 FAST searches)]. Thus,

27  Plaintiff's assertion is factually incorrect. Moreover, there is no claim before the

28

1   Court challenging the violation reports for these three inmates on the ground that the

2   reports were arbitrary, and there is no evidence that Plaintiff herself was written up.

3          Reviewing the record as a whole, there is no basis for finding that a genuine

4   issue of material fact exists about whether the August 11, 2019 search was

5   conducted in violation of Plaintiff's First Amendment rights.  She cannot meet

6   element (5) of the above-noted test for a retaliation claim.  The Court also finds that

7   Plaintiff also has not satisfied elements (2) and (3).  There is no evidence that she

8   had engaged in any First Amendment expressive activity prior to the FAST search

9   of her module.  As Plaintiff admitted in her deposition, she did not socialize with

10  many people while she was at the Jail.  [Joint Ex. A at 92-94.]  As to Plaintiff or any

11  other inmate, there is no evidence that the FAST search occurred because any one of

12  them had expressed herself in a manner that led to retaliation.  *See In re Alcala*, 222

13  Cal. App. 3d 345, 363 (1990) (rejecting prisoner's First Amendment claim based on

14  clothing restriction when "there is no suggestion in the record that the prisoners are

15  attempting symbolic speech, no indication of what message they seek to convey, and

16  no evidence which identifies the audience which they may be trying to reach" and

17  concluding that the prisoner's "vague, unfocused message of personal expression

18  does not merit the protection of the First Amendment").  As Plaintiff has not raised a

19  genuine issue of material fact with respect to all of the elements of a First

20  Amendment retaliation claim, Defendants are entitled to summary judgment on

21  Claim 5.

22         The same is true as to Claim 13, which is brought under California

23  Constitution, Article I, § 2 on the theory that the August 11, 2019 FAST search

24  violated Plaintiff's "freedom of expression."  While "'the liberty of speech clause in

25  the California Constitution is more protective of speech than its federal

26  counterpart'" (*Los Angeles All. for Survival v. City of Los Angeles*, 987 F. Supp.

27  819, 826 (C.D. Cal. 1997) (citation omitted), *aff'd*, 224 F.3d 1076 (9th Cir. 2000)),

28  the fact remains that Plaintiff has not shown any expressive speech or conduct on

1   her part, much less that the Defendants retaliated against her for it.  Defendants,

2   therefore, also are entitled to summary judgment on Claim 13.

3

4   **V.  Plaintiff's *Monell* Claims**

5          As discussed above, the County is named as the sole Defendant in three

6   Section 1983 claims – Claims 1, 2, and 3 – and for it to be liable, a basis for

7   municipal liability ultimately must be proven under the *Monell* requirements.  The

8   Complaint pleads two extant municipal liability claims:  Claim 7, for

9   unconstitutional custom or policy; and Claim 8, for failure to train and supervise.

10  These freestanding claims necessarily fail as to any County liability for the reasons

11  the Court has discussed in connection with its foregoing analyses of Claims 1, 2, and

12  3, in which the Court has found no constitutional violation.  As the Court explained

13  above, a municipality cannot be found liable "where no injury or constitutional

14  violation has occurred," *Jackson*, 268 F.3d at 653, and even "[p]roof of a single

15  incident of unconstitutional activity is not sufficient to impose liability under

16  *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. at 823-24; *Kirkpatrick*, 843 F.3d

17  at 796.

18         Plaintiff's other two Section 1983 claims – Claims 4 and 5 – were brought

19  only against the five Deputy Defendants and not directly against the County.

20  Nonetheless, neither Claim 7 nor Claim 8 can warrant imposing *Monell* liability

21  against the County based on the subject matter of Claims 4 and 5 for the same

22  reasons already noted, namely, because the Court has concluded that the Deputy

23  Defendants did not commit any constitutional violation in connection with the

24  subject matter of Claims 4 and 5.  As no constitutional violation by a County

25  employee could be found on the record before the Court in connection with these

26  two claims, there is no basis for imposing municipal liability on it pursuant to

27  Claims 7 and 8.  *City of Los Angeles v. Heller*, 475 U.S. at 799.

28         Accordingly, the County is entitled to summary judgment based on Claims 7

1   and 8.

2

3   ## VI.   Plaintiff's State Law Tort Claims

4   Claim 15 is brought against the County and the Management/Supervisor

5   Defendants and alleges that they acted negligently by failing to provide training,

6   supervision, and oversight as to the Deputy Defendants and/or in retaining them.[30]

7   Plaintiff alleges that the Deputy Defendants were unfit or incompetent when they

8   were hired and/or became unfit or incompetent once employed by the Jail and, thus,

9   were unable to properly perform their duties, resulting in the August 11, 2019 FAST

10  search that is the subject of Claims 4, 5, 12, and 13, as discussed earlier.

11  Claim 17 is brought against all ten Defendants based on a theory of

12  intentional infliction of emotional distress.  Plaintiff alleges that all of the

13  Defendants' "unconstitutional policies and practice" caused her to suffer

14  "debilitating psychological damage."

