1  JANE DOE

2  11151 Valley Blvd #4886,

3  El Monte, CA 91734

4

5  Plaintiff in Pro Se

6

7

8  **UNITED STATES DISTRICT COURT**

9  **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JANE DOE,                                No. 8:20-cv-00322-JWH-GJS

12              Plaintiff,

13       v.                                 **PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION**

14  COUNTY OF ORANGE; et al

15              Defendants.                 Action filed: 2/18/2020
                                            Trail Date: None
16

17

18

19       Pursuant to 28 U.S.C. §636(b)(1), Jane Doe (Plaintiff) respectfully makes the following

20  objections to the Report and Recommendation entered in this matter on December 16, 2022. See

21  ECF 163. For the reasons stated below, the Report should not be followed.

22  **I.    THE MAGISTRATE JUDGE CLEARLY ERRED IN APPLYING THE WRONG**

23  **STANDARD OF HARM**

24       The Supreme Court held in *Bell v. Wolfish* that "under the Due Process Clause, a detainee

25  may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell*

26  *v. Wolfish*, 441 U.S. 520, 535 (1979). More specifically, Bell's test applies to identify

27  unconstitutional punishment at the pretrial stage of a criminal proceeding. That test asks whether

28  there was an express intent to punish, or "whether an alternative purpose to which [the restriction]

1  may rationally be connected is assignable for it, and whether it appears excessive in relation to the

2  alternative purpose assigned [to it]." Id. at 538, 99 S.Ct. 1861(quoting *Kennedy v. Mendoza-*

3  *Martinez*, 372 U.S. 144, 168-69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

4       The Fourteenth Amendment prohibits all punishment of pretrial detainees, while the

5  Eighth Amendment only prevents the imposition of cruel and unusual punishment on convicted

6  prisoners. See *Bell*, 441 U.S. at 535 n. 16, 99 S.Ct. 1861; *Demery v. Arpaio*, 378 F.3d 1020, 1028

7  (9th Cir. 2004) (rejecting to apply *Turner v. Safley*, 482 U.S. 78 (1987) to pretrial detainees.)

8       In *Bell*, the Court held that the means employed cannot be "excessive in relation to the

9  alternative purpose." 441 U.S. at 538, 99 S.Ct. 1861. Nothing in *Bell* requires that, to be

10  punishment, a harm must be independently cognizable as a separate constitutional violation (e.g.,

11  a deprivation of First Amendment rights, or a violation of a constitutional right to privacy).

12  Rather, to constitute punishment, the harm or disability caused by the government's action must

13  either significantly exceed, or be independent of, the inherent discomforts of confinement. *Bell*,

14  441 U.S. at 537, 99 S.Ct. 1861. See also *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004)

15  (concluding that streaming images of pretrial detainees on the web constitutes a harm because the

16  additional impact on pretrial detainees of webcam transmission was greater than the intrusion

17  inherent in incarceration.)

18       Plaintiff was a pretrial detainee, detained for the sole purpose of assuring court appearance

19  and protected from all punishment. 20 plus hours without food along with 12 plus hours in bone

20  chillingly cold environment, dramatically dropped pulse, being forced to expose her fully naked

21  body to jail guards and other inmates for no legitimate security reason, 4 nights of loss of sleep

22  with insufficient hygienic supplies constitute harm within the meaning of the Fourteenth

23  Amendment because they significantly exceeded the inherent discomforts of confinement of a

24  pretrial detainee instead of a sentenced prisoner and no legitimate governmental purpose has been

25  offered as justification for each deprivation. The magistrate judge analyzed each deprivation

26  independently which significantly minimized the cumulative harm suffered by Plaintiff at the

27  hands of the jail guards.

28  **II.   DENIAL OF LIFE NECESSITIES AND SUFFICIENT HYGIENIC SUPPLIES**

1    A reasonable corrections officer should know that when an inmate can be fed without risk

2    to the prison officer's safety the prison official cannot arbitrarily deny an inmate his meals. See

3    Cal. Code Regs. tit. 15, § 3050(a)(2) (2000).

4    The fact, that Cousins offers no decisional, statutory, or other legal basis to suggest that a

5    reasonable official would have any way of knowing that by failing to personally check all

6    California appellate court decisions for changes in the law, failing to apply these changes to

7    individual inmates statewide, and then failing to contact the appropriate sentencing courts, he or

8    she was violating Cousins' constitutional rights, sufficiently distinguishes this case from *Cousins*

9    *v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009).

10    Plaintiff did not rely on violation of jail rules to assert her constitutional right to life

11    necessities. Plaintiff alleges she was denied both food and clothing to keep warm at the same time,

12    both were done intentionally to cause unnecessary pain and punishment. See *Dearman v.*

13    *Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970) (holding that whether relief may be granted

14    under 42 U.S.C. § 1983 must consider facts and circumstances surrounding the withdrawal of

15    food from prisoners.)

16    The magistrate judge finds *Willis v. Brown*, 726 F. Supp. 1118 (N.D. Ill. 1989)[1] is

17    factually distinguishable. ECF 163 at 22. However, the cases relied by the magistrate judge are

18    also factually distinguishable. *Foster v. Runnels*, 554 F.3d 807 (9th Cir. 2009) involves a prisoner,

19    not a pretrial detainee, being denied food but not in a freezing cold environment. *Mendiola-*

20    *Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016) involves a nutrition claim filed by a prisoner,

21    on a "modified diet" specifically for pregnant women, who did not allege she was denied food in

22    bone chilling environment. *Billy Driver v. Doe*, No. CV 19-3791-GW (AGR), 2020 WL 9848690,

23    (C.D. Cal. Jan. 2, 2020) involves a state prisoner, not a pretrial detainee.

24    The fact, that Plaintiff was denied food for consecutive 20 hours intentionally, 12 hours of

25    which in extremely cold environment, sufficiently distinguishes this case from *Garrett v.*

26    *Gonzalez*, No. 1:11-cv-00686-SAB, 2014 WL 12539696, (E.D. Cal. March 7, 2014), that

27

28

---

[1] *Willis v. Bell*, 726 F. Supp. 1118 (N.D. Ill. 1989) involves a pretrial detainee being deprived of food for 12 hours in custody. The court reasoned, the deprivation of food for 12 hours may not be particularly harsh, no legitimate governmental purpose has been (or could be) offered as justification for that deprivation.

involved a state prisoner; *Mateo Cortez v. Solano Cnty. Sheriff's Off.*, No. 2:20-CV-0392 KJN P, 2020 WL 1503439 (E.D. Cal. Mar. 30, 2020), that involved a pretrial detainee deprived of meals on two non-consecutive occasions; one, because the kitchen was closed; and two, a dinner three days later; and *Massaquoi v. McConaughey*, CIVIL ACTION No. 3:17-CV-938 (M.D. Pa. Jan. 24, 2020) involving a state prisoner missing one meal, not in freezing cold environment.

The risk that an inmate might suffer harm as a result of the denial of meals in bone chilling environment is obvious. If *Willis v. Brown*, 726 F. Supp. 1118 (N.D. Ill. 1989) is factually distinguishable, none of Ninth Circuit authorities on this topic suggests that the denial of meals in bone chilling environment does not rise to the level of a constitutional violation.

The magistrate judge characterizes all Plaintiff's self-serving testimony/declarations as uncorroborated but credits defendants' self-serving declarations as competent evidence.

At the summary judgment stage the court may not weigh the moving party's evidence against the nonmoving party's evidence. *Lowry v. City of San Diego*, 858 F.3d 1248, 1263 (9th Cir. 2017). Rather, "the judge must assume the truth of the evidence set forth by the nonmoving party." *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) ).