15  As a threshold matter, Defendant County is entitled to summary judgment on

16  Claims 15 and 17, because it has immunity as to both claims under California

17  Government Code § 844.6(a)(2).  This statute provides immunity to public entities

18  for claims based on injuries to a prisoner, and it has been applied in a wealth of

19  contexts to afford immunity, including as to claims brought by arrestees and pretrial

20  detainees, who are considered "prisoners" within the meaning of the statute.  *See*

21  *Teter v. City of Newport Beach*, 30 Cal. 4th 446, 449 (2003); *see also Pina v. Cnty.*

22  *of Los Angeles,* No. CV18-8149-DMG, 2020 WL 13588159, at *8 (C.D. Cal. Jan. 2,

23  2020) (county and sheriff's department held to be immune from liability for pretrial

24  detainees' negligent supervision, hiring, and retention claim and sexual battery

25

26  ――――――――――――――

27  [30]      As the Deputy Defendants' alleged wrongdoing is limited to the events involved in the August 11, 2019 FAST search, Claim 15 necessarily also is limited to the alleged negligence of the Management/Supervisor Defendants in connection with their hiring, training, supervising, etc.

28  of the Deputy Defendants in that particular respect.

claim, pursuant to Section 844.6.  This includes claims for negligence (Claim 15) and intentional infliction of emotional distress (Claim 17).  *See, e.g., Wright v. State of California*, 122 Cal. App. 4th 659, 672 (2004) (public entity immune from liability under Section 844.6(a) for intentional infliction of emotional distress and negligence); *Savitt v. Jordan*, 142 Cal. App. 3d 820, 822 (1983) (holding that immunity under Section 844.6 applies to negligence claim); *see also Est. of Levee v. Los Angeles Cnty.*, No. CV10-01266-SJO, 2010 WL 11549362, at *4 (C.D. Cal. Aug. 26, 2010) (finding county and sheriff's department immune from jail inmate's state law claims based on negligence, negligent supervision, and cell inspections).  Accordingly, as the County has immunity from Plaintiff's negligence and intentional infliction of emotional distress state law claims, it is entitled to summary judgment on these two claims.[31]

With respect to Claim 15, in California, "'[a]n employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit. [Citation.],'" . . . and "[n]egligence liability will be imposed upon the employer if it 'knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes.'. . ." *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 815 (2006) (Citations omitted).

Defendants have presented competent evidence that the Deputy Defendants were trained in connection with the August 11, 2019 FAST search.  Defendant Stichter, who was the Captain responsible for the facility operation of the Jail at the relevant time (which included overseeing subordinates), declares that he received training on Jail policies regarding overcrowding in the Jail, sleep deprivation, sound

---

[31] Given that the County indisputably is immune from these claims under Section 844.6(a)(2), the Court need not, and will not, address the other, alternate statutory immunity provisions proffered by Defendants that arguably might apply to these claims as against the County.

74

1    and light policies, temperature, body searches, hygiene products available to

2    inmates, and FAST and cell searches.  [Joint Ex. D at 412.]  Each of the five Deputy

3    Defendants declares that they received the same training, including learning the

4    processes and procedure for FAST searches, and that they acted in accordance with

5    Jail policies and procedure in connection with the August 11, 2019 FAST search.

6    [Joint Ex. D at 423, 425, 429-31, 434-36, 439-41, and 446-47.]

7         Plaintiff has not competently disputed this showing or shown that the training

8    received was inadequate.  At most, she states that when she reviewed the training

9    materials provided by the County, she did not see anything in there on these topics

10   and dismisses them as reflecting training that was not sufficient, and further asserts

11   that the alleged "threatening announcement" she claims was made during the Cell

12   Search "is not compliance with training."  [Plaintiff's Declaration ¶20.]  The Court

13   has reviewed the training materials Plaintiff has proffered that are relevant to her

14   claims (which do not appear to correlate with the specific training events that the

15   Defendants described in their declarations); they consist of slide shots captured from

16   a Powerpoint presentation.  [*See* Dkt. 149-2 at 16 *et seq.*]  Powerpoint slides are

17   used in conjunction with orally-provided training and only set forth, typically in

18   bullet point format, items to be discussed in further detail at that training; they do

19   not reveal the scope of all that is addressed in any such training or constitute a limit

20   on what was discussed.  The Powerpoint slides on which Plaintiff relies cannot serve

21   as the outer limit of what training Defendants may have received orally at any

22   training sessions.  Plaintiff's self-serving and conclusory assertion about what is or

23   is not in compliance with the training Defendants received or the adequacy of such

24   training, bereft of any evidentiary support or indication that she possesses the

25   expertise to render an opinion on training adequacy, is insufficient to raise a genuine

26   issue of material fact, nor does it raise the specter that the Defendants were

27   inadequately supervised and trained.  *See Shakur v. Schriro*, 514 F.3d 878, 890 (9th

28   Cir. 2008) ("'[c]onclusory affidavits that do not affirmatively show personal

75

1    knowledge of specific facts are insufficient'" to oppose summary judgment)

2    (citation omitted).