"Uncorroborated and self-serving" testimony may be sufficient to establish a genuine dispute of fact where it is "based on personal knowledge, legally relevant, and internally consistent. *Lowry v. City of San Diego*, 858 F.3d 1248, 1262 (9th Cir. 2017) (quoting *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495 (9th Cir. 2015).) Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature. *Lowry v. City of San Diego*, 858 F.3d 1248, 1262 (9th Cir. 2017) (quoting *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495 (9th Cir. 2015); *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir.2007).) See also *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (concluding that Keenan, through a verified complaint treated as an affidavit, produced sufficient evidence to make his noise claim a disputed issue of material fact not subject to summary judgment despite the defendants produced contrary evidence, see Affidavit of Theodore S. Long

4

1   of Nov. 3, 1993, at 3 (denying knowledge of the banging, and claiming to have moved inmates

2   who became "major noise problem[s]" to muffled cells).)

3          The district court considered Lowry's testimony, that the door to Suite 201 was shut when

4   the officers arrived because it had automatically closed behind her after she came back in from

5   the bathroom, to be speculation rather than first-hand testimony and determined that the

6   testimony was insufficient to create a dispute of fact. The Ninth Circuit concluded that Lowry's

7   testimony was based on her first-hand knowledge of the door in question and her personal

8   recollection that she did not prop it open on the night in question and also specific, "legally

9   relevant, and internally consistent." *Lowry v. City of San Diego*, 858 F.3d 1248, 1263 (9th Cir.

10  2017).

11         To establish that he was terminated by Sears because of his disability, Nigro submitted a

12  declaration stating that on June 29, 2009, he had a phone conversation with Larry Foerster,

13  General Manager of the Sears Carlsbad store at which Nigro worked, and Foerster told him that

14  "[i]f you're going to stick with being sick, it's not helping your situation. It is what it is. You're

15  not getting paid, and you're not going to be accommodated." Nigro also testified in his deposition

16  that Sears's District Facilities Manager Alan Kamisugu told him not to be concerned about his

17  pay issue because Chris Adams, Sears's District General Manager, had indicated to Kamisugu

18  that Nigro was "not going to be here anymore." The district court disregarded the evidence

19  proffered by Nigro, on the basis that "the source of this evidence is Nigro's own self-serving

20  testimony."

21         The Ninth Circuit concluded that the district court erred in disregarding Nigro's testimony

22  in granting Sears's motion for summary judgment. Nigro's declaration and deposition testimony,

23  albeit uncorroborated and self-serving, were sufficient to establish a genuine dispute of material

24  fact on Sears's discriminatory animus. He related statements made to him both in person and over

25  the telephone. His testimony was based on personal knowledge, legally relevant, and internally

26  consistent. *Nigro v. Sears, Roebuck & Co*., 784 F.3d 495, 498 (9th Cir. 2015).

27         Phan's and Yang's declarations, attesting to a restructuring of the transaction that created a

28  bona fide obligation for Wu fully to repay Hartcourt for the stock, were viewed as

"uncorroborated and self-serving" and as contradicted by earlier testimony in the record by the district court, and so disregarded regarding restructuring. The Ninth Circuit concluded that the district court's characterizations of the statements cannot justify disregarding them. *S.E.C. v. PHAN*, 500 F.3d 895, 909 (9th Cir. 2007).

In most cases, "[t]hat an affidavit is selfserving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). Only in certain instances — such as when a declaration "state[s] only conclusions, and not 'such facts as would be admissible in evidence,'" — can a court disregard a selfserving declaration for purposes of summary judgment. Id. (quoting FED. R. CIV. P. 56(e)).

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002), relied upon by the magistrate judge as supporting the disregard of Plaintiff's "uncorroborated and self-serving" declaration, involved just such a situation: The declaration in question included facts beyond the declarant's personal knowledge and "provide[d] no indication how she knows[these facts] to be true." Id. at 1059 n. 5, 1061. Here, Plaintiff's declaration does not have a similar defect, as it involves the declarant's own direct personal knowledge. Plaintiff's "uncorroborated" declaration does not disqualify her from testifying about the events — subject, of course, to a credibility determination by the finder of fact. ECF 163 at 29-30.

The requirement that Plaintiff's testimony shall be corroborated necessarily implies that Plaintiff is lying. However, "[a] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ). As the Supreme Court has further observed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). Thus, it was error for the magistrate judge to assess Plaintiff's credibility and impose requirement of corroboration of her testimony.

1    Further, the sufficiency of the corroboration is, of course, a question for the jury. *United*

2    *States v. Seavey*, 3 Cir., 180 F.2d 837, 840. In speaking of the question of the trustworthiness of

3    the corroborative testimony, the Supreme Court said in *Weiler v. United States*, 323 U.S. 606, 65

4    S.Ct. 548, 89 L.Ed 495, "To resolve this latter question is to determine the credibility of the

5    corroborative testimony, a function which belongs exclusively to the jury." See also *Buckner v.*

6    *United States*, 81 U.S.App.D.C. 38, 154 F.2d 317, 318, and *Adams v. United States*, 9 Cir., 191

7    F.2d 206.

8    It is remarkable to note that Defendants cannot corroborate their declarations. ECF 163 at

9    13, 29. Nor can they refute Plaintiff's declaration. Based on O'Connell's description of his job

10   duties, a deputy who did not establish where he was on August 8, 2018, the magistrate judge took

11   credit of his declaration over Plaintiff's concerning the jail temperature. See *Tolan v. Cotton*, 572

12   U.S. 650, 658-659 (2014) (finding error where the court credited the evidence of the party

13   seeking summary judgment and failed properly to acknowledge key evidence offered by the party

14   opposing that  motion.)

15   Plaintiff's uncorroborated assertion as to her "normal" pulse was not refuted by

16   Defendants despite Defendants possess Plaintiff's medical records over six years. Not only

17   Plaintiff's testimony is sufficient to establish the bone chilling temperature Plaintiff also provided

18   corroboration. ECF 149-2 at 11, describing freezing cold temperature. Simply put, the 70 degrees

19   alleged by Defendant is uncorroborated and self-serving.

20   The magistrate judge states that given the average 70 degree temperature, a reasonable Jail

21   official could have concluded that Plaintiff was not at substantial risk of suffering serious harm,

22   notwithstanding her complaints of being cold. ECF 163 at 30. However, whether a prisoner needs

23   medical attention is determined by whether the prisoner is sick, not by whether the deputy is sick.

24   The question, therefore, is whether the denial of clothing after being informed that Plaintiff was

25   cold to death violated Plaintiff's constitutional right. An inmate should be fed even when the

26   deputies do not feel hungry. Whether the deputies feel cold is irrelevant in terms of an inmate's

27   need for life necessity. Any reasonable officer, after being told someone is cold to death, should

28   have understood the substantial risk of suffering serious harm, such as causing dramatically

1    dropped pulse. The rude response by the deputies has shown the deliberate indifference to

2    inmates' health. See *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (Holding that

3    complaint alleging that prison officials deliberately failed to provide blankets in "extremely cold

4    indoor air" stated an Eighth Amendment claim.)

5         Despite Plaintiff has identified other inmates, ECF 149-2 at 1, the magistrate judge erred

6    in concluding that Plaintiff does not identify any person who can so testify. ECF 163 at 29. The

7    magistrate judge prohibits Plaintiff from disclosing the identity of other inmates, ECF 102, as

8    such Plaintiff can only identifies the initials of other inmates.