3            As discussed above, the Court has concluded that there was nothing

4    unconstitutional about the August 11, 2019 FAST search and the related purported

5    infringement on Plaintiff's speech rights.  Plaintiff has not shown that the Deputy

6    Defendants did anything wrong and/or that they were incompetent/unfit when hired

7    or became so later, much less that anything occurred in connection with the search

8    that was the result of negligent hiring or defective training or supervision.  At most,

9    Plaintiff alludes vaguely to a "duty of care" owed her, but she has not raised any

10   genuine dispute of material fact as to her negligence claim, because she has not

11   produced *any* evidence to bolster her vague assertion that there was negligent hiring,

12   supervision and training on the part of the Management/Supervisor Defendants.

13   Accordingly, the Management/Supervisor Defendants, along with the County, are

14   entitled to summary judgment on Claim 15.[32]

15           With respect to Claim 17, in California, "'[t]he tort of intentional infliction of

16   emotional distress is comprised of three elements: (1) extreme and outrageous

17   conduct by the defendant with the intention of causing, or reckless disregard of the

18   probability of causing, emotional distress; (2) the plaintiff suffered severe or

19   extreme emotional distress; and (3) the plaintiff's injuries were actually and

20

21   _____

     [32]      Defendant Stichter describes the Jail's management structure and supervision structure in

22   his Declaration.  With respect to supervision of Jail Deputies, Stichter's Declaration makes clear

     that supervision and discipline responsibilities start at the Sergeant level and may end there, as a

23   Sergeant may end up handling a performance issue without the need to report it further up the

     chain of command, that is, to the Lieutenants and then to the Captains.  Stichter states that on

24   occasion, he might have been made aware of an employee issue or problem, and he would inform

     Defendant Balicki only if necessary, but that it was unlikely that any such issue ever would reach

25   Defendants Barnes or Baker, who typically did not handle discipline, supervision, and hiring of

     Jail employees.  Stichter also declares that he was unaware of any unfitness problems with respect

26   to the Deputy Defendants, who had no records of prior complaints or disciplinary actions, which

     means that Defendants Barnes, Balicki, and Baker would not have been so aware, given that

27   Stichter would have been the one to hear about any such matter.  [Joint Ex. D at 413-14.]  Plaintiff

     has not rebutted this showing with any evidence.

28

proximately caused by the defendant's outrageous conduct.'" *Cabral*, 624 F. Supp. 2d at 1195 (citation omitted).  "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community' . . ., [a]nd the defendant's conduct must be 'intended to inflict injury or engaged in with the realization that injury will result. . . .'" *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009) (citations omitted and internal punctuation cleaned up for clarity).  "Liability for intentional infliction of emotional distress 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Id*. at 1051 (citation omitted).  "[M]ere petty oppressions and other trivialities do not amount to 'extreme and outrageous conduct.'" *Tilei v. Calif. Dep't of Corrections and Rehabilitation*, 2022 WL 16946600, at *2 (9th Cir. Nov, 15, 2022) (citation omitted).

As the Court's discussion of the August 11, 2019 FAST search and related claims makes clear, the Court has found nothing wrongful about those events.  The record does not permit a finding that the Deputy Defendants' conduct was extreme and outrageous as to the August 11, 2019 FAST search-related events or that they acted with the intent to cause Plaintiff emotional distress or other injury or so recklessly that this was probable.  Plaintiff's indignation that her sleep was interrupted on a single occasion and for a limited period shortly after midnight by a routine random search appears to be wholly outsized in comparison to the nature of the search performed as she describes it.  Regardless of the reasonableness of Plaintiff's reaction to these events, nothing in the record makes, or could make, the conduct at issue extreme and outrageous; it simply was not.  There is no genuine dispute of material fact as to Claim 17, and all Defendants are entitled to summary judgment on this state law tort claim.[33]

---

[33]     Because Claim 17 so clearly fails on the first prong requirement of extreme and outrageous conduct, the Court need not, and will not, address the parties' arguments and showings on the

\* \* \* \* \*

For all of the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on each of the claims alleged in the Complaint.[34] Accordingly, the Court recommends that the Motion be granted in full.

## RECOMMENDATION

For all of the foregoing reasons, **IT IS RECOMMENDED** that the District Judge issue an Order:

(1) Accepting this Report and Recommendation;

(2) Granting Defendants' Motion for Summary Judgment in full; and

(3) Entering judgment dismissing this action with prejudice.

DATED: December 16, 2022

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Reports and Recommendations are not appealable to the United States Court of Appeals for the Ninth Circuit, but may be subject to the right of any party to file objections as provided in the Local Civil Rules for the United States District Court for the Central District of California and review by the United States District Judge

---

question of Plaintiff's asserted emotional distress and the extent to which it pre-existed her Jail stay.

[34]   Given the Court's findings that Plaintiff has not raised a genuine issue of material fact as to the merits of the claims alleged in the Complaint, thereby entitling Defendants to summary judgment, the Court declines to reach Defendants' qualified immunity arguments and their state statutory immunity arguments not otherwise addressed herein.

1    whose initials appear in the docket number.  No notice of appeal pursuant to the

2    Federal Rules of Appellate Procedure should be filed until the District Court enters

3    judgment.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28