9         Maintaining the temperature freezing cold is a permanent and well-settled practice by the

10   County gave rise to the alleged violation. ECF 149-2 at 11. The denial of clothing to keep warm

11   and repeated denial of food by multiple jail employees, such open misconduct committed by

12   multiple officers, represents the County's official policy and consistency that the conduct has

13   become a traditional method of carrying out policy. See *Menotti v. City of Seattle*, 409 F.3d 1113,

14   1148 (9th Cir. 2005) (holding that a plaintiff may prove a widespread practice where several

15   different officers independently engage in the same unconstitutional conduct.)

16        The Report states that "Plaintiff did not include her allegation about being cold on August

17   12, 2019 in the Complaint and, instead, only made the claim later on when she was deposed and

18   then again in her Declaration filed in opposition to the Motion." ECF 163 at 19. However,

19   Plaintiff explicitly made allegation of being cold. See ECF 56 at 7, 16.

20        The Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which

21   includes those sanctions that are "so totally without penological justification that it results in the

22   gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 96 S.Ct. 2909, 2925,

23   2929, 49 L.Ed.2d 859 (1976). See also *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). This

24   includes not only physical torture, but any punishment incompatible with "the evolving standards

25   of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78

26   S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). See also *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285,

27   290, 50 L.Ed.2d 251 (1976). In determining whether a challenged condition violates "evolving

28   standards of decency," courts may consider opinions of experts and pertinent organizations. But

1   these opinions will not ordinarily establish constitutional minima. What experts may consider

2   desirable may well constitute appropriate goals to which the other branches may aspire but they

3   do not usually establish those minimums below which the Constitution establishes a prohibition.

4   See *Rhodes v. Chapman*, 452 U.S. 337, 351 n. 13 (1981). Indeed, they weigh less heavily in this

5   determination than what the general public would consider decent. Id. The relevant inquiry is

6   therefore whether the general public would consider shampoo as basic hygienic supplies in terms

7   of evolving standards of decency in 21st century. None of the cases cited by the magistrate judge

8   conducted any analysis on evolving standards of decency. Instead, they all made a conclusory

9   statement that the failure to provide shampoo is not cruel and unusual.

10      There is no evidence in the record suggesting that Plaintiff was informed that she could

11  obtain additional free soap and toothpaste. There is no evidence in the record indicating that

12  Plaintiff was offered free soap and toothpaste two days after the initial supply despite the initial

13  supply was enough only for two days. It is the County's practice to force inmates to pay for

14  hygienic supplies regardless of its written policy. ECF 149-2 at 12.

15      The magistrate judge clearly erred in concluding that Plaintiff has not shown that she

16  actually ran out of toothpaste. ECF 163 at 28. Defendants did not dispute that the Welfare Pack

17  was for only two days. Defendants have not shown that the Welfare Pack could last more than

18  two days. It is irrefutable that Plaintiff did not purposely skip brushing her teeth. There is no

19  evidence in the record suggesting that Plaintiff had sufficient toothpaste during her custody. See

20  *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 256 (1986) (holding that the moving party bears

21  the initial burden of demonstrating the absence of a genuine issue of material fact.)

22      The non- low-wattage light above Plaintiff's bed was never turned off, offered by

23  Plaintiff's own declaration statement, based on her first-hand personal knowledge, is legally

24  relevant, internally consistent, and sufficient to establish a genuine dispute of fact. *Lowry v. City*

25  *of San Diego*, 858 F.3d 1248, 1262 (9th Cir. 2017). It is remarkable to note that there is no

26  evidence in the record showing the lights over Plaintiff's bed were low-wattage lights. While

27  Defendants possess the light, no photo or configuration of the light was presented. See *Anderson*

28  *v. Liberty Lobby. Inc*., 477 U.S. 242, 256 (1986) (holding that the moving party bears the initial

9

1  burden of demonstrating the absence of a genuine issue of material fact.) The magistrate judge

2  faulted Plaintiff for her difficulty in sleeping prior to incarceration, however, Plaintiff's testimony

3  regarding her sleep pattern sufficiently distinguishes her difficulty in sleeping caused by WCJ's

4  condition with both loud noise and bright light. ECF 149-2 at 6.

5    *Walker v. Woodford*, 393 F. App'x 513 (9th Cir. 2010), relied by the magistrate judge, is

6  distinguishable. In *Walker*, the plaintiff continued to complain of insomnia and other symptoms

7  after he was transferred to a prison that did not have night lights. In contrast, here Defendants

8  present no evidence showing Plaintiff's sleep was not affected by the lighting and noise in her

9  cell. See *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 256 (1986) (holding that the moving

10  party bears the initial burden of demonstrating the absence of a genuine issue of material fact.)

11  Defendants' claim that the light over Plaintiff's bed did not affect her sleep is mere speculation

12  insufficient to demonstrate the absence of a triable issue of material fact. Sleep undoubtedly

13  counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the

14  Eighth Amendment. *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). See also *Williams v.*

15  *Boles*, 841 F.2d 181, 183 (7th Cir. 1988) (infliction of incessant noise, even if it causes only

16  agony and not enduring injury, may be a due process violation.)

17    None of those cases relied by the magistrate judge address the specific circumstances

18  faced here.

19  **III. SEVEN GROUP STRIP SEARCHES**

20    In faulting Plaintiff for her prior refusal to wear a bra without prior knowledge that she

21  would be subject to strip search, the magistrate judge overlooks that fact that Plaintiff was

22  ordered to wear a bra in the hallway instead of a restroom. ECF 163 at 33. Plaintiff did not

23  willingly chose to wear a bra in the hallway, but she was forced to despite she could have been

24  ordered to wear a bra in a restroom.

25    Notably, nowhere in Penal Code suggests that only searches requiring exposure of genitals

26  constitute strip search. Penal Code § 4030(c)(3) defines "strip search" as a search which requires

27  a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection

28  of the underclothing, breasts, buttocks, or genitalia of such person. Penal Code § 4030 (l) requires

1    all strip, visual, and physical body cavity searches shall be conducted in an area of privacy so that

2    the search cannot be observed by persons not participating in the search. Nowhere in the penal

3    code suggests that a search must be conducted on a person fully naked to afford privacy.

4            *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) involved visual strip searches on

5    the state's most dangerous prisoners with prior incidents that contraband and homemade weapons

6    were confiscated. Nevertheless, the court did "encourage [the prison] to opt for less public

7    searches when security considerations allow[ed]." *Michenfelder*, 860 F.2d at 333. *Lopez v.*

8    *Youngblood*, 609 F. Supp. 2d 1125 (E.D. Cal. 2009) rejected *Michenfelder* because the policy in

9    *Michenfelder* limited searches to the state's most dangerous prisoners, which were housed in the

10   maximum security unit, not a blanket strip search policy and the *Michenfelder* court focused its

11   analysis on officer safety and the lack of available alternatives. *Lopez v. Youngblood*, 609 F.

12   Supp. 2d 1125, 1136 (E.D. Cal. 2009).

13           *Bull v. City County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) involved strip searches

14   in a professional manner and in a place that afforded privacy under the circumstances that there

15   was a pervasive and serious problem with contraband inside San Francisco's jails. *Florence v. Bd.*

16   *of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318 (2012) addressed a one time strip

17   search prior to general population placement and the court was not confronted by a blanket policy

18   permitting group strip searches, including forcing female inmates to show their menstrual pads in

19   the hallway. *Florence* also did not address a blanket strip search after a mandatory shower in the

20   view of jail guards. *United States v. Fowlkes*, 804 F.3d 954 (9th Cir. 2015) involved a one time

21   strip search, after receiving information that *Fowlkes* had "put a baggie down his pants,"  in the

22   jail's strip search room, a five by six enclosure with three concrete walls and an opening in the

23   fourth wall. *Rickman v. Avaniti*, 854 F.2d 327 (9th Cir. 1988) involved visual strip and body

24   cavity searches conducted only on convicted prisoners in the administrative segregation, the

25   highest custody status that can be assigned an inmate requiring close supervision.

26           *Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997) involved a state prisoner being strip

27   search under a plan to detect illicit drugs on pre-selected inmates chosen because of their prior

28   involvement with illicit drugs. *Cunningham v. Multnomah Cty.*, 737 F. App'x 814, 816-17 (9th

11

Cir. 2018) involved group strip searches restricted to a discrete class of inmates in a medium security facility, not a blanket strip search policy on all pretrial detainees.

None of the above situations bear any relevance to that involved here, seven strip searches under a blanket strip search policy in four days on a pretrial detainee with charges irrelevant to contraband or weapon without any allegation of a pervasive and serious problem with contraband inside women's central jail. None of the above cases suggest that forcing female pretrial detainees to expose their menstrual pads in a group is not a frightening and humiliating invasion. *Giles v. Ackerman*, 746 F.2d 614, 617 (9th Cir. 1984). Instead, this circuit has held that a blanket policy of strip searching all detainees upon return from court, including detainees ordered released, and transferees from one facility to another, violated the Fourth Amendment, Article 1, §1 of the California Constitution, and Article 1, §13 of the California Constitution. *Craft v. County of San Bernardino*, 468 F. Supp. 2d 1172, 1180 (C.D. Cal. 2006). The magistrate judge clearly erred in finding that Craft might have some relevance only for the sixth and seventh searches. Instead, Craft is relevant for at least six searches while Plaintiff never made any outside contact and never out of jail staff's sight.

Defendants made no apparent efforts to conduct individualized searches or to preserve the privacy of the individuals during searches. *Michenfelder*, 860 F.2d at 333 (encouraging prison to opt for less public searches when security considerations allow); *Craft v. County of San Bernardino*, 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (factor regarding manner of searches strongly favored inmates where searches were conducted "en masse without any attempt to limit the humiliation occasioned by conducting the searches in full view of dozens of other individuals.") Nevertheless, the magistrate judge flouted at Plaintiff's argument that Defendants should have used alternative methods to meet the jail's penological goal. However, to establish the reasonableness of the manner of searches it is Defendants' burden to show lack of available alternatives or the preclusion of officer safety. See *Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1137 (E.D. Cal. 2009) (concluding that defendants proffered no evidence of lack of available alternatives or the preclusion of officer safety, and, while not determinative, the subsequent policy change belies any assertion that there were a lack of alternatives or that safety

considerations would not permit individualized searches.)

The magistrate judge clearly erred in concluding that Plaintiff does not allege, much less proffer evidence, that any of other inmates actually were looking at her during the searches. ECF 163 at 40. Throughout Plaintiff's operative complaint[2], Plaintiff alleges that sever strip searches were conducted in the view and presence of OCSD personnel and other inmates. ECF 56 at 8. Defendants proffered no evidence to refute Plaintiff's testimony, such as other inmates' testimony indicating they did not see Plaintiff during any search. See *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 256 (1986) (holding that the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.)

The magistrate judge clearly erred in finding that the jail logs reviewed by Plaintiff were not before the Court. ECF 163 at 40. In fact, the jail logs, ECF 93-1 at 4-14, 36-99, were reviewed by the magistrate judge where she claimed she found two extra entries of written violations of altered razors. ECF 163 at 70. The magistrate judge also erred in concluding that Plaintiff asserts, without any evidentiary support, that "[t]here has not been a lot of violence at" the Jail and that there is no "real security reason" to support the Jail's Extended Correctional Search policy. ECF 163 at 40. In fact, during the entire discoverable period that represents the Jail's security, policy and practice, ECF 93-1 at 4-14, 36-99, approximately 42 incidents were recorded. None of them involved violence committed with altered razors or any type of concealable weapons, sufficient to indicate that the officials have exaggerated their response to security considerations.

Further, the evidence presented by Defendants does not reveal any contraband or weapon discoveries made pursuant to the blanket group strip searches at issue, a clear indicator of exaggerated or excessive means of enforcing security. See, e.g., *Way v. County of Ventura*, 445 F.3d 1157, 1161 (9th Cir. 2006) (requiring link between blanket strip search policy and legitimate security concerns); *Giles*, 746 F.2d at 618 (requiring demonstration that security interests warranted the serious invasion of privacy inflicted by strip searching of arrestee and concluding the evidence of smuggling activity was minimal), overruled on other grounds by *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n. 1 (9th Cir. 1999); *Craft*, 468 F.Supp.2d at 1178 ("evidence

---

[2] A verified complaint can be treated as an affidavit. *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996).

1    does not reveal whether [contraband] discoveries were made pursuant to a search of a pre-

2    arraignment transferee (such as the ones at issue in the present case), to say nothing of the fact

3    that defendants make no attempt to demonstrate that any particular pre-arraignment transferee had

4    been identified as likely or potentially likely to smuggle contraband in a manner likely to be

5    detected by a strip and/or visual body search"). Defendants have not provided evidence

6    suggesting that group strip searches (versus individualized searches) increase the likelihood of

7    contraband finds. Defendants have provided no evidence to suggest that the contraband or

8    weapon was more likely to be found during a group strip search than a search which afforded the

9    individual being searched some privacy.

10           The fact that nudity was exposed behind blurred glass door is sufficient to distinguish this

11   case from *Litmon v. Santa Clara County*, No. C 03-2054 RMW, 2009 WL 890884, (N.D. Cal.

12   March 31, 2009). The fact that only casual and occasional views by a correctional officer is also

13   sufficient to distinguish this case from *Whittington v. California Dep't of Corrections &*

14   *Rehabilitation*, No. C 09-2636 SI, 2010 WL 761314, (N.D. Cal. March 3, 2010). Here, Plaintiff

15   was not forced to be fully naked behind blurred glass door, nor was she viewed only by jail staff.

16   Instead, Plaintiff was forced to be fully naked in front of both jail staff and a group of other

17   inmates in their clear view, not once but twice for no legitimate security goal. Defendants provide

18   no justification for the deprivation of the most basic privacy, self-respect and personal dignity.

19   Such failure infers the Jail's purpose to humiliate detainees. See *Anderson v. Liberty Lobby. Inc*.,

20   477 U.S. 242, 256 (1986) (holding that the moving party bears the initial burden of demonstrating

21   the absence of a genuine issue of material fact.)

22           In concluding that no violation of Cal. Const. Art. I, § 13 can be found, the sole basis

23   relied by the magistrate judge is that pretrial detainees' expectations of privacy are substantially

24   diminished and the security concerns of the correctional facility are paramount. ECF 163 at 46-

25   47. However, California courts have rejected the notion—which the United States Supreme Court

26   has embraced—that an individual subject to custodial arrest has significantly diminished

27   expectations of privacy. *People v. Brisendine* (1975) 13 Cal.3d 528, 547, 119 Cal.Rptr. 315, 531

28   P.2d 1099 ["we cannot accept ... that 'an individual lawfully subjected to a custodial arrest retains

no significant Fourth Amendment interest in the privacy of his person"]; see also People v.

Longwill (1975) 14 Cal.3d 943, 951, 123 Cal.Rptr. 297, 538 P.2d 753 (rejecting the rule of

United States v. Robinson (1973) 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 [approving search

of the person at time of valid arrest made without warrant]). There is no difference of

constitutional magnitude between individuals subject to custodial arrest and pretrial detainees in

the context of unreasonable search and seizure.

The California Constitution is, and has always been, "a document of independent force"

(*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 325, 66 Cal.Rptr.2d 210,

940 P.2d 797) that sets forth rights that are in no way "dependent on those guaranteed by the

United States Constitution" (Cal. Const., art. I, §24). "As an historical matter, article I and its

Declaration of Rights was viewed as the only available protection for our citizens charged with

crimes, because the federal Constitution and its Bill of Rights was initially deemed to apply only

to the conduct of the federal government." *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352–353,

276 Cal.Rptr. 326, 801 P.2d 1077. While the setting changed following ratification of the

Fourteenth Amendment to the United States Constitution and the selective incorporation of the

Bill of Rights, it remains a basic tenet of our system of federalism that "the nation as a whole is

composed of distinct geographical and political entities bound together by a fundamental federal

law but nonetheless independently responsible for safeguarding the rights of their citizens."

*Brisendine*, supra , 13 Cal.3d at p. 550, 119 Cal.Rptr. 315, 531 P.2d 1099.

Under Cal. Const. Art. I, §13, whether the intrusion on  expectation of privacy is

unreasonable depends on "a general balancing test 'weighing the gravity of the governmental

interest or public concern served and the degree to which the [challenged government conduct]

advances that concern against the intrusiveness of the interference with individual liberty.' "*Hill

v. National Collegiate Athletic Assn*. (1994) 7 Cal.4th 1, 29–30, 26 Cal.Rptr.2d 834, 865 P.2d

633, quoting *Ingersoll v. Palmer* (1987) 43 Cal.3d 1321, 1338, 241 Cal.Rptr. 42, 743 P.2d 1299.

Within the specific context of search and seizure of arrestees, Article I, Section 13

provides greater protection than does the Fourth Amendment. *Brisendine*, supra, 13 Cal.3d at pp.

545–546, 119 Cal.Rptr. 315, 531 P.2d 1099; *People v. Longwill* (1975) 14 Cal.3d 943, 951, fn. 4,

1    123 Cal.Rptr. 297, 538 P.2d 753; *People v. Norman* (1975) 14 Cal.3d 929, 939, 123 Cal.Rptr.

2    109, 538 P.2d 237; *People v. Ruggles* (1985) 39 Cal.3d 1, 9–11, 216 Cal.Rptr. 88, 702 P.2d 170;

3    see also *People v. Laiwa* (1983) 34 Cal.3d 711, 727, 195 Cal.Rptr. 503, 669 P.2d 1278. In those

4    cases, Article I, Section 13"requires a more exacting standard" for search and seizure cases

5    arising in this state. *Brisendine*, supra, 13 Cal.3d at p. 545, 119 Cal.Rptr. 315, 531 P.2d 1099. The

6    same principle protects pretrial detainees. The magistrate judge wisely avoids debating such

7    principle. Instead, she relies on, *Yourke v. City & County of San Francisco*, No. C 03-03105

8    CRB, 2010 WL 3701789, (N.D. Cal. Sept. 16, 2010), a case does not speak directly to the issues

9    Plaintiff raises concerning the frequency and manner of seven group strip searches, and the force

10   of exposing inmates' fully naked bodies to deputies and other inmates for no legitimate security

11   goal.

12        Defendants have not shown how constant group strip searches advance any legitimate

13   security goal. For instance, constant group strip searches would increase the chances to detect

14   weapon or contraband, or constant group strip searches would increase the quantities of weapon

15   or contraband to be detected. In fact, Defendants never detected any weapon or contraband

16   through any of the constant group strip searches. Defendant also fail to show how forcing inmates

17   to expose their fully naked bodies to deputies and other inmates for the purposes of shower and

18   getting back inmates' own clothing would increase the chances to detect weapon or contraband,

19   or increase the quantities of weapon or contraband to be detected. In fact, Defendants never

20   detected any weapon or contraband through forcing inmates to expose their fully naked bodies to

21   jail guards and other inmates. None of any legitimate security goal were achieved other than

22   humiliating and degrading pretrial detainees. Any diminished expectation of privacy pretrial

23   detainees may or may not have in their bodies does not justify an intrusion of this magnitude.

24        As to the damages remedy, there is no dispute that the California Supreme Court has not

25   held that Section 13 provides a private right of action. In *Katzberg v. Regents of Univ. of Cal.*, 29

26   Cal.4th 300, 329, 127 Cal.Rptr.2d 482, 58 P.3d 339 (2002), the California Supreme Court

27   suggested there should be a damages remedy for violations of Section 13 by contrasting the rights

28   of a victim subject to a search and seizure in violation of Section 13 with the rights of a victim of

1    Cal. Const. Art. I, §7 (a), which does not permit a damages remedy. See *Katzberg*, 29 Cal. 4th at

2    321-24, 127 Cal.Rptr.2d 482, 58 P.3d 339; see also *Smith v. County of Riverside*, No. 5-512-VAP,

3    at *18-20 (C.D. Cal. 2006). The California Supreme Court in *Katzberg* recognized the history of

4    Section 13 supported a damages action, as the Magna Carta "provided a damage remedy for the

5    victims of unlawful searches at common law." *Katzberg*, 29 Cal. 4th at 323-324, 127 Cal.Rptr.2d

6    482, 58 P.3d 339 (citing Brown v. State, 89 N.Y.2d 172, 188, 652 N.Y.S.2d 223, 674 N.E.2d

7    1129 (N.Y. Ct. App. 1996) ). The Katzberg Court concluded that Cal. Const. Art. I, §7 (a) did not

8    support a damages action because "[t]he parties have not cited ... any similar history with respect

9    to the liberty interest set out in article I, section 7(a) [.]" Id. at 324, 127 Cal.Rptr.2d 482, 58 P.3d

10   339.

11        "For questions of California law, [this Court] must apply the law as [it] believe[s] the

12   California Supreme Court would apply it." *Astaire v. Best Film & Video Corp*., 116 F.3d 1297,

13   1300 (9th Cir. 1997), amended, 136 F.3d 1208 (9th Cir. 1998). If the issue has not been decided

14   by the California Supreme Court, this Court "must predict how the California Supreme Court

15   would decide the issue ..." Id. As the California Supreme Court would decide Section 13 supports

16   a damages action based on the Katzberg opinion, the magistrate judge clearly erred in concluding

17   that no damages remedy exists under Section 13.

18        In concluding that the California Constitutional right to privacy contained in article I,

19   section 1 does not give rise to a cause of action for money damages, *Blanco v. Cnty. of Kings*, 142

20   F. Supp. 3d 986 (E.D. Cal. 2015) relies solely on *Clausing v. San Francisco Unified School Dist*.,

21   221 Cal.App.3d 1224 (Cal. Ct. App. 1990). However, when deciding a couple of cases after

22   Clausing, the Supreme Court noted that whether the California Constitutional right to privacy

23   contained in article I, section 1 gave rise to a cause of action for money damages was an open

24   question. See *Hernandez v. Hillsides, Inc*., 211 Cal.App.3d 1063, 1072 (Cal. 2009) (citing Katzberg as

25   "suggesting it is an open question whether the state constitutional privacy provision, which is

26   otherwise self-executing and serves as the basis for injunctive relief, can also provide direct and

27   sole support for a damages claim" (citing *Katzberg*, 58 P.3d at 347 n.13)). Therefore, the

28   magistrate judge clearly erred in concluding that no damages remedy exists under Section 1.

Penal Code §4030(b) provides that the provisions of this section shall apply only to **prearraignment detainees** arrested for infraction or misdemeanor offenses and to any minor detained prior to a detention hearing on the grounds that he or she is a person described in Section 300, 601, or 602 of the Welfare and Institutions Code alleged to have committed a misdemeanor or infraction offense. There is no dispute that Plaintiff was arraigned on August 12, 2019. Five group strip searches were conducted on Plaintiff before she was arraigned. The magistrate judge clearly erred in concluding that the statute applies only to searches conducted "prior to placement in the general jail population." ECF 163 at 49. Penal Code §4030(e) provides that arrestees held in custody on a misdemeanor or infraction offense, except those…., shall not be subjected to a strip search or visual body cavity search prior to placement in the general jail population, unless a peace officer has determined there is reasonable suspicion, based on specific and articulable facts, to believe that person is concealing a weapon or contraband, and a strip search will result in the discovery of the weapon or contraband. Nowhere in Penal Code §4030 suggests that arrestees shall be subjected strip searches in any manner or frequency after placement in the general jail population.

*Yourke v. City & County of San Francisco*, No. C 03-03105 CRB, 2010 WL 3701789, (N.D. Cal. Sept. 16, 2010), involving one single strip search not in a group setting, bears no relevance to the particular circumstances where the reasonableness of frequency and manner of group strip searches without privacy is at issue here and where Plaintiff never had outside contact and was in constant supervision by jail guards.

## IV.    OVERCROWDING AND SLEEP DEPRIVATION

The magistrate judge faulted Plaintiff for her failure to show that Title 24 Minimum Standards for Local Detention Facilities were in effect when the Jail module was built. ECF 163 at 51. However, there is no dispute that the WCJ has been found operating over its design capacity. ECF 93-1 at 101; ECF 149-2 at 175-183. In the context of prison conditions litigation "crowding" refers to the presence in a facility or prison system of a prisoner population exceeding that facility or system's capacity. See, e.g., *Doty v. County of Lassen*, 37 F.3d 540, 543 (9th Cir.1994) (finding overcrowding where a jail's actual population exceeded its design capacity by

1   an average of approximately fifty percent); *Hoptowit v. Ray*, 682 F.2d 1237, 1248–49 (9th

2   Cir.1982) (finding a penitentiary overcrowded where its population exceeded its design capacity);

3   see also *Lareau v. Manson*, 651 F.2d 96, 99–100 (2d Cir.1981); cf. *Random House Webster's*

4   *Unabridged Dictionary* 482 (2d ed. 1998) (defining "crowded" as "filled to excess"); *Coleman v.*

5   *Schwarzenegger*, 922 F. Supp. 2d 882, 921 (E.D. Cal. 2009) (noting that the words crowding and

6   overcrowdinghave the same meaning.)

7       A prison system's capacity is not defined by square footage alone; it is also determined by

8   the system's resources and its ability to provide inmates with essential services such as food, air,

9   and temperature and noise control. *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 921 (E.D.

10   Cal. 2009). Here, Defendant proffered no evidence showing any attempt to limit the noise from

11   the flushing of toilets, nor did they provide any justification to install industrial toilets that cause

12   loud noise despite they were well aware of the noise. [Joint Ex. A at 75-77, prohibiting inmates

13   from flushing toilets when deputies were present.]

14       Plaintiff never suggested removal of toilets from the cell or dormitory in which the

15   inmates were housed. Rather, the noise of constant flushing of toilets stems from overcrowding of

16   the cell and the use of industrial type toilets. In concluding that Plaintiff's over four days custody

17   is not a circumstance that renders the Jail Module unconstitutionally overcrowded, the magistrate

18   judge overlooks the fact that Plaintiff was forced to remain in her cell for a substantial part of

19   time and the noise caused by overcrowding. See *LaReau v. MacDougall*, 473 F.2d 974, 977-79

20   (2d Cir. 1972) (finding that inmate who spent five days in small cell that contained only a grate-

21   covered hole in the floor for a toilet was deprived of Eighth Amendment rights.)

22       Even though Plaintiff could not remember the exact times of toilet flushing, she testified

23   that constantly there were people using the toilet. [Joint Ex. A at 74.] Plaintiff also testified that

24   over the course of the over four days that she was in custody she barely got any sleep. [Joint Ex.

25   A at 78.] Defendants proffered no evidence to refute Plaintiff's testimony, such as other inmates'

26   testimony indicating no noise from the toilets. See *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242,

27   256 (1986) (holding that the moving party bears the initial burden of demonstrating the absence

28   of a genuine issue of material fact.)

V. **MIDNIGHT CELL SEARCH**

*Hudson v. Palmer*, 468 U.S. 517 (1984) addressed prisoners' expectation of privacy bears no relevance to that involved pretrial detainees here. *Block v. Rutherford*, 468 U.S. 576 (1984) and *Bell v. Wolfish*, 441 U.S. 520 (1979), relied by the magistrate judge, are distinguishable. Plaintiff did not allege she had to be present at the shakedown, nor did she complain about unannounced searches before bedtime for legitimate safety purposes.

In concluding that the August 11, 2019 midnight search was a random search and was not targeted at Plaintiff, ECF 163 at 61, the magistrate judge fails to view the following evidence at summary judgment in the light most favorable to Plaintiff: (1) in the entire discoverable period represents WCJ's random search policy and practice, there was only one midnight search and Defendants presented no evidence of any other midnight search, ECF 93-1 at 4-14, 36-99, a clear indicator of the absence of a legitimate correctional goal for midnight searches[3]; (2) on other occasions when altered razors were found, no one was written up a major violation. However, during the midnight cell search on Aug 11, 2019 at issue, three inmates were written up a major violation due to the altered razors, ECF 93-1 at 4-14, 36-99; and (3) the deputy shouted to all 40 inmates, including Plaintiff, that such midnight searches would continue regularly unless and until all inmates would keep quiet during the day. The deputy went on and declared in a degrading manner that dayroom and phone service would be shut down unless and until all inmates would shut up during the day, ECF 149-2 at 4. A jury could reasonably infer that the purpose of the midnight search, in context, was retaliation and harassment targeted at all 40 inmates rather than legitimate security or safety interest. See *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (holding that courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.)

The magistrate judge relied on her view that Plaintiff has not shown the midnight search in question did not advance the legitimate security goal (to "detect, control, and prevent the intake

---

[3] Had midnight cell search been part of random cell search, Defendants should not have had any difficulty in providing evidence of another midnight cell search. See *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 256 (1986) (holding that the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.)

1  and introduction of weapons, contraband, and illegal items into" the Jail.) ECF 163 at 64.

2  However, it is not Plaintiff's burden to show the midnight search in question did not advance this

3  legitimate security goal. Instead, it is defendants' burden to show searches conducted during

4  midnight advance legitimate security goal. See *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir.

5  2004) (concluding that the sheriff failed to show that webcams improved the security of the

6  pretrial detention when closed-circuit video cameras were already present, or webcams served to

7  increase the area of the jail that was subject to video surveillance, and there was no added benefit

8  to publishing the images on the internet.) Similarly, Defendants here, as moving party of the

9  summary judgment, fail to show that midnight searches, as opposed to searches before bedtime,

10  improved the chances to detect weapons and contraband. Nor do Defendants show that midnight

11  searches, as opposed to searches before bedtime, increased the quantities of weapons and

12  contraband subject to confiscation. Based on the timing of the midnight search, the common

13  practice of two FAST searches per day, and on August 10, 2019 (the day before the midnight

14  search in question), no FAST search was performed during the day, but on the next day, three

15  FAST searches were performed, the magistrate judge admits that there are two possible

16  interferences: (1) the midnight search in question was a make up search given the failure to

17  conduct the typical two FAST searches per day; (2) the midnight search was retaliatory because it

18  took place after midnight. ECF 163 at 69. Despite her admission that the possible inference in

19  favor of defendants is speculative due to lack of evidence, the magistrate judge disregards the

20  deputy's announcement during the midnight search and the possible interference in Plaintiff's

21  favor because in her view the midnight search was retaliatory is wholly speculative. See *Tolan v.*

22  *Cotton*, 572 U.S. 650, 660 (2014) (finding error where, "[b]y weighing the evidence and reaching

23  factual inferences contrary to [the non-moving party's] competent evidence, the court below

24  neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable

25  inferences should be drawn in favor of the nonmoving party.")

26     The announcement made by an unidentified deputy, offered by Plaintiff's self-serving

27  Declaration, based on her first-hand personal knowledge, is legally relevant, internally consistent,

28  and sufficient to establish a genuine dispute of fact. *Lowry v. City of San Diego*, 858 F.3d 1248,

1262 (9th Cir. 2017). Notably, none of the named defendants who were present at the midnight

search denied making such announcement. See *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242,

256 (1986) (holding that the moving party bears the initial burden of demonstrating the absence

of a genuine issue of material fact.) The magistrate judge faulted Plaintiff for failure to show any

such threatened consequence actually happened by ignoring the fact that Plaintiff was released the

next day after the midnight search.

The magistrate judge states that Plaintiff cannot seriously contend that the Jail was not

entitled to conduct a random FAST search of her module, or that a correctional institution is not

entitled to require inmates to keep noise levels at a reasonable level for security and safety

purposes and to warn that consequences will follow if this does not happen. ECF 163 at 69.

However, such statement is meaningless because Plaintiff did not challenge the general goal of a

correctional institution. Plaintiff's question for the jury is, to be particular, what reasonable jail

guard would simply "voice her frustration" about any situation unrelated to security or emergency

during midnight?

Plaintiff did not allege verbal harassment, including "disrespectful and assaultive

comments" or vulgar language, alone, would constitute a constitutional violation. Despite her

admission that the midnight announcement could be reasonably perceived as indicative of a

retaliatory animus, the magistrate judge disregards such reasonable interference in Plaintiff's

favor and indicates that the Court does not believe so. ECF 163 at 69-70. See *Tolan v. Cotton*,

572 U.S. 650, 658 (2014) (finding that the court erred in its review of a summary judgment

motion when it "did not credit directly contradictory evidence" to the nonmoving party).

The magistrate judge exaggerates the confiscation of three altered razors during the

midnight search but minimizes the fact that on other occasions when altered razors were found no

one was written up a major violation. ECF 163 at 70.

During the entire discoverable period that represents the jail's policy and practice, ECF

93-1 at 4-14, 36-99, there were only ten occasions where altered razors were found as follows:

On 7/10/2019, F.A.S.T. search was conducted in Module I Tank 9 Cell 4 and Tank 10 Cell

4. Trash and altered razor was found and disposed of properly in the security trash. Sgt. A.

1   Sandler #1800 was present. Jl#WJ071019/1130. ECF 93-1 at 40-41. No major jail rule violation
2   was written up.

3       On 7/10/2019, F.A.S.T. search conducted in Module G and H, Tanks 3-6 Dayrooms by
4   Deputies (Redacted inmates' names). Trash, altered flip flops, extra jail issue, altered razor and a
5   medical pitcher was found. Sgt. White #5119 was present. Report by Redacted. JI: WJ07-10-
6   19/2010. ECF 93-1 at 41. No major jail rule violation was written up.

7       On 8/1/2019, F.A.S.T SEARCH was conducted in Tank 3. Chow hall food, an altered
8   razor and ripped sheets were found. Report written by CSA Lopez #9460. Jl:WJ080119/1020.
9   ECF 93-1 at 85. No major jail rule violation was written up.

10      On 8/1/2019, Redacted will be written up on a Major Jail Rule violation for possession of
11  contraband and an altered razor. Report written by Deputy Addington #10682. Sgt. Mclain was
12  notified. Jl:WJ/080119/1021.0017. ECF 93-1 at 85.

13      On 8/2/2019, Redacted was written up on a Major jail rule violation for an altered razor
14  found under her mattress during the F.A.S.T Search. Report written by Deputy Falconer #10050.
15  JI: WJ08-02-19/2030.

16      On 8/3/2019, Chow hall food, altered razor, pillow belonging to another I/M and trash was
17  found. Sgt. Hodges #7230 present. Report by CSA Linich #9914. JI: WJ08-03-19/1140ECF 93-1
18  at 89. No major jail rule violation was written up.

19      On 8/11/2019, Redacted will be written up on a Major Jail Rule violation for an altered
20  razor found during the F.A.S.T search. Report written by Deputy Addington Jl:WJ081119/0117.
21  ECF 93-1 at 10.

22      On 8/11/2019, Redacted will be written up on a Major Jail Rule violation for an altered
23  razor found during the F.AS.T search. Report written by Deputy Addington. Jl:WJ081119/0118.
24  ECF 93-1 at 10.

25       On 8/11/2019, Redacted will be written up on a MaJor Jail Rule violation for an altered
26  razor found during the F.A.S.T search. Report written by Deputy Addington. Jl:WJ081119/0119.
27  ECF 93-1 at 10.

28      On 8/12/2019, Chow hall food, altered razors and altered pads were found and disposed of

1   in security trash, Sgt. L. Cantrell #7814 was present Report by Redacted. JI: WJ0S-12-19/0817.

2   ECF 93-1 at 13.  No major jail rule violation was written up.

3       Out of ten, only five occasions were written up major jail rule violations. Three of the five

4   occasions occurred during the midnight search. The extra two entries indicating that altered razors

5   were found and the inmates were written up violation do not erase the fact that there were five

6   occasions no violation was written up when altered razors were found. Instead, whether to write

7   up violations is apparent to be used as arbitrary punishment.

8       The magistrate judge incorrectly interpreted that Plaintiff changed the theory of her claim

9   as to First Amendment claim. First Amendment protects both speakers and listeners. The right's

10  "protection" is "afforded" not only to one who speaks but also to those who listen. *Va. Pharmacy

11  Bd. v. Va. Consumer Council* (1976) 425 U.S. 748, 756; see Pacific Gas Elec. Co. v. Public Util.

12  Comm'n (1986) 475 U.S. 1, 8 (plur. opn. of Powell, J). Prohibiting one inmate from speaking

13  simultaneously prohibits other inmates from receiving information. Because all 40 inmates were

14  ordered to shut up, Plaintiff was prohibited from speaking to other inmates and other inmates

15  were prohibited from speaking to Plaintiff, e.g. receiving information from other inmates.

16  Receiving mails is analogous to receiving information. *In re Alcala*, 222 Cal.App.3d 345 (Cal. Ct.

17  App. 1990), relied by the magistrate judge, addressed clothing as symbolic speech and concluded

18  that there is no suggestion in the record that the prisoners were attempting symbolic speech. Here,

19  on the contrary, deals with purely verbal speech, as announced by the deputy during the midnight

20  search. Therefore, the reliance on In re Alcala is misplaced. The record clearly shows the

21  audience Plaintiff may be trying to reach was other inmates and the audience other inmates may

22  be trying to reach was Plaintiff.

23      In concluding that Plaintiff has not shown the midnight search was retaliatory as to her

24  personally, the magistrate judge overlooks the fact that the midnight search was retaliatory as to

25  all 40 inmates and Plaintiff was one of them.

26      In sum, Plaintiff alleges that defendants present at the midnight shakedown (1) arbitrarily

27  wrote up violations due to altered razors and threatened to continue midnight shakedowns until

28  and unless all 40 inmates shut up during the day, (2) because all 40 inmates, including Plaintiff,

1  (3) exercised their First Amendment rights to verbally communicate with each other, and that (4)

2  beyond imposing those tangible and intangible harms, the guards' actions chilled all 40 inmates'

3  First Amendment rights and (5) were not undertaken to advance legitimate penological purposes.

4  See *Rhodes v. Robinson*, 408 F.3d 559, 568-569 (9th Cir. 2004) (holding that the plaintiff's

5  operative complaint was the very archetype of a cognizable First Amendment retaliation claim

6  and the plaintiff does not have to demonstrate that his speech was "actually inhibited or

7  suppressed.") Instead, the proper First Amendment inquiry asks "whether an official's acts would

8  chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino*

9  *Environ. Ctr. v. Mendocino Cty*, 192 F.3d 1283, 1300 (9th Cir. 1999).

10        The magistrate judge states that there is no evidence that Plaintiff had engaged in any First

11  Amendment expressive activity prior to the midnight search of her module and she did not

12  socialize with many people while she was at the Jail. In her own deposition, however, Plaintiff

13  was asked if she spoke to anyone while she was in custody. Plaintiff testified she had a handful of

14  conversations with other inmates. ECF 139-5 at 92-94. Nowhere in the First Amendment suggests

15  that it protects only extensive conversation. See *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir.

16  2004) (holding that speech can be chilled even when not completely silenced.)

17        By failing to credit evidence that contradicted some of her key factual conclusions, the

18  magistrate judge improperly "weigh[ed] the evidence" and resolved disputed issues in favor of

19  the moving party, *Tolan v. Cotton*, 572 U.S. 650, 658 (2014) (quoting Anderson, 477 U. S., at

20  249, 106 S. Ct. 2505, 91 L. Ed. 2d 202.)

21  **VI.    MONELL CLAIMS**

22        The magistrate judge erroneously finds that Claims 4 and 5 – were brought only against

23  the five Deputy Defendants and not directly against the County. ECF 163 at 72. However, Claims

24  4 and 5 – were brought against both the five Deputy Defendants and the County. ECF 56 at 19-20.

25        As discussed above, Plaintiff objects to the magistrate judge's finding that no

26  constitutional violation was committed, the basis the magistrate judge relies on whether imposing

27  municipal liability.

28  **VII.    STATE LAW TORT CLAIMS**

The magistrate judge states that the County has immunity as to all state law claims under California Government Code §844.6(a)(2). ECF 163 at 73. This creation of immunity expressly applies only to public entities, not public employees, as the statute states that "[n]othing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission." (Gov. Code, §844.6, subd. (d).) Also, in contrast with *Monell* liability, California law allows for vicarious liability of a municipality whose employee violates the statute when acting within the scope of employment. See Cal. Gov't Code § 815.2. Therefore, neither the County nor the individual defendants are immune.

There is no evidence in the record supporting that Defendants may have received orally at any training sessions. ECF 163 at 75. Nowhere in Defendants' self-serving declarations indicate that they may have received orally at any training sessions. See *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 256 (1986) (holding that the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.) The lack of training, supervising and discipline is evident by open misconduct of multiple officers.

Conduct aims to humiliate and degrade exceeds all bounds of that usually tolerated in a civilized community as a matter of law. See *Huber v. Standard Ins. Co*., 841 F.2d 980, 986 (9th Cir. 1988) (holding that the defendant had not shown the conduct in the instant case did not constitute outrageous conduct as a matter of law.)

In *Rulon-Miller v. International Business Machines Corp*., 162 Cal.App.3d 241, 208 Cal.Rptr. 524 (1984), an employee was told by her superior, in disregard of IBM's policies, that she would have to choose between her employment and her romantic relationship with a competitor's employee. Although she was told that she had a couple of days to make her decision, her superior called her in the next day and told her that he had made up her mind for her and that she would end the relationship. When the employee refused she was fired. The court stated that the superior's conduct was sufficiently outrageous to constitute intentional infliction of emotional distress because the "combination of statements and conduct would under any reasoned view tend to humiliate and degrade [the employee]." 162 Cal.App.3d at 256, 208 Cal.Rptr. at 534.

In *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 207 Cal.Rptr. 123 (1984), a fifty-five-

year-old employee who had been laid off brought suit against his former employer who had

agreed to pay him a monthly sum for ten years in exchange for a promise not to compete. The

court held that the employer's termination of payments could give rise to an action for breach of

the implied covenant of good faith and fair dealing and an action for intentional infliction of

emotional distress. *Wallis* cites *Newby v. Alto Riviera Apartments*, 60 Cal.App.3d 288, 131

Cal.Rptr. 547 (1976) (unrelated holding superseded by statute as noted in *Western Land Office,*

*Inc. v. Cervantes*, 175 Cal.App.3d 724, 739, 220 Cal.Rptr. 784, 795 (1985)) for the following

definition of outrageous conduct for the purpose of establishing intentional infliction of emotional

distress:

> Behavior may be considered outrageous if a defendant (1) abuses a relation
> or position which gives him power to damage the plaintiff's interest; (2)
> knows the plaintiff is susceptible to injuries through mental distress; or (3)
> acts intentionally or unreasonably with the recognition that the acts are likely
> to result in illness through mental distress.

*Wallis*, 160 Cal.App.3d at 1120, 207 Cal.Rptr. at 130. In *Wallis*, the court held that

allegations of financial control of the employer and a recognition of the employee's vulnerability

were sufficient under this standard to constitute outrageous conduct. 160 Cal.App.3d at 1120, 207

Cal.Rptr. at 130.

In the present case, through Plaintiff's legally relevant and internally consistent testimony

based on her first-hand personal knowledge, both named and unnamed deputies treated inmates

like animals. This evidence tends to show that the way in which jail guards abused their position

of power to damage Plaintiff's interests would humiliate and degrade Plaintiff. Therefore, this

evidence raises genuine issues of material fact as to intentional infliction of emotional distress.

See *Huber v. Standard Ins. Co.*, 841 F.2d 980, 987 (9th Cir. 1988) (holding that abusing position

of power to damage the plaintiff's interests raises genuine issues of material fact as to intentional

infliction of emotional distress); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1100 (9th Cir. 2013)

(holding that a plaintiff was not required to show any particular susceptibility, the district court

improperly resolved a fact question, and whether the incident was "extreme and outrageous" was

1    for a factfinder to determine.)

2    **VIII.    CONCLUSION**

3         For the foregoing reasons, the Report should not be followed.

4         Dated: January 30, 2022

5         Respectfully submitted.

6                                                    */s/ JANE DOE*

7                                                    JANE DOE

8                                                    Plaintiff in Pro Se

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION

**CERTIFICATE OF SERVICE**

I, JANE DOE, declare and say as follows:

I am over the age of eighteen years of age and am a party to this action. I reside in the County of Los Angeles, State of California. My business address is 11151 Valley Blvd #4886, El Monte, CA 91734, in said county and state.

I electronically filed the following document(s):

Plaintiff's Objections to R&R

with the United States District Court, Central District of California. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: January 30, 2022

*/s/ JANE DOE*

JANE DOE

Plaintiff in Pro Se

PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION